UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> RODRIGO KEDE DE FREITAS LIMA, <br><br> Defendant. | 20 Civ. 4573 |

**PLAINTIFF IBM'S MEMORANDUM OF LAW IN SUPPORT
OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER
<u>AND MOTION FOR A PRELIMINARY INJUNCTION</u>**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Robert A. Atkins
Liza M. Velazquez
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff
International Business Machines Corporation*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.............................................................................ii

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS .............................................................................. 5

ARGUMENT ................................................................................................. 7

    I.      STANDARD OF REVIEW AND BURDEN OF PROOF...................................7

    II.     IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE
           RELIEF ....................................................................................7

           A.     Lima's IBM Trade Secrets, Confidential Information & Customer
                Goodwill .........................................................................7

           B.     This Court Has Found Irreparable Harm Under IBM's
                Noncompetition Agreements Before.............................................. 12

           C.     The Risk that Lima Will Inevitably Disclose Trade Secrets
                Constitutes Irreparable Harm.................................................... 13

           D.     The Risk of Exploiting Customer Goodwill Constitutes Irreparable
                Harm.............................................................................. 17

           E.     Lima Stipulated That a Violation of His Noncompetition
                 Agreement Would Irreparably Harm IBM ............................................. 18

    III.    IBM IS LIKELY TO PREVAIL ON THE MERITS........................................... 19

           A.     The Limitations on Lima's Post-IBM Employment Are Reasonable .......20

           B.     IBM Has a Legitimate Interest in Safeguarding its Confidential
                 Information ....................................................................22

    IV.    IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO
           TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS
           IN IBM'S FAVOR.........................................................................24

    V.     A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND
           AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET ..........25

CONCLUSION................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alside Div. of Associated Materials Inc.* v. *Leclair*,
743 N.Y.S.2d 898 (N.Y. App. Div. 3d Dep't 2002) ........................................................21

*Ayco Co., L.P.* v. *Feldman*,
No. 1:10-CV-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) .............................. 16, 19

*Battenkill Veterinary Equine P.C.* v. *Cangelosi*,
768 N.Y.S.2d 504 (N.Y. App. Div. 3d Dep't 2003) ........................................................21

*BDO Seidman* v. *Hirshberg*,
93 N.Y.2d 382 (N.Y. 1999) ..................................................................................... 18, 22

*Bus. Intelligence Sers., Inc.* v. *Hudson*,
580 F. Supp. 1068 (S.D.N.Y. 1984) ......................................................................... 16, 22

*Cont'l Grp., Inc.* v. *Kinsley*,
422 F. Supp. 838 (D. Conn. 1976) ..............................................................................14

*DoubleClick, Inc.* v. *Henderson*,
No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997) .......................................23

*Estee Lauder Cos. Inc.* v. *Batra*,
430 F. Supp. 2d 158 (S.D.N.Y. 2006) ...................................................................... passim

*Global Switching Inc.* v. *Kasper*,
No. CV 06 412(CPS), 2006 WL 1800001 (E.D.N.Y. Jun. 28, 2006) .................................17

*Greenwich Mills Co., Inc.* v. *Barrie House Coffee Co., Inc.*,
459 N.Y.S.2d 454 (1983) ...........................................................................................16

*IBM Corp.* v. *Papermaster*,
No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ..................... passim

*IBM* v. *Visentin*,
No. 11 Civ. 399 (LAP), 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011)............................ 13, 23

*IDG USA, LLC* v. *Schupp*,
No. 10-CV-76S, 2010 WL 3260046  (W.D.N.Y. Aug. 18, 2010), *aff'd in part,
vacated in part and remanded on other grounds by* 416 F. App'x 86 (2d Cir.
2011)........................................................................................................................19

*Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*,
No. 9202–08, 2008 WL 5206291 (N.Y. Sup. Ct. Dec. 12, 2008) .........................................19

ii

**Page(s)**

*Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ...............................................................18

*Lumex, Inc.* v. *Highsmith*,
    919 F. Supp. 624 (E.D.N.Y. 1996)................................................. 12, 13, 17, 23

*Microsoft* v. *Kai-Fu Lee*,
    No. 05-2-23561, 2005 WL 4881381 (Wash. Super. Ct. July 25, 2005) ...............................24

*Microsoft* v. *Miszewski*,
    No. 11-2-04589-7 SEA (Wash. Super. Ct. April 15, 2011) ................................................23

*N. Atl. Instruments, Inc.* v. *Haber*,
    188 F.3d 38 (2d Cir. 1999) ...................................................................... 19, 23

*Natsource LLC* v. *Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001) ...............................................21, 22, 24

*Nutmeg Tech., Inc.* v. *Mahshie*,
    No. 89-CV-511, 1989 WL 60285 (N.D.N.Y. June 6, 1989) ..................................16

*Payment Alliance Intern., Inc.* v. *Ferreira*,
    530 F. Supp. 2d 477 (S.D.N.Y. 2007) ...................................................... 17, 21

*Reed Elsevier, Inc.* v. *Transunion Holding Co.*,
    No. 13 CIV. 8739 PKC, 2014 WL 97317 (S.D.N.Y. Jan. 9, 2014) ....................................21

*Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997) ...........................................................................23

*Ticor Title Ins. Co.* v. *Cohen*,
    173 F.3d 63 (2d Cir. 1999) ...............................................18, 19, 20, 24

## OTHER AUTHORITIES

Fed. R. Civ. P. 65(b) ...............................................................................................25

Plaintiff International Business Machines Corporation ("IBM" or the "Company") respectfully submits this memorandum of law in support of its application for a temporary restraining order and a preliminary injunction to prevent its former senior executive, defendant Rodrigo Lima ("Lima"), from commencing employment at IBM's direct competitor, Microsoft Corporation ("Microsoft"), in violation of his one-year Noncompetition Agreement with IBM.

## PRELIMINARY STATEMENT

In violation of his one-year Noncompetition Agreement with IBM, Defendant Lima has resigned as one of the most senior executives of IBM to immediately become a senior executive at one of IBM's biggest competitors, Microsoft. Even though his experience and contacts at companies in virtually every sector of the economy qualify him to work for all kinds of businesses, Lima wants to become a direct competitor of IBM, joining Microsoft this week. That, he cannot do. Given that Lima will inevitably use IBM's trade secrets and confidential information to compete against IBM, he should be enjoined from starting his new job at Microsoft without waiting 12 months.

