# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>RODRIGO KEDE DE FREITAS LIMA,<br><br>Defendant. | 20 Civ. _____<br><br><br>**COMPLAINT** |

International Business Machines Corporation ("IBM" or the "Company"), by its undersigned attorneys, upon personal knowledge with respect to itself and its actions and otherwise on information and belief, alleges as follows:

**Nature of the Action**

1.      In violation of his one-year Noncompetition Agreement with IBM, as well as the common law duties he owes to IBM, Defendant Rodrigo Kede de Freitas Lima ("Lima") has resigned as a senior executive of IBM to immediately become a senior executive at one of IBM's biggest competitors, Microsoft.  Even though his experience and contacts at companies in virtually every sector of the economy qualify him to work for all kinds of businesses, Lima wants to become a direct competitor of IBM, starting this week.  That, he cannot do.

2.      Lima was among the top 1% of IBM's highest ranking executives, with a seat at the table alongside the Chairman and Chief Executive Officer of the Company in exclusive senior executive strategy sessions and in a recent meeting of the Board of Directors setting the strategic direction of the Company.  Over the years, Lima had responsibility for overseeing IBM's Latin America operations, running IBM's Global Technology Services business in North America, and managing IBM's largest customer relationships across all of

IBM's businesses.  Unbeknownst to IBM, however, Lima was in talks *for over a year* with Microsoft while continuing to be entrusted with some of IBM's most competitively sensitive strategic secrets -- many directly related to competing against Microsoft.

3.     IBM heavily invested in and supported Lima's career and advancement. But despite being afforded every opportunity to succeed at the highest levels of IBM -- with access to highly valuable IBM trade secrets -- Lima's performance did not match the Company's expectations, or even his own ambitions.  Now, Lima is violating his Noncompetition Agreement by seeking immediate employment at the highest levels of Microsoft, where he cannot avoid exploiting his IBM client relationships, and using his knowledge of IBM confidential business plans, to face off against IBM.

4.     To prevent precisely that harm to IBM, Lima agreed that he would not leave IBM to work for a competitor without waiting at least 12 months.  IBM brings this action to enforce that agreement, and seeks injunctive relief to prohibit Lima from breaching his Noncompetition Agreement and from threatening to use IBM's trade secrets or customer goodwill against IBM.

5.     Given his wealth of knowledge about IBM's secret competitive strategies, product development projects, and acquisition plans, Lima poses a real and immediate threat to IBM.  He was a "Band A" executive—the highest rank at IBM below the Senior Vice President level.  He also was a member of IBM's Performance Team, an exclusive group of about sixty high-ranking executives, including the Chairman, CEO, and Senior Vice Presidents, who are responsible for the operational performance of the entire company.  And he was a member of IBM's Acceleration Team, a select group of executives that accelerates IBM's growth through leadership initiatives to promote innovation.

6.      In recent years, Lima ascended to the top executive leadership of the

Company.  Since January 2020, as General Manager, IBM Integrated Accounts, Lima was

responsible for overseeing all aspects of IBM's 77 largest, most valuable, and most strategic

customer accounts across all IBM business lines and regions.  Lima was responsible for knowing

highly confidential details about the current status of IBM's business with these accounts (e.g.,

pricing, strengths and weaknesses, renewal timelines) and IBM's future plans for these

customers (e.g., targeted product development and launch plans, sales opportunities).

7.      In 2019, Lima was the leader of IBM's Global Technology Services

business ("GTS") for all of North America, making him privy to IBM's global (and confidential)

strategies for competing against Microsoft and others in the information technology business.

And in 2016, Lima was IBM's General Manager of Latin America -- essentially the same role

that Lima plans to commence immediately at Microsoft.  So Lima is going back to running Latin

America, but this time for IBM's competitor, now armed with all of IBM's trade secrets he was

exposed to in running IBM's GTS and Integrated Accounts businesses and participating on the

Performance Team and Acceleration Team.

8.      As one of the leaders of IBM, Lima generated and learned numerous IBM

trade secrets.  These are just some:

- IBM's launch plans and roadmap for new products and services in
  development, including a new suite of Cloud computing offerings for
  customers in the financial services industry;

- IBM's competitive strategies in bids for business where IBM competes
  head-to-head against Microsoft to win customers, including in large
  business and government accounts;

- IBM's projected profits and revenues, pricing strategies, strengths and
  weaknesses, and key opportunities with respect to the Company's top 77
  customer accounts across all business lines, as well as the key individuals

3

at each client account involved in managing the business that client
provides to IBM or its competitors;

- IBM's business, financial, growth, and investment plans for its global
  business over the next 12 months; and

- IBM's acquisition strategies, including IBM's plans to integrate and
  deploy capabilities of Red Hat, Inc., the Cloud computing company IBM
  acquired in 2019.

9.      In addition to all that, Lima used IBM's invaluable goodwill to cultivate

deep relationships with IBM's biggest customers in Latin America -- the same Latin American

customers Microsoft targets for its own business.  If he is not enjoined from becoming

Microsoft's Corporate Vice President for Latin America, Lima will be responsible for running

Microsoft's business that markets to those same customers.

10.     It will be Lima's job to devise and implement Microsoft's plans for

competing head-to-head with IBM for corporate, banking, insurance and other enterprise

customers.  To do that job, it is inevitable that Lima will use and rely on his IBM confidential

information and customer relationships, to the direct detriment of IBM and for the benefit of its

competitor Microsoft.

11.     Given the overlap between Lima's former IBM responsibilities and his

expected responsibilities at Microsoft, it is unavoidable that he will exploit and even divulge

IBM's trade secrets, as well as his confidential information about IBM's customers.

Furthermore, his proposed role at Microsoft will require him to develop and implement

Microsoft's competitive strategy in the region, using the confidential information and customer

goodwill he possesses concerning IBM customers in Latin America.

12.     This is the very harm IBM sought to prevent when it elevated Lima to the

senior leadership of the Company and asked him to make a simple promise:  not to take a

competitive position or solicit his IBM customers for 12 months after leaving.  Lima was trusted

to keep that promise, and was handsomely compensated, in exchange for using IBM's trade

secrets for IBM's business.  IBM paid Lima over $4 million in compensation and equity over his

last five years, further supported Lima by paying for him to participate in external leadership

programs, and even committed to sponsoring Lima's United States permanent residency

application -- all as part of IBM's investment in what IBM expected would be a long-term

relationship with Lima as a senior executive of the Company developing and protecting IBM's

trade secrets.  Yet Lima now intends to turn around, breach his Noncompetition Agreement, and

put those trade secrets to work for Microsoft.

> 13.     Lima should be directed to comply with his noncompetition agreement,

enjoined from accepting the position at Microsoft without first waiting 12 months, and ordered to

pay the damages suffered by IBM.  In addition, IBM seeks to recover the equity IBM paid Lima

that is subject to rescission as a result of Lima's breaches of his contractual duties to IBM.

### Parties

> 14.     IBM is a New York corporation with its principal place of business in

Armonk, New York.

> 15.     Lima is a citizen of Brazil who, on information and belief, resides in

Riverside, Connecticut.

### Jurisdiction and Venue

> 16.     The Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in

controversy exceeds the sum of $75,000, exclusive of costs and interest.

> 17.     The Court has personal jurisdiction over Lima because, in the

Noncompetition Agreement (attached hereto as **Exhibit A**), he agreed to exclusive jurisdiction

and venue in the federal and state courts of the State of New York, New York County or County

of Westchester, for all disputes arising from the agreement.  (2019 Noncompetition Agreement §

13.)

      18.    Venue properly lies in this Court both because of Lima's aforementioned

agreement, and pursuant to 28 U.S.C. § 1391, because IBM's headquarters are in this judicial

district and a substantial part of the events giving rise to the claims occurred in this district.

**Relevant Facts**

**IBM**

      19.    IBM is a globally integrated business that offers information technology

("IT") products and services to a wide range of business, Public sector, and individual customers.

      20.    IBM designs, develops, and markets a portfolio of software products and

services for customers in all industries, including (1) Hybrid Cloud, which offers businesses and

government entities infrastructure, services, and tools for integrated Cloud computing; (2)

Cognitive Solutions, which provides Artificial Intelligence ("AI")-based software and services to

clients; (3) Global Technology Services, which provides assistance to companies and

government entities in assessing, designing, implementing, and running their computer

infrastructure and network systems; (4) Global Business Services, which offers professional

management and strategic consulting services as well as systems integration, and application

management services, to help clients use and integrate technology into their businesses; (5)

Enterprise Server and Storage Systems, which offers clients a wide range of data storage

products, data protection services, and IT infrastructure hardware such as computer servers; and

(6) IBM Blockchain, which offers clients a suite of Cloud-based services to help clients create

and manage blockchain networks.

21.     Cloud computing is one of the areas of the most intense competition between technology companies like IBM and Microsoft.  It refers to the delivery of on-demand computing resources—everything from applications to data storage—over the internet, generally on a pay-for-use basis.  Cloud computing enables individuals, businesses, and Public sector entities to access, store and use data and software via the internet on computer servers owned and/or managed by third-party "Cloud" service providers—such as IBM, Microsoft, and Amazon—and pay for that service based on usage.

22.     Clients procure Cloud computing services in three main sectors:  Private Cloud, Public Cloud, and Hybrid Cloud.  Private Cloud computing, also referred to as an internal or corporate Cloud, is a Cloud computing environment offered only to select users, usually a single organization, either through secure access over the internet or over a Private internal network.[1]  In contrast, Public Cloud computing services are offered to the general Public, either for free, or for a fee, over the internet.[2]  Hybrid Cloud computing allows data and applications to be shared across two or more cloud environments—environments that could include a combination of Private Cloud and Public Clouds.[3]

23.     IBM relies on trade secrets, other confidential information, and proprietary methods and processes in developing, implementing and marketing its products and services offerings, and each year it spends billions of dollars and dedicates extensive research efforts to the development of technological innovations supporting its hardware, software and services

---

[1]   IBM Cloud Education, *Private Cloud* (April 10, 2010),
     https://www.ibm.com/cloud/learn/introduction-to-Private-cloud.

[2]   IBM Cloud Education, *Public Cloud* (March 3, 2010),
     https://www.ibm.com/cloud/learn/Public-cloud.

[3]   Red Hat, *Cloud Computing: what is Hybrid cloud?* (last visited June 15, 2020),
     https://www.redhat.com/en/topics/cloud-computing/what-is-Hybrid-cloud.

businesses. Among other things, IBM utilizes trade secrets, proprietary information and methods, confidential technical know-how, competitively sensitive customer and distribution information and confidential competitive strategies to design, develop, manufacture and bring to market a variety of products and services relating to technology infrastructure systems.

24. In order to protect its trade secrets, IBM asks a select group of its executives to enter into noncompetition agreements by which they promise that if they leave the Company, they will wait 12 months before joining a competitor in a position where they may use, disclose, or rely on IBM trade secrets and confidential information, or exploit IBM customer goodwill in their possession.

**Lima's Extensive Knowledge of IBM's Confidential Plans, Strategies and Clients**

25. Lima is a longtime IBM employee—he started working at IBM in February 1995, and other than a six-month departure from the Company in 2015, he has worked continuously for IBM in various roles for 25 years. In 2012, Lima was promoted to the role of General Manager, Latin America, where he was responsible for among other things, revenues, profits and losses, overseeing all aspects of customer accounts and business development, managing operations, and developing and implementing business strategy across the region.

26. On August 6, 2013, while he was in the role of General Manager, Latin America, Lima signed his first Noncompetition Agreement with IBM. In 2015, Lima resigned from that position at IBM to work for a Brazilian software company. Upon leaving IBM in 2015, Lima entered into a Noncompetition Settlement Agreement with IBM.

27. Lima rejoined IBM in January 2016 as General Manager of Latin America. When he accepted this role, he executed a new Noncompetition Agreement with IBM. In 2017, he became the GTS Manager, North America. This was a promotion to a "Band A"

executive role—meaning that Lima was among the top 1% of executives at IBM.[4]  Lima worked

in this role for nearly three years through December 2019.  On December 3, 2019, when he

became a U.S.-based employee, Lima executed a new Noncompetition Agreement with IBM

(attached hereto as **Exhibit A**).  In January 2020, Lima became General Manager, IBM

Integrated Accounts, another Band A position, responsible for IBM's largest and most strategic

client accounts.

28.     In his last five years at IBM, Lima received over $4 million in

compensation and equity from the Company.  Further, throughout his career, IBM has invested

in Lima by supporting his professional development, providing him the opportunity to participate

in a leadership development program with executives from other leading companies.  IBM also

committed last year to sponsoring Lima's United States permanent residency.

29.     In his most recent role as General Manager, Integrated Accounts, from

January 2020 until his resignation in May 2020, Lima was responsible for operationally running

and growing the global portfolio for IBM's 77 top client accounts across all of the Company's

business lines.  In this position, Lima directed and oversaw the development and execution of

IBM's strategy for winning new contracts for IBM products and services, securing renewals and

expansion of existing contracts, marketing, product development, and delivery and

implementation.  The products and services that IBM provides for these clients span all of IBM's

business lines, including software, hardware, services, Cloud computing and AI.  This work

exposed Lima to IBM confidential information and trade secrets about IBM's top client

---

[4]     IBM employees with letter Bands (beginning at Band D and rising to Band A and AA) are
        IBM executives, and IBM employees with number Bands (beginning at Band 1and rising to
        Band 10) are non-executives.  Band A and AA executives are the highest ranking executives
        in the Company.

accounts, including IBM's strategies for maintaining and growing business in those accounts; the strengths, perceived weaknesses, and opportunities for improvement in the service of those accounts; and new sales or renewal opportunities in those accounts.

