K6JHIBMO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    INTERNATIONAL BUSINESS
     MACHINES CORPORATION,
4
                    Plaintiff,
5
              v.                              20 Civ. 4573 (PMH)
6
     RODRIGO KEDE DE FREITAS LIMA,
7                                            Oral Argument

8                   Defendant.

9    ------------------------------x
                                             New York, N.Y.
10                                           June 19, 2020
                                             11:00 a.m.
11
     Before:
12
                         HON. PHILIP M. HALPERN,
13
                                              District Judge
14
                              APPEARANCES
15
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
16        Attorneys for Plaintiff
     BY:  ROBERT A. ATKINS
17        LIZA MAY VELAZQUEZ
          PIETRO JOHN SIGNORACCI
18
     ORRICK HERRINGTON & SUTCLIFFE LLP
19        Attorneys for Defendant
     BY:  MICHAEL DELIKAT
20        JAMES H. McQUADE
          -and-
21   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
     BY:  ROBERT NEIL HOLTZMAN
22

23

24

25

K6JHIBMO

1          (The Court and all parties present telephonically)

2          THE COURT:  Good morning, everybody.  I see I've

3     attracted a crowd.

4          All right.  I have -- and we'll get into it a little

5     bit more in a moment -- I have received, I believe, all of the

6     papers that were filed yesterday afternoon.  I've endeavored to

7     review them and have a reasonable sense of what's going on

8     here.  I want to give counsel the opportunity to tell me what

9     it is they want me to hear.  I'm a burden of proof person.  I'm

10    familiar with this area of the world, and I'm familiar with the

11    burden of proof associated with a temporary restraining order

12    and preliminary injunction under Rule 65 of the Federal Rules

13    of Civil Procedure.  So I don't need you to remind me of that

14    as much as I'm interested in hearing -- Mr. Atkins, we'll start

15    with you -- what it is you want to emphasize during this

16    argument for a temporary restraining order.

17          MR. ATKINS:  Thank you, your Honor.  Shall I proceed?

18          THE COURT:  Please.

19          MR. ATKINS:  Thank you.

20          If it may please the Court, this is Robert Atkins.  I

21    represent the plaintiff IBM.  Let me just say at the outset,

22    and I believe I speak for everyone on both sides of the aisle

23    here, that we're very grateful for your Honor making the time

24    under the extraordinary circumstances, by which I refer to

25    COVID-19.

K6JHIBMO

1          So we're here today on our application for a TRO to

2     preserve the status quo and enjoin Mr. Lima from commencing and

3     announcing his employment at Microsoft as the corporate VP of

4     Latin America, and we seek to preserve the status quo,

5     obviously, until your Honor has a chance to decide the

6     preliminary injunction after taking some expedited discovery.

7          As you've seen, it's our belief that Mr. Lima, by

8     accepting that particular employment at this particular

9     competitor, has violated his noncompete agreement which he

10    signed several times but most recently in December of 2019,

11    which prevents him from taking a competitive position that

12    would or could result in him intentionally or unintentionally

13    using, disclosing, or relying on IBM trade secrets.

14          Let me start, and I promise to move briskly.  Who is

15    Mr. Lima?  Well, he was until May 18 one of IBM's most

16    high-ranking senior executives.  He was part of the 1 percent.

17    He was a Band A executive which means his compensation rank

18    surpassed only by the chairman and CEO and her successor.  He

19    is, as a result, steeped in IBM confidential information and

20    trade secrets.  I'll get into some of them in a moment, but he

21    is by virtue of his various leadership and executive roles

22    aware of IBM strategies to compete against Microsoft.  He's

23    aware of products, innovations, and priorities.  He's very

24    aware of the company's client targets and strategies for

25    winning those clients head to head against Microsoft, and of

K6JHIBMO

1   course, he's very familiar with the most sensitive information

2   perhaps, which is the company's pricing forecasts of 2020

3   revenue and profit and margins and the like.

4           How is it that he came to be possessed and had access

5   to all those trade secrets and more?  Well, he, first of all,

6   had numerous strategic corporate roles and responsibilities,

7   which means he literally and certainly figuratively sat next to

8   the chairman and CEO.  For example, he attended and more the

9   most recent board of directors annual strategy meeting.  Each

10  year there is one board meeting that is devoted to strategy.

11  Mr. Lima not only was in attendance and an observer, but he

12  participated in a presentation, part of which was the strategic

13  plan of attack and was present for discoveries regarding plans

14  for "countering Microsoft."  That's his board role.

15          He also was a member of what IBM refers to as the

16  performance team.  That, again, is a role next to the chair and

17  CEO.  It is comprised of the top 60 executives, which is quite

18  a leap in a company of hundreds of thousands of employees.  The

19  performance team directs the operations of the company.  That's

20  worldwide, which, of course, includes Latin America.  It's all

21  products, all product lines, all clients, all industries in all

22  regions.  Just by way of example, at the most recent

23  performance team meeting in 2020, there were discussions of

24  cloud strategy.  I am going to -- unless your Honor wants me to

25  go into depth about cloud, I think everyone recognizes that

K6JHIBMO

cloud computing is the number one battleground or maybe the air

war among IT companies like IBM and Microsoft.  So at the

performance team meeting earlier this very year, there were

discussions of cloud strategy, new cloud offerings, corporate

priorities, and where and how and with what products to beat

the competition and, of course, specifically Microsoft.

His day jobs were as follows:  In 2019, he ran the

entire global technology services business in North America,

again, in direct competition with Microsoft, with a focus, of

course, or an involvement of cloud.

In 2020, this year, before he announced his

resignation in May, he was the head of an entire business unit,

the responsibility of which was overseeing IBM's largest, most

strategically important and most valuable customers, amounting

to 77.  And, obviously, as we've set forth, that includes many

clients and customers in Latin America.  And in that role, he

had responsibility for implementing IBM's competitive strategy,

a strategy that was devised and applied worldwide and, of

course, again in Latin America, and again involving all

products in all industries that IBM offers.

In his own words in the declaration he submitted your

Honor yesterday, he described his role as "overseeing the top

clients and the financial performance of those relationships

that are most important to IBM," and all of those activities

and all of these clients were devised to beat Microsoft, among

K6JHIBMO

1    other competitors.  And specifically in his own words and the

2    evidence your Honor will see, he said of Microsoft that they

3    are competing in 100 percent of IBM's clients, and that was his

4    responsibility before he departed.

5         Another example which goes more closely to the issue

6    of secrets, Mr. Lima said in his 2020 business plan for

7    overseeing all these important clients that "we need to take

8    Azure" -- that's the Microsoft cloud -- "we need to take Azure

9    by surprise and by speed."  "Surprise," obviously, meaning

10   referring to strategies and products and directions that are a

11   secret to Microsoft and thus a surprise.