Lima was among the top 1% of IBM's highest ranking executives, with a seat at the table alongside the Chairman and Chief Executive Officer of the Company in senior executive strategy sessions and a recent meeting of the Board of Directors setting the strategic direction of the Company. Over the years, Lima had responsibility for overseeing IBM's Latin America operations, running IBM's Global Technology Services business in North America, and managing IBM's largest customer relationships across all of IBM's businesses. Unbeknownst to IBM, however, Lima was in talks *for over a year* with Microsoft, while continuing to be entrusted with some of IBM's most important client relationships and competitively sensitive strategic secrets -- many directly related to competing against Microsoft.

IBM heavily invested in and supported Lima's career and advancement. But despite

being afforded every opportunity to succeed at the highest levels of IBM -- with access to highly valuable IBM trade secrets -- Lima's performance did not match the Company's expectations, or even his own ambitions. Now, Lima is violating his Noncompetition Agreement by seeking immediate employment at the highest levels of Microsoft, where he cannot avoid using his knowledge of IBM confidential business plans to face off against IBM.

Given his wealth of knowledge about IBM's secret corporate strategies, product development plans, and competitive campaigns, Lima poses a real and immediate threat to IBM. He was a "Band A" executive -- the highest rank at IBM below the Senior Vice President level. He also was a member of IBM's Performance Team, an exclusive group of about sixty high-ranking executives, including the Chairman, CEO, and Senior Vice Presidents, who are responsible for the operational performance of the entire company. And he was a member of IBM's Acceleration Team, a select group of executives that accelerates IBM's growth through leadership initiatives to promote innovation.

In recent years, he ascended to the top executive leadership of the Company. Since January 2020, as General Manager, Integrated Accounts, Lima was responsible for overseeing all aspects of IBM's 77 largest, most valuable, and most strategic customer accounts across all IBM business lines and regions. Lima was responsible for knowing highly confidential details about the current status of IBM's business with these accounts (e.g., pricing, strengths and weaknesses, renewal timelines) and IBM's future plans for these customers (e.g., targeted product development and launch plans, sales opportunities). In 2019, Lima was the leader of IBM's Global Technology Services ("GTS") business for all of North America, making him privy to IBM's global (and confidential) strategies for competing against Microsoft and others in the information technology business. And in 2016, Lima was IBM's General Manager of Latin America -- essentially the same role that Lima plans to commence immediately at Microsoft. So

Lima is going back to running Latin America, but this time for IBM's competitor, now armed with all of IBM's trade secrets he was exposed to in running IBM's GTS and Integrated Accounts businesses and participating on the Performance Team and Acceleration Team.

As one of the leaders of IBM, Lima generated and learned numerous IBM trade secrets. These are just some:

- IBM's launch plans for new products and services in development, including a new suite of Cloud-computing offerings for customers in the financial services industry;

- IBM's competitive strategies in bids for business where IBM competes head-to-head against Microsoft to win customers, including in large enterprise accounts;

- IBM's projected profits and revenues, pricing strategies, strengths and weaknesses, and key opportunities with respect to the Company's top 77 customer accounts across all business lines -- meaning Lima not only knows the right person at each customer to speak to in an attempt to win business, but also knows confidential details about IBM's pricing, cost structure, and plans for investment or innovation for the accounts that could give Microsoft a competitive advantage;

- IBM's business, financial, growth, and investment plans for its global business over the next 12 months; and

- IBM's acquisition strategies, including IBM's plans to integrate and deploy capabilities of Red Hat, Inc., the Cloud-computing company IBM acquired in 2019.

In addition to all that, Lima used IBM's invaluable goodwill to cultivate deep relationships with IBM's biggest customers in Latin America -- the same Latin American customers Microsoft targets for its own business. And if he is not enjoined from becoming Microsoft's Corporate Vice President for Latin America, Lima will be responsible for running Microsoft's business that markets to those same customers. It will be Lima's job to devise and implement Microsoft's plans for competing head-to-head with IBM for corporate, banking,

insurance and other enterprise customers.  To do that job, it is inevitable that Lima will use and rely on his IBM confidential information to the direct detriment of IBM.

This is the very harm IBM sought to prevent when it elevated Lima to the senior leadership of the Company and asked him to make a simple promise:  not to take a competitive job for 12 months after leaving.  Lima was trusted to keep that promise, and was handsomely compensated, in exchange for using IBM's trade secrets.  IBM paid Lima over $4 million in compensation and equity over the last five years, supported Lima by providing him the opportunity to participate in development programs, and even committed to sponsoring Lima's United States permanent residency application -- all as part of IBM's investment in what IBM expected would be a long-term relationship with Lima as a senior executive of the Company developing and protecting IBM's trade secrets.  Yet Lima now intends to turn around, breach his Noncompetition Agreement, and put those trade secrets to use for Microsoft.

As part of its investigation regarding Lima's departure from the Company, IBM requested that Lima turn over for review the laptop and smartphone devices he used for work purposes under IBM's Bring-Your-Own-Device policy.  After some delay, Lima agreed to have a third-party vendor perform forensics on those devices, but Lima has not yet authorized IBM to review the contents of the devices.  As a result, IBM has not yet been able to confirm whether Lima has taken any IBM confidential information with him since leaving the Company.  However, IBM's review of Lima's server mail uncovered evidence that, in at least one recent instance, Lima used his personal email address to transfer IBM confidential documents, and he has used his IBM email address to access a third-party storage application that is not authorized by the Company.  This evidence, based on the limited record available, suggests that Lima cannot be trusted to safeguard the IBM trade secrets, confidential information, and customer goodwill he possesses.  And if Lima was not fully faithful to IBM as an IBM executive, there is

no reason to trust that he will protect IBM's interests and secrets as a Microsoft executive. The Noncompetition Agreement is in place so that IBM does not have to trust Lima to be a vigilant guardian of IBM's active competitive secrets while working for the competition.

Therefore, Lima should be directed to comply with his Noncompetition Agreement and enjoined from accepting the position at Microsoft without first waiting 12 months.

## STATEMENT OF FACTS

A full statement of the facts regarding Lima, his responsibilities in his former role at IBM, his departure from IBM, and the competition between IBM and Microsoft is set forth in the declaration of Randy Walker, Global Managing Director, IBM Financial Services Sector, and the declaration of Pietro Signoracci, counsel for IBM.