30.     Prior to January 2020, Lima was IBM's GTS Manager for North America. In that role, he was responsible for, among other things, driving product sales in North America, primarily through IBM's GTS business focused on Cloud computing and other IT infrastructure services, but also with respect to all other business areas of IBM.  As a result, Lima has in-depth knowledge about IBM's products that are in development, such as the one of a kind financial services Public Cloud, as well as marketing and business plans—further increasing the risk to IBM if he is permitted to simply defect to Microsoft.

31.     Lima also was exposed to IBM's global strategic business, financial, growth, and investment plans, which IBM is implementing at a regional level in Latin America and elsewhere, through his participation in numerous senior executive discussions and meetings:

(a)     Lima participated in a September 2019 IBM Board of Directors meeting detailing the global strategy for the Company's business in the months and years to come, and he developed and reviewed materials for IBM's annual business plans, projections, and strategies that were presented to the Chairman and CEO of the Company.

(b)     Lima was a member of IBM's Performance Team, consisting of approximately 60 of IBM's senior leaders who run IBM business units across geographies, including the Chairman, CEO, and each Senior Vice President of the Company.  Lima was exposed, as recently as April 2020, to the Performance Team's discussions of IBM's global product development and marketing strategy in Cloud and AI—which is directly applicable to the competition between IBM and Microsoft in Latin America—and confidential details about IBM's competitive plans against Microsoft.

(c)     Lima was a member of IBM's Acceleration Team, a select group of executives charged with accelerating IBM's growth through leadership initiatives to promote innovation.  Lima was exposed to details about IBM's global Cloud and AI strategy and competitive

initiatives discussed at the Acceleration Team's annual meeting in January 2020.

32.     Lima also knows IBM's confidential information regarding its active bids for business in direct competition against Microsoft.  As one of many examples, just last year IBM and Microsoft competed for contracts with AT&T that span a number of business sectors. Ultimately, AT&T partnered separately with each of the companies:  while AT&T agreed to enlist IBM's expertise to modernize its Business Solutions internal software applications, which will enable migrations to the IBM Cloud,[5] AT&T also enlisted Microsoft to shift workloads to Microsoft's Public Cloud.[6]  In addition, AT&T agreed to collaborate with each company on 5G and edge computing platforms and to make use of, and or collaborate on, AI developments.[7] Although some aspects of the division of labor between IBM and Microsoft have been settled, many of the decisions as to which company will do what remain open—leaving Microsoft and IBM in active competition with regard to AT&T.  Lima was personally involved in the signing of IBM's contracts with AT&T and ran the team responsible for the contract deliverables.  This

---

[5]    *See* Press Release, IBM, *IBM and AT&T Announce Multi-Year Strategic Alliance* (July 16, 2019), https://newsroom.ibm.com/2019-07-16-IBM-And-AT-T-Announce-Multi-Year-Strategic-Alliance.

[6]    *See* Press Release, Microsoft, *AT&T and Microsoft Announce a Strategic Alliance to Deliver Innovation with Cloud, AI and 5G* (July 17, 2019), https://news.microsoft.com/2019/07/17/att-and-microsoft-announce-a-strategic-alliance-to-deliver-innovation-with-cloud-ai-and-5g/.

[7]    *Id*. ("By working together on common efforts around 5G, the cloud, and AI, we will accelerate the speed of innovation and impact for our customers and our communities") (internal citations omitted); *IBM and AT&T Announce Multi-Year Strategic Alliance*, *supra* note 5 ("The two companies will also collaborate on edge computing platforms, which will help enterprise clients capitalize on the power of 5G network speeds and the internet-connected devices and sensors at the edge of the network"); Agam Shah, *IBM Lands AT&T as Client in Cloud Deal*, Wall St. J. (July 16, 2019), https://www.wsj.com/articles/ibm-lands-at-t-as-client-in-cloud-deal-11563317480 ("AT&T Business also will use IBM's artificial-intelligence applications for a range of services").

information would be very valuable to Microsoft to compete against IBM for AT&T business in Latin America, and globally.

33.     Lima has been involved in the development and business strategies for a new Cloud product that IBM is launching soon:  a financial services-ready Public Cloud.  This product, the first of its kind, was designed by IBM specifically for financial institutions with the goal of helping these institutions address their regulatory compliance obligations, as well as their security resiliency requirements,[8] while moving computing workloads to the Cloud.  The product will play an important role in IBM's strategy to compete against Microsoft and others in the Cloud computing market for business in the financial services sector.  Documents Lima received and reviewed in his recent work for IBM confirm that this sector is a priority in IBM's efforts to win business in the Cloud computing market against competitors like Microsoft.  Many confidential and competitively sensitive details about the function, operation, cost and marketing strategies of the offering have not yet been publically disclosed.  Lima was involved in regular updates regarding the progress and development of the offering and also had access to strategy and development documents relating to it.

34.     Lima's senior executive positions, and his participation in meetings and discussions where IBM's top leaders worldwide discussed IBM's technology and strategies to win business, has exposed him to confidential information about how IBM intends to integrate and deploy its recent acquisition of the software company Red Hat, Inc.  In the largest deal in IBM's history, IBM acquired Red Hat in July 2019, with the strategic aim of increasing IBM's

---

[8]     Financial institutions face a number of regulations and statutes they must comply with in handling client data.  IBM's financial services Public Cloud is designed to address these special requirements.

Cloud computing revenues and to help IBM in its competition for Cloud business against competitors like Microsoft.[9]

35.     Red Hat specializes in open-source software—meaning that the basic code is free—that enables customers to manage their data and run their applications both in their own IT environment and on Cloud platforms hosted by outside providers such as IBM.[10]  IBM has not disclosed many of the confidential details surrounding its future strategy for Red Hat, including how IBM will continue to develop and market Red Hat capabilities alongside IBM's offerings portfolio and design, market, and deliver combined Red Hat and IBM capabilities to customers, and how IBM will compete against Microsoft and others.  Lima knows confidential details about IBM's strategic plans for combined Red Hat-IBM offerings both generally and with respect to specific strategic customer accounts.  Lima's knowledge about how IBM will use Red Hat's capabilities to gain market share in Latin America would be invaluable to Microsoft.  It is imperative that this competitively sensitive, confidential information remains secret.

36.     Furthermore, over the course of his career at IBM, Lima developed significant relationships with IBM's clients, particularly Latin American clients, financial services clients and global clients doing business in Latin America, and he has continued to

---

[9]     *See* Press Release, IBM, *IBM Closes Landmark Acquisition of Red Hat for $34 Billion; Defines Open, Hybrid Cloud Future* (July 9, 2019), https://newsroom.ibm.com/2019-07-09-IBM-Closes-Landmark-Acquisition-of-Red-Hat-for-34-Billion-Defines-Open-Hybrid-Cloud-Future.

[10]    Angus Loten, *IBM Strengthens Hybrid Cloud with Red Hat Acquisition*, Wall St. J. (July 12, 2019), https://www.wsj.com/articles/ibm-strengthens-Hybrid-cloud-with-red-hat-acquisition-11562967857; *IBM Closes Landmark Acquisition of Red Hat for $34 Billion; Defines Open, Hybrid Cloud Future*, *supra* note 9 (reporting that the IBM-Red Hat proposition "will accelerate innovation by offering a next-generation Hybrid multicloud platform" allowing businesses to "securely deploy, run and manage data and applications . . . across Private clouds and multiple clouds from multiple vendors").

cultivate those relationships and work closely with those clients in his most recent Integrated Accounts role.

37.     Lima has worked with IBM's product development teams to expand IBM's market share for its products and services in Latin America.  He was involved in negotiating and closing major agreements with clients to provide IBM products and services, including deals for which IBM competed directly against Microsoft.  Lima also served until his resignation as IBM's primary relationship executive for several Latin and North American clients through IBM's "Partnership Executive Program."  Lima knows IBM's strategic and marketing plans, pricing, and confidential details about IBM's relationship with each of these clients, all of which would be highly relevant in his intended role to run and grow Microsoft's business in Latin America.

38.     Lima's knowledge of confidential information about IBM's products and services in development, and IBM's plans to win business from top clients in Latin America, particularly in Cloud—knowledge which he gained and expanded through his consecutive leadership positions at IBM—would be very valuable to Microsoft.  Across various business sectors, IBM and Microsoft routinely engage in head-to-head competition for clients, whose contracts are continually up for renewal and future negotiation, making Lima's knowledge about these deals and his deep relationships with these clients particularly valuable to Microsoft.  This competition is especially fierce in the Cloud computing sector, and in Latin America, where Lima's client connections are particularly strong.

**IBM-Microsoft Competition**

39.     IBM and Microsoft compete for the same business and government customers.  They market computer software and service offerings that compete directly against each other in many areas of IT, particularly in Cloud computing.  Recent industry reports

identify IBM and Microsoft as among the top competitors in Cloud computing,[11] and specifically

identify Latin America as a significant battleground for IBM and Microsoft in this sector.[12]

40. With only about 20% of the IT workload worldwide having been migrated

to the Cloud, 80% of the market remains up for grabs. Further intensifying the battle for Cloud

business, the vast majority of organizations do not simply choose one Cloud provider, but instead

run multiple Cloud programs. This means that although IBM may have one or more Cloud

computing contracts with a client, they are not guaranteed other Cloud computing contracts with

that same client. This is especially true given the recent rise in popularity of open source

software. Moreover, all deals, in the Cloud computing sector and otherwise, are subject to future

renewal and renegotiation—perpetually leaving open the possibility that Microsoft could poach a

current IBM contract.

41. Outside of Cloud computing, recent industry reports identify numerous

additional areas of competition between IBM and Microsoft. For example, IBM and Microsoft

are among the top competitors in Data Science and Machine Learning Platforms,[13] Cloud-AI

---

[11] *See, e.g.*, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (July 16, 2019) (listing IBM as a "niche player" and Microsoft as a "leader" among providers of Cloud infrastructure as a service); *see also* Statista, *Distribution of Cloud Computing Market Revenues Worldwide from 2015 to June 2019, by vendor* (last visited May 26, 2020), https://www.statista.com/statistics/540511/worldwide-cloud-computing-revenue-share-by-vendor/#statisticContainer (demonstrating that Microsoft and IBM were among the largest market share holders among Cloud computing vendors worldwide).

[12] *See, e.g.*, Alcides Leon, Cloud in LATAM: An Inside Look at Growth Drivers, Nearshore Americas (April 3, 2019), https://nearshoreamericas.com/cloud-market-latin-america-growth/;ICloud; *Computing Market in Latin America 2016-2020*, Business Wire, (Aug. 17, 2017), https://www.businesswire.com/news/home/20170801005756/en/Cloud-Computing-Market-Latin-America-2016-2020--.

[13] *See, e.g.*, Gartner, *Magic Quadrant for Data Science and Machine Learning Platforms* (Feb. 11, 2020) (listing IBM as a "challenger" and Microsoft as a "visionary" after evaluating vendors of data science and machine learning platforms).

Developer Services,[14] Insight Engines,[15] Access Management,[16] Enterprise Integration Platform Services,[17] Enterprise Agile Planning Tools,[18] Application Performance Monitoring,[19] Streaming Analytics,[20] Operational Database Management Systems,[21] Data Integration Tools,[22] Content Services Platforms,[23] Full Life Cycle Application Programming Interface Management,[24]

---

[14] *See, e.g.*, Gartner, *Magic Quadrant for Cloud AI Developer Services* (Feb. 24, 2020) (listing IBM and Microsoft as "leaders" in the Cloud-hosted AI services sector).

[15] *See, e.g.*, Gartner, *Magic Quadrant for Insight Engines* (Sept. 17, 2019) (listing IBM as a "leader" and Microsoft as a "niche player" in the insight engine space).

[16] *See, e.g.*, Gartner, *Magic Quadrant for Access Management, Worldwide* (Aug. 12, 2019) (listing IBM and Microsoft as "leaders" in the access management market).

[17] *See, e.g.*, Gartner, *Magic Quadrant for Enterprise Integration Platform as a Service* (April 23, 2019) (listing IBM as a "visionary" and Microsoft as a "leader" among EiPaaS providers).

[18] *See, e.g.*, Gartner, *Magic Quadrant for Enterprise Agile Planning Tools* (April 21, 2020) (listing IBM as a "niche player" and Microsoft as a "challenger" among vendors of EAP tools).

[19] *See, e.g.*, Gartner, *Magic Quadrant for Application Performance Monitoring* (April 22, 2020) (listing IBM as a "niche player" and Microsoft as a "challenger" in the APM market).

[20] *See, e.g.*, Forrester, *The Forrester Wave: Streaming Analytics Q3 2019* (Sept. 23, 2019) (including IBM and Microsoft in a list of 11 evaluated vendors in the streaming analytics sector).

[21] *See, e.g.*, Gartner, *Magic Quadrant for Operational Database Management Systems* (Nov. 25, 2019) (listing IBM as a "visionary" and Microsoft as a "leader" in the operational database management systems market).

[22] *See, e.g.*, Gartner, *Magic Quadrant for Data Integration Tools* (Aug. 1, 2019) (listing IBM as a "leader" and Microsoft as a "challenger" in the market for data integration tools).

[23] *See, e.g.*, Gartner, *Magic Quadrant for Content Services Platforms* (Oct. 30, 2019) (listing IBM and Microsoft as "leaders" in the content services platforms market).

[24] *See, e.g.*, Gartner, *Magic Quadrant for Full Life Cycle API Management* (Oct. 9, 2019) (listing IBM as a "leader" and Microsoft as a "Niche Player" among vendors in the full life cycle API management market).