12        So what is the confidential information that Mr. Lima

13   knows, has access to, and was privy to as a result of all these

14   senior leadership positions?  There are several.  I'll go

15   through just a couple, your Honor.

16        Number one, as I mentioned, he was -- he participated

17   in and was aware of meetings and discussions and received

18   documents concerning IBM's global corporate strategy, including

19   the strategy to combat and, where possible, defeat Microsoft,

20   again, on a worldwide basis, which naturally includes Latin

21   America and, again, with respect to the most important turf in

22   the competitive war with Microsoft cloud.  That's number one.

23        Number two, he is aware of and was privy to and part

24   of discussions regarding products and development, product

25   innovations, product priorities to beat the competitions,

K6JHIBMO

1    again, to surprise, in his words, the competition.  That

2    includes, as we have identified, your Honor, because it is in

3    part public but not entirely, a first of its kind cloud

4    designed specifically for financial service businesses.  We

5    will get into that when we proceed to the preliminary

6    injunction, but just to give your Honor a sense of what we're

7    talking about, we're talking about access to a cloud designed

8    specifically to protect the privacy and security of the type of

9    data that financial service companies, investment firms,

10   insurance firms, and banks possess on behalf of their

11   customers.  Data security, data privacy, has been a huge

12   challenge in cloud computing, and IBM has a breakthrough.

13   Again, in Mr. Lima's own words, in his own strategic documents,

14   he referred to financial services as "a priority in the cloud

15   battle."  That's number two.

16          Number three, he had access to and was aware of the

17   strategy and usages of IBM's largest acquisition in its

18   history, that's what we have referred your Honor to as Red Hat,

19   which is an open source cloud platform, and that acquisition

20   was made specifically to compete against Microsoft and the two

21   or three other major cloud competitors.  How that acquisition

22   is going to be used, what type of products will unfold, and the

23   strategy for targeting clients with that new acquisition is

24   part of the surprise that IBM intends to use to compete in

25   cloud against Microsoft.  That's number three.

K6JHIBMO

1          Number four, client targets in head-to-head

2    competition with Microsoft.  And just to give your Honor

3    context, when we talk about client targets and head-to-head

4    competition, the largest battleground in terms of clients is

5    winning large enterprise businesses in large, long-term service

6    and product contracts, which are often or most often awarded

7    after RSP proceedings and enormous effort, and that is where

8    Microsoft and IBM butt heads with the world's biggest

9    companies, again, worldwide, in LA -- sorry, Latin America,

10   industry by industry, client by client.  That was his

11   responsibility but a month ago and for the balance or the first

12   half of 2020.  That's number four.

13          Number five, he's aware of and had access to what may

14   be the most sensitive information, IBM's forecasts for 2020 of

15   its client signings, its revenues, its profits, its margins,

16   and its pricing.  So what is it that he intends to do?  He

17   intends to go into direct competition against IBM for one of

18   IBM's fiercest rivals, Microsoft, which is in clear violation

19   of his noncompete agreement so long as he doesn't wait for 12

20   months, as he agreed he would and as he agreed would cause IBM

21   irreparable harm if he did not, in fact, honor his obligation

22   to wait 12 months.

23          The position he has accepted is the corporate vice

24   president for Latin America.  In other words, he is the CEO of

25   Microsoft in Latin America.  And here, I'm using words of the

K6JHIBMO

job description that Microsoft has provided to IBM, and bear in

mind, at this point this is all we know about his new job

because he haven't had a chance to take discovery.  But what we

know from Microsoft is the following:  As the de facto CEO of

Microsoft in Latin America, he will "be responsible for overall

strategy and direction of Microsoft in that region." He will

oversee all aspects of competition -- naturally, competition

against IBM -- involved in all operations, all functions, all

products, and all client battles.  His mandate, again,

according to Microsoft is to set direction to implement

Microsoft "global strategy."  He is to ensure in Latin America

that he is running Latin America in a "one Microsoft fashion."

So he is going to be privy to and be duty bound to implement

Microsoft's global strategy.

        Well, that's exactly what he knows from his senior

leadership roles at IBM.  He knows IBM's global strategy.  He

knows IBM's one company global plans, plans to compete against

Microsoft, plans to compete worldwide, which, again, obviously

include Latin America.  So he is going from a global corporate

role to a Latin America corporate role.  Obviously, Latin

America is part of the globe.  So there is a complete overlap

in job responsibilities, or put another way, Latin America is

fully covered by his prior role.

        Your Honor, we submit that under the governing law for

noncompetes in New York State, he should be enjoined.  He

K6JHIBMO

1    certainly should be enjoined until such time, quickly,

2    expeditiously the Court has a chance to rule.  And that's not

3    merely because it is a breach of his agreement, though it is,

4    it is because of the real and irreparable risk of what we all

5    know as inevitable disclosure.  It just so happens that one of

6    the leading cases, at least in this district, is an IBM case

7    involving the IBM noncompete decided by this very court, and

8    that is the case of *IBM v. Papermaster* decided by Judge Karas.

9            THE COURT:  I read it.

10           MR. ATKINS:  You read it.

11           THE COURT:  Yes.  I also read *Visentin* and *Johnson*.

12   So I get it.  I got it.

13           MR. ATKINS:  So I think in this case, on these facts,

14   at this time, it is, to quote Judge Karas, likely that Mr. Lima

15   will inevitably draw upon what he knows from IBM whether or not

16   that's intentional or in bad faith.  Among other things, like

17   Mr. Papermaster, Mr. Lima knows strategic plans, product and

18   development and long-term business opportunities.  So, as your

19   Honor can see and obviously decide for yourself, at this point

20   it is a question of whether there is a risk, whether it is

21   likely that there is a risk of inevitable disclosure given his

22   positions at IBM, his knowledge from within IBM, and where he's

23   going at Microsoft.

24           I might just point out by way of illustration how this

25   might manifest itself.  I found it interesting that in his

K6JHIBMO

1    declaration in opposition to the motion, or the TRO

2    application, he says in paragraph 20, and I quote:  "It is

3    dubious that IBM is a serious competitor to Microsoft with

4    respect to public cloud computing."  Now, how are we to suppose

5    that he knows or thinks that?  How is IBM to have confidence

6    that it is not based on what he learned and what he knows from

7    inside IBM?  That's kind of a crystallization, an example of

8    inevitable disclosure.  He cannot help himself given the type

9    of knowledge, secret knowledge, he brings with him from IBM.