### Lima's Noncompetition Agreement with IBM

Because of his exposure to trade secrets and highly confidential and commercially sensitive information, Lima was one of IBM's senior executives asked to sign a Noncompetition Agreement, to restrict the potential disclosure of trade secrets and confidential IBM information in the event that he left the Company. (*See* Signoracci Decl. Ex. 1 ("Complaint") ¶ 44.)

Lima executed his most recent Noncompetition Agreement with IBM on December 3, 2019. In the Noncompetition Agreement, Lima acknowledged and agreed that:

> during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . : (i) [he] will not directly or indirectly, within the Restricted Area, Engage in or Associate with (a) any Business Enterprise or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in [his] (1) intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which [he] had access by virtue of [his] job duties or other responsibilities with IBM or (2) exploiting customer goodwill cultivated in the course of [his] employment at IBM. (Complaint Ex. A, 2019 Noncompetition Agreement § 1(e).)

The Noncompetition Agreement provides the following definitions:

(a) "Restricted Area" is defined as "any geographic area in the world in which [he] worked or for which [he] had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of [his] employment with IBM." (*Id*. § 2(f).)

(b) "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor." (*Id*. § 2(d).)

(c) "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id*. § 2(a).)

(d) "IBM Confidential Information" is defined to include information about "the Company's selling, manufacturing, and servicing methods and business techniques, implementation strategies . . . client data, global strategic plans, marketing plans, . . . the development status of specific Company products, assessments of the global competitive landscape of the industries in which the Company competes . . . [and] financial status and plans." (*Id*. § 2(e).)

Thus, Lima agreed that, for a period of one year following the termination of his employment from IBM, he would not work for any competitor of IBM in any geographic area in the world for which he had job responsibilities in the last 12 months of his employment with IBM if such employment could result in the intentional or unintentional use or disclosure of IBM Confidential Information to which he was exposed in his IBM employment.

**Lima Violates the Noncompetition Agreement by Accepting**
**Employment with Microsoft As Corporate Vice President, Latin America**

Notwithstanding the covenants in his Noncompetition Agreement, Lima informed IBM on May 18, 2020 that he intended to join Microsoft as Corporate Vice President, Latin America. In response, IBM raised concerns, both with Lima's legal counsel and Microsoft's legal counsel, regarding the Noncompetition Agreement and Lima's confidentiality obligations to the Company. As a result of discussions among counsel for IBM, counsel for Microsoft, and counsel for Lima, Microsoft agreed that it would not permit Lima to commence employment with Microsoft prior to June 19, 2020. (Signoracci Decl. ¶ 8.)

Counsel for Microsoft informed IBM that as Corporate Vice President, Latin

America, Lima will be responsible for setting the direction for Microsoft's business pursuant to Microsoft's global strategy. This includes working with regional management and sector leaders to meet revenue goals, being responsible for budget and headcount, and ensuring that Latin America runs in coordination with Microsoft's global business. The Corporate Vice President has Latin America-wide governance and reporting responsibility, meaning Lima would be the ultimate supervisor for all Microsoft executives in the region. He will also act as an ambassador for Microsoft in Latin America, focused on building brand equity. (Walker Decl. ¶ 33.)

**ARGUMENT**

I.      **STANDARD OF REVIEW AND BURDEN OF PROOF**

Lima should be enjoined from commencing his proposed employment with Microsoft until his noncompete expires. A temporary restraining order and preliminary injunction are appropriate under the relevant standard here because IBM can meet its burden of proof by demonstrating: "(1) that [it] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *IBM Corp.* v. *Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at *6 (S.D.N.Y. Nov. 21, 2008) ("*Papermaster*").

II.     **IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF**

      A.      **Lima's IBM Trade Secrets, Confidential Information & Customer Goodwill**

As set forth in the accompanying Declaration of Randy Walker, Lima was a top-tier IBM executive with extensive confidential and proprietary knowledge about IBM's business and customers. Lima's two most recent high-ranking executive roles at IBM exposed him to the Company's most confidential and competitively sensitive trade secrets and strategic plans in two of IBM's primary business segments, GTS and Integrated Accounts. Lima also was exposed to

7

closely guarded, highly competitive and sensitive information through his participation on the Company's elite Performance Team and Acceleration Team and through his attendance at the September 2019 Board of Directors meeting. (Walker Decl. ¶¶ 3-5, 20-22.)

Lima knows confidential details about the following highly valuable IBM trade secrets concerning IBM's business globally and in Latin America, and its competition against Microsoft:

*IBM's development plans for new products and services.* Lima was exposed to IBM's offerings roadmap, including a forthcoming IBM Cloud product launching soon: a financial services-ready Public Cloud. This product, the first of its kind, is expected to play an important role in IBM's strategy to compete against Microsoft in the Cloud computing market for business in the financial services sector. Documents Lima received in his recent work for IBM confirm that this sector is a priority in IBM's efforts to win business in the Cloud-computing market against its competitors like Microsoft. Although the launch of this highly anticipated offering has been announced, many confidential and competitively sensitive details about its function, operation, cost and marketing have not yet been publicly disclosed. (*Id*. ¶¶ 6, 11, 21, 22, 24.)

*IBM's competitive strategies regarding head-to-head competition with Microsoft.* Lima knows confidential details about IBM's strategies for competing against Microsoft for bids for business, particularly in the Cloud computing market. As just one of many examples, last year, IBM and Microsoft competed for contracts with AT&T that span across a number of business sectors. Many of the decisions as to which company will service which of AT&T's needs remain open—leaving Microsoft and IBM in active competition with regard to AT&T. Lima was personally involved in the signing of IBM's contracts with AT&T and ran the team responsible for the contract deliverables. (*Id*. ¶¶ 6, 10, 11, 23.)

*IBM's strategies in its top 77 customer accounts across all business lines.* Lima has secret information regarding IBM's projected profits, revenues, and key opportunities with

respect to the Company's largest and most strategic customer accounts. Lima not only knows the right person at each of these accounts to contact in order to win business, he also knows confidential details about IBM's pricing, cost structure, and plans for investment or innovation for accounts that could give Microsoft a competitive bidding advantage. (*Id*. ¶¶ 3, 6, 10, 20.)