Unified Endpoint Management Tools,[25] Analytics and Business Intelligence Platforms,[26] Application Release Orchestration Tools,[27] Multiexperience Development Platforms,[28] and Disaster Recovery.[29]

42.     Microsoft is listed in IBM's financial disclosures as a competitor to various IBM business segments.  More specifically, Microsoft is listed as a "broad based competitor" to IBM's Global Business Services, among its list of "principal competitors" in the Cloud and cognitive software market, and as a competitor to IBM's Global Technology Services and Systems businesses.[30]  Likewise, IBM is listed in Microsoft's financial disclosures as a competitor in server applications; server operating systems and applications; enterprise-wide computing systems; database, business intelligence, and data warehousing solutions; system management solutions; products for software developers; and Azure, Microsoft's Cloud computing offering.[31]

---

[25]   *See, e.g.*, Gartner, *Magic Quadrant for Unified Endpoint Management Tools* (Aug. 6, 2019) (listing IBM and Microsoft as "leaders" among unified endpoint management tool vendors).

[26]   *See, e.g.*, Gartner, *Magic Quadrant for Analytics and Business Intelligence Platforms* (Feb. 11, 2020) (listing IBM as a "niche player" and Microsoft as a "leader" in the analytics and business intelligence platform market).

[27]   *See, e.g.*, Gartner, *Magic Quadrant for Application Release Orchestration* (Oct. 7, 2019) (listing IBM as "niche player" and Microsoft as "challenger" in the market for application release orchestration tools).

[28]   *See, e.g.*, Gartner, *Magic Quadrant for Multiexperience Development Platforms* (July 10, 2019) (listing IBM as a "niche player" and Microsoft as a "challenger" in the multiexperience development platform market).

[29]   *See, e.g.*, Gartner, *Magic Quadrant for Disaster Recovery as a Service* (June 5, 2019) (listing IBM as a "visionary" and Microsoft as a "leader" in the disaster recovery as a service market).

[30]   International Business Machines Corp., Annual Report (Form 10-K) 7-8 (Feb. 25, 2020).

[31]   Microsoft Corp., Annual Report (Form 10-K) 7-9 (Aug. 1, 2019).

43.     Lima's own statements confirm that Microsoft was a top competitor for Lima in both his GTS role and in his Integrated Accounts role at IBM, stating that Microsoft competes for business in all of IBM's largest client accounts.

**Lima's Noncompetition Agreement with IBM**

44.     Precisely because of his exposure to trade secrets and highly confidential and commercially sensitive information, Lima was one of IBM's senior executives who the Company asked to sign a Noncompetition Agreement, to restrict the potential disclosure of trade secrets and confidential IBM information in the event that he left the Company.

45.     Lima executed his first Noncompetition Agreement with IBM on August 6, 2013.  When he returned to IBM in 2016, he executed another Noncompetition Agreement with IBM.  When he relocated to the United States, he executed his most recent Noncompetition Agreement with IBM on December 3, 2019.

46.     In the 2019 Noncompetition Agreement, Lima acknowledged and agreed that:

> during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . : (i) [he] will not directly or indirectly, within the Restricted Area, Engage in or Associate with (a) any Business Enterprise or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in [his] (1) intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which [he] had access by virtue of [his] job duties or other responsibilities with IBM or (2) exploiting customer goodwill cultivated in the course of [his] employment with IBM. . . and (ii) [he] will not directly or indirectly solicit, for competitive business purposes, any actual or prospective customer of the Company with which [he was] directly or indirectly involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM. (2019 Noncompetition Agreement § 1(e).)

18

47.     The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

(a)     "Restricted Area" is defined as "any geographic area in the world in which [he] worked or for which [he] had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of [his] employment with IBM."  (*Id*. § 2(f).)

(b)     "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor."  (*Id*. § 2(d).)

(c)     "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id*. § 2(a).)

(d)     "IBM Confidential Information" is defined as including, among other things, information about "the Company's selling, manufacturing, and servicing methods and business techniques, implementation strategies . . . vendor and product information, customer and prospective customer lists, other customer and prospective customer information, client data, global strategic plans, marketing plans, information about the Company's management techniques and management strategies . . . information regarding the development status of specific Company products, assessments of the global competitive landscape of the industries in which the Company competes . . . [and] financial status and plans."  (*Id.* § 2(e).)

48.     Thus, Lima agreed in the Noncompetition Agreement that, for a period of one year following the termination of his employment from IBM, he would not work for any competitor of IBM in any geographic area in the world for which he had job responsibilities in the last 12 months of his employment with IBM if such employment could result in the

intentional or unintentional use or disclosure of IBM Confidential Information to which he was exposed in his IBM employment.

49.  Additionally, in the Noncompetition Agreement, Lima agreed and acknowledged that:

(a)  "the business in which IBM and its affiliates . . . are engaged is intensely competitive" (*Id.* § 1(b));

(b)  his "employment by IBM . . . require[d] that [he] have access to, and knowledge of, IBM Confidential Information" (*Id.*);

(c)  "the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*Id.* § 3.); and

(d)  "the restrictions set forth in [the noncompetition and the nonsolicitation covenants] are reasonable as to geography, scope, and duration." (*Id.*)

**Lima Violates the Noncompetition Agreement
by Accepting Employment with Microsoft
As Corporate Vice President, Latin America**

50.  Notwithstanding the covenants in his Noncompetition Agreement, Lima informed IBM on May 18, 2020 that he intended to accept an offer to join Microsoft as Corporate Vice President, Latin America.  Lima's last day at IBM was May 20, 2020.

51.  In response, IBM raised concerns, both with Lima's legal counsel and Microsoft's legal counsel, regarding the Noncompetition Agreement Lima entered into with IBM and his confidentiality obligations to the Company.  As a result of discussions among counsel for IBM, counsel for Microsoft, and counsel for Lima, Microsoft agreed that it would not permit Lima to commence employment with Microsoft prior to June 19, 2020.

52.  Counsel for Microsoft informed IBM that as the Corporate Vice President, Latin America, Lima will be responsible for setting the direction for the region's product and

services portfolio in alignment with global strategy, including responsibility for Microsoft's

overall revenues and profits in Latin America. Lima will work with Microsoft's industry sector

leaders and regional managers to maintain various targets, such as budget and headcounts, and

ensure that Microsoft's Latin America business is aligned with Microsoft's global business.

Lima would also be responsible for the overall strategy and direction for the subsidiary

Countries, Commercial Partner, Customer Success, Marketing & Operations, Enterprise

Commercial and Public Sector organizations. The Corporate Vice President has Latin America-

wide governance and reporting responsibility, meaning Lima would be the ultimate supervisor

for all of Microsoft's executives in the region. He will also act as an ambassador for Microsoft

in Latin America, focused on corporate citizenship and building brand equity.

      53.    As Microsoft's Corporate Vice President for Latin America, Lima will

report to the Executive Vice President of Global Sales, Marketing, and Operations, Jean-Philippe

Courtois. Lima's direct reports will include Country and Multi-Country General Managers as

well as the Sales, Marketing and Operations Vice President.

      54.    Just as they were vital to his role at IBM, the IBM confidential

information and competitive business secrets Lima knows by virtue of his responsibilities in each

of his recent roles—as IBM General Manager, Latin America; GTS Manager, North America;

General Manager, Integrated Accounts; and a member of the Performance Team and

Acceleration Team—will all be highly relevant and valuable to these Microsoft strategy,

planning and decision-making responsibilities.

      55.    Lima poses a particularly competitive threat to IBM, not merely because

he knows the Company's trade secrets, but because he has developed relationships with

significant IBM customers and potential customers at IBM's expense and on the strength of

IBM's goodwill, products, and services. Throughout his tenure at IBM, Lima has had significant exposure to Latin American clients and IBM's confidential Latin American business strategy.

56. The job that Lima intends to take at Microsoft is thus in direct competition with the role and responsibilities that he was performing at IBM. Lima has had significant exposure to IBM's most important clients, product development, and business strategy in the Latin America region, including in the highly competitive Cloud computing market.

57. Now, Lima intends to move to a strategic Latin America role at one of IBM's top competitors, Microsoft. His proposed role at Microsoft would involve him in the development of competitive strategies, and the cultivation and expansion of client relationships, directly in competition with IBM. Lima's in-depth knowledge of IBM's important clients in Latin America, as well as its confidential business strategies and plans, would provide a distinct and unfair competitive advantage to Microsoft.

**IBM's Right to Rescind Long-Term Incentive
Awards It Provided to Lima**

58. As recently as June 1, 2019, Lima accepted awards of IBM stock options, Restricted Stock Units, and Performance Share Stock Units under IBM's 1999 Long-Term Performance Plan, as amended through August 1, 2007 ("LTPP"). (The LTPP Prospectus is attached hereto as **Exhibit B**.) Lima's equity awards also were governed by a document titled "Terms and Conditions of Your Equity Award: Effective June 1, 2019" (the "Terms and Conditions") (attached hereto as **Exhibit C**).

59. The equity awards that Lima received under the LTPP were in addition to, and not part of, the salary he received for his work at IBM.

60. Under the LTPP, equity awards are subject to cancellation and rescission in certain circumstances, and any exercise, payment or delivery pursuant to a rescinded award is

subject to repayment.  In particular, the awards may be canceled and rescinded if the participant

engages in "Detrimental Activity," as defined in the Plan.

61.     Detrimental Activity consists of eight categories of conduct, including,

among others:

> (a)     the rendering of services for any organization or engaging directly
> or indirectly in any business which is or becomes competitive with
> the Company; [and]

> (b)     any other conduct or act determined to be injurious, detrimental or
> prejudicial to any interest of the Company.

62.     Lima's plan to work for Microsoft constitutes Detrimental Activity under

the LTPP, triggering IBM's right to rescind and recover awards granted to him in the prior 12

months.

63.      Lima had the choice each year whether to accept his equity awards.

Upon acceptance of the awards in June 2019, he agreed that he understood that "IBM may

cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in

accordance with the terms of the Plan, including, without limitation, canceling or rescinding this

Award if [he] render[s] services for a competitor prior to, or during the Rescission Period.  [He]

understand[s] that the Rescission Period that has been established is 12 months."  (A copy of

Lima's "Long-Term Incentive Award Acceptance Information" is attached hereto as **Exhibit D**.)

64.     In the Terms and Conditions to the LTPP, Lima acknowledged and agreed

that if he were to violate the prohibition on direct or indirect solicitation of IBM customers, "the

Company would suffer irreparable harm" and that "the Company will be entitled to any

appropriate relief including money damages, equitable relief and attorneys' fees."  (**Exhibit C** p.

8.)

65.     The Terms and Conditions also require Lima to pay "all costs and expenses incurred by the Company" in a successful action to enforce the terms of the LTPP, "including reasonable attorneys' fees." (*Id.* p. 6.)

66.     The stock options that Lima exercised and Restricted Stock Units that were released to him in the 12 months prior to his resignation and announcement of his intent to join Microsoft total approximately $1,285,417.

## COUNT I — Breach of Noncompetition Agreement

67.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 66 above.

68.     The Noncompetition Agreement is an enforceable agreement that imposes upon Lima contractual obligations.

69.     IBM has complied with all material terms of this agreement.

70.     Lima has breached the terms of this agreement by, among other things, accepting a position as Corporate Vice President, Latin America of Microsoft without waiting for expiration of the one-year non-compete period to which he expressly agreed.

71.     As Lima agreed in the Noncompetition Agreement, if he is not enjoined from working at Microsoft as Corporate Vice President, Latin America until May 20, 2021, and thereby violating his Noncompetition Agreement, IBM will be irreparably injured.

72.     In view of the similarity of Lima's current and prior positions at IBM to his proposed role at Microsoft, he will inevitably (if inadvertently) make use of and/or disclose IBM trade secrets and other confidential and proprietary IBM information in performing his proposed role at Microsoft.

73. IBM will also be harmed if Lima violates the nonsolicitation covenants in the Noncompetition Agreement.

74. In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury. IBM is also entitled to recover money damages to the extent that Lima is not enjoined from violating his agreement.

### COUNT II — Misappropriation of Trade Secrets

75. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 74 above.

76. IBM possesses certain trade secrets and confidential information with which Lima is familiar, and which Lima has a common law duty not to disclose outside of IBM.

77. The Noncompetition Agreement is an enforceable agreement that imposes upon Lima contractual obligations, including the obligations of nondisclosure with respect to IBM's confidential information.

78. If he is permitted to work for Microsoft, Lima will inevitably (if inadvertently) use and/or disclose IBM trade secrets for his own benefit and for the benefit of Microsoft.

79. As an unavoidable result of Lima's impending misappropriation of IBM trade secrets in violation of his common law and contractual duties, IBM will be damaged.

### COUNT III — Declaratory Judgment: Rescission of Equity Award

80. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 79 above.

81. By accepting employment at Microsoft in competition against IBM, Lima has engaged in "Detrimental Activity" under the LTPP agreement, triggering IBM's right to rescind and demand repayment of equity awards granted to him in the prior 12 months.

82.     The LTPP agreement is an enforceable agreement, and IBM has performed all of its material obligations under the agreement.

83.     IBM has informed Lima of this claim.  Lima has refused and, on information and belief, will continue to refuse to return and repay his equity awards, as required by the LTPP agreement.

84.     IBM does not have an adequate, alternative remedy in another form of action.

85.     Accordingly, IBM is entitled to a declaratory judgment confirming its right to rescind and demand repayment of Lima's equity awards.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff IBM demands judgment seeking relief against defendant Rodrigo Lima as follows:

(a)     A preliminary injunction and permanent injunction ordering Lima to refrain from:  (i) breaching the terms of his Noncompetition Agreement with IBM or the Terms and Conditions of the equity awards he accepted from IBM; (ii) commencing his employment with Microsoft as Corporate Vice President, Latin America or in any similar capacity until May 20, 2021; (iii) directly or indirectly soliciting, for competitive business purposes, any IBM customer with which Lima was directly or indirectly involved as part of his job responsibilities during the last 12 months of his employment with IBM prior to May 20, 2021; or (iv) directly or indirectly hiring, soliciting, making an offer to, or attempting or participating or assisting in any effort to hire, solicit, or make an offer to any IBM employee to be employed or to perform services outside of the Company prior to May 20, 2022;

(b)     Declaring that IBM is entitled to rescind and demand repayment of the equity awards granted to Lima in the 12 months prior to his accepting employment with Microsoft;

(c)     Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action;

Case 7:20-cv-04573-PED   Document 1   Filed 06/15/20   Page 27 of 27

    (d)    Awarding IBM monetary damages in an amount sufficient to compensate the Company for Lima's breaches of contract, together with rescission of any LTPP awards Lima has received from IBM within the last 12 months, and any other compensation or benefits that IBM is entitled to rescind or recoup; and

    (e)    Awarding IBM such further relief as the Court deems just and proper.