10   And absent enforcement of the agreement, that is the very risk

11   that IBM faces and that IBM is entitled to be protected

12   against.  After all, that is what Mr. Lima agreed to.

13          So why is it that we need a TRO?  Obviously, to

14   preserve the status quo.  The parties had a standstill that

15   expired yesterday.  Mr. Lima would not consent, though we

16   asked, to a temporary restraining order pending your decision

17   on the preliminary injunction.  He has referred to the fact

18   that Microsoft appears to have agreed that he will not start

19   until July 15.  That, I suppose, is a partial restraining

20   order, but it's not sufficient because at least they have not

21   said and have yet to commit to him doing nothing with respect

22   to Microsoft, not engaging and not associating with Microsoft

23   in the words of the noncompete agreement.  We have in other

24   cases become familiar with what often happens in these

25   situations where even if "employment doesn't start" or the new

K6JHIBMO

employee doesn't go on the payroll, they begin communications with folks on the inside.  They get briefings, they attend meetings, or they listen to meetings.  They review documents.  They receive orientation.  That we need to be protected against as well to ensure that the status quo is, in fact, preserved until your Honor has a chance to rule.

          Likewise, he and Microsoft are threatening to jump the gun and announce his employment.  We were told they might do it as early as today.  They were good enough to refrain from doing so at least until this hearing.  We submit they should be required to refrain until there's a ruling and not, in effect, usurp your Honor's role to decide this issue, but rather, your Honor should preserve the status quo by enjoining him from starting, associating, or announcing his employment.  I would say that there's nothing that I have seen that the parties, particularly Mr. Lima, cannot wait the short time until the preliminary injunction, our motion, is decided.  As I mentioned, he's already willing to wait at least to some extent until mid-July.  There's surely no reason that we cannot be done with this exercise by end of July, of course, subject to your Honor's schedule and timing.  We've done this many times before, and I am confident that the parties, working together, can be efficient and reasonable and collegial and get this done by the end of July.  I have no reason to believe and have seen no evidence from Mr. Lima that he's in any financial extreme,

1    at least for the next month.  He was a highly compensated

2    executive with salary and bonuses in the neighborhood of a

3    million.  He's leaving, even after forfeiture, with equity

4    worth at least $3 million, so there's no reason to believe that

5    another month will put him in any jeopardy.

6             So, your Honor, for all those reasons, we respectfully

7    submit that the status quo be preserved, the parties have an

8    opportunity to take discovery, and your Honor have an

9    opportunity to rule on the preliminary injunction motion.

10            THE COURT:  Mr. Atkins, thank you.  I very much

11   appreciate your clarity.

12            Mr. McQuade, I'm happy to hear from you now.

13            MR. McQUADE:  Yes.  Good morning, your Honor.  So I

14   will start with Mr. Atkins' final points because I think it

15   goes to one of our -- one of the crucial issues that's before

16   us today on this temporary restraining order, and that is the

17   issue of irreparable harm.  Both Microsoft and Mr. Lima have

18   committed in writing to IBM that Mr. Lima will not start work

19   for Microsoft, will not commence employment with Microsoft,

20   before July 15.  Their entire irreparable harm argument is

21   based on the fact that he's going to start employment, and they

22   believe that there's a chance that he could use or disclose IBM

23   information.  Given that he's not going to start until July 15,

24   their entire irreparable harm argument collapses.  There's just

25   no -- there is no irreparable harm absent the issuance of a

K6JHIBMO

1    temporary restraining order.

2              With respect to the job announcement or the

3    announcement that Mr. Lima will be starting work with

4    Microsoft, there is no basis for that type of restriction.

5    There's no basis for it in the noncompete agreement.  IBM, in

6    fact, has already issued that statement essentially publicly by

7    commencing this lawsuit and taking -- and disclosing to the

8    world in their papers filed with the Court that Mr. Lima will

9    be commencing employment with Microsoft.  So the cat's out of

10   the bag on that one.  They can't ask Mr. Lima to put it back

11   in.  They're not entitled to that under the agreement, and I

12   think any restraint on Mr. Lima's ability to make such a

13   statement would impinge upon his First Amendment rights.

14             I don't even know how that would work.  I mean, if he

15   received a telephone call from a relative and he disclosed

16   what's going on in his life, that he accepted a position, he's

17   been named as a defendant in a lawsuit, that would be put him

18   at risk of violating a court order.  That can't be the case.

19   With respect to Microsoft's announcement, Microsoft is not a

20   party to this litigation, so there's no basis for restricting

21   Microsoft in making any type of announcement that it deems

22   necessary.

23             So with what, your Honor, we really don't see a basis

24   for a temporary restraining order.  We committed to not having

25   him commence work until July 15, and as Mr. Atkins said, we've

1   done this before.  We see no reason why we couldn't conduct the

2   discovery that we need to conduct and be in a position to have

3   this ultimate issue resolved in the injunction hearing.

4              THE COURT:  OK.

5              MR. McQUADE:  Your Honor, I'd also like to respond to

6   some of the other points --

7              THE COURT:  Sure.

8              MR. McQUADE:  -- the confidential information and the

9   other protectable -- alleged protectable interests under the

10  noncompete agreement.

11             With respect to -- there's a couple things that

12  Mr. Atkins did now point out, and that is in addition to IBM --

13  Microsoft's pledge to IBM that it would not start Mr. Lima

14  working with Microsoft until July 15, Microsoft also pledged

15  that it would wall Mr. Lima off from working on any of those

16  enterprise accounts, those top 77 accounts, for a period of one

17  year.  So he'd be entirely walled off from those.  He'd also be

18  entirely walled off from any customers that he worked with as

19  part of the partnership executive program.  So that takes

20  the -- that entirely takes the customer overlap issue out of

21  the case.  He's not going to be working with any of the same

22  customers during the first year of his employment with

23  Microsoft.

24             With respect to a number of the other alleged

25  confidential information that he was privy to, it's our

K6JHIBMO

1    position that the description of that information is

2    exaggerated, and as pointed out in Mr. Lima's affidavit --

3    declaration, it's our position that the affidavit submitted by

4    Mr. Walker is not based on firsthand information.  And your

5    Honor, I could refer you to page 15 of our memo of.  Law, we go

6    through each of the alleged categories of confidential

7    information that Mr. Lima was allegedly subject and privy to

8    during his employment at IBM.  We go through them point by

9    point, and Mr. Lima, in his declaration and as laid out in the

10   brief, we explain why there's no valid basis for the

11   allegations.