*IBM's business, financial, growth and investment plans.* Lima's high-level positions, participation as a member of the elite Performance Team, and attendance at the September 2019 Board of Directors meeting exposed him to Company-wide, global business, financial, growth, and investment plans that will remain current for at least the next 12 months. (*Id*. ¶¶ 6, 22.)

*IBM's acquisition strategies.* Lima was involved in IBM's 2019 acquisition of the Cloud-computing company Red Hat, Inc. IBM acquired Red Hat with the strategic aim of increasing IBM's Cloud computing revenues and to help IBM in its competition for Cloud business against competitors like Microsoft.[1] IBM has yet to disclose many of the confidential details surrounding its future strategy for Red Hat, including how IBM will continue integrating Red Hat products and services into IBM's offerings portfolio and design, market, and deliver combined Red Hat and IBM capabilities to specific customers. (*Id*. ¶¶ 6, 11, 25, 26.)

In addition, Lima has used his various positions at IBM to develop relationships with IBM's top customers. (*Id*. ¶ 7.)   In particular, Lima's three-year service as General Manager, Latin America, gave him the chance to work closely with IBM's Latin America-based clients, as well as with global clients doing business in Latin America. (*Id*. ¶¶ 7, 18.)   He has maintained those relationships.  In his most recent role as General Manager, Integrated Accounts, Lima was responsible for IBM's 77 largest, most profitable, and most valuable client accounts across all

---

[1] *See* Press Release, IBM, *IBM Closes Landmark Acquisition of Red Hat for $34 Billion; Defines Open, Hybrid Cloud Future* (July 9, 2019), https://newsroom.ibm.com/2019-07-09-IBM-Closes-Landmark-Acquisition-of-Red-Hat-for-34-Billion-Defines-Open-Hybrid-Cloud-Future.

business lines and regions.  Lima also served as IBM's primary relationship executive for several clients in Latin America through IBM's "Partnership Executive Program." (*Id*. ¶ 7.)  For each of these clients, Lima knows IBM's confidential strategy and marketing plans for maintaining and growing the account, pricing, and customer feedback -- information that leaves Lima well-positioned to help Microsoft compete for IBM's most important clients.

All of this highly confidential, competitively sensitive and valuable information is at risk of use or disclosure if Lima commences work in a directly competitive role at Microsoft prior to the expiration of his 12-month noncompetition period.  Lima's involvement in the development of strategies and products related to IBM's Cloud computing business is particularly concerning.  Recent industry reports confirm that Cloud computing is at the core of the competition between IBM and Microsoft.[2]  This competition is especially strong in Latin America, where IBM and Microsoft are among the top market shareholders in certain Cloud sectors.[3]  Lima's own statements confirm that Microsoft was a top competitor for Lima in both his GTS role and in his Integrated Accounts role at IBM, competing for business in all of IBM's largest client accounts.

Just as they were vital to his role at IBM, the IBM confidential information and competitive business secrets Lima knows, and the IBM customers Lima knows, by virtue of his responsibilities in each of his recent roles—as IBM General Manager, Latin America; GTS Manager, North America; General Manager, Global Integrated Accounts; and a member of the Performance Team and Acceleration Team—will all be highly relevant to his Microsoft strategy, planning and decision-making responsibilities.  (Walker Decl. ¶¶ 8, 10, 11.)  Lima has had significant exposure to IBM's confidential product development plans, business strategy and

---

[2] *See* Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (July 16, 2019).
[3] *See* Business Wire, *Cloud Computing in Latin America 2016-2020—Key Vendors are Amazon Web Services (AWS), Microsoft, Google, IBM, and Salesforce—Research and Markets* (Aug. 1, 2017), https://www.businesswire. com/news/home/20170801005756/en/Cloud-Computing-Market-Latin-America-2016-2020--.

most important clients, particularly in the Latin America region and the highly competitive Cloud computing market. (*Id.* ¶¶ 8, 11, 22.)

Lima's defection to Microsoft poses an acutely competitive threat to IBM because, in addition to the trade secrets and confidential information he possesses, he has developed deep relationships with significant IBM customers at IBM's expense and on the strength of IBM's goodwill, products, and services, particularly in Latin America. (*Id.* ¶ 7.) Thus, the job Lima intends to take at Microsoft is in direct competition with the role and responsibilities that he was performing at IBM. That, he cannot do without violating his Noncompetition Agreement and putting IBM's trade secrets in jeopardy. (*Id.* ¶¶ 32-37.)

Because his proposed responsibilities at Microsoft are so similar to those he had at IBM, the risk Lima may disclose or use some of the IBM trade secrets in his possession at Microsoft (even if inadvertently) is not only likely, but inevitable. Lima's proposed role at Microsoft will place him at the helm of Microsoft's business in Latin America—a region for which Lima has substantial knowledge about IBM's confidential business plans, strategies, and client information. At Microsoft, Lima will be responsible for product development and marketing, designing and implementing business plans, and for aligning the strategy of Microsoft's Latin America business with Microsoft's global strategy. Lima's proposed role at Microsoft would involve him in the development of competitive strategies against IBM. (*Id.* ¶ 33.)

It is not possible that Lima will be able to wall off within his own mind his knowledge of IBM's trade secrets—its confidential product development plans, competitive strategies, business and financial plans, acquisition activity, and client information and strategies—as he performs his responsibilities of managing Microsoft's business in Latin America. Lima's knowledge of IBM's highly sensitive confidential information, together with the similarity between his recent jobs at IBM and his new job at Microsoft, creates a risk of inevitable

disclosure of trade secrets. *See, e.g.*, *Lumex, Inc.* v. *Highsmith*, 919 F. Supp. 624, 631 (E.D.N.Y. 1996). This demonstrates irreparable injury and entitles IBM to an injunction enforcing Lima's noncompetition agreement. *Id.*; *see also Estee Lauder Cos. Inc.* v. *Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("A trade secret once lost is, of course, lost forever' and, therefore, such a loss 'cannot be measured in money damages."); *accord Papermaster*, 2008 WL 4974508, at *7.

IBM has reasons to be concerned that Lima may not safeguard the Company's confidential information. On April 29, 2020 -- just three weeks before he announced his resignation to join Microsoft -- Lima transferred IBM confidential documents to his personal email. These documents contained highly sensitive trade secret information, including IBM's revenue projections and performance. Lima took these documents while he was in the final stages of his plan to leave for Microsoft, and the confidential information the documents contain would be highly valuable to Microsoft in its attempts to compete against IBM. Further, IBM discovered that Lima used his IBM email address to access a third-party storage application that is not authorized by the Company. (Signoracci Decl. ¶ 9.) IBM is continuing its investigation of Lima's use of this storage application and his potential transfer of IBM confidential information.