Dated:  New York, New York
        June 15, 2020

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
    Robert A. Atkins
    Liza Velazquez
    Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com
lvelazquez@paulweiss.com
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*

# EXHIBIT A



## NONCOMPETITION AGREEMENT

In recognition of your critical role as a senior executive with International Business Machines Corporation ("IBM") and in recognition of your access to IBM Confidential Information and/or IBM customer goodwill by virtue of your position, and/or your membership on the Acceleration Team, and/or your appointment as an IBM Fellow, and/or as mutually agreed upon consideration for your promotion or hiring as a senior executive, including your eligibility for awards to be granted to you under an IBM Long-Term Performance Plan (which constitutes independent consideration for Paragraph 1(e) herein), and/or for other good and valuable consideration, you ("Employee" or "you") agree to the terms and conditions herein of this Noncompetition Agreement (the "Agreement"). Capitalized terms not otherwise defined shall have the meaning ascribed to them in Paragraph 2.

1. **Covenants.**

You acknowledge and agree that:

a) the compensation that you will receive in connection with this Agreement, including any equity awards, cash and other compensation, your position as a senior executive, and/or your appointment to or continued membership on the Acceleration Team or any successor team or group ("AT"), if applicable, and/or your appointment as an IBM Fellow, if applicable, is consideration for your work at IBM, your agreement to the terms and conditions of this Agreement, and your compliance with the post-employment restrictive covenants included in this Agreement.

b) (i) the business in which IBM and its affiliates (collectively, the "Company") are engaged is intensely competitive and your employment by IBM and/or your membership on the AT, if applicable, and/or your role as an IBM Fellow, if applicable, requires that you have access to, and knowledge of, IBM Confidential Information, including IBM Confidential Information that pertains not only to your business or unit, but also to the Company's global operations; (ii) you are given access to, and develop relationships with, customers of the Company at the time and expense of the Company; and (iii) by your training, experience and expertise, your services to the Company are, and will continue to be, extraordinary, special and unique.

c)       (i) the disclosure of IBM Confidential Information would place the Company at a serious competitive disadvantage and would do serious damage, financial and otherwise, to the business of the Company; and (ii) you will keep in strict confidence, and will not, directly or indirectly, at any time during or after your employment with IBM, disclose, furnish, disseminate, make available or use, except in the course of performing your duties of employment with IBM, any IBM Confidential Information or any other trade secrets or confidential business and technical information of the Company's customers or vendors, without limitation as to when or how you may have acquired such information.

d)       IBM Confidential Information, whether reduced to writing, maintained on any form of electronic media, or maintained in your mind or memory and whether compiled by the Company and/or you, is owned by the Company, and (i) IBM Confidential Information includes, but is not limited to, information that derives independent economic value from not being generally known to or readily ascertainable through proper means by others who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain the secrecy of such information; (ii) IBM Confidential Information includes, but is not limited to, information that constitutes a trade secret of the Company; and (iii) the retention and/or use of such IBM Confidential Information by you during or after your employment with IBM (except in the course of performing your duties and obligations to the Company) shall constitute a misappropriation of the Company's trade secrets.

e)       during your employment with IBM and for twelve (12) months following the termination of your employment either by you or by IBM: (i) you will not directly or indirectly, within the Restricted Area, Engage in or Associate with (a) any Business Enterprise or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in you (1) intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which you had access by virtue of your job duties or other responsibilities with IBM or (2) exploiting customer goodwill cultivated in the course of your employment with IBM; however, in the event that your employment with IBM is terminated by IBM as a direct result of a resource action or similar restructuring action and not for Cause, the post-employment restriction in this clause will not apply; and (ii) you will not directly or indirectly solicit, for competitive business purposes, any actual or prospective

2

customer of the Company with which you were directly or indirectly involved as part of your job responsibilities during the last twelve (12) months of your employment with IBM.

f) during your employment with IBM and for two (2) years following the termination of your employment either by you or by IBM for any reason, you will not directly or indirectly, within the Restricted Area, hire, solicit or make an offer to, or attempt to or participate or assist in any effort to hire, solicit, or make an offer to, any Employee of the Company to be employed or to perform services outside of the Company.

## 2. **Definitions.**

The following terms have the meanings provided below.

a) "Business Enterprise" means any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which you worked at any time during the three (3) year period prior to the termination of your employment.

b) "Cause" means, as reasonably determined by IBM, the occurrence of any of the following: (i) embezzlement, misappropriation of corporate funds or other material acts of dishonesty; (ii) commission or conviction of any felony or of any misdemeanor involving moral turpitude, or entry of a plea of guilty or nolo contendere to any felony or misdemeanor (other than a minor traffic violation or other minor infraction); (iii) engagement in any activity that you know or should know could harm the business or reputation of the Company; (iv) failure to adhere to the Company's corporate codes, policies or procedures; (v) a breach of any covenant in any employment agreement or any intellectual property agreement, or a breach of any other provision of your employment agreement, in either case if the breach is not cured to the Company's satisfaction within a reasonable period after you are provided with notice of the breach (no notice and cure period is required if the breach cannot be cured), provided, however, that the mere failure to achieve performance objectives shall not constitute Cause; (vi) failure by you to perform your duties or follow management direction, which failure is not cured to the Company's satisfaction within a reasonable period of time after a written demand for substantial performance is delivered to you (no notice or cure period is required if the failure to perform cannot be cured); (vii) violation of any statutory, contractual or common law duty or obligation to the Company, including, without limitation, the duty of loyalty; (viii) rendering of services for

3

any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company; or (ix) acceptance of an offer to Engage in or Associate with any business which is or becomes competitive with the Company.

c)      "Employee of the Company" means any employee of the Company who worked within the Restricted Area at any time in the twelve (12) month period immediately preceding any actual or attempted hiring, solicitation or making of an offer.

d)      "Engage in or Associate with" includes, without limitation, engagement or association as a sole proprietor, owner, employer, director, partner, principal, joint venturer, associate, employee, member, consultant, or contractor.  The phrase also includes engagement or association as a shareholder or investor during the course of your employment with IBM, and includes beneficial ownership of five percent (5%) or more of any class of outstanding stock of a Business Enterprise or competitor of the Company following the termination of your employment with IBM.

e)      "IBM Confidential Information" is any information of a confidential or secret nature that is disclosed to you, or created or learned by you that relates to the business of the Company, including trade secrets.  Examples of IBM Confidential Information include, but are not limited to:  the Company's formulae, patterns, compilations, programs, devices, methods, techniques, software, tools, systems, and processes, the Company's selling, manufacturing, and servicing methods and business techniques, implementation strategies, and information about any of the foregoing, the Company's training, service, and business manuals, promotional materials, training courses, and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, client data, global strategic plans, marketing plans, information about the Company's management techniques and management strategies, information regarding long-term business opportunities, information regarding the development status of specific Company products, assessments of the global competitive landscape of the industries in which the Company competes, plans for acquisition or disposition of products or companies or business

units, expansion plans, financial status and plans, compensation information, and personnel information.

f)      "Restricted Area" means any geographic area in the world in which you worked or for which you had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of your employment with IBM.  You acknowledge that IBM is a global company and that the responsibilities of certain IBM employees, including, without limitation, AT members, are global in scope.

3.      **Acknowledgements.**

You acknowledge that a mere agreement not to disclose, use, or rely on IBM Confidential Information after your employment by IBM ends would be inadequate, standing alone, to protect IBM's legitimate business interests.  You acknowledge that disclosure of, use of, or reliance on IBM Confidential Information, whether or not intentional, is often difficult or impossible for the Company to detect until it is too late to obtain any effective remedy.  You acknowledge that the Company will suffer irreparable harm if you fail to comply with Paragraph 1 or otherwise improperly disclose, use, or rely on IBM Confidential Information.  You acknowledge that the restrictions set forth in Paragraph 1 are reasonable as to geography, scope and duration.   You acknowledge that you have the right to consult with counsel prior to signing this Agreement.

4.      **Injunctive Relief.**

You agree that the Company would suffer irreparable harm if you were to breach, or threaten to breach, any provision of this Agreement and that the Company would by reason of such breach, or threatened breach, be entitled to injunctive relief in a court of appropriate jurisdiction, without the need to post any bond, and you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching, or further breaching, this Agreement.  This Paragraph shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief.

5.      **Severability.**

In the event that any one or more of the provisions of this Agreement shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall

not in any way be affected or impaired thereby. Moreover, if any one or more of the provisions contained in this Agreement shall be held to be excessively broad as to duration, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law. Furthermore, a determination in any jurisdiction that this Agreement, in whole or in part, is invalid or unenforceable shall not in any way affect or impair the validity or enforceability of this Agreement in any other jurisdiction.

### 6. Headings.

The headings in this Agreement are inserted for convenience and reference only and shall in no way affect, define, limit, or describe the scope, intent or construction of any provision hereof.

### 7. Waiver.

The failure of IBM to enforce any terms, provisions or covenants of this Agreement shall not be construed as a waiver of the same or of the right of IBM to enforce the same. Waiver by IBM of any breach or default by you (or by any other employee or former employee of IBM) of any term or provision of this Agreement (or any similar agreement between IBM and you or any other employee or former employee of IBM) shall not operate as a waiver of any other breach or default.

### 8. Successors and Assigns.

This Agreement shall inure to the benefit of and be binding upon IBM, any successor or organization which shall succeed to IBM by acquisition, merger, consolidation or operation of law, or by acquisition of assets of IBM and any assigns. You may not assign your obligations under this Agreement.

### 9. Disclosure of Existence of Covenants.

You agree that while employed by IBM and for two (2) years thereafter, you will communicate the contents of this Agreement to any person, firm, association, partnership, corporation or other entity which you intend to be employed by, associated with or represent, prior to or at the time of accepting such employment, association or representation.

10.     **Notice to IBM of Prospective Position.**

You agree that if, at any time during your employment or within twelve (12) months following the termination of your employment with IBM, you are offered and intend to accept a position with any person, firm, association, partnership, corporation or other entity other than the Company, you will provide the Senior Vice President of Human Resources for IBM Corporation with two (2) week written notice prior to accepting any such position.  This two (2) week written notice is separate from any other notice obligations you may have under agreements with IBM.  If for any reason you cannot, despite using your best efforts, provide the two (2) week written notice prior to accepting any such position, you agree that you will provide two (2) week written notice prior to commencing that new position.  You acknowledge and agree that a two (2) week written notice period is appropriate and necessary to permit IBM to determine whether, in its view, your proposed new position could lead to a violation of this Agreement, and you agree that you will provide IBM with such information as IBM may request to allow IBM to complete its assessment (except that you need not provide any information that would constitute confidential or trade secret information of any entity other than the Company).  During the notice period required by this Paragraph, IBM may choose, in its sole discretion, to limit your duties in your position with IBM and to restrict your access to IBM's premises, systems, products, information, and employees.  IBM is committed to protect its trade secrets and other confidential and proprietary information, and will take all necessary and appropriate steps to do so.  Upon giving notice, you agree to cooperate with IBM in good faith to ensure that its trade secrets and other confidential and proprietary information are not disclosed, either intentionally or inadvertently.

11.     **No Oral Modification.**

This Agreement may not be changed orally, but may be changed only in a writing signed by the Employee and a duly authorized representative of IBM.

12.     **Entire Agreement.**

Although this Agreement sets forth the entire understanding between the Employee and IBM concerning the restrictive covenants herein, this Agreement does not impair, diminish, restrict or waive any other restrictive covenant, nondisclosure obligation or confidentiality obligation of the Employee to the Company under any other agreement, policy,

plan or program of the Company.  Nothing herein affects your rights, immunities, or obligations under any federal, state or local law, including under the Defend Trade Secrets Act of 2016, as described in the Company's Business Conduct Guidelines, or prohibits you from reporting possible violations of law or regulation to a government agency, as protected by law.  The Employee and IBM represent that, in executing this Agreement, the Employee and IBM have not relied upon any representations or statements made, other than those set forth herein, with regard to the subject matter, basis or effect of this Agreement.

**13.**  **Governing Law and Choice of Forum.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules.  The parties agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the state and federal courts sitting in New York County or Westchester County, New York.  The parties agree to the personal jurisdiction thereof, and irrevocably waive any objection to the venue of such action, including any objection that the action has been brought in an inconvenient forum.  Notwithstanding this Paragraph, (a) if you are, and have been for at least 30 (thirty) days immediately preceding, a resident of or an employee in Massachusetts at the time of the termination of your employment with IBM, the law of Massachusetts shall apply to this Agreement, and (b) if you reside in Massachusetts, and have resided for at least 30 (thirty) days immediately preceding, at the time of the termination of your employment with IBM, any action or proceeding with respect to this Agreement may be brought in the county where you reside.

RODRIGO KEDE DE FREITAS LIMA

INTERNATIONAL BUSINESS MACHINES CORPORATION

By: _Rodrigo Kede de Freitas Lima_
(Employee Signature)

By: _Diane Gherson_
Diane J. Gherson
Senior Vice President, Human Resources

_3A1184_          _12/03/2019_
Employee Serial No.      Date

# EXHIBIT B

## PROSPECTUS

### International Business Machines Corporation

### 1999 Long-Term Performance Plan

118,671,300 shares

Capital Stock, $.20 Par Value

**THE SECURITIES AND EXCHANGE COMMISSION AND STATE SECURITIES
REGULATORS HAVE NOT APPROVED OR DISAPPROVED THESE SECURITIES,
OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

This document constitutes part of a prospectus covering securities that have been registered
under the Securities Act of 1933.