12        Your Honor, I'm glad to hear that you were able to

13   review the *Visentin* case.  I think that case is instructive and

14   it is -- it provides an example that's very similar to this

15   case.  It's a case that was where the Court granted the

16   preliminary injunction, and it was affirmed by the Second

17   Circuit.

18        Your Honor, also with respect to the inevitable

19   disclosure argument, as cited in our papers, the inevitable

20   disclosure doctrine is disfavored here in New York.  There was

21   a -- there are a number of cases cited in the brief where the

22   court has refused to apply the inevitable disclosure doctrine

23   and has pointed out that that doctrine is disfavored by New

24   York courts, particularly the *Marietta* decision cited in our

25   papers.

K6JHIBMO

1            Finally, your Honor, with respect to the harm to

2      Mr. Lima, there will be harm to Mr. Lima if he is required to

3      sit out for the -- for a temporary restraining order period,

4      and that is also laid out in our brief.  This is an individual

5      who has spent his whole life in this field, and it would be

6      inappropriate and unfair for him to have to sit out for any

7      period of time.

8            MR. DELIKAT:  Your Honor, it's Mike Delikat also for

9      the defendant.  If I could just make a very brief comment, if

10     that would be permitted?

11           THE COURT:  I want to make sure -- Mr. Delikat, I will

12     hear from you.  Let me make sure Mr. McQuade -- as we all know

13     and realize, we're talking to each other on the telephone, so I

14     can't see any of you, and I can't tell whether Mr. McQuade or

15     done or is taking a carefully planned breath to continue to

16     think what else he wants to say to me.

17           So if you're done, Mr. McQuade, terrific.  If you're

18     not, I don't want to cut you off.

19           MR. McQUADE:  Yeah, thank you, your Honor.  Michael

20     Delikat is with Orrick and on the papers on the case, so happy

21     to have him jump in.

22           THE COURT:  OK.  Mr. Delikat, it's all yours.

23           MR. DELIKAT:  Good morning, your Honor, and thank you

24     for hearing us today and for allowing me to add a few points.

25           We also very much believe, as you do, that burden of

1    proof is important and a temporary restraining order is an

2    extraordinary remedy that can only be issued -- we all know

3    what those conditions are, and that burden has clearly not been

4    met in this particular case.

5        I just want to respond to a couple of the other major

6    points that Mr. Atkins made about trade secret information that

7    IBM claims will be inevitably disclosed.  First of all, there's

8    never been a case under inevitable disclosure where -- even

9    outside this circuit, where that doctrine has been applied

10   unless there was a reason to believe that the departing

11   employee was untrustworthy or was a bad leaver or had done

12   something wrong, and there is absolutely no evidence of that in

13   this particular case.  So I think inevitable disclosure can be

14   taken off the table as it's been applied in any circuit.

15       They also make a really big point about competition in

16   the cloud.  We've been on many of these cases where Paul Weiss

17   is on the other side where cloud has been an issue for IBM

18   seeking to enforce these noncompetes, which it frequently does,

19   and as the Second Circuit said in *Visentin,* they use it not for

20   protectable interests but as a way of discouraging highly

21   qualified employees from leaving and improving their careers

22   and trying to do better in a situation.  And even here IBM has

23   already said in their papers publicly that Mr. Lima's

24   performance was no longer top notch, as far as they were

25   concerned.

K6JHIBMO

         With respect to any competitively sensitive
information that he has, he is also subject to an entirely
separate obligation of confidentiality of nondisclosure which
continues indefinitely, and they have a remedy if there is any
breach of that.  He said he has no intention and he has
reaffirmed his obligation to keep any information confidential.

         With respect to some of the big items that Mr. Atkins
talks about, the cloud, everybody in the technology space knows
that IBM is not at the same level of a competitor in the cloud
space as is Microsoft, Oracle, and Amazon.  Those are the three
big players.  IBM has for many years sought to effectively
compete in that space and, at least at the level that the three
big players compete in it, have been totally unsuccessful.
That's why they acquired Red Hat, because they couldn't make a
go of it.  Everybody knows what Red Hat does.  This was a
public acquisition.  Mr. Lima had no involvement in the
strategic decision to acquire Red Hat or its integration or
anything like that.  He knows nothing more than what the public
would know and what IBM has said publicly about its plans, why
it acquired Red Hat, to improve its position in the cloud
market.  So they do not compete at level.

         This attention to these 77 customers, clients, that
Mr. Lima had overall responsibility for, well, he took that job
on, your Honor, in January of this year.  As we all know, the
terrible tragedy of COVID beset us shortly after that.  He did

K6JHIBMO

1    not meet or interact or travel.  He's been doing what we've all

2    been doing in terms of sheltering in place, and so it's not

3    like he's worked with these 77 clients for the last six years.

4    He's been in a variety of different jobs.  His stint in South

5    America was three to four years ago.  We all know how rapidly

6    the market in technology and the technology itself changes.  So

7    anything he knew about what was happening then is totally

8    irrelevant today.

9         So there's a lot of smoke and mirrors in their "he

10   possesses most confidential information and somehow he

11   inevitably has to use that."  He doesn't.  And, you know, he's

12   not sitting at the arm of the chairman at Microsoft.  He has

13   overall responsibility for the business in South America.  He's

14   from South America.  He's comfortable in that space.  He can

15   put his skills, both language and understanding the culture and

16   markets down there, to use, but he hasn't done that work for

17   IBM for over three years.  And he has, as Microsoft has

18   promised, as Mr. McQuade said, to wall him off from any

19   dealings with clients that he had dealings with while he was at

20   IBM.  And then, on top of that, he has the independent

21   obligation on nondisclosure and confidentiality and

22   nonsolicitation of IBM employees going forward.

23        So what this case is about is an effort only to

24   enforce a noncompete, to send a message to every senior

25   executive at IBM, as they do when they -- as they filed dozens

K6JHIBMO

of this lawsuit, that if you leave, we will go after you.  We

will clawback your equity that we've given you, and we will

also seek to restrain you from working and sitting you on the

bench for a year in an industry, such as technology, that is

moving so rapidly so that by the time they get back into the

market, they're already a year behind all the changes that have

occurred.  It's a retention tool, and as the Second Circuit

recognized in *Visentin* that is not appropriate.  They've also

sued in this case for a recovery of his equity, to capture that

money back, and so they have a remedy that is not an equitable

remedy that is in compensation that they are attempting to

recover, and wherever the chips fall on that in the litigation,

the chips will fall in terms of whether he has to give that

back or doesn't have to give that back.

    THE COURT:  I understand.

    MR. DELIKAT:  So for all of those reasons, we think,

again, they have not met their burden for the extraordinary

relief of a temporary restraining order.

    THE COURT:  Thank you, Mr. Delikat.

    Mr. Atkins, I'm sure you're anxious to reply, but I

don't really need a reply.  I really don't.  I've heard enough.