**B.      This Court Has Found Irreparable Harm**
**        Under IBM's Noncompetition Agreements Before**

In *Papermaster*, this Court preliminarily enjoined another IBM employee from working for another competitor, Apple, based on the prospective violation of his noncompete. *See* 2008 WL 4974508, at *7-9. Although the ex-employee had not yet disclosed any confidential information to the rival, professed no intention to make such disclosure, and did not act in bad faith in any way, the Court found that "it is likely that Mr. Papermaster inevitably will draw upon his experience and expertise" at IBM. *Id.* at *9. Here, Lima possesses myriad IBM trade secrets, including the same type of information regarding "strategic plans, marketing plans, product

development, and long-term business opportunities" at issue in *Papermaster*, some of which

were specifically devised to compete against Microsoft. *Id*. at *3. Like Papermaster, Lima

agreed that IBM would suffer irreparable harm if he violated his Noncompetition Agreement. *Id*.

(citing *Lumex* for the proposition that risk of irreparable harm exists "where employee was a

'member of the elite strategic planning committee' and therefore 'privy to discussions' involving

marketing strategy and product lines"). And like Papermaster, Lima has been "inculcated" with

IBM trade secrets concerning the Company's plans in the growing and highly competitive Cloud

computing market, and thus "it is no great leap for the Court to find that [IBM] has met its

burden of showing a likelihood of irreparable harm." *Id*. at *8. As in *Papermaster*, and perhaps

more so given Lima's seniority, this is a case where preliminary injunctive relief is appropriate.[4]

C.     **The Risk that Lima Will Inevitably Disclose**
       **Trade Secrets Constitutes Irreparable Harm**

Like in *Papermaster*, courts find irreparable harm where there is a risk that a former

employer's trade secrets likely will inevitably be disclosed because "'the movant competes

directly with the prospective employer and the transient employee possesses highly confidential

or technical knowledge concerning . . . marketing strategies, or the like.'" *Estee Lauder*, 430 F.

Supp. 2d at 174 (quoting *EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)).

---

[4]   Despite the similarities in this case to the facts of *Papermaster*, Lima may argue that this Court should instead seek guidance from *IBM* v. *Visentin*, No. 11 Civ. 399 (LAP), 2011 WL 672025, at *1 (S.D.N.Y. Feb. 16, 2011). However, *Visentin* is inapposite. There, after a temporary restraining order had been entered and a full evidentiary hearing was held, the Court declined to issue a preliminary injunction against a sales manager who left IBM to work for HP. The *Visentin* court ruled that enforcement was not necessary in that case because the evidence presented at the preliminary injunction hearing did not establish that the executive was inculcated with IBM confidential information and trade secrets. The Court determined the executive's primary job at IBM was to be a "general manager," and that, "[a]lthough trade secrets may have lurked somewhere on the periphery, the real thrust of his position was to manage his teams to make them as efficient as possible." *Id*. at *8. Here, in contrast to *Visentin*, Lima is not just a "manager," but was directly involved in the most senior executive strategy discussions and decisions in IBM, including with respect to IBM's product and service development and marketing, top revenue-generating client accounts, acquisitions, and other trade secrets and proprietary information. Moreover, as the *Visentin* Court noted, the ruling in that case was limited to the dispute at hand, and the reasonableness of a restrictive covenant "is determined on a case-by-case basis." *Id*. at *22 n.7.

As discussed above, Lima has detailed knowledge of IBM trade secrets, including: (1) launch plans and roadmaps for products and services in development; (2) strategies for winning business in head-to-head competition with Microsoft; (3) projected profits and revenues, pricing strategies, strengths and weaknesses, and key opportunities for the Company's top 77 customer accounts across all business lines; (4) business, financial, growth and investment plans current for the next 12 months; and (5) acquisition activity, including IBM's strategies for marketing, deploying, and implementing Red Hat capabilities. (Walker Decl. ¶ 6.) The factors that guide courts in determining whether there is a risk of inevitable disclosure of trade secrets include:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (quotation omitted).

The "inevitable disclosure" standard is based on the *risk* of disclosure. It does not require proof that the new employer will for certain use the trade secret in the same way as the former employer. As one court held:

> Of course, the nature of the subsequent employer's work is relevant to determining the risk of disclosure. But I find no requirement in the New York decisions that the first employer's secrets be readily usable by the second employer. <u>It is enough if the second employer's work is sufficiently similar to that of the first employer to make likely the risk of disclosure</u> by the employee in the course of his subsequent employment.

*Cont'l Grp., Inc.* v. *Kinsley*, 422 F. Supp. 838, 845 (D. Conn. 1976) (emphasis added).

Thus, the law does not require proof that the defecting employee intends to disclose trade secrets prior to issuance of an injunction. As the court in *Papermaster* observed:

> [T]he Court has no evidence before it that Mr. Papermaster has disclosed any IBM trade secrets to date. <u>The harm to IBM, however, is more likely to derive from inadvertent disclosure of the IBM trade secrets that have defined</u>

14

> Mr. Papermaster's long career. . . . Thus, while the Court ascribes no ill-will to Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm to IBM.

2008 WL 4974508, at *10 (citations omitted and emphasis added).

Here, each of the *Papermaster* factors favors injunctive relief. *First*, IBM and Microsoft are direct competitors. IBM and Microsoft compete head-to-head across a number of different sectors in Latin America, and worldwide. In particular, the Cloud computing space in Latin America—where Lima developed deep client relationships over the course of his career— is a significant battleground for IBM and Microsoft. (Walker Decl. ¶¶ 29-31.) *Second*, the work Lima will be doing at Microsoft is substantially similar to the work he performed at IBM. In fact, the responsibilities that Lima will be taking on at Microsoft involve many of the same he had at IBM: overseeing sales and revenue-generating activities, managing client relationships, and participating in strategic decision-making. (*Id.* ¶¶ 32-37.) *Third*, the trade secrets Lima possesses would unquestionably be valuable to Microsoft in gaining a competitive edge over IBM. At Microsoft, Lima will be responsible for developing and implementing Microsoft's competitive strategies in Latin America, where Lima knows IBM's confidential plans, client targets, client information, product development roadmaps, and competitive strategies. (*Id.*) *Finally*, the technology industry—and in particular Cloud computing—is a highly competitive industry. With only about 20% of the workload worldwide having been migrated to the Cloud, 80% of the market remains up for grabs. (*Id.* ¶ 30.) Thus, "it is likely that [Lima] inevitably will draw upon his experience and expertise" based on IBM's trade secrets and confidential information—trade secrets and information that would clearly be invaluable to Microsoft, which would have no alternative way of attaining them. *Papermaster,* 2008 WL 4974508, at *9.