============
March 15, 2000, as amended through August 1, 2007
============

## GENERAL INFORMATION ABOUT THE PLAN

For detailed information regarding the 1999 Long-Term Performance Plan, reference is made to the terms of the Plan itself, which is included in this Prospectus in its entirety.  The Plan was approved by the Company's stockholders at the Company's 1999 Annual Meeting on April 27, 1999.  All share references in the Plan have been adjusted to reflect a two-for-one stock split as of May 10, 1999.  Terms used herein without definition shall have the definitions set forth in the Plan.  IBM has also filed a registration statement with the SEC (SEC File 333-30424) registering the shares of IBM common stock to be offered under the Plan.

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus.

Administration

The Plan is administered by a Committee designated by the IBM Board of Directors, currently the Executive Compensation and Management Resources Committee. This Committee is composed entirely of outside directors, who are elected to hold office until the next Annual Meeting of Stockholders and until their successors shall have qualified. The Plan is not subject to the Employee Retirement Income Security Act of 1974 and is not qualified under Section 401(a) of the Code. Additional information about the Plan and its administration may be obtained from the Vice President, Compensation & Benefits, IBM Corporation, New Orchard Road, Armonk, New York 10504, (914) 499-4148.

WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document we file at the SEC's public reference rooms in Washington, D.C. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public at the SEC's web site at (http://www.sec.gov).

The SEC allows us to "incorporate by reference" into this prospectus the information we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus, and later information that we file with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until our offering is completed:

 i.  Annual Report on Form 10-K for the year ended December 31, 2006;

ii. Quarterly Reports on Form 10-Q, filed on April 24, 2007 and July 31, 2007; and

iii. Current Reports on Form 8-K, filed on January 18, 2007, January 19, 2007, January 25, 2007, January 31, 2007, February 5, 2007, March 21, 2007, April 17, 2007, April 18, 2007, April 24, 2007, April 27, 2007, May 29, 2007, June 4, 2007, June 26, 2007, July 18, 2007 July 19, 2007, and August 1, 2007.

You may request a copy of these filings at no cost, by writing to or telephoning our transfer agent at the following address:

Computershare Trust Company, N.A.
P.O. Box 43072
Providence, Rhode Island 02940
(781) 575-2727

===================================================================

3

IBM 1999 Long-Term Performance Plan

1. Objectives.

The IBM 1999 Long-Term Performance Plan (the "Plan") is designed to attract, motivate and
retain selected employees of, and other individuals providing services to, the Company. These
objectives are accomplished by making long-term incentive and other awards under the Plan,
thereby providing Participants with a proprietary interest in the growth and performance of the
Company.

2. Definitions.

(a) "Awards"—The grant of any form of stock option, stock appreciation right, stock or cash
award, whether granted singly, in combination or in tandem, to a Participant pursuant to such
terms, conditions, performance requirements, limitations and restrictions as the Committee may
establish in order to fulfill the objectives of the Plan.

(b) "Award Agreement"—An agreement between the Company and a Participant that sets forth
the terms, conditions, performance requirements, limitations and restrictions applicable to an
Award.

(c) "Board"—The Board of Directors of International Business Machines Corporation ("IBM").

(d) "Capital Stock" or "stock"—Authorized and issued or unissued Capital Stock of IBM, at
such par value as may be established from time to time.

(e) "Code"—The Internal Revenue Code of 1986, as amended from time to time.

(f) "Committee"—The committee designated by the Board to administer the Plan.

(g) "Company"—IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries
and partnerships and other business ventures in which IBM has an equity interest.

(h) "Fair Market Value"—The average of the high and low prices of Capital Stock on the New
York Stock Exchange for the date in question, provided that, if no sales of Capital Stock were
made on said exchange on that date, the average of the high and low prices of Capital Stock as
reported for the most recent preceding day on which sales of Capital Stock were made on said
exchange.

(i) "Participant"—An individual to whom an Award has been made under the Plan. Awards may
be made to any employee of, or any other individual providing services to, the Company.
However, incentive stock options may be granted only to individuals who are employed by IBM
or by a subsidiary corporation (within the meaning of section 424(f) of the Code) of IBM,
including a subsidiary that becomes such after the adoption of the Plan.

(j) "Performance Period"—A multi-year period of no more than five consecutive calendar years over which one or more of the performance criteria listed in Section 6 shall be measured pursuant to the grant of Long-Term Performance Incentive Awards (whether such Awards take the form of stock, stock units or equivalents or cash). Performance Periods may overlap one another, but no two Performance Periods may consist solely of the same calendar years.

3. Capital Stock Available for Awards.

The number of shares that may be issued under the Plan for Awards granted wholly or partly in stock during the term of the Plan is 118,671,300. In addition, any shares previously authorized by stockholders for awards under prior Company long-term performance plans which are still available for issuance or which either wholly or in part were not earned or that expired or were forfeited, terminated, canceled, settled in cash, payable solely in cash or exchanged for other awards shall be available for issuance under the Plan. Shares of Capital Stock may be made available from the authorized but unissued shares of the Company or from shares held in the Company's treasury and not reserved for some other purpose. For purposes of determining the number of shares of Capital Stock issued under the Plan, no shares shall be deemed issued until they are actually delivered to a Participant, or such other person in accordance with Section 10. Shares covered by Awards that either wholly or in part are not earned, or that expire or are forfeited, terminated, canceled, settled in cash, payable solely in cash or exchanged for other awards, shall be available for future issuance under Awards. Further, shares tendered to or withheld by the Company in connection with the exercise of stock options, or the payment of tax withholding on any Award, shall also be available for future issuance under Awards.

4. Administration.

The Plan shall be administered by the Committee, which shall have full power to select Participants, to interpret the Plan, to grant waivers of Award restrictions, to continue, accelerate or suspend exercisability, vesting or payment of an Award and to adopt such rules, regulations and guidelines for carrying out the Plan as it may deem necessary or proper. These powers include, but are not limited to, the adoption of modifications, amendments, procedures, subplans and the like as necessary to comply with provisions of the laws and regulations of the countries in which the Company operates in order to assure the viability of Awards granted under the Plan and to enable Participants regardless of where employed to receive advantages and benefits under the Plan and such laws and regulations.

5. Delegation of Authority.

The Committee may delegate to officers of the Company its duties, power and authority under the Plan pursuant to such conditions or limitations as the Committee may establish, except that only the Committee or the Board may select, and grant Awards to, Participants who are subject to Section 16 of the Securities Exchange Act of 1934.

6. Awards.

The Committee shall determine the type or types of Award(s) to be made to each Participant and shall set forth in the related Award Agreement the terms, conditions, performance requirements, and limitations applicable to each Award. Awards may include but are not limited to those listed in this Section 6. Awards may be granted singly, in combination or in tandem. Awards may also be made in combination or in tandem with, in replacement or payment of, or as alternatives to, grants, rights or compensation earned under any other plan of the Company, including the plan of any acquired entity. During any five-year period, no Participant may receive, under the Plan, stock options or stock appreciation rights with respect to an aggregate of more than 10,000,000 shares. With regard to any "covered employee" (as defined by section 162(m) of the Code), the maximum number of shares of Capital Stock or share equivalents of Capital Stock (stock units) that can be earned by any Participant for any Performance Period is 400,000 shares, subject to adjustment for changes in corporate capitalization, such as a stock split, and if an Award is denominated in cash rather than in shares of Capital Stock or stock units, the share equivalent for purposes of the maximum will be determined by dividing the highest amount that the Award could be under the formula for such Performance Period by the closing price of a share of Capital Stock on the first trading day of the Performance Period.

(a) Stock Option—A grant of a right to purchase a specified number of shares of Capital Stock the exercise price of which shall be not less than 100% of Fair Market Value on the date of grant of such right, as determined by the Committee, provided that, in the case of a stock option granted retroactively in tandem with or as substitution for another award granted under any plan of the Company, the exercise price may be the same as the purchase or designated price of such other award. A stock option may be in the form of an incentive stock option ("ISO") which, in addition to being subject to applicable terms, conditions and limitations established by the Committee, complies with section 422 of the Code. The number of shares of stock that shall be available for issuance under ISOs granted under the Plan is limited to twenty million.

(b) Stock Appreciation Right—A right to receive a payment, in cash and/or Capital Stock, equal in value to the excess of the Fair Market Value of a specified number of shares of Capital Stock on the date the stock appreciation right (SAR) is exercised over the grant price of the SAR, which shall not be less than 100% of the Fair Market Value on the date of grant of such SAR, as determined by the Committee, provided that, in the case of a SAR granted retroactively in tandem with or as substitution for another award granted under any plan of the Company, the grant price may be the same as the exercise or designated price of such other award.

(c) Stock Award—An Award made in stock and denominated in units of stock. All or part of any stock award may be subject to conditions established by the Committee, and set forth in the Award Agreement, which may include, but are not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates, and other comparable measurements of Company performance. An Award made in stock or denominated in units of stock that is subject to restrictions on transfer and/or forfeiture provisions may be referred to as an Award of "Restricted Stock," "Restricted Stock Units" or "Long-Term Performance Incentive" units.

(d) Cash Award—An Award denominated in cash with the eventual payment amount subject to future service and such other restrictions and conditions as may be established by the Committee, and as set forth in the Award Agreement, including, but not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates, and other comparable measurements of Company performance.

(e) Performance Criteria under section 162(m) of the Code for Long-Term Performance Incentive Awards—The performance criteria for Long-Term Performance Incentive Awards (whether such Awards take the form of stock, stock units or equivalents or cash) made to any "covered employee" (as defined by section 162(m) of the Code) shall consist of objective tests based on one or more of the following: earnings, cash flow, customer satisfaction, revenues, financial return ratios, market performance, shareholder return and/or value, operating profits (including EBITDA), net profits, earnings per share, profit returns and margins, stock price and working capital. Performance criteria may be measured solely on a corporate, subsidiary or business unit basis, or a combination thereof. Further, performance criteria may reflect absolute entity performance or a relative comparison of entity performance to the performance of a peer group of entities or other external measure of the selected performance criteria. The formula for any Award may include or exclude items to measure specific objectives, such as losses from discontinued operations, extraordinary gains or losses, the cumulative effect of accounting changes, acquisitions or divestitures, foreign exchange impacts and any unusual, nonrecurring gain or loss. Nothing herein shall preclude the Committee from making any payments or granting any Awards whether or not such payments or Awards qualify for tax deductibility under section 162(m) of the Code.

7. Payment of Awards.

Payment of Awards may be made in the form of cash, stock or combinations thereof and may include such restrictions as the Committee shall determine. Further, with Committee approval, payments may be deferred, either in the form of installments or as a future lump-sum payment, in accordance with such procedures as may be established from time to time by the Committee. Any deferred payment, whether elected by the Participant or specified by the Award Agreement or the Committee, may require the payment to be forfeited in accordance with the provisions of Section 13. Dividends or dividend equivalent rights may be extended to and made part of any Award denominated in stock or units of stock, subject to such terms, conditions and restrictions as the Committee may establish. The Committee may also establish rules and procedures for the crediting of interest on deferred cash payments and dividend equivalents for deferred payments denominated in stock or units of stock. At the discretion of the Committee, a Participant may be offered an election to substitute an Award for another Award or Awards of the same or different type.

8. Stock Option Exercise.

The price at which shares of Capital Stock may be purchased under a stock option shall be paid in full in cash at the time of the exercise or, if permitted by the Committee, by means of tendering Capital Stock or surrendering another Award or any combination thereof.
The Committee shall determine acceptable methods of tendering Capital Stock or other Awards and may impose such conditions on the use of Capital Stock or other Awards to exercise a stock option as it deems appropriate.

9. Tax Withholding.

Prior to the payment or settlement of any Award, the Participant must pay, or make arrangements acceptable to the Company for the payment of, any and all federal, state and local tax withholding that in the opinion of the Company is required by law. The Company shall have the right to deduct applicable taxes from any Award payment and withhold, at the time of delivery or vesting of shares under the Plan, an appropriate number of shares for payment of taxes required by law or to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for withholding of such taxes.

10. Transferability.

No Award shall be transferable or assignable, or payable to or exercisable by, anyone other than the Participant to whom it was granted, except (i) by law, will or the laws of descent and distribution, (ii) as a result of the disability of a Participant or (iii) that the Committee (in the form of an Award Agreement or otherwise) may permit transfers of Awards by gift or otherwise to a member of a Participant's immediate family and/or trusts whose beneficiaries are members of the Participant's immediate family, or to such other persons or entities as may be approved by the Committee.

Notwithstanding the foregoing, in no event shall ISOs be transferable or assignable other than by will or by the laws of descent and distribution.

11. Amendment, Modification, Suspension or Discontinuance of the Plan.

The Board may amend, modify, suspend or terminate the Plan for the purpose of meeting or addressing any changes in legal requirements or for any other purpose permitted by law. Subject to changes in law or other legal requirements that would permit otherwise, the Plan may not be amended without the consent of the holders of a majority of the shares of Capital Stock then outstanding, to (i) increase the aggregate number of shares of Capital Stock that may be issued under the Plan (except for adjustments pursuant to Section 14 of the Plan), or (ii) permit the granting of stock options or SARs with exercise or grant prices lower than those specified in Section 6.

12. Termination of Employment.

If the employment of a Participant terminates, other than as a result of the death or disability of a Participant, all unexercised, deferred and unpaid Awards shall be canceled immediately, unless the Award Agreement provides otherwise. In the event of the death of a Participant or in the event a Participant is deemed by the Company to be disabled and eligible for benefits under the terms of the IBM Long-Term Disability Plan (or any successor plan or similar plan of another employer), the Participant's estate, beneficiaries or representative, as the case may be, shall have the rights and duties of the Participant under the applicable Award Agreement.