I understand where I am.

    I first want to say, because you all know I'm new, I'm

the new judge, how much I appreciate counsel's presentations.

It's a pleasure to listen to lawyers like you who actually come

K6JHIBMO

forward with the relevant information and politely attempt to

steer the judge in the right direction, and I have to say how

much I enjoy listening to competent lawyers explain to me what

they want me to hear.  So thank you for putting in the time and

effort, and I hope some of the young lawyers who are listening

recognize that you're listening to lawyers who are highly

qualified and, as far as I'm concerned, very competent.  So

thank you for that.

          I want to be clear as to what's going on here, and so

I'm going to make a record of what I perceive to be going on.

And I will have a couple of questions, but I will get to my

ruling pretty quickly.

          This is an application for a preliminary injunction

and temporary restraining order that was filed yesterday

afternoon at 2 p.m.  The plaintiff filed an affidavit of a

Randy Walker, a global managing director of IBM; affidavit of

Mr. Signoracci, counsel at Paul Weiss; a memorandum of law; and

also pointed out to me a Microsoft case called *Matthews v.*

*Miszewski*.

          Plaintiff -- I'm sorry, the defendant filed the

affidavit of the defendant, the affidavit of an assistant

general counsel Ann Pannoni, as well as a memorandum of law,

all of which I've endeavored to read and understand.

          This action was commenced on June 15 by the plaintiff,

IBM, to enforce a noncompete agreement entered into between the

K6JHIBMO

1    plaintiff and the defendant on December 3, 2019.  The

2    affidavits reflect that this December 3 version of the

3    agreement is the most recent version of an agreement signed by

4    the defendant over the years.

5           On May 18, the defendant informed the plaintiff that

6    he intended to join Microsoft as a corporate vice president for

7    Latin America.  The defendant was employed by the plaintiff for

8    approximately 24 years.  From May 18 until now, the parties and

9    their counsel have been in regular communication, entering into

10   standstill agreements of limited duration.  Counsel for

11   Microsoft submitted an affidavit indicating that the defendant

12   will not begin employment until July 15, 2020, and that

13   defendants will have no involvement with Microsoft's business

14   relations concerning customers that were IBM integrated

15   accounts or that the defendant worked with previously.

16          On June 5, the defendant formally accepted the job

17   from Microsoft.  The plaintiff's complaint includes three

18   claims for relief.  The first claim for relief is a breach of

19   contract, noncompete seeking both money damages and preliminary

20   and permanent injunctive relief.  The second claim for relief

21   is a misappropriation of trade secrets.  And the third is a

22   declaratory judgment seeking declaration of the

23   plaintiff's right to rescind an equity award and to demand

24   repayment.

25          Let me just interrupt myself and say, Madam Court

K6JHIBMO

1    Reporter, are you OK?

2              (Discussion off the record)

3              THE COURT:  The noncompete agreement itself contains a

4    number of very straightforward and clearly written provisions

5    which the Court will consider in determining this application.

6              Paragraph 2(e) relates to the protection of "IBM

7    confidential information" and the nonsolicitation of customers.

8    Paragraph 2(f) relates to the nonsolicitation of employees.

9    Paragraph 3(f) creates a number of acknowledgements which the

10   Court will consider in connection with this application for a

11   temporary restraining order, as well as paragraph 4 which again

12   addresses irreparable injury and injunctive relief.

13             Counsel for both sides have addressed themselves to

14   the burden of proof for a temporary restraining order.  The

15   plaintiff has suggested that a case similar, *IBM v.*

16   *Papermaster*, 2008 WL 497508, a Southern District 2008 case,

17   where Judge Karas issued an injunction enforcing a similar

18   noncompete is what carries the day.  The plaintiff also has

19   pointed out that *Microsoft v. Miszewski*, that Microsoft itself

20   enforces its own noncompetes in court and cites that decision

21   from the Superior Court in Washington State for the proposition

22   that Microsoft as well enforces.

23             Defendant has suggested that this case is covered by

24   *IBM v. Johnson*, 629 F.Supp.2d 321, a Southern District 2009

25   decision which was affirmed at 355 F.App'x -- and I don't have

K6JHIBMO

the page, but it's a Second Circuit decision.  We'll supply

that page -- as well as *IBM v. Visentin*, 2011 WL 672025, a

Southern District 2011 case which was affirmed at 437 F.App'x

53 from 2011 where plaintiff's request for injunctive relief

was denied.  Mr. Visentin was a general manager at IBM leaving

for Dell, and Mr. Johnson was a VP of corporate development

leaving for HP.  In *Visentin*, Judge Seibel issued a temporary

restraining order and scheduled a preliminary injunction

hearing.  In *Johnson*, Judge Karas issued a TRO but permitted

the defendant there to commence work.  There was an issue in

that case, *Johnson*, initially about whether Mr. *Johnson*

executed the agreement at issue.  He apparently signed under

the IBM block to give him a -- signature block, to give himself

a chance to think more about whether he agreed with the

noncompete.  In *Papermaster*, Judge Karas also issued a TRO,

albeit after return date of the order to show cause because

apparently plaintiff there did not learn that Mr. Papermaster

had started working at Apple until then.

          The burden of proof on an application for temporary

restraining order is clear, and frankly, both sides agree.  In

order to sustain the proposition, there needs to be a

likelihood of success or sufficiently serious questions going

to the merits to make them fair grounds for litigation,

irreparable injury, and a balancing of the hardships in favor

of the movant.

K6JHIBMO

1          From what I see, there are sufficiently serious

2     questions going to the merits to make them fair grounds for

3     litigation.  It is clear to me that IBM and Microsoft are

4     competitors.  A valid agreement was signed by sophisticated

5     individuals with counsel available.  The restrictions as to

6     time and geography appear reasonable to me, and defendant

7     himself agreed with that conclusion in paragraph 3 of the

8     agreement.  The defendant and his new employer have

9     acknowledged that they will not have any involvement with

10    customers that were IBM integrated accounts or customers that

11    the defendant worked with concerning his partnership executive

12    program for 12 months from May of this year.  I construe that

13    as agreeing to the provisions of paragraph 2(e)(ii).

14          I also find that the defendant agreed to an injunction

15    should we find ourselves -- he find himself in this situation.

16    He said and agreed that -- and this is from paragraph 4 -- you

17    agree that the company would suffer irreparable harm if you

18    were to breach or threaten to breach any provision of this

19    agreement and that the company would by reason of such breach

20    or threatened breach be entitled to injunctive relief in a

21    court of appropriate jurisdiction without the need to post a

22    bond, and you further consent and stipulate to the entry of

23    such injunctive relief in such a court prohibiting you from

24    breaching or further breaching this agreement.