Given the breadth, depth and duration of Lima's tenure at IBM and his high ranking executive roles and responsibilities, his detailed knowledge of IBM's most closely guarded

competitive strategies, product development plans, and client accounts, and his proposed position at Microsoft, there is a "likely inevitability of even inadvertent disclosure" sufficient to establish a real risk of irreparable harm and sustain an injunction even if Lima had the best intentions.

Courts enforce noncompete agreements in scenarios where the employee possesses the type of information that Lima has obtained:

In *Business Intelligence Services, Inc.* v. *Hudson*, 580 F. Supp. 1068 (S.D.N.Y. 1984), the court issued a preliminary injunction enjoining a senior consultant from leaving one software company to work for a competitor. Like Lima, the employee in that case possessed a breadth of important client information, including "data on the types of hardware and software ordered by specific clients, lists of products sold to clients but not yet developed and problems arising in the course of client relations," which the court deemed protectable as trade secrets.[5] *Id*. at 1072. Thus, the court held that "disclosure [would be] likely, if not inevitable and inadvertent." *Id*.[6]

In *Estee Lauder*, 430 F. Supp. 2d at 182, the court enjoined a product marketing manager at Estee Lauder from working for a cosmetics rival primarily on the basis that, like Lima, the executive knew about his former employer's products in development, was responsible for developing marketing strategies, and had "a general idea of the plans for launch of new products, including the marketing and geographic plans and the channels of distribution for these products." *Id*. at 163. Rejecting the argument that the former employer could not suffer irreparable harm because the employee had no "technical expertise" and "was not the scientist behind the formulas and the development of new products," the court granted a preliminary

---

[5]   Courts have protected customer information as trade secret. *See Greenwich Mills Co., Inc.* v. *Barrie House Coffee Co., Inc.,* 459 N.Y.S.2d 454, 459 (1983) (confidential information of customers' product preferences and the price customers are willing to pay for such products constitutes sufficient allegations of trade secrets to preclude summary judgment); *Nutmeg Tech., Inc.* v. *Mahshie*, No. 89-CV-511, 1989 WL 60285, at *6 (N.D.N.Y. June 6, 1989) ("[T]he customer information to which [defendant] was privy does constitute a trade secret.").

[6]   *See also Ayco Co., L.P.* v. *Feldman*, No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154, at *6 (N.D.N.Y. Oct. 22, 2010) ("The loss of an employer's confidential customer information also constitutes irreparable harm.").

injunction based upon the risk of inevitable disclosure of marketing trade secrets—specifically, information about upcoming product launches. *Id.* at 175-76.[7]

Because an injunction is appropriate where there is a likelihood that the former employer's trade secrets will inevitably (even if inadvertently) be used or disclosed, the Court should issue an injunction here, barring Lima from working at Microsoft during the remaining eleven months of his non-competition agreement.

### D.    The Risk of Exploiting Customer Goodwill Constitutes Irreparable Harm

Courts also find irreparable harm where there is a risk that a former employee might exploit or expropriate the goodwill of client or customer relationships cultivated through the former employee's job responsibilities. *See, e.g.*, *Global Switching Inc.* v. *Kasper*, No. CV 06 412(CPS), 2006 WL 1800001, at *13 (E.D.N.Y. Jun. 28, 2006) ("The loss of customer goodwill constitutes an irreparable injury."); *Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (finding that "[employee's] actions threaten to cause [employer] irreparable harm by luring away the business of a number of long-term [] clients" of employer); *Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (holding that it is "very

---

[7] In *Payment Alliance*, the court issued a preliminary injunction to bar violation of a noncompete by an executive with knowledge of the marketing of a software application his former employer launched, despite the fact the employee was a non-technical operations office who was not involved in the design of the software at the source code level. *Payment Alliance Intern., Inc.* v. *Ferreira*, 530 F. Supp. 2d 477, 482, 485 (S.D.N.Y. 2007). Given the direct competition between the employers, and that the defecting employee would be working in a similar capacity—just like Lima—the court explained, "even if [the employee] acted with the best of intentions, he may unintentionally transmit information gained through his association with [his former employer] during his day to day contact with his new employer." *Id.*

In issuing a preliminary injunction in *Lumex*, the court found that the employee, like Lima, had obtained confidential information, including information concerning Lumex's market objectives, future target markets, and new product development, as well as a competitive analysis of Lumex and the prospective employer's relative market positions, which was "confidential and constituted trade secrets," and that "the disclosure of these trade secrets and confidential information would seriously and irreparably damage the future interests of Lumex." 919 F. Supp. at 630, 636. The former Lumex employee, like Lima, "was a member of the elite strategic planning committee together with the top personnel of [his business unit] and attended high level meetings in which future restructuring of [the business unit] was discussed, together with detailed financial information, including costs and [] profit margins." *Id.* at 636.

difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come").

Lima developed close personal relationships with major IBM customers in his 25 year long tenure at IBM. In his earlier roles, as GTS Manager, North America and General Manager, Latin America, Lima cultivated significant client relationships, particularly with Latin American clients, financial services clients, and global clients doing business in Latin America. In his most recent role as General Manager, Integrated Accounts, Lima has expanded on these pre-existing client relationships as well as developed many new ones. He has also served as IBM's primary relationship executive for several Latin and North American clients, through IBM's "Partnership Executive Program." (Walker Decl. ¶¶ 3-5, 7, 8.) By moving to Microsoft, Lima threatens to exploit and/or expropriate the important customer relationships he developed with the benefit of IBM's resources. IBM thus is entitled to an injunction protecting the customer goodwill that Lima developed throughout his career at IBM. *See, e.g.*, *BDO Seidman* v. *Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999) ("The employer has a legitimate interest in preventing former employees from exploiting or expropriating the goodwill of a client or customer, which has been created and maintained at the employer's expense, to the employer's competitive detriment.").