13. Cancellation and Rescission of Awards.

(a) Unless the Award Agreement specifies otherwise, the Committee may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time if the Participant is not in compliance with all applicable provisions of the Award Agreement and the Plan, or if the Participant engages in any "Detrimental Activity." For purposes of this Section 13, "Detrimental Activity" shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company; (ii) the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential Information and Intellectual Property, relating to the business of the Company, acquired by the Participant either during or after employment with the Company; (iii) the failure or refusal to disclose promptly and to assign to the Company, pursuant to the Company's Agreement Regarding Confidential Information and Intellectual Property, all right, title and interest in any invention or idea, patentable or not, made or conceived by the Participant during employment by the Company, relating in any manner to the actual or anticipated business, research or development work of the Company or the failure or refusal to do anything reasonably necessary to enable the Company to secure a patent where appropriate in the United States and in other countries; (iv) activity that results in termination of the Participant's employment for cause; (v) a violation of any rules, policies, procedures or guidelines of the Company, including but not limited to the Company's Business Conduct Guidelines; (vi) any attempt directly or indirectly to induce any employee of the Company to be employed or perform services elsewhere or any attempt directly or indirectly to solicit the trade or business of any current or prospective customer, supplier or partner of the Company; (vii) the Participant being convicted of, or entering a guilty plea with respect to, a crime, whether or not connected with the Company; or (viii) any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

(b) Upon exercise, payment or delivery pursuant to an Award, the Participant shall certify in a manner acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan. In the event a Participant fails to comply with the provisions of paragraphs (a)(i)-(viii) of this Section 13 prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise, payment or delivery. In the event of any such rescission, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery, in such manner and on such terms and conditions as may be required, and the Company shall be entitled to set-off against the amount of any such gain any amount owed to the Participant by the Company. As used herein, Rescission Period shall mean that period of time established by the Committee which shall be not less than 6 months after any exercise, payment or delivery pursuant to an Award.

14. Adjustments.

In the event of any change in the outstanding Capital Stock of the Company by reason of a stock split, stock dividend, combination or reclassification of shares, recapitalization, merger, or similar event, the Committee may adjust proportionately: (a) the number of shares of Capital Stock (i) available for issuance under the Plan, (ii) available for issuance under ISOs, (iii) for which Awards may be granted to an individual Participant set forth in Section 6, and (iv) covered by outstanding Awards denominated in stock or units of stock; (b) the exercise and grant prices related to outstanding Awards; and (c) the appropriate Fair Market Value and other price determinations for such Awards. Notwithstanding the foregoing, in the event of any change in the outstanding Capital Stock of the Company by reason of a stock split or a reverse stock split, the above-referenced proportionate adjustments, if applicable, shall be mandatory.

In the event of any other change affecting the Capital Stock or any distribution (other than normal cash dividends) to holders of Capital Stock, such adjustments in the number and kind of shares and the exercise, grant and conversion prices of the affected Awards as may be deemed equitable by the Committee, including adjustments to avoid fractional shares, shall be made to give proper effect to such event. In the event of a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation, the Committee shall be authorized to cause IBM to issue or assume stock options, whether or not in a transaction to which section 424(a) of the Code applies, by means of substitution of new stock options for previously issued stock options or an assumption of previously issued stock options. In such event, the aggregate number of shares of Capital Stock available for issuance under awards under Section 3, including the individual Participant maximums set forth in Section 6 will be increased to reflect such substitution or assumption.

15. Miscellaneous.

(a) Any notice to the Company required by any of the provisions of the Plan shall be addressed to the chief human resources officer of IBM in writing, and shall become effective when it is received.

(b) The Plan shall be unfunded and the Company shall not be required to establish any special account or fund or to otherwise segregate or encumber assets to ensure payment of any Award.

(c) Nothing contained in the Plan shall prevent the Company from adopting other or additional compensation arrangements or plans, subject to shareholder approval if such approval is required, and such arrangements or plans may be either generally applicable or applicable only in specific cases.

(d) No Participant shall have any claim or right to be granted an Award under the Plan and nothing contained in the Plan shall be deemed or be construed to give any Participant the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any Participant at any time without regard to the effect such discharge may have upon the Participant under the Plan. Except to the extent otherwise provided in any plan or in an Award Agreement, no Award under the Plan shall be deemed compensation for purposes of computing benefits or contributions under any other plan of the Company.

(e) The Plan and each Award Agreement shall be governed by the laws of the State of New York, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Unless otherwise provided in the Award Agreement, recipients of an Award under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement.

(f) In the event that a Participant or the Company brings an action to enforce the terms of the Plan or any Award Agreement and the Company prevails, the Participant shall pay all costs and expenses incurred by the Company in connection with that action, including reasonable attorneys' fees, and all further costs and fees, including reasonable attorneys' fees incurred by the Company in connection with collection.

(g) The Committee and any officers to whom it may delegate authority under Section 5 shall have full power and authority to interpret the Plan and to make any determinations thereunder, including determinations under Section 13, and the Committee's or such officer's determinations shall be binding and conclusive. Determinations made by the Committee or any such officer under the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

(h) If any provision of the Plan is or becomes or is deemed invalid, illegal or unenforceable in any jurisdiction, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended or limited in scope to conform to applicable laws or, in the discretion of the Committee, it shall be stricken and the remainder of the Plan shall remain in full force and effect.

(i) The Plan shall become effective on the date it is approved by the requisite vote of the stockholders of the Company.

IBM 1999 Long-Term Performance Plan — Federal Income Tax Consequences

The Company has been advised by counsel that, in general, under the Internal Revenue Code, as presently in effect, a Participant will not be deemed to recognize any income for federal income tax purposes at the time an option or SAR is granted or a restricted stock award is made, nor will the Company be entitled to a tax deduction at that time. However, when any part of an option or SAR is exercised, when restrictions on restricted stock lapse, or when an unrestricted stock award is made, the federal income tax consequences may be summarized as follows:

1. In the case of an exercise of a stock option other than an ISO, the optionee will generally recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the exercise date over the option price.

2. In the case of an exercise of a SAR, the Participant will generally recognize ordinary income on the exercise date in an amount equal to any cash and the fair market value of any unrestricted shares received.

3. In the case of an exercise of an option or SAR payable in restricted stock, or in the case of an award of restricted stock, the immediate federal income tax effect for the recipient will depend on the nature of the restrictions. Generally, the fair market value of the stock will not be taxable to the recipient as ordinary income until the year in which his or her interest in the stock is freely transferable or is no longer subject to a substantial risk of forfeiture. However, the recipient may elect to recognize income when the stock is received, rather than when his or her interest in the stock is freely transferable or is no longer subject to a substantial risk of forfeiture. If the recipient makes this election, the amount taxed to the recipient as ordinary income is determined as of the date of receipt of the restricted stock.

4. In the case of ISOs, there is generally no tax liability at time of exercise. However, the excess of the fair market value of the stock on the exercise date over the option price is included in the optionee's income for purposes of the alternative minimum tax. If no disposition of the ISO stock is made before the later of one year from the date of exercise and two years from the date of grant, the optionee will realize a capital gain or loss upon a sale of the stock, equal to the difference between the option price and the sale price.  If the stock is not held for the required period, ordinary income tax treatment will generally apply to the excess of the fair market value of the stock on the date of exercise (or, if less, the amount of gain realized on the disposition of the stock) over the option price, and the balance of any gain or any loss will be treated as capital gain or loss. In order for ISOs to be treated as described above, the Participant must remain employed by the Company (or a subsidiary in which the Company holds at least 50 percent of the voting power) from the ISO grant date until three months before the ISO is exercised. The three-month period is extended to one year if the  Participant's employment terminates on account of disability. If the Participant does not meet the employment requirement, the option will be treated for federal income tax purposes as an option as described in paragraph 5 below. A Participant who exercises an ISO might also be subject to an alternative minimum tax.

5. Upon the exercise of a stock option other than an ISO, the exercise of a SAR, the award of stock, or the recognition of income on restricted stock, the Company will generally be allowed an income tax deduction equal to the ordinary income recognized by a Participant. The Company will not receive an income tax deduction as a result of the exercise of an ISO, provided that the ISO stock is held for the required period as described above. When a cash payment is made pursuant to the Award, the recipient will recognize the amount of the cash payment as ordinary income, and the Company will generally be entitled to a deduction in the same amount.

6. Pursuant to section 162(m) of the Code and underlying guidance, the Company may not deduct compensation of more than $1,000,000 that is paid in a taxable year to an individual who, on the last day of the taxable year, is the Company's chief executive officer or among one of its three other highest compensated officers for that year, not including the Company's chief financial officer. The deduction limit, however, does not apply to certain types of compensation, including qualified performance-based compensation. The Company believes that compensation attributable to stock options and stock appreciation rights granted under the Plan should qualify as performance-based compensation and therefore should not be subject to the deduction limit. The Plan also authorizes the grant of long-term performance incentive awards utilizing the performance criteria set forth in the Plan that may likewise qualify as performance-based awards.

[END OF PROSPECTUS]

# EXHIBIT C

# IBM

# TERMS AND CONDITIONS OF YOUR EQUITY AWARD:
# EFFECTIVE June 1, 2019

# Terms and Conditions of Your Equity Award

## Table of Contents

**Introduction** ................................................................................................. 3

**How to Use This Document** ........................................................................ 3

**Definition of Terms** .................................................................................... 4

**Provisions that apply to all Award types and all countries** ............................. 6

**Provisions that apply to all Award types but not all countries** ........................ 8

**Provisions that apply to specific Award types for all countries** ...................... 9

**a. Restricted Stock Units ("RSUs") including Cash-Settled RSUs and Retention RSUs ("RRSUs")** ........................................................................... 9

   *i. All RSUs*................................................................................................ 9

   *ii. RSUs Other Than Cash-Settled RSUs and Cash-Settled RRSUs* ..................... 11

   *iii. Cash-Settled RSUs including Cash-Settled RRSUs*.................................... 11

**b. Restricted Stock** .................................................................................... 11

**c. Stock Options ("Options") and Stock Appreciation Rights ("SARs")** ......... 13

   *i. All Option and SAR Awards* ................................................................... 13

   *ii. All SAR Awards* ................................................................................... 14

**d. Performance Share Units ("PSUs")** ........................................................ 15

**Provisions that apply to specific countries** ................................................. 16

**a. Denmark** ............................................................................................... 16

**b. Israel** .................................................................................................... 16

**c. United States** ........................................................................................ 16

# Terms and Conditions of Your Equity Award

## Introduction

This document provides you with the terms and conditions of your Award that are in addition to the terms and conditions contained in your Equity Award Agreement for your specific Award. Also, your Award is subject to the terms and conditions in the governing plan document; the applicable document is indicated in your Equity Award Agreement and can be found at http://w3.ibm.com/hr/exec/comp/eq_prospectus.shtml.

As an Award recipient, you can see a personalized summary of all your outstanding equity grants in the "Personal statement" section of the IBM executive compensation web site (http://w3.ibm.com/hr/exec/comp). This site also contains other information about long-term incentive awards, including copies of the prospectus (the governing plan document).  If you have additional questions and you are based in the U.S., you can call the IBM Benefits Center at 866-937-0720, weekdays from 8:00 a.m. to 8:00 p.m. Eastern time (TTY available at 800-426-6537). Outside of the U.S. dial your country's toll-free AT&T Direct® access number, and then enter 866-937-0720. In the U.S., call 800-331-1140 to obtain AT&T Direct access numbers. Access numbers are also available online at www.att.com/traveler or from your local operator.

## How to Use This Document

Terms and conditions that apply to all awards in all countries can be found on page 6. Review these in addition to any award- or country-specific terms and conditions that may be listed. Once you have reviewed these general terms, check in your Equity Award Agreement for any award-specific and/or country-specific terms that apply to your Award.

## Terms and Conditions of Your Equity Award:

## Definition of Terms

The following are defined terms from the Long-Term Performance Plan, your Equity Award Agreement, or this Terms and Conditions document. These are provided for your information. In addition to this document, see the Plan prospectus and your Equity Award Agreement for more details.

"Awards" -- The grant of any form of stock option, stock appreciation right, stock or cash award, whether granted singly, in combination or in tandem, to a Participant pursuant to such terms, conditions, performance requirements, limitations and restrictions as the Committee may establish in order to fulfill the objectives of the Plan.

"Board" -- The Board of Directors of International Business Machines Corporation ("IBM").

"Capital Stock" -- Authorized and issued or unissued Capital Stock of IBM, at such par value as may be established from time to time.

"Committee" -- The committee designated by the Board to administer the Plan.

"Company" -- IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest.

"Engage in or Associate with" includes, without limitation, engagement or association as a sole proprietor, owner, employer, director, partner, principal, joint venture, associate, employee, member, consultant, or contractor. This also includes engagement or association as a shareholder or investor during the course of your employment with the Company, and includes beneficial ownership of five percent (5%) or more of any class of outstanding stock of a competitor of the Company following the termination of your employment with the Company.

"Equity Award Agreement" -- The document provided to the Participant which provides the grant details.

"Fair Market Value" -- The average of the high and low prices of Capital Stock on the New York Stock Exchange for the date in question, provided that, if no sales of Capital Stock were made on said exchange on that date, the average of the high and low prices of Capital Stock as reported for the most recent preceding day on which sales of Capital Stock were made on said exchange.

"Participant" -- An individual to whom an Award has been made under the Plan. Awards may be made to any employee of, or any other individual providing services to, the Company. However, incentive stock options may be granted only to individuals who are

employed by IBM or by a subsidiary corporation (within the meaning of section 424(f) of the Code) of IBM, including a subsidiary that becomes such after the adoption of the Plan.