25          With respect to the confidential information covenant,

paragraph 2(e)(i), the defendant acknowledged in his agreement

the difficulty of understanding whether this agreement would be

breached.  He said:  You acknowledge that a mere agreement not

to disclose, use, or rely on confidential information after

employment by IBM ends would be inadequate standing alone to

protect IBM's legitimate business interests.  You acknowledge

that disclosure of, use of, or reliance on IBM confidential

information, whether or not intentional, is often difficult or

impossible for the company to detect until it's too late to

obtain any effective remedy.  You acknowledge that the company

will suffer irreparable harm if you fail to comply with

paragraph 1 or otherwise improperly disclose, use, or rely on

IBM confidential information.

        Defendant has offered to make his commitment date

July 15, 2020, which I take as an effort to comply with

paragraph 2(e)(i).  It appears to me on the papers that the

defendant has confidential -- IBM confidential information as

defined in this agreement worthy of protection, and I'm

applying the definition of the agreement set forth in

paragraph 2(e).  Just to give a feel for what I see, there is

confidential information in top client accounts and strategies,

acquisition strategies, including the deployment of this Red

Hat pricing strategies, competitive strategies.  There's

argument this morning that even at board meetings the defendant

revealed plans for competing with Microsoft.  He's on the

1    performance team.  He's a Band A executive in the top 1 percent

2    at IBM.  He runs a global portfolio for IBM's top 77 clients.

3    He's exposed to software, hardware, cloud computing, AI, IBM's

4    financial services ready public cloud, a new product.  There

5    are serious questions here which need to be adjudicated at a

6    hearing after discovery.

7         With respect to irreparable injury, as I previously

8    indicated, the defendant has acknowledged it both in

9    paragraph 3 and paragraph 4 of the agreement he signed.  The

10   risk of exploiting customer relations, goodwill, etc., as I've

11   indicated is irreparable injury.  That's *Ticor Title v. Cohen*,

12   173 F.3d 63, 69 (2d Cir. 1999).

13        With respect to the balance of the equities, as of

14   now, as of now, I believe the balance of equities favors the

15   plaintiff's legitimate interest in protecting their

16   contractually paid for rights.  The defendant, of course, has

17   an interest in continuing his career, but he agreed to these

18   restrictions, he was well paid for them, and he has

19   acknowledged his willingness to abide by them, albeit not

20   through May of 2021.  So far the defendant has indicated that

21   he has a financial hardship in a general way, in a way that I

22   can't adjudicate presently without any proof.  So, for all of

23   those reasons, I'm going to grant a limited temporary

24   restraining order.

25        Now, let me stop for a second.  I have not heard a

K6JHIBMO

1    word about and the papers do not reflect anything about

2    contacting current employees and leaving -- and soliciting

3    employees from leaving IBM, so I'm not going to consider in the

4    TRO that branch.  That's the first thing.

5            The second thing is I agree with counsel for the

6    defendant, both Mr. Delikat and Mr. McQuade, that I have no

7    business enjoining a nonparty or this party from announcing any

8    prospective employment.  I'm not going to do that.  I am going

9    to enjoin the defendant working and providing services, for

10   that would be in violation of this agreement.  For example,

11   rudimentary, if the answer to the temporary restraining order

12   was perhaps Microsoft would put him in a ministerial role, I

13   don't know what it would be.  I don't believe that IBM

14   bargained for that protection.  On the other hand, any

15   alternative position that would run the risk that IBM bargained

16   for would be inappropriate.

17           Now, I also did not hear, and I believe it's because

18   the parties to this litigation agree, that there would be no

19   bond required under Rule 65.  Am I correct about that, counsel?

20           MR. ATKINS:  Yes, your Honor.

21           THE COURT:  So I'm going to modify the temporary

22   restraining order, and I want to emphasize something.  I want

23   to be clear about something.  I'm crystal clear that what's

24   right here today is what I'm doing.  Obviously, that's what I

25   think.  I am interested in giving the parties an opportunity to

K6JHIBMO

1    complete expedited discovery and to actually come to my

2    courtroom where we'll be able to have a hearing in July.  I

3    have an interest in getting to the bottom of this and

4    understanding whether this is a case that a preliminary

5    injunction is appropriate, and I believe when we sharpen our

6    pens a little bit and get some of this discovery done, it will

7    become clearer as to whether or not this temporary restraining

8    order turns into some kind of a preliminary injunction.  But

9    for now, that's my ruling.

10           Now, I need to understand how long it will take for

11   the parties to complete preliminary injunction discovery.  I

12   heard both of you say there's collegiality here and mutual

13   respect.  I appreciate that.  There shouldn't be any fights

14   here about what we need to get done.  But how long do you need

15   to complete discovery in order to be ready for a hearing before

16   me on preliminary injunction?

17           MR. ATKINS:  Your Honor, given the July 4th in there

18   and all, I'm confident -- I'll come from the other end.  I am

19   confident we could have a hearing the week of July 20.

20           THE COURT:  Who's speaking?  Is that Mr. Atkins?

21           MR. ATKINS:  I was speaking.

22           THE COURT:  OK.  You need to identify yourself for the

23   reporter because she can't see you either.

24           MR. ATKINS:  I apologize.  It's Robert Atkins, counsel

25   for IBM.  And what I was saying was I was comfortable that we

1    would be able to have a hearing the week of the 20th, of

2    course, if your Honor is available.

3              MR. DELIKAT:  Your Honor, this is Mike Delikat for the

4    defendant.  As you know, there was an agreement here that

5    Mr. Lima would not start before July 15.  And we very much

6    appreciate the challenges to the system that are being caused

7    by COVID-19; however, the rules for a TRO in 65 are pretty

8    clear that they cannot exceed -- a TRO cannot exceed ten days

9    unless there is consent by the parties or good cause shown.  We

10   can supply the authority on this, but we think the authority is

11   clear that good cause would not be shown here to extend the TRO

12   beyond the ten-day period without having the preliminary

13   injunction adjudicated.

14             We would be willing to advance that schedule so that

15   we could appear before your Honor at some point before July 15

16   so that your Honor -- and your Honor seems very capable to go

17   through a lot of material and make decisions quickly here --

18   could make a decision around the July 15 date.  We're dealing

19   with two big law firms here that have a lot of people.  We can

20   double track whatever depositions are necessary.  It's not a

21   huge discovery case, by any means, given what the facts and

22   issues are in this case.  So we would like a date to appear in

23   your court several days before that July 15 date to present the

24   evidence and the arguments on the preliminary injunction with

25   the intent that your Honor could rule very closely therein to

K6JHIBMO

1    that date.  And under those circumstances, I think we would be

2    willing to consent to the extension, you know, of course

3    reserving all our rights.