### E.     Lima Stipulated That a Violation of His Noncompetition Agreement Would Irreparably Harm IBM

In determining whether a threat of irreparable harm exists, "the existence of the Noncompetition Agreement is highly relevant." *Papermaster*, 2008 WL 4974508, at *7. Lima acknowledged in his Noncompetition Agreement that IBM's business "is intensely competitive," and he would have "access to, and knowledge of, IBM Confidential Information" as part of his work at IBM. (Complaint Ex. A § 1(b).) Lima agreed that disclosing the IBM confidential information he possesses to a competitor would cause irreparable injury to IBM, and that an

injunction is the appropriate remedy for that threat. (*Id.* §§ 3, 4.) Lima even consented to an injunction: "you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching, or further breaching, this Agreement." (*Id.*)

The Second Circuit has noted that contractual provisions acknowledging such harm "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision." *Ticor Title Ins. Co.*, 173 F.3d at 69; *cf. N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 48-49 (2d Cir. 1999). In *Papermaster*, the court relied on the same acknowledgments Lima made in his Noncompetition Agreement—*i.e.*, "that IBM would suffer 'irreparable harm' if he violated" his obligations—finding that this "'explicit provision in the agreement' and 'common sense' indicate that IBM will be irreparably harmed by the disclosure of the important technical and proprietary information that Mr. Papermaster carries in his head." 2008 WL 4974508, at *9 (quoting *Global Telesys., Inc.* v. *KPNQwest*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001)).[8] So too here.

## III.   IBM IS LIKELY TO PREVAIL ON THE MERITS

IBM is likely to prevail on its claims for breach of the Noncompetition Agreement and misappropriation of trade secrets. The same facts that support a finding of irreparable harm in the absence of a preliminary injunction also demonstrate IBM's likelihood of success on the merits. "In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated." *Papermaster*, 2008 WL 4974508, at *6 (quotation omitted).

---

[8]   *Accord Ticor Title*, 173 F.3d at 68-69; *Ayco Co., L.P.* v. *Feldman*, No. 1:10-CV-1213 (GLS/DRH), 2010 WL 4286154, at *8 (N.D.N.Y. Oct. 22, 2010); *IDG USA, LLC* v. *Schupp*, No. 10-CV-76S, 2010 WL 3260046, at *9 (W.D.N.Y. Aug. 18, 2010), *aff'd in part, vacated in part and remanded on other grounds by* 416 F. App'x 86 (2d Cir. 2011); *Estee Lauder*, 430 F. Supp. 2d at 174; *Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*, No. 9202–08, 2008 WL 5206291, at *17 (N.Y. Sup. Ct. Dec. 12, 2008).

As explained above, Lima signed the Noncompetition Agreement, in which he acknowledged and agreed that he would "have access to, and knowledge of, IBM Confidential Information and in which he conceded that IBM would suffer "irreparable harm" if he were to disclose those secrets or breach his noncompetition obligations. (Noncompetition Agreement §§ 1(b), 3.) Lima agreed to wait for one year before going to work for "any competitor of [IBM]" if such employment would result in the intentional or unintentional use or disclosure of IBM confidential information to which he was exposed in his IBM employment. (*Id*. at § 1(e).) Lima's proposed employment at Microsoft squarely violates the Noncompetition Agreement.

Under New York law, noncompetition agreements that are reasonable in time and scope are enforced to the extent necessary: "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." *See Estee Lauder*, 430 F. Supp. 2d at 177 (citing *Ticor,* 173 F.3d at 70.). Here, because the limitations on Lima's post-IBM employment are reasonable, the Court should enforce the agreement to protect IBM's legitimate interest in safeguarding its trade secrets, confidential information, and customer relationships.

### A.    The Limitations on Lima's Post-IBM Employment Are Reasonable

Under New York law, "there are no *per se* lines demarcating what constitutes an unreasonable durational or geographic scope" in a noncompetition agreement. *See Estee Lauder*, 430 F. Supp. 2d at 180. The "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable." *Id*. However, New York courts do "routinely find one-year restrictions to be reasonable." *Reed Elsevier, Inc*. v. *Transunion Holding Co.*, No. 13 CIV. 8739 (PKC), 2014 WL 97317, at *8 (S.D.N.Y. Jan. 9, 2014). Indeed, in the *Papermaster* case, the court found that the

same one-year prohibition on competition and customer solicitation that Lima agreed to was "very limited in time." 2008 WL 4974508, at *11 (quoting *Natsource LLC* v. *Paribello*, 151 F. Supp. 2d 465, 471-72 (S.D.N.Y. 2001)). The court also found that IBM had established that "the trade secrets that [Papermaster] has been exposed to during his long tenure at IBM are likely to remain competitively valuable to IBM and its competitors for more than a year." *Id.* Other courts applying New York law have upheld two- and three-year noncompete periods. *See, e.g.*, *Payment Alliance*, 530 F. Supp. 2d at 485; *Battenkill Veterinary Equine P.C.* v. *Cangelosi*, 768 N.Y.S.2d 504, 506-07 (N.Y. App. Div. 3d Dep't 2003); *Alside Div. of Associated Materials Inc.* v. *Leclair*, 743 N.Y.S.2d 898, 898-99 (N.Y. App. Div. 3d Dep't 2002).

The overlap between Lima's positions and responsibilities at IBM and his proposed position and responsibilities at Microsoft also makes enforcement reasonable. The business secrets and confidential information Lima has in his possession will be valuable to Microsoft for at least a year. He is familiar with both the product development and marketing strategies that IBM is currently employing as well as the plans for offerings that have not been released and which the marketplace recognizes as increasing IBM's competitive strength in Cloud computing. (Walker Decl. ¶ 6.) The information that Lima knows will remain part of the competitive battleground between IBM and Microsoft for at least the next 12 months.

The geographical scope of Lima's restriction is worldwide, which, too, is reasonable because the employer (IBM) and the competitor (Microsoft) compete globally and Lima's job responsibilities at IBM were global. In *Papermaster*, the court found that "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope.'" 2008 WL 4974508, at *11 (quoting *Natsource*, 151 F. Supp. 2d at 471-72). Other courts have upheld worldwide limits on post-employment competition. *See, e.g.*, *Estee Lauder*, 430 F. Supp. 2d at 181; *Bus. Intelligence Servs., Inc.* v. *Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984).