"Plan" -- Any IBM Long-Term Performance Plan.

"Termination of Employment" -- For the purposes of determining when you cease to be an employee for the cancellation of any Award, a Participant will be deemed to be terminated if the Participant is no longer employed by IBM or a subsidiary corporation that employed the Participant when the Award was granted unless approved by a method designated by those administering the Plan.

**Terms and Conditions of Your Equity Award:**

# Provisions that apply to all Award types and all countries

The following terms apply to all countries and for all Award types (Restricted Stock Units, Cash-Settled Restricted Stock Units, Restricted Stock, Stock Options, Stock Appreciation Rights and Performance Share Units).

## Cancellation and Rescission

All determinations regarding enforcement, waiver or modification of the cancellation and rescission and other provisions of the Plan and your Equity Award Agreement (including the provisions relating to termination of employment, death and disability) shall be made in IBM's sole discretion. Determinations made under your Equity Award Agreement and the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

You agree that the cancellation and rescission provisions of the Plan and your Equity Award Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture of your Award is the penalty for violation. Engaging in Detrimental Activity as defined in the Plan may result in cancellation or rescission of your Award. Detrimental Activity includes your acceptance of an offer to Engage in or Associate with any business which is or becomes competitive with the Company.

## Jurisdiction, Governing Law, Expenses, Taxes and Administration

Your Equity Award Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules. You agree that any action or proceeding with respect to your Equity Award Agreement shall be brought exclusively in the state and federal courts sitting in New York County or, Westchester County, New York. You agree to the personal jurisdiction thereof, and irrevocably waive any objection to the venue of such action, including any objection that the action has been brought in an inconvenient forum.

If any court of competent jurisdiction finds any provision of your Equity Award Agreement, or portion thereof, to be unenforceable, that provision shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of your Equity Award Agreement shall continue in full force and effect.

If you or the Company brings an action to enforce your Equity Award Agreement and the Company prevails, you will pay all costs and expenses incurred by the Company in connection with that action and in connection with collection, including reasonable attorneys' fees.

If the Company, in its sole discretion, determines that it has incurred or will incur any obligation to withhold taxes as a result of your Award, without limiting the Company's rights under Section 9 of the Plan, the Company may withhold the number of shares

that it determines is required to satisfy such liability and/or the Company may withhold amounts from other compensation to the extent required to satisfy such liability under federal, state, provincial, local, foreign or other tax laws. To the extent that such amounts are not withheld, the Company may require you to pay to the Company any amount demanded by the Company for the purpose of satisfying such liability.

If the Company changes the vendor engaged to administer the Plan, you consent to moving all of the shares you have received under the Plan that is in an account with such vendor (including unvested and previously vested shares), to the new vendor that the Company engages to administer the Plan. Such consent will remain in effect unless and until revoked in writing by you.

## Terms and Conditions of Your Equity Award:

## Provisions that apply to all Award types but not all countries

The following provision applies to all Award types (Restricted Stock Units, Cash-Settled Restricted Stock Units, Restricted Stock, Stock Options, Stock Appreciation Rights and Performance Share Units) granted to all individuals in all countries except those with a home country of Latin America, specifically: Argentina, Bolivia, Brazil, Chile, Columbia, Costa Rica, Ecuador, Mexico, Paraguay, Peru, Uruguay, and Venezuela.

### Non-Solicitation

In consideration of your Award, you agree that during your employment with the Company and for two years following the termination of your employment for any reason, you will not directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company. Also, you agree that during your employment with the Company and for one year following the termination of your employment for any reason, you will not directly or indirectly, solicit, for competitive business purposes, any customer of the Company with which you were involved as part of your job responsibilities during the last year of your employment with the Company. By accepting your Award, you acknowledge that the Company would suffer irreparable harm if you fail to comply with the foregoing, and that the Company would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees.

# Terms and Conditions of Your Equity Award:

## Provisions that apply to specific Award types for all countries

## a. Restricted Stock Units ("RSUs") including Cash-Settled RSUs and Retention RSUs ("RRSUs")

All references in this document to RSUs include RRSUs, unless explicitly stated otherwise
*i. All RSUs*

### Termination of Employment including Death, Disability and Leave of Absence

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan) prior to the Vesting Date(s) set in your Equity Award Agreement, all then unvested RSUs, including RRSUs, under your Award shall be canceled.

However, your unvested and/or outstanding RSUs, but not RRSUs, will continue to vest upon the termination of employment if all of the following criteria are met:

- You are on the performance team, or any successor team thereto, at the time of termination of employment;
- You have completed at least one year of active service since the award date of grant;
- You have reached age 55 with 15 years of service at the time of termination of employment (age 60 with 15 years of service for the Chairman and CEO); and
- Appropriate senior management, the Committee or the Board, as appropriate, do not exercise their discretion to cancel or otherwise limit the vesting of the RSUs.

For purposes of the Plan the performance team refers to the team of IBM's senior leaders who run IBM Business Units or geographies, including the chairman and CEO.

*Death or Disability*
Upon your death all RSUs covered by this Agreement shall vest immediately and your Vesting Date shall be your date of death. If you are disabled as described in Section 12 of the Plan, your RSUs shall continue to vest according to the terms of your Award.

*Leave of Absence*

In the event of a management approved leave of absence, any unvested RSUs shall continue to vest as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active

status, your unvested RSUs will continue to vest in accordance with the terms in this document and your Equity Award Agreement.

**Dividend Equivalents**
IBM shall not pay dividend equivalents on cash-settled or stock-settled unvested RSU awards.

**Terms and Conditions of Your Equity Award:**
**Provisions that apply to specific Award types for all countries**

*ii. **RSUs Other Than Cash-Settled RSUs and Cash-Settled RRSUs***

**Settlement of Award**

Subject to Sections 12 and 13 of the Plan and the section "Termination of Employment including Death, Disability and Leave of Absence" above, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, IBM shall make a payment to Participant in shares of Capital Stock equal to the number of vested RSUs, subject to any applicable tax withholding requirements as described in Section 9 of the Plan, and the respective RSUs shall thereupon be canceled. RSUs are not shares of Capital Stock and do not convey any stockholder rights.

*iii. Cash-Settled RSUs including Cash-Settled RRSUs*

**Settlement of Award**

Subject to Sections 12 and 13 of the Plan and the section entitled "Termination of Employment including Death, Disability and Leave of Absence" above, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, the Company shall make a payment to Participant in cash equal to the Fair Market Value of the vested RSUs, subject to any applicable tax withholding requirements as described in Section 9 of the Plan, and the respective RSUs shall thereupon be canceled. Fair Market Value will be calculated in your home country currency at the exchange rate on the applicable Vesting Date using a commercially reasonable measure of exchange rate. RSUs are not shares of Capital Stock and do not convey any stockholder rights.

## b. Restricted Stock

**Settlement of Award**

Subject to Sections 12 and 13 of the Plan and the paragraph entitled "Termination of Employment including Death, Disability or Leave of Absence" below, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, the shares of Restricted Stock awarded under your Equity Award Agreement will be deliverable to you, subject to any applicable tax withholding requirements as described in Section 9 of the Plan.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

### Termination of Employment including Death, Disability and Leave of Absence

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan) prior to the Vesting Date(s) in your Equity Award Agreement, all then unvested shares of Restricted Stock under your Award shall be canceled (unless your Equity Award Agreement provides otherwise).

*Death or Disability*
Upon your death all unvested shares of Restricted Stock covered by your Equity Award Agreement shall vest immediately and your Vesting Date shall be your date of death. If you are disabled as described in Section 12 of the Plan, your unvested shares of Restricted Stock shall continue to vest according to the terms of your Equity Award Agreement.

*Leave of Absence*
In the event of a management approved leave of absence, any unvested shares of Restricted Stock shall continue to vest as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your unvested shares of Restricted Stock will continue to vest in accordance with the terms in this document and your Equity Award Agreement.

### Dividends and Other Rights
During the period that the Restricted Stock is held by IBM hereunder, such stock will remain on the books of IBM in your name, may be voted by you, and any applicable dividends shall be paid to you. Shares issued in stock splits or similar events which relate to Restricted Stock then held by IBM in your name shall be issued in your name but shall be held by IBM under the terms hereof.

### Transferability
Shares of Restricted Stock awarded under your Equity Award Agreement cannot be sold, assigned, transferred, pledged or otherwise encumbered prior to the vesting of your Award as set forth in your Equity Award Agreement and any such sale, assignment, transfer, pledge or encumbrance, or any attempt thereof, shall be void.

**Terms and Conditions of Your Equity Award:**
**Provisions that apply to specific Award types for all countries**

## c. Stock Options ("Options") and Stock Appreciation Rights ("SARs")

### i. *All Option and SAR Awards*

#### Termination of Employment including Death, Disability and Leave of Absence

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan):

- Any Options or SARs that are not exercisable as of the date your employment terminates shall be canceled immediately (unless your Equity Award Agreement provides otherwise), and

- Any Options or SARs that are exercisable as of the date your employment terminates (other than for cause) will remain exercisable for 90 days (not three months) after the date of termination, after which any unexercised Options or SARs are canceled; provided, however, if you are a banded executive when your employment with the Company terminates (other than for cause) after you have attained age 55 and completed at least 15 years of service with the Company at the time of termination, any Options or SARs that are exercisable as of the date your employment terminates shall remain exercisable for the full term as in your Equity Award Agreement (unless your Equity Award Agreement provides otherwise).

*Death or Disability*
In the event of your death, all Options or SARs shall become fully exercisable and remain exercisable for their full term.

In the event you are disabled (as described in Section 12 of the Plan), any unvested Options or SARs shall continue to vest and be exercisable.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

*Leave of Absence*
In the event of a management approved leave of absence, any unvested Options or SARs shall continue to vest and be exercisable as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your Options or SARs will continue to vest and be exercisable in accordance with their terms. If you do not return to active status,

- Your unvested Options or SARs will be canceled immediately; and

- Your vested Options or SARs will be canceled on the later of the 91st day following your last day of active employment or the date of the termination of your leave of absence; provided, however, if you are a banded executive when your employment terminates (other than for cause) after you have attained age 55 and completed at least 15 years of service with the Company at the time of termination, any Options or SARs that are exercisable as of the date your employment terminates shall remain exercisable for the full term as in your Equity Award Agreement.

### Termination of Employment for Cause
If your employment terminates for cause, all exercisable and not exercisable Options or SARs are canceled immediately.

### ii. All SAR Awards

#### Settlement of Award
Upon exercise, the Company shall deliver an aggregate amount, in cash, equal to the excess of the Fair Market Value of a share of Capital Stock on the date of exercise over the Exercise Price set forth in your Equity Award Agreement multiplied by the number of SARs exercised, subject to any applicable tax withholding requirements as described in Section 9 of the Plan. The value of the Award will be calculated in your home country currency at the exchange rate on the date the Award becomes fully vested using a commercially reasonable measure of exchange rate.

**Terms and Conditions of Your Equity Award:**
**Provisions that apply to specific Award types for all countries**

## d. Performance Share Units ("PSUs")

### Termination of Employment, including Death and Disability, and Leave of Absence

*Termination of Employment and Leave of Absence*
If you cease to be an active, full-time employee for any reason (other than on account of death or are disabled as described in Section 12 of the Plan) before the Date of Payout (in the case of a recipient in the United States, at year end of the applicable PSU Performance Period), all PSUs are canceled immediately provided, however, if you are a banded executive when you cease to be an active, full-time employee (other than for cause) after you have attained age 55, completed at least 15 years of service with the Company at such time, and completed at least one year of active service during the PSU Performance Period (as set forth in your Equity Award Agreement), the PSUs granted hereunder shall be paid out on the Date of Payout (as set forth in your Equity Award Agreement) based on IBM performance over the entire applicable Performance Period(s), in an amount that will be prorated for the number of months completed as an active, full-time executive during the PSU Performance Period, adjusted for the performance score.

However, your unvested PSUs will continue to vest upon termination of employment or the time you cease to be an active, full-time employee if all of the following criteria are met:

- o  You are on the performance team, or any successor team thereto, at the time of termination of employment or the time you cease to be an active, full-time employee;
- o  You have completed at least one year of active service during the PSU Performance Period (as set forth in your Equity Award Agreement);
- o  You have reached age 55 with 15 years of service at the time of termination of employment or the time you cease to be an active, full-time employee (age 60 with 15 years of service for the Chairman and CEO);
- o  The Committee has certified that all performance conditions have been met; and
- o  Appropriate senior management, the Committee or the Board, as appropriate, do not exercise their discretion to cancel or otherwise limit the payout.

*Death or Disability*
Prior to the Date of Payout, (i) in the event of your death or (ii) if you are disabled (as described in Section 12 of the Plan), all PSUs shall continue to vest according to the terms of your Equity Award Agreement and the PSUs will be paid out at the end of the Performance Period based on IBM performance over the entire applicable Performance Period(s).

**Terms and Conditions of Your Equity Award:**
**Provisions that apply to specific countries**

## a. Denmark

### i. All Awards

**Non-Solicitation**
The following part of the above non-solicitation provision does not apply to those individuals with the home country of Denmark: "In consideration of your Award, you agree that during your employment with the Company and for two years following the termination of your employment for any reason, you will not directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company."

## b. Israel

### i. All Awards

**Data Privacy**
In addition to the data privacy provisions in your Equity Award Agreement, you agree that data, including your personal data, necessary to administer this Award may be exchanged among IBM and its subsidiaries and affiliates as necessary (including transferring such data out of the country of origin both in and out of the EEA), and with any vendor engaged by IBM to administer this Award.

## c. United States

### i. All Awards

Nothing in the Plan prospectus, your Equity Award Agreement or this Document affects your rights, immunities, or obligations under any federal, state, or local law, including under the Defend Trade Secrets Act of 2016, as described in Company policies, or prohibits you from reporting possible violations of law or regulation to a government agency, as protected by law.