4            THE COURT:  First of all, you will preserve all of

5    your rights with me every time we entertain any application.

6    Rule 65(b)(2), which is what you're referring to, extends the

7    period for 14 days, not ten.

8            MR. DELIKAT:  Fourteen, I'm sorry.

9            THE COURT:  And extends it beyond that for good cause

10   shown.  You're right to raise that issue.  I've got a couple of

11   logistic issues that may or may not be good cause shown.  We're

12   working our way out of the COVID period, and I am trying to get

13   the date on which you'll be able to enter the courtroom.  I

14   have two options in connection with this hearing.  One is to do

15   it in my courtroom.  It's courtroom 12D.  It's socially distant

16   and actually ready for civil juries.  So there's plenty of room

17   for counsel and the witnesses and everything else.  That would

18   be my preference.  I want to look at and hear from, in front of

19   me, these witnesses.  I want to meet them eyeball to eyeball

20   and take a look at and listen to them carefully.  That would be

21   my preference.

22           The other option, of course, is we could attempt a

23   Skype or a Zoom preliminary injunction hearing.  It is not out

24   of the question if you both insisted.  It's not my preference,

25   frankly.  It's not my preference.  I want to see and meet

K6JHIBMO

Mr. Lima.  I want to understand from the IBM individuals who
are going to appear and testify exactly what it is that they're
concerned about with Mr. Lima.  I want to hear more, obviously.
So it would be my preference.

     As to my ability to comprehend, I assure you that I am
endeavoring to do what's right, and I'm endeavoring -- you both
earnestly came to me and asked me to expedite.  I did, and I am
always happy to help lawyers.  I just don't know, Mr. Delikat,
that I can hear the testimony and rule before the 15th.  I
would encourage, I would encourage, that you consider the
possibility so as to give the judge a reasonable opportunity to
rule.  You know what I've ruled on now.  You understand where I
am.  You could try to enter into some kind of an understanding
that gives us a fair amount of time.  Otherwise what we'll do
is we'll have a return date on the temporary restraining order
for 14 days from today, and you'll come back and tell me in 14
days why I should or should not extend it, and I will hear
argument with an open mind and determine what to do in 14 days.

     If we need to do that, OK by me.  You're entitled to
that.  I'm trying to expedite for both parties a resolution
here.  I've been in this problem approximately 22 hours, and
I've done my level best to call it as I see it in accordance
with the law and the burden of proof, subject to further proof.
So if you need to insist on the 14 days, we'll get a conference
date.

1          Let me get my courtroom deputy.  I don't know what it

2     is you want to do.  Do you want to wait 14 days come back?

3          MR. DELIKAT:  Your Honor, this is Mr. Delikat.  Let me

4     respectfully suggest perhaps one other thing.  I think

5     everything you said is eminently reasonable and fair,

6     especially under the circumstances, and we very much appreciate

7     how quickly you got deeply into the facts of this case since

8     the papers were filed yesterday.

9          Because we know your schedule will also be in demand,

10    might it be possible as part of this -- and I have no idea

11    what's on your schedule -- to set the hearing on the

12    preliminary injunction for July 13, which is a Monday, or some

13    period right around there, right around the 15th?  We can, of

14    course, have the two-week capture date that you're speaking to,

15    the 14 days, but at least knowing, subject, of course, to your

16    Honor's schedule, that we're moving towards really an

17    expeditious preliminary injunction hearing and that gives the

18    parties, you know, three full weeks -- July 4 is a Saturday

19    this year -- but three full weeks with the exception of July 4

20    to do what they have to do with respect to discovery.

21          THE COURT:  Let me ask you a question.  I realize you

22    have a client who agreed to July 15, and I appreciate that and

23    I respect that.  What I'm wondering is whether it would be

24    possible to, by agreement or not, extend that date a couple of

25    days.  I have to go and get a firm commitment -- let me get my

K6JHIBMO

1   courtroom deputy.

2          Frank -- first of all, on the 13th or the 20th, are

3   both counsel available for a hearing?

4          MR. DELIKAT:  Defendant is.

5          MR. ATKINS:  Yes, your Honor.

6          THE COURT:  Plaintiff?

7          MR. ATKINS:  Yes, your Honor.

8          THE COURT:  OK.  Frank, could you please look and see

9   what we have.  We're going to need probably -- these lawyers

10  are familiar with the Rules of Evidence -- probably a day or

11  two, maybe two days, for a hearing here to get to the bottom of

12  this.  What about the 14th, Frank, two days?

13          We're just checking, counsel.  Give me a chance here.

14          MR. ATKINS:  Your Honor, it's Mr. Atkins.  When the

15  moment is right, I'd just like to share my thoughts about this.

16          THE COURT:  Of course.

17          MR. ATKINS:  Would you like me to go ahead?

18          THE COURT:  No, hold on a second.  Let me do one thing

19  at a time.

20          MR. ATKINS:  That's what I figured.

21          (Discussion off the record)

22          THE COURT:  So, counsel, where I am is the public --

23  I'm actually here in the courthouse today where a lot of judges

24  actually are and have been for this entire period, trying to do

25  what's right.  They're saying when the courthouse hits Phase 2,

K6JHIBMO

1     not New York City but the courthouse, the public will be

2     allowed back in, and we're allowed to have hearings and do

3     whatever we want.  The current thinking is that will be the end

4     of the month of June, and so I will -- we'll have to get firmer

5     on that.

6             But before I set this date, Mr. Atkins, you have

7     politely been quiet, listening to Mr. Delikat on the issue of

8     14 days, etc.  What would you like to say about that or

9     anything else?

10            MR. ATKINS:  Thank you, your Honor.

11            I think because of the slowdown in work, the obstacles

12    created by COVID, notwithstanding the prospect of things

13    opening up slowly, it's been my experience in the last several

14    months that things that appear to take -- ordinarily would take

15    one week end up taking two weeks.  In addition, we may well

16    have need of your services, let me put it that way, in terms of

17    discovery issues.  For example, we're going to need discovery

18    from Microsoft.  We need -- we're still waiting on access to

19    Mr. Lima's electronic devices which are in the hands of some

20    forensic vendor.  If history teaches, these things take more

21    than a couple of days.

22            So it would be my recommendation and suggestion that

23    we just buy ourselves one other week and do it on the 20th.  I

24    don't see any prejudice or harm to anyone.  And I suppose I

25    would add, July 4 -- of course, Mr. Delikat and I have worked

K6JHIBMO

through holidays many times before, but I don't see the

necessity of doing that here.  So taking into account all those

factors, having done this many times, I just think the 20th is

going to be a more reliable date to get this done and give your

Honor an opportunity to rule on a full record.