21

Finally, Lima's skills and experience at IBM in various management and senior executive positions make him marketable for a high ranking executive position at any number of companies, including companies that do not compete directly against IBM. The Noncompetition Agreement would not prevent Lima from working for such companies. The Agreement does however, prevent Lima from switching sides and joining IBM's primary adversary in the Cloud computing business in which Lima was involved at IBM. That restriction is reasonable under applicable law, and should be enforced.

**B.      IBM Has a Legitimate Interest in Safeguarding its Confidential Information**

An employer has a "legitimate interest" in "safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy." *Estee Lauder*, 430 F. Supp. 2d at 177 (quoting *Reed, Roberts Assocs., Inc.* v. *Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976)); *see also BDO Seidman*, 93 N.Y.2d at 391 (explaining that an employer has a "legitimate interest" in preventing the "competitive use, for a time, of *information* or *relationships* which pertain peculiarly to the employer and which the *employee acquired* in the course of the employment" (emphasis in original)). Therefore, "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." *Estee Lauder,* 430 F. Supp. 2d at 177 (quoting *Reed, Roberts*, 353 N.E.2d at 593).

The confidential business information that Lima knows constitutes protectable trade secrets under New York law, which considers a trade secret "'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner of such secrets] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)); *Visentin* 2011 WL 672025, at *8

(S.D.N.Y. Feb. 16, 2011) (same); *see also Papermaster*, 2008 WL 4974508 at *8 (noting Papermaster's knowledge of "strategic plans, product development, technical recruitment, and long-term business opportunities for IBM").[9]

New York cases confirm IBM has a "legitimate interest" in protecting the types of confidential business and marketing information and strategies Lima acquired at IBM. *See, e.g.*, *Estee Lauder*, 430 F. Supp. 2d at 175-76 (knowledge of confidential brand strategies, products in development, and planned innovations); *Lumex*, 919 F. Supp. at 629-31 (knowledge of confidential strategies, future product offerings, and pricing and cost information); *DoubleClick, Inc.* v. *Henderson*, No. 116914/97, 1997 WL 731413, at *4-5 (N.Y. Sup. Ct. Nov. 7, 1997) (knowledge of confidential revenue projections, future plans, pricing and product strategies).

Indeed, Microsoft's own conduct supports the reasonableness of IBM's Noncompetition Agreement on the facts presented here. Microsoft has obtained injunctive relief from Washington courts to enforce its own noncompetition agreements, governed by Washington law, which is similar to New York law. In *Microsoft* v. *Miszewski*, No. 11-2-04589-7 SEA (Wash. Super. Ct. April 15, 2011), Microsoft obtained a preliminary injunction enjoining its former employee for one year from taking a position at Salesforce.com that would include many of the same responsibilities as his prior role at Microsoft—namely, the strategic business development, marketing, and sales of Cloud computing solutions. And in *Microsoft* v. *Kai-Fu Lee*, No. 05-2-

---

[9]   New York courts consider the following factors in determining whether information constitutes a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt. Inc.* v. *Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993)).  A review of each factor confirms that Lima's knowledge of IBM's competitive strategies, client information, and product development are protected trade secrets.

23561, 2005 WL 4881381 (Wash. Super. Ct. July 25, 2005), Microsoft obtained injunctive relief barring an employee from engaging in competitive employment activities for Google.

## IV. IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS IN IBM'S FAVOR

Even if this Court were not satisfied that IBM is likely to prevail on the merits, IBM has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction. In balancing the equities, a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Natsource*, 151 F. Supp. 2d at 470 (quoting *Ticor Title*, 173 F.3d at 69).

Here, the balance of equities tips decidedly in IBM's favor. Lima *agreed* to wait a year before working for one of IBM's competitors, and he did so in exchange for career opportunities and significant consideration from IBM. (*See* Noncompetition Agreement § 1(a).) IBM paid Lima over $4 million in compensation and equity over his last five years at the Company, and further invested in him by providing him opportunities to participate in a leadership development program with executives from other leading companies. IBM even committed to sponsoring Lima's United States permanent residency application in 2019. After benefiting from IBM's investment in him and in his career, Lima chose to leave and start a new phase of his career at a company that competes against IBM for the very same business, revenue and future growth. Lima did not have to choose to leave for a competitor. His general skills as an executive leader are transferrable, as evidenced by the fact that his sits on the board of a Brazilian company that produces paper, and does not compete in the information technology business. But Lima chose to join one of IBM's primary competitors in a position that will place him in the exact same competition for business from enterprise and government customers, but now on the side of

Microsoft.  There is no inequity in compelling Lima to honor his contractual undertaking to wait before beginning that job, and certainly no inequity in delaying his employment by Microsoft while the Court considers IBM's motion for a preliminary injunction.  This is particularly so where Lima's skills can be applied in high-level executive positions for companies that do not directly compete against IBM, and such positions are readily available to him.

In contrast, IBM faces immediate and irremediable injury, including the disclosure of highly confidential information, and loss of substantial business, should Microsoft gain access to Lima's knowledge of IBM's confidential plans and strategies.  In *Papermaster,* the court found the balance of equities favored IBM because "IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple." *Papermaster*, 2008 WL 4974508, at *13.  Similarly, any prejudice to Lima is substantially outweighed by the prejudice IBM would suffer absent injunctive relief.

## V.   A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET

The immediacy of Lima's intended employment at Microsoft justifies a temporary restraining order.  *See* Fed. R. Civ. P. 65(b).  Lima intends to compete against IBM by becoming Microsoft's Corporate Vice President, Latin America as early as June 19, 2020.  Unless enjoined, Lima will join Microsoft soon, creating a real risk that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."   *Id*.

## CONCLUSION

For the foregoing reasons, IBM respectfully submits that this Court should enter a temporary restraining order and a preliminary injunction prohibiting defendant Rodrigo Lima from commencing employment at Microsoft prior to May 20, 2021, in accordance with the Noncompetition Agreement.

Dated: New York, New York
       June 18, 2020

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   */s/ Pietro J. Signoracci*
      Robert A. Atkins
      Liza M. Velazquez
      Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
ratkins@paulweiss.com
lvelazquez@paulweiss.com
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*