If you are, and have been for at least 30 days immediately preceding, a resident of, or an employee in Massachusetts at the time of the termination of your employment with IBM, cancellation and rescission provisions of the Plan will not apply if you engage in competitive activities after your employment relationship has ended with IBM. For the avoidance of doubt, cancellation and rescission provisions of the Plan will apply if you engage in (1) any Detrimental Activity prior to your employment relationship ending with IBM or (2) any Detrimental Activity described in Section 13(a) of the Plan other than engaging in competitive activities after your employment relationship has ended with IBM.

# EXHIBIT D



## Long-Term IncentiveAward Acceptance Information

Dear Rodrigo Lima:

IBM's grants to you become effective only after, and are conditioned upon your accepting the terms and conditions of the award agreements, the accompanying "Terms and Conditions of Your Equity Award Effective June, 1, 2019" ("Terms and Conditions") document attached below and the Long-Term Performance Plan ("LTPP") under which these long-term incentive awards are granted, including those provisions relating to the cancellation and rescission of awards.

If you have not read the LTPP prospectus that governs your equity awards, please do so by viewing the "Prospectuses" section of the executive compensation web site (http://w3.ibm.com/hr/exec/comp/eq_prospectus.html). The prospectus contains the terms of the LTPP and is the legal offering document covering IBM's stock-based awards, and you should read it before accepting your grant.  In the event of any conflict between the terms of the LTPP and the information provided on this screen, the LTPP shall govern.

To record your acceptance and agreement to the terms and conditions of your award, you must press the ACCEPT button below.  By pressing the ACCEPT button below, you are certifying that you have read and understand the terms and conditions of each award agreement, the Terms and Conditions document and the LTPP covering each stock-based award listed here, and that you accept and agree to all the relevant terms and conditions.

**Until you formally accept your award, Restricted Stock Units and/or Performance Share Units will not be released to you or settled at vesting and Stock Options will not be exercisable.  In addition, after you accept your award and your RSU or PSU award vests, the shares (net of taxes where applicable) will typically be available for sale, and/or transfer at https://www.stockplanconnect.com/ within 2 business days from the vesting and/or payout date, as applicable.  As described in the plan documents, the Company withholds taxes from your award (and/or reports income) as required by local laws.  In some countries, the Company does not withhold taxes  because there is no requirement to do so.  Irrespective of any withholding and/or reporting by the Company, it is important for you to consult with your personal tax advisor to satisfy your individual tax obligations.**

| Award Type | Award Date | Shares / Units | Long-Term Performance Plan |
|---|---|---|---|
| Restricted Stock Units | June 7, 2019 | 3,706 | 1999 |
| Performance Share Units (PSUs) | June 7, 2019 | 3,706 | 1999 |

## International Business Machines Corporation ("IBM")

# Equity Award Agreement
**IBM Confidential**

| | |
|---|---|
| **Plan** | IBM 1999 Long-Term Performance Plan (the "Plan") |
| **Award Type** | Restricted Stock Units |
| **Purpose** | The purpose of this Award is to retain selected employees and executives. You recognize that this Award represents a potentially significant benefit to you and is awarded for the purpose stated here. |
| **Awarded to** | Rodrigo Lima |
| **Home Country** | Brazil (BRA) 0022573 |
| **Award Agreement** | This Equity Award Agreement, together with the "Terms and Conditions of Your Equity Award Effective June 1, 2019" ("Terms and Conditions") document and the Plan http://w3.ibm.com/hr/exec/comp/eq_prospectus.html, both of which are incorporated herein by reference, together constitute the entire agreement between you and IBM with respect to your Award. This Equity Award Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. |
| **Grant** | Date of Grant: June 7, 2019<br>Number of Units Awarded: 3,706 |
| **Vesting** | This Award vests as set forth below, subject to your continued employment with the Company as described in the Terms and Conditions document. |

| Units | Date |
|---|---|
| 926 | June 7, 2020 |
| 926 | June 7, 2021 |
| 926 | June 7, 2022 |
| 928 | June 7, 2023 |

**Terms and Conditions of Your Equity Award** Refer to the Terms and Conditions document http://w3.ibm.com/hr/exec/comp/eq_prospectus.html for an explanation of the terms and conditions applicable to your Award, including those relating to:

- Cancellation and rescission of awards (also see below)
- Jurisdiction, governing law, expenses and taxes
- Non-solicitation of Company employees and clients, if applicable
- Treatment of your Award in the event of death or disability or leave of absence
- Treatment of your Award upon termination of employment, including retirement or for cause, (i) if you are on the performance team, or any successor team thereto, and (ii) under all other circumstances.

It is strongly recommended that you print the Terms and Conditions document for later reference.

## International Business Machines Corporation ("IBM")
# Equity Award Agreement

| | |
|---|---|
| **Cancellation and Rescission** | You understand that IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months. Refer to the Terms and Conditions document and the Plan for further details. |

| Data Privacy, Electronic Delivery | By accepting this Award, you agree that data, including your personal data, necessary to administer this Award may be exchanged among IBM and its subsidiaries and affiliates as necessary, and with any vendor engaged by IBM to administer this Award, subject to the Terms and Conditions document; you also consent to receiving information and materials in connection with this Award or any subsequent awards under IBM's Long-term performance plans, including without limitation any prospectuses and plan documents, by any means of electronic delivery available now and/or in the future (including without limitation by e-mail, by Web site access and/or by facsimile), such consent to remain in effect unless and until revoked in writing by you. |
|---|---|
| Extraordinary Compensation | Your participation in the Plan is voluntary. The value of this Award is an extraordinary item of income, is not part of your normal or expected compensation and shall not be considered in calculating any severance, redundancy, end of service payments, bonus, long-service awards, pension, retirement or other benefits or similar payments. The Plan is discretionary in nature. This Award is a one-time benefit that does not create any contractual or other right to receive additional awards or other benefits in the future. Future grants, if any, are at the sole grace and discretion of IBM, including but not limited to, the timing of the grant, the number of units and vesting provisions. This Equity Award Agreement is not part of your employment agreement, if any. |
| Accept Your Award | This Award is considered valid when you accept it. This Award will be cancelled unless you accept it by 11:59 p.m. Eastern time two business days prior to the first vesting date in the "Vesting" section of this Agreement. By pressing the Accept button below to accept your Award, you acknowledge having received and read this Equity Award Agreement, the Terms and Conditions document and the Plan under which this Award was granted and you agree (i) not to hedge the economic risk of this Award or any previously-granted outstanding awards, which includes entering into any derivative transaction on IBM securities (e.g., any short sale, put, swap, forward, option, collar, etc.), (ii) to comply with the terms of the Plan, this Equity Award Agreement and the Terms and Conditions document, including those provisions relating to cancellation and rescission of awards and jurisdiction and governing law, and (iii) that by your acceptance of this Award, all awards previously granted to you under the Plan or other IBM Long-Term Performance Plans are subject to jurisdiction, governing law, expenses, taxes and administration section of the Terms and Conditions document (unless you are, and have been for at least 30 days immediately preceding, a resident of or an employee in Massachusetts at the time of the termination of your employment with IBM, in which case the jurisdiction, governing law, expenses, taxes and administration terms of your previous awards shall apply). |

Page 2 of 2     IBM Confidential

# International Business Machines Corporation ("IBM")

# Equity Award Agreement
IBM Confidential

| Plan | IBM 1999 Long-Term Performance Plan (the "Plan") |
|---|---|
| Award Type | Performance Share Units (PSUs) |
| Purpose | The purpose of this Award is to retain selected executives. You recognize that this Award represents a potentially significant benefit to you and is awarded for the purpose stated here. |
| Awarded to Home Country | RodrigoLima Brazil (BRA) 0022573 |
| Award Agreement | This Equity Award Agreement, together with the "Terms and Conditions of Your Equity Award Effective June 1, 2019" ("Terms and Conditions") document and the Plan http://w3.ibm.com/hr/exec/comp/eq_prospectus.html, both of which are incorporated herein by reference, together constitute the entire agreement between you and IBM with respect to your Award. This Equity Award Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. |

| Grant | Date of Grant | # PSUs Awarded | Performance Period | Date of Payout |
|---|---|---|---|---|
| | June 7, 2019 | 3,706 | Jan 1, 2019 - Dec 31, 2021 | February 1, 2022 |

| Vesting | You can earn the PSUs awarded above based on IBM's performance in achieving cumulative business targets of operating earnings per share and free cash flow, weighted 70/30 respectively, over the 3-year Performance Period applicable to the award. Performance against each of the targets will be subject to separate payout calculations according to the following table (which will be applied separately for each award of PSUs listed above): |
|---|---|

| % of Target | <70% | 70% | 80% | 90% | 100% | 110% | >120% |
|---|---|---|---|---|---|---|---|
| % of PSUs earned | 0% | 25% | 50% | 75% | 100% | 125% | 150% |

After the percentage of PSUs earned is determined, such percentage is further subject to a Relative Return on Invested Capital (ROIC) modifier over the three-year Performance Period that could result in (1) the percentage of PSUs earned being reduced up to 20 points if the performance falls below the S&P 500 Index median; or (2) the percentage of PSUs earned being increased up to 20 points when IBM exceeds the median performance of both the S&P 500 Index and the S&P

**Payout of Awards**

Information Technology Index. The relative ROIC modifier has no effect on the percentage of PSUs earned when IBM's ROIC performance falls between the S&P 500 Index and the S&P Information Technology Index median. The final number of PSUs earned under this Award is generally determined after the ROIC modifier is applied. In the event the final percentage of PSUs earned is 0% based on IBM's performance in achieving cumulative business targets of operating earnings per share and free cash flow, the relative ROIC modifier would not apply.

Following the Date of Payout, the Company shall either (a) deliver to you a number of shares of Capital Stock equal to the number of your earned PSUs, or (b) make a cash payment to you equal to the Fair Market Value on the Date of Payout of the number of your earned PSUs at the end of the Performance Period, in either case, net of any applicable tax withholding, and the respective PSUs shall thereafter be cancelled.

All payouts under this Award are subject to the provisions of the Plan, this Agreement and the Terms and Conditions document, including those relating to the cancellation and rescission of awards.

Page 1 of 3          **IBM Confidential**

# International Business Machines Corporation ("IBM")
# **Equity Award Agreement**

**Terms and Conditions of Your Equity Award**

Refer to the Terms and Conditions document **http://w3.ibm.com/hr/exec/comp/eq_prospectus.shtml** for an explanation of the terms and conditions applicable to your Award, including those relating to:

- Cancellation and rescission of awards (also see below)
- Jurisdiction, governing law, expenses and taxes
- Non-solicitation of Company employees and clients, if applicable
- Treatment of your Award in the event of death or disability or leave of absence
- Treatment of your Award upon termination of employment, including retirement or for cause, (i) if you are on the performance team, or any successor team thereto, and (ii) under all other circumstances.

It is strongly recommended that you print the Terms and Conditions document for later reference.

**Cancellation and Rescission**

You understand that IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months. Refer to the Terms and Conditions document and the Plan for further details.

**Data Privacy, Electronic Delivery**

By accepting this Award, you agree that data, including your personal data, necessary to administer this Award may be exchanged among IBM and its subsidiaries and affiliates as necessary, and with any vendor engaged by IBM to administer this Award, subject to the Terms and Conditions document; you also consent to receiving information and materials in connection with this Award or any subsequent awards under IBM's long-term performance plans, including without limitation any prospectuses and plan documents, by any means of electronic delivery available now and/or in the future (including without limitation by e-mail, by Web site access and/or by facsimile), such consent to remain in effect unless and until revoked in writing by you.

**Extraordinary Compensation**

Your participation in the Plan is voluntary. The value of this Award is an extraordinary item of income, is not part of your normal or expected compensation and shall not be considered in calculating any severance, redundancy, end of service payments, bonus, long-service awards, pension, retirement or other benefits or similar payments. The Plan is discretionary in nature. This Award is a one-time benefit that does not create any contractual or other right to receive additional awards or other benefits in the future. Future grants, if any, are at the sole grace and discretion of IBM, including but not limited to, the timing of the grant, the number of units and vesting provisions. This Equity Award Agreement is not part of your employment agreement, if any.

Page 2 of 3          **IBM Confidential**

# International Business Machines Corporation ("IBM")
# **Equity Award Agreement**

**Accept Your Award**

This Award is considered valid when you accept it. This Award will be cancelled unless you accept it by 11:59 p.m. Eastern time two business days prior to the end of the Performance Period in the "Grant" section of this Agreement. By pressing the Accept button below to accept your Award, you acknowledge having received and read this Equity Award Agreement, the Terms and Conditions document and the Plan under which this Award was granted and you agree (i) not to hedge the economic risk of this Award or any previously-granted outstanding awards, which includes entering into any derivative transaction on IBM securities (e.g., any short sale, put, swap, forward, option, collar, etc.), (ii) to comply with the terms of the Plan, this Equity Award Agreement and the Terms and Conditions document, including those provisions relating to cancellation and rescission of awards and jurisdiction and governing law, and (iii) that by your acceptance of this Award, all awards previously granted to you under the Plan or other IBM Long-Term Performance Plans are subject to (A) jurisdiction, governing law, expenses, taxes and administration section of the Terms and Conditions document (unless you are, and have been for at least 30 days immediately preceding, a resident of or an employee in Massachusetts at the time of the termination

of your employment with IBM, in which case the jurisdiction, governing law, expenses, taxes and administration terms of your previous awards shall apply) and (B) any cancellation, rescission or recovery required by applicable laws, rules, regulations or standards, including without limitation any requirements or standards of the U.S. Securities and Exchange Commission or the New York Stock Exchange.

**Page 3 of 3**      **IBM Confidential**