THE COURT:  Frank, would you just look and see on our

calendar the 20th and the 21st, what we have on those days.

(Discussion off the record)

THE COURT:  My courtroom deputy's pointing out to me

that on the 27th and 28th, I have two clear days.  I want to

accommodate the lawyers and their needs as best I can.  I don't

know whether it's even possible on the 20th or the 21st.  So

let me just wait and get that.  So if I issue a temporary

restraining order, today is the 19th, so there'd be ten days

plus four days, that would bring me to July 4.  I guess that

would get me to Monday, the 6th, 14 days.

(Discussion off the record)

THE COURT:  All right.  I would say this:  We're going

to block out two two-day periods primarily because (a) I want

to accommodate Mr. Delikat and his clients July 15, so we'll do

the 14th and the 15th.  We're going to also block out, Frank,

the 20th and the 21st, mark both of those days out, and we'll

see the answer to which days are going to be -- from my end are

going to be COVID-related and public coming into the courthouse

related.

K6JHIBMO

1          Now, Mr. Atkins, you raise an interesting question

2     about the discovery.  So on Monday, the 6th of July, Frank,

3     let's fit everybody in for a hearing on whether or not this

4     temporary restraining order should be extended another 14 days,

5     and that will get me to a hearing one way or the other,

6     hopefully.  I'm going to need -- they're going to want to talk

7     at least an hour.

8          July 6 at 10:30.  OK.  So for the moment, I'm going to

9     make this motion returnable, I think, on the 14th, subject to

10    the Court adjourning it to the 20th for COVID reasons.

11         Now, on the discovery, what I may do is I may have you

12    talk to the magistrate.  I have an enormous amount on my plate,

13    and I would prefer if we're going to get into the weeds and

14    bang and holler at each other, I prefer that the magistrate

15    hear all of that, and I can keep a clear mind about the merits

16    here for my hearing and not get dragged into the

17    plaintiff-against-defendant and defendant-against-plaintiff

18    issues.  So I think what I'll do is I'll send you to the

19    magistrate for discovery issues on the preliminary injunction,

20    unless somebody has a serious objection to that.

21         MR. DELIKAT:  Your Honor, it's Mr. Delikat.  I think

22    that's a very sensible decision.  Hopefully, we can work out

23    our discovery with Paul Weiss on this, but if not, we will go

24    to the magistrate.  I assume we could do that by letter at that

25    point to resolve any disputes we have.

K6JHIBMO

1          THE COURT:  I'm going to issue an order directing the

2     magistrate to hear the discovery issues, and then I don't know

3     who is the magistrate in this case.  I don't have it in front

4     of me, but whomever it is, he or she will address your

5     discovery issues in the manner in which they do it.

6          MR. DELIKAT:  Yeah, I think we know who it is, Jim.

7     It's the same magistrate we had in the last IBM case.

8          MR. ATKINS:  Your Honor, it's Mr. Atkins.  I believe

9     it's Magistrate Davidson.

10          THE COURT:  Oh, Davidson.  Terrific.  Wonderful.

11     That's great.  OK.

12          I would also encourage -- as my last point, the

13     parties here are very sophisticated, and the clients have

14     retained extremely competent counsel.  You can resolve this

15     problem without having to appear before me and do a preliminary

16     injunction hearing by each being a little uncomfortable with

17     the resolution.  I know you know that.  Don't be afraid to

18     engage that discussion while you're addressing your discovery

19     issues.  This is a solvable problem that counsel is able to

20     solve.  I take it this is not your first rodeo together, and so

21     you know each other's points of view, and I'm sure in other

22     situations you've come to a proper resolution that neither of

23     you is completely satisfied with.  So don't be afraid to do

24     that here.

25          MR. DELIKAT:  Will do, your Honor.

K6JHIBMO

1          THE COURT:  All right.  I'm going to make this

2     returnable on the 14th, and I'm going to put an asterisk

3     subject to the Court moving it to the 20th for purposes of

4     courtroom availability.  I'll get an order out today on your

5     going to see Magistrate Davidson.

6          Is there anything else I can do for the moment for

7     either of you?

8          MR. ATKINS:  Your Honor, it's Mr. Atkins.  I just had

9     a -- just wanted a clarification on the form of the order or

10    the text of the order.  I'm looking at our proposed order.  I

11    presume that you -- well, let me start with this:  You

12    mentioned in your ruling that we had not addressed the issue of

13    nonsolicitation of contacting current IBM employees.

14         THE COURT:  Right.

15         MR. ATKINS:  OK.  I just want to point out that is in

16    the proposed order.

17         THE COURT:  I'm striking it.

18         MR. ATKINS:  OK.

19         THE COURT:  I'm striking it.  I'm striking the

20    announcing.  I'm going to work with your order.  I'll do my

21    best to not make a mess of it, and I'm hopeful that we can get

22    our hearing going.  If you do have discovery issues that are

23    going to get in the way and you both agree that it's not

24    possible to start on the 14th and you want to adjourn or move

25    these dates, one of you can write to me on consent and make

K6JHIBMO

1   proposals, and I'm happy to listen.  OK?

2             MR. ATKINS:  Your Honor.

3             THE COURT:  Yes.

4             MR. ATKINS:  At the risk of overstaying my welcome, I

5   wouldn't want the record to be unclear.  Your Honor isn't

6   suggesting that Mr. Lima is permitted to contact IBM employees

7   given that the agreement prohibits him from doing so?

8             THE COURT:  Let me be crystal clear -- and thank you

9   for that -- the agreement says what the agreement says.  One of

10  the things I'm learning is that I need to adjudicate only what

11  the lawyers ask me to adjudicate and which is supported by

12  evidence.  There is no evidence before me about Mr. Lima

13  contacting current employees to influence them to leave IBM.

14  That has nothing to do with whatever contractual obligations he

15  has.  And you should never infer that I'm suggesting something.

16  I would rather just say it one way or the other.  I'm not

17  inferring anything such at all.

18            MR. ATKINS:  Thank you, your Honor.

19            THE COURT:  OK.

20            MR. DELIKAT:  Your Honor, Mr. Delikat.  Just one

21  ministerial matter.  Madam Court Reporter, how do we go about

22  contacting you if we want to get an expedited transcript?

23            (Discussion off the record)

24            MR. DELIKAT:  Jim McQuade, anything further I might

25  have missed?

K6JHIBMO

1              MR. McQUADE:  No, I think that covers it.

2              THE COURT:  Thank you, counsel.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25