K7L5ibm1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

INTERNATIONAL BUSINESS
MACHINES CORPORATION

                    Plaintiff

          v.                              20 Civ. 4573 (PMH)

RODRIGO KEDE de FREITAS LIMA

                    Defendant

------------------------------x
                                          New York, N.Y.
                                          July 21, 2010
                                          9:45 a.m.

Before:

                    HON. PHILIP M. HALPERN

                                          District Judge

                         APPEARANCES

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
        Attorneys for Plaintiff
PIETRO J. SIGNORACCI
ROBERT A. ATKINS
LIZA MAY VELAZQUEZ

ORRICK HERRINGTON & SUTCLIFFE LLP
        Attorneys for Defendant
JAMES H. McQUADE
MARK R. THOMPSON
MICHAEL DELIKAT

K7L5ibm1

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Would the plaintiffs please stand
 3    and note your appearance?
 4              MR. ATKINS:  Robert Atkins from Paul Weiss for
 5    plaintiff IBM.
 6              THE COURT:  Good morning.
 7              MR. ATKINS:  Good morning.
 8              MR. SIGNORACCI:  And Pietro Signoracci from Paul Weiss
 9    for plaintiff IBM.
10              THE COURT:  Good morning to you as well.
11              MR. SIGNORACCI:  Thank you, your Honor.  Liza May
12    Velazquez from Paul Weiss for plaintiff IBM.
13              THE COURT:  Good morning.
14              MR. DELIKAT:  Good morning, your Honor.  Mike Delikat
15    from Orrick Harrington for the defendant Lima.
16              THE COURT:  Good morning, counsel.
17              MR. McQUADE:  Good morning, your Honor.  James McQuade
18    from Orrick for defendant Rodrigo Lima.
19              THE COURT:
20              MR. THOMPSON:  Good morning.  Mark Thompson for
21    defendant Rodrigo Lima.
22              THE COURT:  Good morning.
23              I am glad everybody is here; we are socially
24    distanced.  I was anticipating that counsel, if you are
25    interested, might make a brief opening statement and I would
```

1    like to make one when you are both done.

2             Is there anything you would like to emphasize,

3    Mr. Atkins, at the beginning?

4             MR. ATKINS:  I don't want to take too much of the

5    Court's time because we have a lot of testimony to get through.

6    I think I will just introduce you to the witnesses in advance,

7    who you will be seeing today.  The first witness we will be

8    calling is Mr. Randy Walker.  He is the man responsible for,

9    among other things, the financial services cloud which will be

10   the subject matter of much testimony.  The second witness will

11   be Juan Zufiria who was Mr. Lima's supervisor or boss during

12   2019, and the last will be Bridget Van Kralingen, who was

13   Mr. Lima's boss during 2020.  Each of them will testify to

14   Mr. Lima's access to and knowledge of IBM confidential

15   information and trade secrets, hopefully answering the

16   questions you had when we had the TRO argument.  I think you

17   will find that the record, now, of testimony and documents

18   produced, and there were somewhere -- correct me if I am wrong,

19   team -- but something north of a hundred thousand pages of

20   documents produced, texts, e-mails, demonstrate that Mr. Lima

21   was exposed to, participated in, and generated confidential

22   information trade secrets across a wide range of subjects.  I

23   think that you will see that by virtue of his high level of

24   seniority he was, if you will, your Honor, in the room, both

25   literally, remotely now, in some of the highest level

K7L5ibm1                              Opening – Mr. Atkins

1    discussions at IBM -- board of directors meeting, leadership

2    teams, meetings with the chair and CEO, both the former and

3    current one discussing corporate strategies worldwide across

4    the entire portfolio of IBM products and services.  So, he left

5    IBM immersed in confidential information relating to virtually

6    every aspect of IBM's business.  I think there is little

7    dispute, though you will hear much argument that IBM and

8    Microsoft are competitors and indeed fierce competitors, and

9    though Mr. Lima is now proposed to take a job in one

10   geography -- one of the largest geographies on the planet,

11   Latin America -- his job will be to compete against IBM to take

12   sales from IBM, to win share away from IBM, and to do that

13   knowing what IBM's strategies are worldwide and thus, in Latin

14   America, to defeat Microsoft, and to do so with new

15   initiatives, new products, new strategies, new offerings, and

16   he has been put in the position where it is inevitable,

17   notwithstanding his professed good faith and intentions, it

18   will be inevitable that he will call upon, rely on, use what he

19   knows about IBM in developing, contributing to the creation of

20   Microsoft's global strategies and implementation of those

21   global strategies in Latin America.  And, as your Honor is

22   aware from the papers, the inevitable disclosure doctrine does

23   not require the actual physical nest of trade secrets, the

24   actual misappropriation in the sense of downloading and

25   removing data and documents.  It requires putting the person in

K7L5ibm1                        Opening – Mr. McQuade

1    a competitive position such that notwithstanding best

2    efforts –– and there is a question about whether he will make

3    best efforts or Microsoft will make best efforts –– but

4    notwithstanding the best of intentions, being put in a position

5    knowing the playbook of the competitor that it is inevitable

6    that he will be called upon, will rely on, will use what he

7    knows about IBM.  And that's exactly what he bargained not to

8    do, it's why he stipulated the noncompete agreement, that a

9    confidentiality provision or agreement is insufficient.  You

10   will hear him testify that he agrees that there should be

11   mechanism to prevent former employees from going to competitors

12   even in the face of a confidentiality agreement.

13          And so, for those reasons, as we will walk through the

14   testimony, we think we have more than established sufficient

15   evidence to warrant a preliminary injunction to prevent

16   Mr. Lima from taking this proposed job at Microsoft.

17          THE COURT:  Thank you.

18          MR. ATKINS:  Thank you, your Honor.

19          MR. McQUADE:  Good morning, your Honor.

20          THE COURT:  Good morning.

21          MR. McQUADE:  The evidence from the documents and the

22   seven depositions that were conducted during the expedited

23   discovery in this case, as well as the live testimony and

24   videotaped testimony and zoom testimony that your Honor will

25   hear over the course of this two-day hearing, will establish

K7L5ibm1                    Opening - Mr. McQuade

1   that IBM is unable to carry its heavy burden for the

2   extraordinary relief it seeks here in this court.  That's for a

3   number of reasons, your Honor.

4           First, Mr. Lima has accepted a position at Microsoft

5   which is unrelated to any position he had held at IBM over the

6   course of the last three years, and Microsoft has intentionally

7   shaped that role to assure that no confidential information he

8   may have learned at IBM will be implicated in his new job at

9   Microsoft.

10          Second, none of the confidential business information

11  that Lima may have been exposed to is of any interest at all to

12  Microsoft or of any use to Lima in his position at Microsoft.

13  What IBM describes as the major battleground for technology,

14  the battle for business cloud services, Microsoft has a market

15  share that is 10 times the size of IBM's.  The business

16  community publicly and uniformly has characterized IBM's

17  strategy on cloud as a complete failure and IBM is only now

18  trying to pivot to be more like leaders in cloud like Amazon,

19  Microsoft, and Google.  Lima's knowledge of IBM's failed

20  strategy in cloud and services and IBM's plan to chase the

21  market leaders like Amazon, Microsoft, and Google will not be

22  intentionally or inadvertently shared with his new employer.

23          Third point, your Honor:  No client relationships with

24  which Lima had substantial involvement over his last three

25  years at IBM is in any way at risk for IBM given Lima's

K7L5ibm1                    Opening - Mr. McQuade

1    geographically based responsibilities for only Latin America

2    and the restrictions that Microsoft has already placed on his

3    client contacts.  Microsoft and Lima proactively agreed that

4    Mr. Lima would be precluded from contact with a group of 77 IBM

5    clients that Mr. Lima worked with in his most recent role at

6    IBM, as well as any customers that Mr. Lima worked with as part

7    of his IBM partnership executive program for a period of one

8    year following his resignation from IBM.  These restrictions

9    are sufficient to protect IBM's customer relationships.

10           Fourth.  You will hear today from a number of

11   witnesses -- from each of IBM's witnesses, I believe -- that

12   Mr. Lima is a person of integrity who respects IBM's

13   confidential information and has pledged not to reveal or

14   leverage any of have information in his new role.  The

15   protection of trade secrets is the policy reason behind

16   noncompete agreements and without a legitimate threat to

17   confidential information, restrictions on employment cannot be

18   justified and they're not justified here.

19           Fifth point.  IBM's interpretation of its and

20   Mr. Lima's noncompetition agreement is inconsistent with New

21   York Law because it does not protect legitimate interests.

22   It's unreasonable in time and scope and it is unreasonably

23   burdensome to Mr. Lima and it is harmful to the general public.

24           Six.  If the Court grants this injunction, the

25   injunction that IBM seeks here, Mr. Lima will be required to

K7L5ibm1                         Opening – Mr. McQuade

1    pack his bags and the bags of his wife and his two children,

2    get on a plane and travel to Brazil, a country that has been

3    described in the press as a COVID-19 nightmare.  In doing so,

4    he will have to uproot his two young children from their

5    schools in Greenwich, Connecticut to attend an unfamiliar and

6    very different school system in Brazil as early as a couple

7    weeks from now.

8            IBM's aggressive tactics are not new.  IBM has

9    repeatedly tried to prevent employees from working for other

10   tech companies in any capacity for 12 months, a strategy

11   designed to retain talent rather than to protect trade secrets.

12   Your Honor is familiar with the *Visentin* case, a case in which

13   the Court held that IBM's noncompetition agreement is designed

14   not to protect a legitimate business interest but rather to

15   keep the leadership talent of IBM from leaving.  This case

16   presents even a more compelling set of facts than the *Visentin*

17   case did.  The evidence will show that IBM has evoked this

18   judicial process not to protect its trade secrets which are of

19   no use to Mr. Lima and of no use -- or of any interest to

20   Microsoft but to discourage its executives from leaving by

21   making examples of those who choose to advance their careers

22   elsewhere.

23           That's our position, your Honor.  We intend to present

24   three witnesses over the course of the hearing, one via

25   videotape deposition which the parties have agreed to, one via

K7L5ibm1

1   the zoom platform who will be testifying from Europe, and

2   Mr. Lima himself.

3           Thank you, your Honor.

4           THE COURT:  Thank you, counsel.

5           Let me say this.  I know, because I have read a number

6   of these cases, that all of you are extremely familiar with

7   this issue and I have now looked at some of these cases.  I

8   want you to pinpoint for me the issues that I have to deal

9   with.  There is a contract provision that has elements to it

10  and IBM suggests that they've met all the elements.  The proof

11  should be directed at those elements and none other.

12          You have also claimed in your common law trade

13  misappropriation that there are trade secrets.  They have to be

14  secrets.  There is a test.  Both of you have pointed me in the

15  direction of the test.  If you want to pursue that line you

16  will need to give me proof and no other proof.  I am not

17  interested in debating how many angels there are on the head of

18  a needle, I am interested in understanding what proof we have

19  to address the contractual obligation that exists, both sides

20  acknowledge it, I want to know is there proof or not, and as to

21  the common law cause of action claim for relief that's being

22  pursued, are there trade secrets here.  Okay?  So, that's one

23  point.  I don't need anything else, that's what I am here to

24  do.  We are going to call balls and strikes on each of these

25  issues and we are going to get to it promptly.

K7L5ibm1

1          Now, one other issue.  After you were kind enough to

2    follow my rule I modified your protective order slightly to

3    decide that the Court will decide -- not nonparties, not

4    parties -- what is and what is not to be sealed.  In

5    anticipation of these issues, because they're referred to in

6    all of the cases, I directed all of you to Magistrate Judge

7    Davison, whom I have high regard for on discovery issues, and I

8    asked you, please, go to him and solve your discovery issues so

9    that I don't have to and so that I can stay focused on the

10   merits and not the sideshow of what should be sealed or not.

11         Apparently -- I am inferring because I got a letter at

12   10:45 last night, ECF -- that we haven't met and conferred on

13   that subject, we have no agreement on that subject, and

14   certainly you haven't gone to see Magistrate Judge Davison.

15         So, what I would suggest, as a practical solution, you

16   have me for two days.  I assume you don't want me to go

17   document by document and decide what should be sealed.  I would

18   urge each side to get one person who is authorized, go outside,

19   go in the jury room -- they should socially distance -- see if

20   you can get Magistrate Judge Davison on the phone and figure

21   out by agreement or otherwise what should be sealed and what

22   should not.  I'm not wholesale sealing anything, the public has

23   an interest here.  We are in court fighting in a public forum

24   over a contractual provision but I will protect and I will seal

25   those items that need to be sealed.  The law is very clear.

K7L5ibm1

1    Okay?

2              So, I am putting it to counsel to please maybe take a

3    group, figure out how you want to deal with the sealing.  As an

4    alternative to that, I am happy to spend my two days going one

5    document at a time out of infinite patience for all of you, I

6    will do it one at a time, we will go through each and every

7    request one at a time but at the end of the two days I have to

8    go to the next thing so I won't have time to hear your

9    witnesses, if that's how we spend our time.

10             So, I am encouraging you politely to please figure out

11   amongst yourselves how you are dealing with the sealing issue

12   before Magistrate Judge Davison while we hear testimony.  If I

13   am feeling the vibe here, I think we can start taking testimony

14   without having to run into sealing immediately.  I may be wrong

15   about that.  Counsel?  Okay?  Can we arrange that while we are

16   beginning our preliminary injunction here?

17             MR. DELIKAT:  Yes.  Thank you, your Honor.  I think

18   that's a thoughtful suggestion.  We would also hope, because we

19   only have two days, that one day each roughly can be allotted

20   to each side to be able to present their cases and not get

21   caught up in the minutia of going document by document.

22             THE COURT:  I get it.  I don't know about the one day

23   each but I'm going to hear everybody fully because I need to

24   and I want to, I am interested in understanding every scrap of

25   testimony here, and documentation.

K7L5ibm1                        Walker – Direct

1              So, all right.  With that, Mr. Atkins?

2              MR. ATKINS:  We call our first witness, Randy Walker.

3    Mr. Signoracci will present the witness who is joining us

4    remotely, I believe.

5              THE COURT:  We are anticipating this will work

6    flawlessly, this is the Southern District of New York.

7              The record should reflect that I see Mr. Walker.  I

8    assume that is you, Mr. Walker?

9              THE WITNESS:  Yes, sir, it is.

10             THE COURT:  I didn't think there would be any

11   interlopers.

12             THE DEPUTY CLERK:  Okay, great.  Mr. Walker, just

13   raise your right hand, please.

14    RANDY I. WALKER,

15        called as a witness by the Plaintiff,

16        having been duly sworn, testified as follows:

17             THE DEPUTY CLERK:  Mr. Walker, please state your name

18   for the record and spell it slowly.

19             THE WITNESS:  Randy I. Walker.

20   DIRECT EXAMINATION

21   BY MR. SIGNORACCI:

22   Q.  Mr. Walker, can you hear me all right?

23   A.  I can.

24   Q.  Excellent.

25             Mr. Walker, where do you reside?

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm1                          Walker - Direct

1    A.  6844 Sunrise Court in Coral Gables, Florida.

2    Q.  And is that where you are testifying from today?

3    A.  That is correct.

4    Q.  And you are there because of the COVID-19 situation,

5    correct?

6    A.  That is correct.

7    Q.  Mr. Walker, by whom are you employed?

8    A.  IBM.

9    Q.  And prior to the COVID-19 situation, where was your work

10   located?

11   A.  590 Madison Avenue, in New York, in Manhattan.

12   Q.  What is your current position at IBM?

13   A.  My current position is I'm the global managing director for

14   financial services.  I am the acting general manager for

15   integrated accounts for IBM.  I am also a member of the

16   performance team and the acceleration team.

17   Q.  Thank you.

18          How long have you held the role as acting general

19   manager of integrated accounts?

20   A.  Since mid-May.

21   Q.  And why did you succeed to that role?

22   A.  When Rodrigo left Bridget Van Kralingen asked me to take on

23   the acting role at that time.

24   Q.  And when you referred to Rodrigo, that's the defendant in

25   this case, Rodrigo Lima?

K7L5ibm1                              Walker - Direct

1    A.   That is correct.

2    Q.   Thank you.

3              Can you tell us about your working relationship with

4    Mr. Lima before he resigned from IBM?

5    A.   Yes.

6              Rodrigo and I had been colleagues for 15 plus years in

7    a number of roles when I was in Asia and he was in Latin

8    America.  We worked closely together last year when I was the

9    managing director for AT&T.

10             THE COURT:  The court reporter needs to be able to

11   transcribe everything so if you wouldn't mind, if it is not

12   normal or unnatural, keep your voice up, please.

13             THE WITNESS:  I will.  I will.

14             (Record read)

15   A.   And then at the beginning of this year I took the new

16   role -- sorry, there is a lot of background noise here.

17             So, at the beginning of the year when I took on the

18   global managing director of financial services, I worked

19   closely with Rodrigo in his role as the general manager for

20   integrated accounts.

21   Q.   And you mentioned some teams that you participate on.  Did

22   you work with Rodrigo on those teams as well?

23   A.   Yes; both Rodrigo and I have been long time members of the

24   IBM performance team which is the-handpicked by our CEO that

25   run -- the performance team is handpicked by the CEO, it is the

K7L5ibm1                          Walker - Direct

1    top 60 execs in IBM and the purpose of that is to run the

2    company both operationally and strategically.  We are also part

3    of the acceleration team, that is the top 300 execs at IBM and

4    that is to lead the strategy and execution to accelerate IBM's

5    growth.

6    Q.   And you said that you succeeded to the role of general

7    manager of integrated accounts when Rodrigo resigned.  I will

8    state for the record that we are currently in open court, in

9    public, so I will ask you to keep your answers at high level

10   but can you tell us about IBM's integrated accounts business?

11   A.   The integrated accounts is a program where it was

12   established by our CEO actually where we select the top

13   accounts, the most strategic accounts for IBM, and on those

14   accounts we put a director -- I'm on it with a full-time team

15   to focus on those accounts both tactically around the execution

16   but also strategically around building partners with --

17   currently we have 77 of those accounts around the world and

18   they cut across all of our industries and all of our geography.

19   Q.   And who reports to you in your role as the general manager

20   of integrated accounts?

21   A.   In my role in the integrated account role I have two sets

22   of individuals; I have a core team which handles the broker

23   managed side of the integrated accounts, HR, strategy, finance,

24   the core team, and then all of the 77 managing directors around

25   the world report to me from my integrated accounts role.

K7L5ibm1                           Walker - Direct

1    Q.  And to whom do you report?

2    A.  Bridget Van Kralingen, who is the senior VP of global

3    markets.

4    Q.  And this is the role that Rodrigo Lima had when he

5    resigned, correct?

6    A.  Correct.

7    Q.  Do you know what his previous role was?

8    A.  Yes.  Rodrigo was the general manager of global technology

9    services for North America.

10   Q.  And you referred to global technology services as GTS; is

11   that correct?

12   A.  That is correct.

13   Q.  What does IBM's GTS business do?

14   A.  IBM's GTS business, it provides technology services in

15   support of our clients, that is everything from tactical

16   technology services installing and running data centers,

17   computer systems, software to our large -- leading our large

18   complex relationships, transformational deals, and partnerships

19   that we have with clients.

20   Q.  And, to your knowledge, what were Rodrigo's

21   responsibilities in that role?

22   A.  In that role as global technology services he had the

23   responsibility for the profit and loss, the strategy, the

24   execution for global technology services for North America

25   which included in that role the global firms that were U.S.

K7L5ibm1                    Walker – Direct

1    headquartered.  So, he would be taking responsibility for AT&T,

2    Wal-Mart, Citi, other global clients, but the local geo where

3    they're headquartered would be taking responsibility for those.

4    Q.  And now that Mr. Lima has resigned from IBM, do you have an

5    understanding of what he plans to do next?

6    A.  My understanding is this:  Corporate executive vice

7    president for Latin America for Microsoft.

8    Q.  Thank you.

9            I would like to go back through just a little bit of

10   your background.  Can you tell us how long you have worked for

11   IBM?

12   A.  Initially joined IBM in '97.  I worked in IBM to 2002.  I

13   left for three years to join a company called SAIC based in San

14   Diego.  And then I rejoined IBM in 2005 and I have been

15   employed by IBM continually since then.

16   Q.  And, just generally, what type of a company was SAIC?

17   A.  SAIC is a federal government U.S. systems integrator.  A

18   primary client would be federal U.S. government.

19   Q.  Can you tell me, before your professional career, did you

20   attend college?

21   A.  Yes.  I attended Georgia Institute of Technology.  I have a

22   bachelors degree and a masters degree in electrical

23   engineering.

24   Q.  And where did you work before joining IBM?

25   A.  Post-college I worked for Digital Equipment Corporation.

K7L5ibm1                         Walker - Direct

1    That was out of Greenville, South Carolina, and Atlanta,

2    Georgia, for approximately seven years.  Then I joined Deloitte

3    & Touche.  I joined Deloitte & Touche as a managing consultant

4    in Saudi Arabia for their Middle Eastern practice.  Then I

5    returned to the U.S. -- Philadelphia -- with Deloitte & Touche

6    in the U.S. and then I joined IBM.

7    Q.  Thank you.

8            And turning back to your current role at IBM, can you

9    tell me what are some of the main types of products or services

10   that IBM provides that you are responsible for?

11   A.  I am responsible for the entire IBM portfolio of products

12   solutions, and services to our clients.  They would go from a

13   strategic standpoint -- our high-grade cloud offering which are

14   most strategic; we would have our AI -- our artificial

15   intelligence and cognitive solutions which is applying AI

16   capability to support our clients.  We also have software, we

17   also have services and we also have hardware.

18            MR. SIGNORACCI:  I would like to focus on cloud and,

19   your Honor, we have prepared a few demonstrative slides to

20   accompany Mr. Walker's testimony.  I have copies of those that

21   I can hand out, if permitted.

22            THE COURT:  Defense counsel?

23            MR. McQUADE:  No objection, your Honor.

24            THE COURT:  Okay.  Should we mark them as exhibits?

25            MR. SIGNORACCI:  Yes, we can mark this as Plaintiff's

K7L5ibm1                          Walker – Direct

1    Exhibit 1.

2              THE COURT:  Terrific.

3              MR. SIGNORACCI:  It is the first table of the binder.

4              THE COURT:  Thank you.

5    BY MR. SIGNORACCI:

6    Q.  Mr. Walker, can you see the slides on the screen?

7    A.  I cannot -- yes, I can.

8    Q.  Can we turn to slide 2?  Please, Mr. Walker, I would like

9    you to explain about IBM's Cloud, if you could.

10   A.  So, I will start, you really think of cloud in two

11   chapters.  The first, before the first chapter of cloud most

12   enterprise firms ran their IT or information technology on

13   computer systems, mainframes or other servers that were on

14   their premise that placated to them and it ran very secure in a

15   local environment.  IBM is a leader in that area with our

16   mainframe, our hardware, and our software.  Cloud started when

17   Amazon started running their own internal cloud, started to see

18   that, hey, we could leverage the capacity that we have which is

19   very seasonal with Amazon maybe more for the holiday season

20   that we could sell our capacity to others and allow them to use

21   that capacity in doing that.  And so, they established their

22   AWS theory and created a public cloud.  They were very

23   successful, as we would say, moving items that we would call

24   cloud native, things that were not running in a data center

25   before, things that were not running internal to a client

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm1                         Walker - Direct

1    before, having those run on that public cloud.  Examples would

2    be consumer data, would be videos, would be other.  That was

3    shown to be very successful on the consumer side so others

4    joined in.  Microsoft joined in, Google, IBM, all competitors

5    in this space really looking at that consumer side or moving,

6    e-mail, Office 365, other application to that public cloud.

7    IBM bought a company called Softlayer and Softlayer was IBM's

8    strong entry and investment to move into that public cloud

9    space.

10            So, then you had public cloud which is running in a

11   shared public infrastructure.  Also with clients we said we

12   would like to get some benefits of the Cloud, the availability

13   in those items.  But for our core uploads we don't have the

14   security, encryption that we need in a public cloud so they

15   built private clouds.  These are a cloud that runs within the

16   four walls or within the data centers of their enterprise so it

17   is dedicated to them and that has the security requirements

18   that they need to run as a private cloud.

19            So, the clients today would have things running on

20   their existing infrastructure, we would call that on their

21   mainframes, on their servers on prem.  They could have a

22   private cloud running things in a private cloud in a private

23   environment just to them and then they could have consumer

24   application and the customer basing born on the cloud

25   applications running in a public cloud.

K7L5ibm1                    Walker - Direct

1          What our clients are moving to now is not wanting to

2     have three separate -- on prem, private, and public -- but they

3     want to run in a what we would call a hybrid cloud environment.

4     In a hybrid cloud environment you run workloads and

5     applications in the area where it makes the most sense.

6     Security requirements typically would keep it on prem or

7     private, public information, videos, those kind of things you

8     would run on a public standpoint.  So, that's the work today

9     of -- everyone, what we are focused on is hybrid cloud helping

10    our client run their work in their environments where it makes

11    the most sense whether it is on their mainframe, on a private

12    cloud, or on a public cloud.

13         THE COURT:  Mr. Signoracci, I just want to clean up

14    one item.  We are talking about a document that we have

15    identified but not offered into evidence.  I assume it is your

16    intention to offer it without objection so I am going to mark

17    it in evidence as Exhibit 1.

18         MR. SIGNORACCI:  Yes, your Honor.  We will offer the

19    entire slide deck as Exhibit 1.

20         THE COURT:  Thank you.

21         MR. DELIKAT:  Your Honor, just with the caveat that it

22    is a demonstrative exhibit prepared by counsel and not an

23    actual document from email or something.

24         THE COURT:  I take it as a non-business record.  You

25    are kind enough accede to the presentation, it is helpful, I

K7L5ibm1                          Walker - Direct

1    take it for what it is.

2                (Plaintiff's Exhibit 1 received in evidence)

3    BY MR. SIGNORACCI:

4    Q.  Just before we move from this document, this slide,

5    Mr. Walker, can you tell us where in these three types of

6    clouds IBM competes against Microsoft?

7    A.  In all three.

8    Q.  Moving to slide 3, can you walk through these points for

9    us?

10   A.  Yes.

11               So, as I said, in chapter 1, the workloads that moved

12   to cloud were primarily consumer workloads, non-core data, and,

13   as we said, cloud native.  Cloud native are applications that

14   were not built in core and then moved to a cloud, they were

15   applications that were built originally on the cloud, things

16   like sales force applications that were built and always had to

17   operate within the cloud.  So, these big sets of workloads over

18   the past 10 years that have been moving to cloud have been

19   those and that's where the large growth in cloud has come.

20   That's -- approximately 20 percent of the workloads have moved

21   to cloud today.  That is higher in some areas like consumer and

22   much lower in areas that are regulated where they haven't been

23   able to move because of regulatory requirements.

24               So, the first 20 percent is where Chapter 1 has been.

25   The 80 percent is still where the work is to be done around

K7L5ibm1                          Walker – Direct

1   enterprises, around core data, and where there is regulatory

2   and heightened security.

3              THE COURT:  If I may, Mr. Walker?  When you say work

4   to be done do you mean sales work to be done or technical work

5   to be done?  What do you mean when you say work to be done?

6              THE WITNESS:  The work to be done is when you look at

7   gaining the value of cloud that an enterprise can get.  With

8   running in a cloud you can get shared infrastructure, you can

9   get flexibility, you can get economies of scale, you can get

10  seasonality.  So, there is benefits of a client running these

11  workloads in a cloud.  The issue is for a loft these workloads,

12  especially the ones that run on their mainframe on site,

13  they're not able to get that benefit of scale and flexibility

14  yet because they don't have the security and capability to do

15  that so we are saying that 80 percent is we can move it to

16  cloud and get the benefit but it hasn't been done technically

17  yet because of regulatory requirement.

18             THE COURT:  I see.  Thank you.

19             MR. SIGNORACCI:  Thank you.

20  BY MR. SIGNORACCI:

21  Q.  Next slide, please, Ashley.

22             And for that 80 percent, Mr. Walker, can you tell us a

23  little bit about the competition -- and we will start with this

24  slide -- the competition at the level of the cloud itself?

25  A.  Yes.

K7L5ibm1                         Walker - Direct

1             So, at the cloud itself there is multiple providers --

2    Amazon, Microsoft, Google, IBM, Alibaba -- there is others so

3    there is the cloud providers.  So, the cloud providers are the

4    ones that run the cloud, have the software that runs on the

5    cloud.  They provide the cloud services to run the workloads

6    and the application.  Typically most clients have more than one

7    cloud, one would be multi cloud.  Different work loads run

8    better on clouds.  Amazon had been strong on video workloads

9    like Netflix and others.  Google is strong in areas of data and

10   AI.  So, typically with a client they would have sometimes two,

11   sometimes as many as three or four clouds that they run based

12   on where the application runs best and so they run multiple

13   clouds.

14   Q.  Ashley, next Slide, please.

15             Can you tell us what else goes into the competition

16   aside from the cloud-to-cloud mode?

17   A.  So, when you are talking cloud you think of just running

18   the infrastructure so it's a place that you can run software,

19   you can run applications, you can store data.  With

20   born-on-the-cloud pieces it was directly put on the cloud but

21   as you start in the area of enterprises there is a lot of work

22   that has to go to take what's running currently on a mainframe

23   or a server and do the work to prepare it on the cloud.  A lot

24   of services work goes around this, the applications and the

25   workload, to prepare them to get the benefits of cloud.  You

1    have to do some migration work, you have to do testing.  There

2    is a large piece of services that go around those and there is

3    also a lot of software that runs on those to help make those

4    clouds successful.

5              So, with IBM, we are an integrated firm and we have

6    not only the IBM cloud but we also have IBM software that runs

7    on that cloud and then we also have IBM services which help IBM

8    and others and the IBM cloud and other clouds help work with

9    those applications to move those to the cloud.  Our competitors

10   typically have, are in a single area.  So you would have, for

11   instance, Microsoft would have their cloud and software that

12   they would typically partner with a services provider --

13   Accenture, Pipro, the Indian firms -- to work with clients to

14   take those applications, those workloads, determine where best

15   to run it, and then help to prepare and move them to the cloud

16   and also, once you move them to a cloud, to run the

17   environment.  There is, as I said, there is usually multiple

18   clouds so it gets complex when you have a Microsoft cloud, an

19   IBM cloud, a Google cloud, you need someone to help you, an IBM

20   services or an Accenture to help you run these different clouds

21   so that they work best together and that you keep consistency

22   across the cloud is.

23   Q.  Thank you.

24             And you refer to clients as enterprise clients.  Can

25   you tell us what you mean by enterprise?

K7L5ibm1                         Walker - Direct

1  A.  Correct.  So, when you have, at least consumer-facing ones

2  like a Netflix or HBO or others that are consumer-facing

3  companies.  When we refer to enterprise what we are talking to

4  are our core enterprise clients, the large banks around the

5  world, it would be the large telcos around the world, the large

6  retailers, it would be the insurers, it would be the

7  government.  So, enterprise would be the large, the company

8  that we have that would be large enterprises with large IT

9  entities is how we would characterize those.

10  Q.  Thank you.

11          Ashley, next slide, please.

12          Mr. Walker, you tell us how IBM perceives its next

13  chapter in the battle for cloud?  Can you tell us, to your

14  knowledge, how IBM sees Microsoft battling for Chapter 2 in the

15  cloud?

16  A.  Well, from a competitive standpoint in cloud, Microsoft is

17  our biggest and our most concerning competitor.  AWS has

18  focused on -- their history has been more on the consumer side.

19  Google, their history has been more on the search engine side,

20  that's their heritage comes from the search engine side of the

21  house.  So, both Google and AWS are very strong consumer-facing

22  applications.  IBM and Microsoft, our core has been in the

23  enterprise helping large clients -- big insurers, big banks,

24  big government -- help them to run these in that environment.

25  So, we are very concerned because our core is taking what we

K7L5ibm1                       Walker - Direct

1   knows know with enterprises and we have worked with them over

2   the past one hundred years to transform and move, and Microsoft

3   has that same capability because with their office products and

4   applications in areas they are also very strong in the

5   enterprise space.

6          So, as Microsoft is moving more from consumer into

7   enterprise, we are now almost every client we are seeing them

8   as a competitor in each one of our large enterprise clients.

9   Q.  Thank you, Mr. Walker.

10          Next slide, please, Ashley.

11          You mention that are you helping big banks move to the

12   cloud.  Again, we are in open court and this is a public

13   record.  Can you tell me about IBM's plans to help big banks

14   move to the cloud?

15   A.  So, as I said in chapter 2, the 80 percent that hasn't

16   moved to a cloud yet, the reason that hasn't moved to a cloud

17   is because of government regulatory requirements, securities

18   requirements, encryption requirements -- data encryption

19   requirements.  So, even if large regulated industries wanted to

20   move their data and their information to cloud, they can't,

21   because they can't get government and regulatory approval.  So,

22   with IBM last year we took some parts that we have.  So, we

23   acquired -- a couple years ago we acquired a company called

24   Promontory.  Promontory, they work with the regulators, the

25   banking regulators, the insurance regulators, helping those

1    regulators work with the bank around how do we set up safe and

2    secure regulation which protects the financial information.

3    And Promontory is the leader in that area around the world and

4    they have the domain expertise around regulatory requirements,

5    security requirements, privacy requirements not only for the

6    U.S. but they operate with most of the regulators around the

7    world.  So, we have a deep domain expertise in how to work with

8    regulators and with the large banks and insurers on how to meet

9    those regulations.

10   Q.  And that was Promontory?

11   A.  That was Promontory.

12   Q.  And you said you pulled some pieces together.  What were

13   the other piece or pieces?

14   A.  So, that's Promontory.  The second is we acquired Red Hat

15   last year so it is the largest acquisition that IBM had ever

16   done.  What Red Hat is really, really good for and known for is

17   working with multiple clouds helping to run data that is in

18   different areas -- public cloud, it could be public cloud, it

19   would be on premise.  They are very good at being able to put

20   those in containers that then you can run on a cloud.  So, as I

21   was saying, you can't just move an application from your

22   mainframe to run on a cloud, it won't work.  You have to

23   have -- [inaudible] So, when you are taking the applications

24   and data that's running on a mainframe, you can't just lift and

25   move that to a cloud, you have to do the work to make it

K7L5ibm1                         Walker - Direct

available so it will be optimized to run on the cloud.  Red Hat

is the leader for helping to take those, what's running on a

mainframe or an on-premise, be able to put that into what we

call containers which then allows it to run on a cloud and that

cloud is, can run on an IBM cloud, it can run on a Microsoft

cloud, it can run on a Google cloud.

         So, by acquiring Red Hat we really have the leader

from how do you take these applications and workloads that run

on premise and will allow us to move those to a cloud.  So, you

have regulatory capabilities and you have the software and

capabilities moving to a, as we would call Red Hat is the best

at moving to a hybrid cloud, both a mixture of public and

private and on prem.

         We then combined that with a partnership with Bank of

America.  We announced last year Bank of America, working with

us, to set the standards with the U.S. regulators on how can we

have a financial services cloud that you can move these core

workloads and run them in the cloud and do that in a safe,

secure, and encrypted way.  So, that's the announcement that

brings together our regulatory capabilities, a leading bank as

our anchor client in the U.S. along with our Red Hat

acquisition for a solution that no one else has in the market

place.

Q.  Thank you.

         And you said that that has been announced.  What

K7L5ibm1                              Walker - Direct

1   remains secret about this project?

2   A.   So, what we announced is that we were developing this FS

3   cloud with Bank of America.   This is a multi-year initiative.

4   So, we announced the work was starting last year.   We have

5   announced in our think forum -- one of our industry events --

6   some of the functionality that we will be bringing out.   We

7   have announced some of the partners we are working with.   This

8   is all working to a go-live and availability to the market for

9   1 of 2021.   So, this is a deep work effort, a lot of solutions,

10  and so we are in the middle of developing this with a plan to

11  release this the beginning of next year.

12  Q.   And other than the upcoming release, is there anything else

13  secret about where IBM is going with its financial services

14  cloud?

15            MR. DELIKAT:   Objection.

16            THE COURT:   I'm not sure what you mean by secret.

17  Tell me what you are driving at.

18            MR. SIGNORACCI:   Things that IBM is working on that

19  have not been announced to the market.

20            THE COURT:   Are you telling me that the testimony

21  would relate to a trade secret?

22            MR. SIGNORACCI:   Your Honor, at this level we plan to,

23  at a high level, have Mr. Walker talk about the categories of

24  trade secrets that relate to the financial services cloud and,

25  with your Honor's permission, we intend later in Mr. Walker's

K7L5ibm1                          Walker - Direct

1    testimony to introduce just two exhibits that are highly

2    confidential because they contain information relating to trade

3    secrets.

4              THE COURT:  What's your objection?

5              MR. DELIKAT:  Leading objection.  I know this is a

6    bench trial and you are very sophisticated --

7              THE COURT:  You are kind.

8              MR. DELIKAT:  -- but the question could be asked in

9    such a way that they don't suggest the response to the witness.

10   You have offered a lot of latitude with this demonstrative that

11   was created by the Paul Weiss.

12             THE COURT:  I think that is well taken.

13             I think leading the witness doesn't help me because

14   the testimony, as you know, is evidence, not your question.

15   So, rephrase your question and let's see if we can get past the

16   objection without me having to rule on it.

17             MR. SIGNORACCI:  Thank you, your Honor.

18   BY MR. SIGNORACCI:

19   Q.  Mr. Walker, can you tell us more about what IBM has not

20   released to the market about the financial services cloud?

21   A.  Well, with cloud and with our financial services cloud it's

22   not just you buy the cloud.  It is not a product, it is not a

23   you buy a piece of hardware, you buy a software.  You buy a

24   whole ecosystem and with that there is functionality that comes

25   that we are going to have in this financial services cloud that

K7L5ibm1                          Walker – Direct

1     no one else has.  There is regulatory ways that handle the

2     regulation, the security, the encryption pieces that are trade

3     secrets that no one has access to and how we do that.  We are

4     going to be announcing key partners that are working very

5     closely with us both in the U.S., around -- partners around the

6     U.S. that we are doing and these are like software vendors that

7     will be running their software and certifying it through our

8     cloud.  And then, finally, we started this for the U.S. but we

9     have anchor clients -- Bank of America is the anchor client for

10    the U.S.  We also have anchor clients that we will be

11    announcing already in place for Canada, for Latin America, for

12    Europe, for Japan that we have in place today that we are

13    working closely with them to take the U.S. regulations that we

14    are building with Bank of America and adjusting those for the

15    other markets around the world.  So, which markets that we are

16    focused on, which client we are working on as partners would be

17    information that we would view as very top secret.

18              (Continued next page)

19

20

21

22

23

24

25

K7LQibm2                          Walker - Direct

1              THE COURT:  If I may, I just want to clarify something

2        in my own mind.  You're talking about regulatory having

3        acquired commentary, etc.  When you say regulatory, I have it

4        in my head that you're going to an agency or place, a public

5        place, and complying with legal requirements.  Am I on the

6        right page about that?

7              THE WITNESS:  Yes.  So, your Honor, think that it is

8        for different industries there is a U.S. government regulator.

9        Every country has a regulator of how they regulate in this case

10       the banks.

11             THE COURT:  Yes.

12             THE WITNESS:  That regulator will set the rules and

13       the requirements of what you can run:  Customer data, other

14       data that you have, let's say, in your four walls on your main

15       frame are -- will allow you if you want to move it to a cloud,

16       if you do that you have to follow these -- you know, this set

17       of rules for us to do that.  So that regulator is protecting

18       the consumer to make sure that what is going out into these

19       clouds are not adding undue risk on the consumer.  So, that is

20       what we're doing you know with the regulators for financial

21       services for the banks and the insurers.

22             THE COURT:  And the process, I assume -- and I'll hear

23       about it, I assume or something about it -- requires the filing

24       of applications or statements of sorts.  Yes?

25             THE WITNESS:  Yes.  It's actually working hand-in-hand

K7LQibm2                        Walker - Direct

1    with these regulators.  We're not building something and then

2    going to go ask them to approve it.  We're actually working

3    very closely with the regulators, you know, if we do this,

4    would they approve -- would they be supportive.  So, this is

5    working closely hand-in-hand in order to develop this.

6            THE COURT:  And is this -- when you approach these

7    regulators, is this kept confidential or could I with the right

8    person or know-how go and find what you're discussing and

9    dealing with these regulators about?

10           THE WITNESS:  In the work that we're doing on this,

11   this would be viewed as confidential, so they would not come

12   and share that with other players in the market, or other banks

13   unless there is approval from Bank of America to share that

14   information, the confidential information to IBM and to Bank of

15   America.

16           THE COURT:  And so, for example, if Microsoft wanted

17   to know what you were doing with the regulators, would they be

18   able to on some basis legally, properly, in accordance with the

19   law find out what you were doing with Bank of America?

20           THE WITNESS:  No, not to my knowledge.  No, sir.

21           THE COURT:  OK.  Thank you.

22           MR. SIGNORACCI:  Thank you.  Ashley, next slide,

23   please.

24   Q.  Mr. Walker, can you tell us what this represent about FS

25   cloud?

K7LQibm2                        Walker - Direct

1    A.  So, your Honor, as I was explaining, there's a lot of

2    things that come together when you're moving things to a cloud

3    and that you pull together expertise around our cloud,

4    capabilities.  You pull expertise around the industry that

5    you're working in, what knowledge you need for that.  You also

6    pull in a lot of technical and services expertise to build a

7    solution that is currently taking what's working on site and

8    make it work and work better in a cloud.

9           Also, a piece to that is how you price these

10   solutions.  All the competitors price things differently, not

11   only the price per unit but how price them upfront versus over

12   time, how you invest.  So, how you price, how you incent

13   clients is a very, very important piece of the bar for all of

14   us in the cloud space.

15   Q.  What, if anything, is secret about that, Mr. Walker?

16   A.  Everything is.  What are our pricing points, what are our

17   investment areas, how do we price, how do we invest, the

18   functional areas for that.  So, our pricing and how we go to

19   market is extremely confidential to us.

20   Q.  Thank you.  And you've described the FS cloud and the

21   pricing.  Can you tell me what are your responsibilities with

22   respect to this project at IBM?

23   A.  So, I am the owner of this.  This is called -- we call it

24   our FS cloud.  I am the owner.  It's called Project Hamilton,

25   and on behalf of the CEO I own this for IBM as part of my

K7LQibm2                         Walker - Direct

1    (inaudible).

2    Q.  I'm sorry, you're breaking up.

3    A.  As part of my owning financial services globally, this

4    financial services cloud, I'm the executive owner for this for

5    IBM.

6    Q.  And internally what responsibilities does that entail as

7    the executive owner?

8    A.  So, as the executive owner, I work closely with our

9    chairman and CEO and SVPs around strategy, the short term and

10   long term, who do we partner with, who do need to acquire.  You

11   know, I work with my colleagues on helping them understand what

12   the solution is, the competitive positioning versus our

13   competitors, their offerings versus our offerings, and then

14   specifically I work with all of the executive owners on the

15   transactions and the deals, understanding deal by deal where we

16   are competitively, how do we price, you know, what is the win

17   strategy for all of our key opportunities globally.

18   Q.  Thank you.  I would like to return to a few details about

19   the performance team that you mentioned --

20             THE COURT:  If I could before this --

21             MR. SIGNORACCI:  Yes.

22             THE COURT:  Can you tell me, Mr. Walker, do you know

23   what Mr. Lima's role was and involvement was.  Much like you're

24   indicating your role, while he had his role, were you involved

25   such that you could testify as to what his role is, was,

K7LQibm2                    Walker - Direct

1    rather, in this regard that you're talking about Project

2    Hamilton.

3              THE WITNESS:  Yes, your Honor.  So, in my previous

4    role as financial services, the global managing director, I

5    worked hand-in-hand with Rodrigo in that role.  Rodrigo had

6    those key banks in integrated accounts reported in to him.  So

7    he and I worked very closely, you know, on the large banks 30

8    plus of those that are integrated accounts on the strategy for

9    each one of those with the team and the opportunities, you

10   know, for each one of those as his (inaudible) his integrated

11   account leader and the strategies for those.

12             I also worked closely with him because he was

13   executive sponsor for two of our key transactions, and so he

14   and I worked very closely on those two specific transactions.

15             Then, finally, as far as the performance team,

16   everything that we share in the performance team strategically,

17   both Rodrigo and I were members of that, so, you know,

18   everything that I know from a performance team standpoint and

19   the information that I have, you know, Rodrigo would have

20   exactly that same information because he would have the same

21   access and would have participated in the same meetings that I

22   have.

23             THE COURT:  Just as a point of order, I'm referring to

24   the defendant as Mr. Lima, and I'm looking and saying maybe

25   that is not proper.  Am I inappropriately referring to him and

K7LQibm2                    Walker – Direct

1    is that why everybody else is calling him Rodrigo?  I just want

2    to get it clear and be polite about it.

3            MR. SIGNORACCI:  I think either will work, your Honor,

4    Rodrigo or Mr. Lima.  I expect that the witnesses who worked

5    with him on a day-to-day basis will likely refer to him as

6    Rodrigo naturally.

7            THE COURT:  All right.  And I may do that as well.

8    Thank you.

9    BY MR. SIGNORACCI:

10   Q.  I would just like to follow up on two of the points that

11   you just made, Mr. Walker.  You said Rodrigo was the executive

12   sponsor of two accounts.  Can you explain what that means?

13   A.  Well, so two -- so two pieces:  One, as IBM we have what we

14   call PEXs partnership execs.  So, for our most important

15   client, our CEO names a single IBM executive as the partnership

16   exec; that is for her or for his proxy for those accounts to

17   make sure that everything we do in those accounts we speak as

18   one IBM.  If there's any issues, if there's any, you know,

19   pricing between different parts of IBM, that partnership exec

20   speaks for our CEO in those accounts.  So, Rodrigo was the

21   partnership exec on the account that we talked about.

22           Also, as the partnership exec, he also is the

23   executive sponsor on two specific points of our Hamilton deals,

24   which was Banco Bradesco and Banco Brasil.  So, in that role he

25   was responsible with the team on the ground on the strategy,

K7LQibm2                          Walker - Direct

the relationship, the pricing for these opportunities.  These

opportunities tend to be somewhere between five- and ten-year

relationships.  They tend to be a hundred billion dollar and

above type of deals that are complex and bring everything in.

So, we need a senior IBM-er with the maturity that can go in

and work on these large, complex pieces that bring all parts of

IBMs together in front of our clients.  So, Rodrigo was the

executive sponsor on a couple of those deals.

Q.  Thank you.  And you mentioned that -- in response to your

Honor's question about how Rodrigo knew or was involved in

project Hamilton, you mentioned the performance team.  Again,

and for a matter of public record, can you tell me what is the

connection between the financial services cloud and the

performance team?

A.  Yes.  So, as I stated earlier, the performance team is the

top execs in IBM.  We meet at a minimum quarterly typically.

Q.  Sorry.  You broke out.  I think you said at a minimum

quarterly?

A.  At a minimum quarterly.  We -- that is usually a two-day

session, normally face-to-face for two days; and with COVID we

have been doing it via video the last two.  In that meeting,

the purpose of that meeting is to bring all the senior execs

around the company to look at the operation of IBM, how we are

performing.  We typically do it at the end of the quarter, so

we have a short view of how did we perform versus our

K7LQibm2                    Walker - Direct

1    competitors in the market in the previous quarter, and then we

2    spend the rest of the time, you know, focusing on what do we

3    need to change from a strategic standpoint and other areas of

4    focus strategically for the remainder of the year and going

5    forward.

6           First, say, half day typically is a retrospective on

7    what's working and what's not in the market, and then the next

8    day and a half typically is focused on our strategic place.  We

9    have as part of that meeting, both last year and as recently as

10   April meeting, we went in in detail around the strategy of what

11   we're doing with our Hamilton which is the financial services

12   and Mystic, which is another name for not only financial

13   services but looking to do a similar thing in other industries.

14          Mystic we gave a full update, you know, of the

15   strategy that we're going forward to the full performance team,

16   and then we drove down into a detailed discussion around

17   opportunities with the exec owners that were in the room of the

18   status of things.

19   Q.  Did that include Mr. Lima?

20   A.  Yes, it did.

21   Q.  How do you know he was there?

22   A.  We all participate fully in the performance team.  If there

23   is someone for some reason that cannot, that is called out so

24   that we know who is there and who is not, and we would see you

25   face-to-face.  The April meeting was on video, so we were all

K7LQibm2                         Walker - Direct

1    together on the video screen, so I saw him via video.

2    Q.   Thank you.  How would you generally describe the rank of

3    the executives at IBM or on the performance team?

4    A.   Both the rank and the performance is the senior most

5    members of IBM.  This is our -- as we would call them in IBM,

6    you have our CEO, who is the top of the company, you have our

7    senior vice-presidents, who are kind of next rank, and then you

8    have the performance team.  So, we are the team that is the --

9    typically reports to the SVPs that run the company.  We are on

10   the operations and the strategy for these meetings.  We are --

11   these meetings you don't -- you're on the performance team

12   because you participate and you perform, so the CEO reserves

13   the right to remove people or add people to that which, you

14   know, we do, you know, happens each year.  So we are -- our

15   view is that we are to come prepared.  We send the material for

16   these meetings out typically two days in advance.  Our meetings

17   are -- we are expected to review all the meeting material and

18   data, and then when we come to the meeting, the meeting is not

19   for presentation only but is expected and required that we have

20   discussions, so all the members are required to be fully

21   prepared and also participate in the discussions of this

22   because this is the team that's running IBM.

23   Q.   Thank you.  And you said you send the materials out in

24   advance of the meeting.  How are the materials shared?

25   A.   They are shared in a box, a secure box folder, that we have

K7LQibm2                          Walker - Direct

 1    access to that we would go in.  We're told before the meeting

 2    when the materials are there, so we typically can go into the

 3    secure box folder and get access to it to review.  Before when

 4    we were doing it face-to-face, the material would be presented

 5    in the room but not passed out.  With COVID and doing this

 6    virtually, we have the material that's in a box and then we

 7    look at it on the screen.

 8    Q.  Thank you.

 9              MR. SIGNORACCI:  Your Honor, we would like to discuss

10    with Mr. Walker just two documents from the April 2020

11    performance team meeting that he has described.  These

12    documents were produced by IBM in discovery and designated as

13    highly confidential IBM information.  As Mr. Walker testified,

14    these documents are not widely shared even within the company,

15    and they are kept in a secure box folder that only the

16    performance team members have access to.  I don't know if we

17    would have an objection from defendants that --

18              THE COURT:  Counsel?

19              MR. DELIKAT:  No objection, your Honor, with respect

20    to sealing these two, just to move things along, but we are

21    not, by not objecting, admitting that this information was not

22    otherwise publicly disclosed or otherwise made available.

23              THE COURT:  OK.  So we will accept the 2 and 3,

24    plaintiffs, when you present them, and they'll be sealed.

25              MR. SIGNORACCI:  Thank you, your Honor.  They are in

                      SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm2                         Walker - Direct

1    your binder as Tab Exhibit 1 -- I'm sorry -- that is now

2    Exhibit 2 is JX-129.

3              THE COURT:  We need to clarify something.

4              MR. SIGNORACCI:  Yes, your Honor.

5              THE COURT:  I took the binder and marked the entire

6    binder as Exhibit 1 now in evidence.  In Exhibit 1 are the two

7    separate pieces of paper documents that have labels that you

8    want to seal.  So, we've not accomplished for each other what

9    we need to accomplish.

10             So, I think what we will do is we will remove the

11   documents in the binder tab JX-129 and JX-155, those are the

12   two documents you would like me to seal, correct?

13             MR. SIGNORACCI:  That's correct, your Honor.

14             THE COURT:  And, counsel, those are the two documents

15   which, while you're not conceding anything, you're agreeing

16   that they may be sealed for purposes of this hearing, correct?

17             MR. DELIKAT:  Correct, to move the process along.  We

18   may have a motion at the end.

19             THE COURT:  I got it.  I'm not sure what the motion

20   will be, but I'm considering them sealed and in evidence.

21             So, the record should reflect that we're going to

22   remove from what I had previously marked in evidence as

23   Exhibit 1 in the black binder, we are removing therefrom JX-129

24   and JX-155, each of which consist of multiple pages.  I'm now

25   going to mark those two Exhibit 2 and 3, sealed and in

K7LQibm2                          Walker - Direct

1    evidence.

2              (Plaintiff's Exhibits 2 and 3 sealed and received in

3    evidence)

4              MR. SIGNORACCI:  Your Honor, we would like Mr. Walker

5    to testify to these documents in detail.  In order to do so, we

6    would first request, I believe there are Microsoft participants

7    on the audio conference line, and we would request that they

8    not be permitted to hear that testimony, and that the portions

9    of the transcript that address the documents that are under

10   seal also be placed under seal.

11             MR. DELIKAT:  Your Honor, the only Microsoft

12   participants on the conference line is Cindy Randall, who is

13   the head litigation lawyer, in-house counsel, for Microsoft

14   assisting with the defense of this case.  There are no

15   Microsoft business people on this phone.  I don't think that's

16   necessary under these circumstances.

17             THE COURT:  Sir?

18             MR. SIGNORACCI:  The protective order refers to

19   outside counsel who are permitted to receive IBM's highly

20   confidential information and not in-house counsel.

21             THE COURT:  Let me ask a simpler question.  Has the

22   person you referred to filed an appearance in the action?

23             MR. DELIKAT:  She has appeared at the depositions in

24   the case.  Microsoft is not a party, so it's a third party.

25   She has appeared on the record in depositions.

K7LQibm2                     Walker - Direct

1          THE COURT:  I get it.  I have no way of controlling

2     that person, and while I appreciate the notion that you have a

3     lawyer, I think in fairness, at least for this series of

4     questions, I'm going to exclude the Microsoft lawyer.  And I'm

5     taking it on faith that we are having a discussion now about

6     some sort of confidential or trade secret.  So, I would ask

7     temporarily one way to solve this problem might be -- and I was

8     going to raise it at some point -- if we had Microsoft sign off

9     on our protective order and agree to be bound by it, for

10    counsel, for this counsel, I don't know that that would solve

11    your problem, but that it would help me understand that I do

12    have control over an individual who is participating here.

13    Would that solve your problem or would you still protest?

14          MR. SIGNORACCI:  I think that with the highly

15    confidential IBM information, if it were for a Microsoft

16    in-house litigation attorney solely for the purpose of this

17    litigation --

18          THE COURT:  Yes.

19          MR. SIGNORACCI:   -- I still think as a non-party,

20    only a producing party, we don't understand why Microsoft would

21    need to see IBM's highly confidential material.

22          THE COURT:  I have difficulty with it in several

23    regards.  We're bumping up against practically the gravamen,

24    the essence here of what brings us all to the room.  Microsoft

25    is not a party.  I haven't objected to anybody participating.

SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm2                      Walker - Direct

1    I am not clear that it would solve the problem, but it would go

2    a long way.

3           Having said that, since counsel has not signed, I

4    would ask only for the purposes of these two exhibits and the

5    testimony relating thereto that we exclude Microsoft's in-house

6    counsel

7           MR. DELIKAT:  We understand, your Honor.  We would, of

8    course, be willing to represent -- and I'm sure Ms. Randall

9    would be willing to represent to the Court -- that she would

10   only use this information for purposes of assisting in the

11   defense.  I also point out that two of the three depositions we

12   took in this case -- excuse me -- three of the four depositions

13   they took in this case were of Microsoft witnesses, and so it's

14   not like Microsoft is not in this litigation.

15          THE COURT:  I appreciate it, and I accept the reality

16   that an officer of the court would do nothing more or less than

17   he or she told me he or she would do.  We're doing this right

18   now in live time and so I need to react, so I'm reacting.

19          MR. DELIKAT:  Thank you, your Honor.

20          THE COURT:  So I will ask Microsoft's counsel to

21   depart for the moment.  And, Mr. Signoracci, you assure

22   yourself that that's happened, and then we'll proceed.

23          MR. SIGNORACCI:  May I ask the courtroom deputy if we

24   have a way of telling that the person has been bumped out or

25   not?

K7LQibm2                          Walker – Direct

1            MR. DELIKAT:  One way we could do it, you could close

2       the call and then we reopen it at the appropriate time.

3            THE COURT:  Why don't you ask your co-counsel to hang

4       up?

5            MR. DELIKAT:  OK.

6            DEPUTY CLERK:  Is there only one party on that line?

7            MR. SIGNORACCI:  I believe there is one IBM attorney

8       on as well.

9            DEPUTY CLERK:  Because I will hang up, but then that

10      cuts everybody off.

11           MR. SIGNORACCI:  Do that.

12           THE COURT:  Why don't we take a two-minute break and

13      see if we can't figure out how to solve this problem.

14           (Recess)

15           THE COURT:  Are we all set now?

16           MR. DELIKAT:  Your Honor, are we back on the record?

17           THE COURT:  We are back on the record.

18           MR. DELIKAT:  Again, just to move things along, while

19      reserving whatever rights we have, we won't object to these

20      documents because we know that will just burn too much time of

21      the two days that we have.  So, we just want it on the record

22      so we are not conceding that the documents are trade secrets or

23      highly confidential.

24           THE COURT:  I will have to think about that.  I

25      appreciate your thought to move things along, but I'm marking

SOUTHERN DISTRICT REPORTERS, P.C.

1    them sealed.  Whether they constitute trade secrets later on or

2    confidential information, I guess would be broader, I'm ruling

3    on it now, but I'll consider what you have to say.

4                MR. DELIKAT:  Thank you.

5                THE COURT:  I have an open mind about it.  It's not a

6    problem for me.

7                MR. DELIKAT:  Thank you.

8                MR. SIGNORACCI:  Ashley, could you put JX-129 on the

9    screen.

10   Q.  Mr. Walker, this document was submitted to the Court under

11   seal.  Can you tell us, do you recognize this document?

12   A.  I do.

13   Q.  What is it?

14   A.  It is the agenda for day one of our performance team

15   meeting.  As I said, typically these are two-day meetings back

16   to back.  Because of COVID we split it to a video session and

17   we had day one which this is, and then we had a day two later,

18   I think on the 21st.  So this is the agenda that we had for

19   that morning session.

20   Q.  And the morning was -- can you tell me the date?

21   A.  Friday, April 10.

22   Q.  And this is the same performance team meeting that you said

23   you saw Mr. Lima on, correct?

24   A.  That is correct.

25   Q.  The first two speakers are listed as Krishna and Rometty.

K7LQibm2                          Walker - Direct

1    Can you tell me who they are?

2    A.   Yes.  So.  I think as you are that we had a change of CEO

3    that was effective April 1.  So Krishna is Arvind Krishna.

4    He's our new CEO.  And Rometty is Ginni Rometty.  She was our

5    CEO, and now she's our executive chairman.  So, as this being

6    Arvind's first performance team, he opened up the session.  We

7    were -- typically these meetings are after earnings, so when we

8    have the meetings after earnings, we are not in blackout, so we

9    can talk numbers and, you know, the detail of the previous

10   quarter's performance.  This meeting, given the date of April

11   10, was held while we were still in blackout.  So we did not go

12   into the normal level of detail around the numbers in

13   retrospective.

14        So, Arvind kicked off the meeting.  He was five days

15   into the role, so just a retrospective to his first five days.

16   Then he really gave his expectations to us around as a

17   performance team, his expectations of us around being engaged,

18   participating and being the stewards of the IBM Corporation

19   both on a short-term and a long-term perspective, and how he

20   had planned to run these meetings going forward which would be

21   more on the strategy and less on the detailed operational

22   aspects of the meeting.

23        Ginni gave her observations in her executive chairman

24   role.  She spent a lot of time with chief executives of many of

25   our clients and our key partners, and she gave some macro view

K7LQibm2                        Walker - Direct

1    of COVID and what we were seeing in the market around COVID and

2    what she was hearing from her co-CEOs and chairman around how

3    they were planning to respond not only short term but, you

4    know, evolve over time to the new normal post-COVID.  So that

5    was Arvind and Ginni's opening.

6            MR. SIGNORACCI:  Thank you.  Ashley, if you could flip

7    to the next page.

8    Q.  After Foster, the next two names are Guido and Walker.  Can

9    you tell me about those presentations?

10   A.  Yes.  So, for this section, we had a number of sessions

11   where execs talked about our key strategic plays.  We had

12   Michelle Peluso and John Granger talk about our key offerings.

13   We had others talk about how we were going to change in COVID

14   and go digital.

15           Then we had Mark Foster talking about as a -- a

16   setting that determined the importance of our large deals for

17   our long-term success.  And then he had Phil Guido, who leads

18   the Mystic program for us, and myself, who leads the Hamilton

19   program for us, to lead a discussion session on Mystic and

20   Hamilton.

21   Q.  Can you tell me -- so you said there that Phil leads the

22   Mystic project, and you lead the Hamilton project.  Can you

23   tell me a little more about Mystic independent of Hamilton?

24   A.  Yes.  So, Mystic is -- was based on a large deal that we

25   did last year with AT&T.  This is called -- the deal was called

K7LQibm2                          Walker - Direct

1   Yosemite.  It's a large multibillion dollar partnership

2   agreement that we signed with AT&T in competition with

3   Microsoft.  And in that pursuit and partnership, we saw a new

4   way of what clients were looking for around how they do these

5   large, long-term relationships with cloud.

6         So, that Yosemite deal was taking their current

7   applications that are running on their mainframes and on

8   premise and moving those applications to cloud, to IBM's cloud,

9   to other clouds in the transformation, and we took the

10   ownership off that for the client.

11         In that competition, we needed to do a new way of

12   working, which is investing, because when you move something

13   from an on-premise computer to a cloud, you can -- it costs a

14   lot of money to do that transformation.  What we've come up

15   with is a different way of working which we can use a balance

16   sheet, we can use IBM's financials to finance the upfront move

17   so that the client doesn't have to do a large payment upfront,

18   which, especially now with COVID and things, clients don't

19   usually have the money to make a large payment upfront, but we

20   have a model that we connect a finance for that and invest that

21   with a long-term commitment.  So that model that we developed

22   at AT&T is the model now that we are replicating with other

23   clients around the world.

24         Anthem was the example that Guido felt was a simpler

25   deal for Anthem and the healthcare industry and he laid out

1    exactly how he took what was learned from AT&T and did that for

2    Anthem.  He then went through the other -- the next ten large

3    opportunities that we used across the industries where we

4    thought this type of deal would be appropriate.  So, it was

5    focusing on what are we seeing, how does this compare to

6    competition, what are the opportunities, and what is the

7    pipeline over the next couple of years on these large

8    transformational deals.  For myself -- sorry, so there were a

9    lot of things.

10   Q.  Go ahead.

11   A.  OK.  On Hamilton, Hamilton is a subset of Mystic where we

12   are -- on Mystic, we are moving it just to IBM's public cloud.

13   It's our standard public cloud.  What we're doing for Hamilton

14   is, as I spoke, we have a financial services public cloud which

15   is unique for financial services that we can move financial

16   work loads there.  So, a subset of the Mystic deal or the

17   Hamilton deals, which are these large, complex transformational

18   deals that we're doing with the financial institution, banks,

19   and insurers around the world where we are leveraging and

20   utilizing our financial services cloud as the destination, but

21   we're using the same modeling of investing and business

22   outcomes and other things that we're going into make from a

23   client's standpoint giving them a business outcome that they're

24   looking for and it makes sense to move these work loads from

25   where they are at to a cloud that is financially viable.

1   Q.  And when you refer to work loads, what are you referring

2   to?

3   A.  The work loads as we were saying earlier, the 80 percent of

4   the information that had moved to cloud, those are customer

5   information.  They are financial information.  They are

6   application data that looks at all the orders.  You know, for a

7   bank, it's all the chart of accounts.  It's all of the

8   information that goes into that.  So it's all of the detail

9   core information that you run a bank with or a network with or

10  private information for a healthcare provider around patient

11  information.  So, all of the secure confidential information

12  that normally you would never put on a public cloud, that's the

13  piece that we look at and help them determine a way to move

14  that to our financial services cloud in a safe, secure, and

15  encrypted way.

16  Q.  Thank you.  Looking on the left-hand side, how long was

17  your presentation to the performance team?

18  A.  I think it was approximately -- if I can count,

19  approximately 30 minutes.

20  Q.  Thank you.

21       MR. SIGNORACCI:  Ashley, if you could put JX-155 on

22  the screen.  And if you can flip to the 12th page.  Your Honor,

23  this document was produced in discovery, and that process

24  changed the formatting and the image.  So there is a cleaner

25  image of the same document that begins at page 12.

1      THE COURT:  Counsel, are you OK with that?

2      MR. DELIKAT:  Yes, your Honor.

3      THE COURT:  OK.  Then I'm OK with it.

4      MR. SIGNORACCI:  Great.  Thank you.

5   Q.  Mr. Walker, do you recognize this document?

6   A.  Yes.  This is the presentation that was put into the box

7   folder two days before and that Mr. Guido and I used during our

8   leading the discussion of the performance team.

9   Q.  Can you read the marking at the bottom of the document?

10  A.  Sorry, the way it --

11     THE COURT:  The IBM confidential part?

12     MR. SIGNORACCI:  Yes, your Honor.

13     THE COURT:  I saw that.

14  Q.  You see that it is labeled at the bottom "IBM

15  confidential"?

16  A.  I do.

17     THE COURT:  At least the first two pages.

18     MR. SIGNORACCI:  Ashley, if you could put page 2.

19  Q.  Mr. Walker, can you tell us what this slide represents that

20  you presented at the April 20 performance meeting?

21  A.  Well, this is what we developed with Arvind as the CEO, our

22  new way of going after large transformational deals with our

23  largest clients, and we break the way we pursue these deals

24  into three different initiatives:  Mystic A, which is what I

25  just described that Mr. Guido leads.  It pulls together our

K7LQibm2                       Walker - Direct

1    applications, our infrastructure, our cloud, Red Hat, and we

2    work with clients, our largest clients on, you know, large

3    multiyear transformational deals kind of a minimum size of

4    200 million but typically a billion plus in opportunity.  AT&T

5    was the example where we developed that.  Anthem that we talked

6    about in this meeting was one of those that we did in first

7    quarter.  So, that's that model.

8           Then, as I said, Mystic B is the Hamilton deals.  It's

9    a subset of those Mystic deals which are focused on financial

10   services, focused on the regulatory compliance, the security

11   and the leveraging of our financial services cloud as the base,

12   you know, of that work.  We have a larger number of those

13   because those can be billion dollar plus deals, but they can

14   also go down to smaller, you know, 50 million and above.  So

15   Mystic A, a smaller number, ten plus deals.  Mystic B, we tend

16   to have 20 or 30 of those around the world.

17          And then the bottom piece cloud value transformation,

18   which is if a client doesn't want to move to a cloud -- to our

19   cloud, they just want to do the application and modernization

20   work, then we can help them move it to our cloud or anyone

21   else's cloud from a services only standpoint.

22          And we talked about the IT.  We have dedicated teams

23   that do this.  We have dedicated intellectual property that's

24   unique of how we do it, technical specs., the pricing.  So we

25   explain that to all of the IBM executive team so that they are

K7LQibm2                    Walker - Direct

1   aware of our new transformational play.

2   Q.  What would you consider about this slide to be

3   confidential?

4   A.  Pretty much everything.  How we maintain the market into

5   the different pieces, our model on how we are going after large

6   Mystic deals, pulling together our application of

7   modernization, our services, our cloud, our Red Hat, the list

8   of opportunities how we're focusing on it.  Hamilton, you know,

9   very similar around the destination, the financial services

10  cloud, and cloud value transformation, so it's around the

11  discussion how do we segment the clients, how do we select the

12  clients, and then the discussion was on competitively how does

13  that compare to our competitors and the offerings that they

14  have in each of these three areas.

15          MR. SIGNORACCI:  Ashley, if you could turn to the next

16  page, page 14.

17  Q.  Can you tell us about these two charts in the middle,

18  Mr. Walker?

19  A.  So, on Mystic we get into the detail and we got into -- we

20  wanted to explain in detail to all of the performance team

21  members what was the business driver on the left, what are we

22  seeing from our clients, especially now in this time with COVID

23  what is changing because of COVID and the post COVID world is

24  changing, and so what their business drivers were.

25          Then we went into detail around how work unique, we

K7LQibm2                        Walker - Direct

1    were pulling in what we have with Red Hat, pulling in our

2    capabilities both that we have from an application in services

3    and a security standpoint from software, and how we pull all of

4    that in together into this unique model and the way we engage

5    with clients, the value that we can provide to our clients

6    going forward.  And that's on the right, so it's the outcomes.

7    We wanted to make sure that all of our executive teams and

8    especially the executive owners in the room knew what the new

9    solution and offering was and could be able to articulate and

10   leave that with our clients going forward.

11            THE COURT:  Is there some reason that this piece of

12   paper, this sheet is not marked IBM confidential?

13            MR. SIGNORACCI:  Your Honor, do you mean originally or

14   in the discovery?

15            THE COURT:  I'm just looking at page 14 and 22, as you

16   have my attention, and I don't see it marked confidential.  I'm

17   just curious, was it marked confidential originally and then it

18   didn't show up or --

19            MR. SIGNORACCI:  I believe the produced version is

20   marked on every page as IBM highly confidential.  This is for

21   the convenience of reviewing the slides in color and in clarity

22   version, but we can brand for submission.

23            THE COURT:  There isn't anything else about these

24   slides that's different, correct?

25            MR. SIGNORACCI:  Correct.  Correct.

K7LQibm2                          Walker – Direct

1              THE COURT:  Do you agree with that, counsel?

2              MR. DELIKAT:  I think it's a little bit unclear

3     whether or not Paul Weiss placed the label of highly

4     confidential when they produced it in discovery or your

5     question which was, was the document originally stamped

6     confidential when it was distributed.  I don't think I heard an

7     answer to that.

8              THE COURT:  I think that is a fair point.  I have

9     inferred to this moment that your client marked this

10    confidential.  Am I right about that?

11             MR. SIGNORACCI:  That's correct.  The cover page and

12    the second page have the original IBM confidential branding,

13    and then in production they received an additional

14    confidentiality branding of IBM highly confidential.

15             THE COURT:  So when you made these color slides,

16    somehow the IBM confidential label did not reappear.

17             MR. SIGNORACCI:  That's correct.

18             THE COURT:  And there isn't, to your knowledge,

19    anything else that did not reappear.

20             MR. SIGNORACCI:  Your Honor, on the first slide even

21    in the reproduced version, the original IBM confidential does

22    appear.

23             THE COURT:  OK, got it.

24             MR. DELIKAT:  Your Honor, can my colleague,

25    Mr. Thompson, comment about that, because I still think there's

K7LQibm2                         Walker - Direct

1    confusion about --

2              THE COURT:  Well, wait.  Wait.  Hold on.  Let's keep a

3    nice clean record so that we are not making it difficult for

4    those later.

5              My question was with respect to page 14 of what I have

6    now marked Exhibit 3, page 14 and 22, I noticed that at the

7    bottom there was no IBM confidential, and heretofore I took the

8    IBM confidential on the preceding two pages to mean that back

9    at the ranch when they were having this meeting, that whoever

10   prepared this marked it IBM confidential.  And so the question

11   I asked was, was there any reason why on this particular page

12   there was not a marking.

13             I heard two things:  One, that when I made these

14   colors so that the judge would be able to look at a color and

15   nice presentation, it didn't reappear.  I asked counsel if

16   there was an objection to that.  And he said no, that's fine.

17   And so I took it as no more or no less than that.  But I also

18   heard that separately Paul Weiss in its production marked these

19   documents confidential.  Am I right so far?

20             MR. SIGNORACCI:  You're right so far.

21             THE COURT:  OK.  So now, counsel, if there is

22   something you want to address in that context, I'm happy to

23   hear you.

24             MR. THOMPSON:  Yes, your Honor.  So I think what

25   counsel is talking about, we're talking about the original

1    confidentiality designations by IBM, talking about that for a

2    moment.   There is a designation on the first page, and I

3    believe the second page, and as your Honor points out, there's

4    not a designation on the page we're looking at today.   And I

5    think counsel cannot deny that IBM did not put a designation on

6    that page.

7              THE COURT:  That's not what he said to me.

8              MR. THOMPSON:  Well, I think if you asked him that, he

9    would have to confirm.

10             THE COURT:  I thought I asked you that.

11             MR. SIGNORACCI:  You did, your Honor.

12             THE COURT:  And you said yes on the original there was

13   IBM confidential.

14             MR. SIGNORACCI:  On the first and second pages.

15             THE COURT:  So the difficulty we're having, of course,

16   is only in relation to the reproduction that is in front of me.

17   I was not -- excuse me.  I was not looking to open a can of

18   worms.  I was looking to understand that perhaps what appeared

19   to be more confidential than the cover sheet did not in fact

20   say it was confidential, and I was just trying to understand

21   why that was.  As far as I can tell, you've cleared it up for

22   me.

23             MR. SIGNORACCI:  No.  In that case, your Honor, I

24   think I do need to clear it up for you.  This document as it

25   exists at the ranch is a single PowerPoint that has the IBM

K7LQibm2                          Walker – Direct

1    confidential branding on the cover page and on the second page.

2              THE COURT:  But not on any other.

3              MR. SIGNORACCI:  Correct.

4              THE COURT:  Thank you.  Then I misunderstood, and your

5    objection is well stated so that we're clear, redundantly

6    clear, that Exhibit 3 in evidence has been marked by IBM as

7    "IBM confidential" on the pages marked 12 of 22 and 13 of 22,

8    but not 14 of 22, dare I say, and thereafter?  No, I can't.  So

9    only page 14 of 22 is not marked.  OK.

10             All right.  Let's proceed.

11             MR. SIGNORACCI:  Thank you, your Honor.

12             THE COURT:  We have a clear record now.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SIGNORACCI:  (Continuing)

2   Q.  Ashley, could you turn to page 20, please?

3           THE COURT:  I mean, just for the sake of it, as long

4   as we have digressed, page 15 through 22 all says confidential.

5           MR. SIGNORACCI:  And those are original brands.

6   BY MR. SIGNORACCI:

7   Q.  Mr. Walker, I am just turning to this slide for the top

8   title and then we will look at the next slide.  Do you see the

9   title here?  Can you read that for us?

10  A.  Yes.  This is our Mystic B/Hamilton key pursuits, accounts

11  we were pursuing as a party.

12  Q.  Ashley, can you turn to the next page.

13          Now, this title says?

14  A.  It is the continuation, so these are our Mystic B/Hamilton

15  key pursuits that we are pursuing.

16  Q.  Can you tell me what you mean by key pursuits?

17  A.  These are opportunities that we have identified and spaces

18  where it is green on the right-hand side already have teams

19  engaged and working as of the date here, as of April the 10th

20  of the opportunities that we are working on with Mystic and

21  Hamilton opportunities.  So, the client that you have here

22  would be the client, would be the executive sponsor, member of

23  the PT, and then would you have a team who is the owner for the

24  on the ground full-time pursuit owner and then on the right

25  pursuit underway would mean we have already qualified this with

1    the client and we have teams engaged and working.  Where it is

2    in white it would be that we are working with the client but we

3    have not yet got executive support and we don't have a pursuit

4    underway as of April the 10th.

5          THE COURT:  Just so I am clear, these are clients who

6    are paying customers of IBM, currently the ones in green; am I

7    correct?

8          THE WITNESS:  Your Honor, all of these clients would

9    be existing customers of IBM in some format.  The ones that are

10   on here are ones that we have identified and we were already

11   working on at that time on a opportunity in the Hamilton space.

12   For the ones that are in white, your Honor, are ones that we

13   talked to but we had not yet gotten their approval and support

14   to go forward on a pursuit at that time.

15         THE COURT:  The ones in green have engaged IBM to work

16   on Hamilton or Mystic issues; is that right?

17         THE WITNESS:  That is correct, sir.

18         THE COURT:  Okay.  Thank you.

19   Q.  Mr. Walker, those existing engagements with clients, are

20   those public?

21   A.  Can you clarify the question?

22         THE COURT:  Yes.  I was going to say that myself.

23   Q.  The status of IBM -- the status and the specifics of IBM's

24   outreach to those clients on Mystic or Hamilton.

25   A.  So there is several things, just for clarification on this,

K7L5ibm3                        Walker - Direct

1    that is very confidential.  So, the clients that we have on the
2    left, that mixture of clients includes our integrated accounts
3    and it is not public which accounts that we treat as integrated
4    accounts and which ones we do not so the clients, just for
5    clarity on the left, includes a set of clients that are
6    integrated accounts, but it also includes a set of clients that
7    are not integrated accounts that could be just an industry
8    client.  The Hamilton offering, not just for our largest
9    integrated accounts but it really cuts across all the banks and
10   insurance companies worldwide.  So, that would be one.  Two,
11   the status that we are pursuing and are engaged with these
12   clients would be highly confidential and if our competitors
13   knew that they could come in and put competing offers, they
14   could sell against us in doing that so we treat this very
15   confidential of which clients we are working with at any date
16   in time.
17   Q.  Ashley, if you can zoom in on the bottom three rows of the
18   document?
19          Mr. Walker, do you see those?
20   A.  I do.
21   Q.  Reading from the left to the right, can you tell us what
22   these rows mean?
23   A.  Yes.  So, the three clients that we had in April, on April
24   10th that we were looking at, engagement with Hamilton
25   opportunities the first is Banco Bradesco, that is one that we

1    had Rodrigo as the PT executive sponsor and Katia is the

2    on-the-ground managing director that is running the deal, and

3    green would mean that we have got agreement from the client and

4    we have a team lender engaged on a Hamilton pursuit.

5                On Banco de Brasil it would say that Rodrigo is the

6    sponsor, Teresa is the executive full-time on the ground, and

7    as of April the 10th there was -- did not have approval that

8    the client was underway.

9    Q.  I think you said there was not approval underway with the

10   client?

11   A.  There was not an approved pursuit underway with the client.

12   Q.  And what were Rodrigo's responsibilities in connection with

13   being the PT executive sponsor for these two pursuits?

14   A.  So, as the PT executive sponsor this was the person that

15   spoke for all of IBM, this -- from Arvind our CEO and his

16   responsive ability and delegation to ensure that we were

17   pulling all of IBM together in these complex deals making sure

18   that all the parts of the organization were working closely

19   with the same strategy and competitive strategy, would be

20   engaging with the senior execs of the client personally on

21   this, and would be approving pricing and valuation and would

22   have final sign-off on that.

23   Q.  And you said these were the pursuits in Latin America on

24   the left-hand side.  Is that what the "LA" stands for?

25   A.  That is correct.  These would be the pursuits that were

K7L5ibm3                          Walker - Direct

1    with clients headquartered in Latin America.  They are also

2    clients, global clients that have operations in Latin America

3    that would be headquartered somewhere else but would have a

4    significant footprint in Latin America.  These were the ones

5    that were headquartered in Latin America.

6    Q.  Why was Rodrigo selected as the sponsor for these two Latin

7    America clients?

8    A.  As partnership executive, the relationship with the senior

9    clients with the understanding of the market, the ongoing --

10   the capability, he comes from a services background and his

11   understanding of the financial services cloud, his ability to

12   clearly articulate that and the value to the client.

13   Q.  Did Mr. Lima have any other responsibilities in connection

14   with Latin America?

15   A.  In his role as the integrated account exec he was

16   responsible for all 77 of our globally integrated accounts.

17   Those we had -- we had two of those that were based in Latin

18   America, one was Bradesco that we talk about here, and the

19   other was Itau, which is another large bank in Brazil.  Those

20   are the two integrated accounts that report to Rodrigo that

21   were Brazil-based.  He also had, for all of the integrated

22   accounts that had Latin footprint, he would be responsible for

23   those so Santander, BBVA, AT&T has a large Mexican presence,

24   you would have Wal-Mart with a large Latin American presence,

25   you would have General Motors with a large Latin presence, you

K7L5ibm3                         Walker - Direct

would have Citi with a large Mexican presence.  So, in his role

these are run as global accounts as globally integrated

accounts.  They would have a headquarter location but in his

role he would be responsible for all of the global operations

of these accounts.

Q.  And we heard from Microsoft today that they propose to wall

Rodrigo off from those client accounts.  If they did that,

would that resolve your concerns in this case?

A.  No, on several fronts.

        So, one, all of our -- we set -- a large number of the

integrated accounts that he was responsible for have

significant Latin America footprint so all of those, the

knowledge that he has and strategy for that set of accounts for

those that he had responsibility would be an issue but probably

more importantly Rodrigo, like myself, we have in our head, we

know IBM strategy, we know our competitive strategies, we know

our financials.  As a performance team member we have access to

information that cuts across all geographies of our business,

all parts of our business and his knowledge that he has would

cut across not only the two integrated accounts but would cut

across all of our enterprise clients across Latin America that

we have because the strategy we do is we work on our largest

accounts as kind of setting the strategy but then we look to

replicate that with our smaller accounts.  So, the knowledge of

our strategies ongoing this year and next year around hybrid

K7L5ibm3                         Walker - Direct

1   cloud, around AI, around how we are changing our coverage model

2   and those assets is something that would be very concerning.

3   Q.  Thank you.

4       And the very last line that's expanded here, the third

5   Latin America account, who is the PT executive sponsor of that?

6   A.  Ana Paula Assis.  Ana Paula is our general manager for

7   Latin America so she is in the role similar to the role, as I

8   understand it, that Rodrigo would be performing his.

9   Q.  Thank you.

10      MR. SIGNORACCI:  Your Honor, may I have one moment?

11      THE COURT:  Of course.

12      MR. SIGNORACCI:  Your Honor, at this time we have no

13  further questions.

14      THE COURT:  I have one just before cross.

15      This meeting that took place, I just want to be clear

16  and I want the record clear, is this the only meeting that you

17  are aware of that Mr. Lima attended since his promotion?  Is

18  there another meeting?  In other words, this is an April

19  meeting; was there one in January or before this?

20      THE WITNESS:  Yes.  Good question, your Honor.

21      So, we have -- so, there is several meetings so the

22  performance team meeting is held quarterly.

23      THE COURT:  Right.

24      THE WITNESS:  So we had one in January and then this

25  was the follow-up.  The January one was done face-to-face over

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm3                        Walker - Direct

1   two days.  This one, because of COVID, was held and was done

2   virtually over two days.  We had our acceleration team meeting

3   which set strategy for the year and going forward, that was

4   also held in January that set the strategy.  We had in that

5   meeting one of the keynote speakers was Howard Boville.  Howard

6   was the senior vice president for Bank of America, so Howard

7   spoke around our financial services cloud and the importance of

8   the shift that we were doing, and then we also had the Leonard

9   who is the COO for -- it is BP Paribas, a large bank in France.

10  Leonard spoke, they are also a financial services cloud

11  strategic partner for us for Europe and he was also on stage

12  speaking about our financial services cloud and the work that

13  we were doing and the importance for them going forward.

14          So, that was a key strategic session that we had.

15          THE COURT:  I appreciate all of that.  My concern,

16  question really was was there another performance team meeting

17  in January that you saw Mr. Lima at, yes, you did; or, no, you

18  didn't.

19          THE WITNESS:  Yes, I did.  Face to face.

20          THE COURT:  Simple.  Thank you.  All right.

21          Cross?

22          MR. McQUADE:  Yes, your Honor.  Given the witness

23  can't see me, would it be acceptable if I stayed in my seat and

24  conducted the examination here?

25          THE COURT:  As long as are you comfortable there.

1           THE WITNESS:  I can't see you.

2           MR. McQUADE:  Should I go there?

3           THE COURT:  Whatever is comfortable.  If you want to

4   stay seated you don't need to stand on my account.

5           MR. McQUADE:  Thank you, your Honor.  I will stay

6   here.  Thank you very much, I appreciate that.

7           THE COURT:  Sure.

8   CROSS EXAMINATION

9   BY MR. McQUADE:

10  Q.  Mr. Walker, I think I will follow up on the Judge's last

11  question to you about the January 2020 performance team

12  meeting.

13          THE COURT:  I'm not seeing the witness and I would

14  like to see him as he is being cross-examined, if that's

15  feasible.

16          THE DEPUTY CLERK:  He was up there.

17          MR. SIGNORACCI:  Randy, can you try toggling your

18  video on?

19          THE WITNESS:  Sure.

20          THE COURT:  Yes.  Now I see you fine, Mr. Walker.

21  Thank you.

22  BY MR. McQUADE:

23  Q.  So, Mr. Walker, I wanted to ask you a follow up on the

24  Judge's question about the January 2020 performance team

25  meeting.  You testified that you recalled seeing Mr. Lima at

K7L5ibm3                        Walker - Cross

1    that meeting in person?

2    A.  That is correct.

3    Q.  Do you recall testifying at your deposition that you could

4    not recall the topics presented at that January 2020 quarterly

5    performance team meeting?

6    A.  That's correct.

7    Q.  That's correct, you could not remember any of the topics?

8    A.  No, I could remember -- I could not remember every topic

9    and every item that was discussed in that meeting.

10   Q.  Do you also recall at your deposition you testified that

11   you could not recall all of the individuals who were present at

12   the January 2020 quarterly performance team meeting?  Isn't

13   that right?

14   A.  My understanding is that everyone at -- the performance

15   team members were all there.  Anyone who would not be in the

16   meeting would have been called out as not participating and a

17   reason given for why they would not be participating.  It's a

18   full participation meeting so anyone who was not there, their

19   absence is called out.

20        THE COURT:  Before you proceed, Mr. Walker, I want you

21   to do your best to simply answer the question that you are

22   being asked.

23        THE WITNESS:  Yes, sir.

24        THE COURT:  We are not having a conversation, we are

25   giving testimony under oath and the lawyer is entitled to get a

1   direct answer to his question to the best of your ability.  And

2   if, for any reason, IBM's counsel needs to clean up or clarify

3   or get my attention on something, rest assured you have

4   entirely competent counsel and I assume they would do that

5   forthwith and once cross-examination is over.  So, just try and

6   answer the question and we will move it along.  Okay?

7                THE WITNESS:  Yes, sir.

8                THE COURT:  Thank you, Mr. Walker.

9                MR. McQUADE:  Thank you, your Honor.

10  BY MR. McQUADE:

11  Q.  So, Mr. Walker, I will ask you a yes or no question.  At

12  your deposition you testified that you could not recall all of

13  the individuals who presented at the January 2020 quarterly

14  performance team meeting, correct?

15  A.  Yes.

16  Q.  You said the performance meeting was a quarterly meeting so

17  can you tell me when was the previous performance team meeting

18  before the January 2020 meeting?

19  A.  October of '19.

20  Q.  And at your deposition you testified that you could not

21  recall who spoke at that October 2019 performance team meeting,

22  correct?

23  A.  Yes.

24  Q.  And at your deposition you also testified that you could

25  not recall the details of what was discussed at that October

1    2019 performance team meeting, correct?

2    A.   Yes.

3    Q.   Okay.  So, if we move forward in time to the April 2020

4    performance team meeting, do you recall that the total running

5    time of the first day of the performance team meeting was two

6    hours and 45 minutes?

7    A.   By the agenda it looks like the -- yes.

8    Q.   And you were looking at Joint Exhibit 129 when you were

9    answering that question?

10   A.   The agenda for the April 10th meeting was what I was

11   looking at; yes, correct.

12           THE COURT:  Please mark that as Exhibit 2 in evidence,

13   just so the record is clear.

14           (Plaintiff's Exhibit 2 received in evidence)

15   BY MR. McQUADE:

16   Q.   And so the record is clear, that document is designated in

17   the lower left-hand corner has been designated by IBM as highly

18   confidential IBM information.  Do you see that?

19   A.   I don't see it.

20   Q.   Okay.  In Joint Exhibit 129, if you look in the lower

21   right-hand corner there is a Bates number, IBM Lima 0025094.

22   We are going to put it up for you.

23           Can you see that, Mr. Walker?  Is it up on your screen

24   now?

25   A.   Yes, it is.

K7L5ibm3                        Walker - Cross

1    Q.  So I was referring to the lower left-hand corner of this

2    document, it's been designated by IBM as highly confidential

3    IBM information.  Do you see that?

4    A.  Yes.

5    Q.  Can you take a look at this document and tell me what text

6    in this document would be characterized, in your view, as

7    highly sensitive proprietary business information?

8              MR. SIGNORACCI:  Objection, your Honor.

9              THE COURT:  I think, counsel, I see where you are

10   headed.  I think you have mixed in a little bit of legal

11   conclusion with your fact questions so if you want to ask him

12   about what he believes to be confidential or proprietary,

13   that's fine.  If you want to ask him about the highly

14   confidential IBM information designation, that's also fine.

15   Just pull it apart for me.

16             MR. McQUADE:  Sure.  Happy to, your Honor.

17   BY MR. McQUADE:

18   Q.  Do you believe any of the information contained in this

19   document is confidential information?

20   A.  The focus on Mystic and Hamilton is a very confidential.

21   Q.  Can you tell me what page and what section of the document

22   you are looking at, please?

23             THE COURT:  I thought we were looking at the first

24   page first.  Is there anything on this page, Mr. Walker, that

25   you understand to be confidential as counsel has asked you, on

K7L5ibm3                    Walker - Cross

1   just this one page?

2              THE WITNESS:  Content of the discussions, yes.  What's

3   written in the words on this page, no.

4              THE COURT:  Okay.

5   BY MR. McQUADE:

6   Q.  Same question for page 2, we will blow it up for you, make

7   it larger?

8   A.  Mystic, Hamilton, and Anthem as a key example of large

9   complex services deals would be confidential.

10  Q.  What's confidential about that?  Are those names, are those

11  words confidential?

12  A.  They are code names for the programs that --

13             THE COURT:  Mr. Walker, for the programs that?  You

14  said they were code names for the programs that and the court

15  reporter didn't get the rest.

16             THE WITNESS:  Those are code names for our

17  confidential programs that we were running.

18  BY MR. McQUADE:

19  Q.  Okay.  Are those code names confidential?

20  A.  Our programs are confidential.  The Anthem example, as a

21  client, is confidential.

22  Q.  The question was are the code names confidential?

23  A.  Yes; that we have a Mystic program that's running and a

24  Hamilton program that is running, that is confidential.

25  Q.  Is there anything competitively sensitive about the name

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm3                          Walker – Cross

1    Mystic or Hamilton, the name Mystic/Hamilton update?

2    A.  No.

3    Q.  Is there anything else on this page before we turn to the

4    next page, that's confidential?

5    A.  No.

6    Q.  Can we turn to the next page?  Is there anything on this

7    page that you believe is confidential?

8    A.  I can't see the page.

9    Q.  Okay.  We will enlarge that for you.  Are you able to see

10   that?

11   A.  I am trying to.  I think the piece that would be

12   confidential is the meeting, and that we decided to hold the

13   meeting not in person but via video would be confidential.

14   Q.  And do you think that's competitively sensitive information

15   as well?

16   A.  It could be.

17   Q.  And can you explain that, how it could be, please?

18          THE COURT:  You have to start over, Mr. Walker.  I

19   don't know what's going on but you are blipping in and out so

20   if you wouldn't mind starting your answer over so that the

21   reporter can get this?

22          THE WITNESS:  Thank you.  I will speak up.

23          I would view that when the senior executive team, when

24   and where they are meeting as a group would be confidential

25   information to IBM.

K7L5ibm3                        Walker - Cross

1   BY MR. McQUADE:

2   Q.  Do you think it's competitively sensitive that a company is

3   holding a virtual meeting during COVID-19?

4   A.  I think where the senior-most execs, when, where, and how

5   often they are meeting as a team is competitively sensitive.

6   Q.  Okay.  The final page of this document is a reprint of the

7   first page, I believe; is that correct?  We can turn one more

8   page.

9            THE COURT:  I have two more pages, counsel, 4 of 5 and

10  5 of 5.

11           MR. McQUADE:  4 of 5 is a blank document and 5 of 5 is

12  a second performance team meeting agenda --

13           THE COURT:  I got it.

14           MR. McQUADE:  -- which I believe, and correct me if I

15  am wrong, this is a repeat of what was on page 1 and partially

16  on page 2.

17           THE WITNESS:  Is that me?

18           THE COURT:  That's for you, yes, Mr. Walker.

19           THE WITNESS:  Yes.  I think it is, looks to be the

20  same agenda, correct.

21  BY MR. McQUADE:

22  Q.  Okay.  Mr. Walker, if I can turn your attention to joint

23  Exhibit 155?

24           THE COURT:  3 in evidence, counsel.

25           (Plaintiff's Exhibit 3 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm3                          Walker - Cross

1   BY MR. McQUADE:

2   Q.  You testified earlier that this is the PowerPoint that you

3   used as part of your presentation with Mr. Guido; is that

4   correct?

5   A.  Correct.

6   Q.  And you testified that your presentation lasted 30 minutes

7   according to the agenda; is that correct?

8   A.  Approximately.

9   Q.  And I think we established through some discussion of this

10  document that the document is a total of 11 pages in total,

11  correct?

12  A.  I take that as correct.  I am not sure of the number of

13  pages but that would seem correct.

14  Q.  So, in your presentation with Mr. Guido is it fair to say

15  that you two spent approximately three minutes per page?  Is

16  that a fair characterization?

17  A.  No.  We sent this out in advance.  The team were expected

18  to read the material and so some of the slides we discussed,

19  others we only made mention so it would not be a --

20  Q.  I'm sorry, I didn't hear your answer.

21          Mr. Walker, part of the problem was it was just a yes

22  or no question.  If you could, please, just try to answer the

23  question as the Judge suggested yes or no, if you can.

24          THE WITNESS:  Can you repeat the question?

25          MR. McQUADE:  Can I ask the court reporter to read it

K7L5ibm3                        Walker - Cross

1    back?

2              THE COURT:  Please read it back.

3              MR. McQUADE:  Thank you.

4              (Record read)

5              THE WITNESS:  No.

6              MR. McQUADE:  Thank you.

7              If I could turn your attention to, in this Joint

8    Exhibit 155, if we could turn to page 21 of 22.

9              THE COURT:  I don't want to be redundant or interrupt

10   but we are going to call it Plaintiff's Exhibit 3 for the

11   record so that every time counsel refers to Joint Exhibit 155 I

12   take it to mean Exhibit 3.

13             Okay, continue.

14   BY MR. McQUADE:

15   Q.  Mr. Walker, your attention was drawn to the final three

16   lines of this chart and you identified two, I think you

17   described it as partnership executive program accounts that

18   Mr. Lima was responsible for; is that correct?

19   A.  It is the PT executive sponsor for those two.

20   Q.  And are those both integrated accounts as well?

21   A.  No.  Bradesco is an integrated account, Banco de Brasil is

22   not.

23   Q.  Mr. Walker, as you sit here today, are you aware or do you

24   have any first-hand knowledge of any meeting that Mr. Lima had

25   with Bradesco during the last 12 months of his employment with

K7L5ibm3                          Walker - Cross

1     IBM?

2     A.  No.

3     Q.  And as you sit here today, do you have any first-hand

4     knowledge of any meeting that Mr. Lima had with IBM clients

5     during the final 12 months of his employment with IBM?

6     A.  No.

7     Q.  And you are the finance sector leader; is that correct?

8     A.  Financial services sector leader, correct.

9     Q.  And both of these clients would fall under your area of

10    responsibility in that position; is that correct?

11    A.  Which?

12           THE COURT:  We are not understanding -- Mr. Walker,

13    are you having trouble understanding the question?

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  Okay.

16           Could you reframe your question, please, sir, so that

17    the witness can answer?

18           MR. McQUADE:  Sure.

19    BY MR. McQUADE:

20    Q.  Mr. Walker, you currently hold the position general

21    manager, financial services sector; correct?

22    A.  Global managing director, financial services sector.

23    Q.  And part of your responsibilities relates to clients in the

24    financial services sector, correct?

25    A.  Correct; the integrated accounts in the financial services

K7L5ibm3                    Walker - Cross

1   sector.

2   Q.  Is Banco de Brasil an integrated account in the financial

3   services sector?

4   A.  No.

5   Q.  Is Banco Bradesco a client in the financial services

6   sector?

7   A.  It is an integrated account, yes.

8   Q.  So do you have responsibility for that account?

9   A.  I do.

10  Q.  Mr. Walker, changing directions a bit here, you also

11  testified about an acceleration team and you mentioned, I

12  believe, that that team meets annually; is that correct?

13  A.  Correct.

14  Q.  And so the last acceleration team meeting was in January of

15  2020; is that right?

16  A.  Correct.

17  Q.  And do you recall at your deposition you testified that

18  with respect to that 2020 annual acceleration team meeting you

19  could not recall all of the details of the meeting; isn't that

20  right?

21  A.  Correct.

22  Q.  As you sit here today you also don't know what, if

23  anything, Mr. Lima remembers from any acceleration team

24  meeting; isn't that right?

25  A.  Yes.

1   Q.  And as you sit here today you don't have any idea of what,

2   if anything, Mr. Lima remembers from any performance team

3   meeting; isn't that right?

4   A.  Yes.

5   Q.  And as you sit here today, you have no idea what IBM

6   confidential information Mr. Lima remembers from his employment

7   at IBM, do you?

8   A.  Yes.

9   Q.  And what's the basis for that knowledge of what you believe

10  Mr. Lima has?

11  A.  Mr. Lima was the same teams that I was in.  I know what

12  information that I was privy to so I understand the information

13  that Mr. Lima was privy to.

14  Q.  But you don't have any first-hand knowledge of that

15  information, do you?  You are basing that on your experience;

16  is that correct?

17          MR. SIGNORACCI:  Objection.

18          THE WITNESS:  Correct.

19          THE COURT:  Overruled.

20  BY MR. McQUADE:

21  Q.  So you talked earlier today, you testified earlier today

22  about AT&T; is that right?

23  A.  Yes.

24  Q.  And you said Mr. Lima worked closely with you with respect

25  to that client; is that correct?

K7L5ibm3                        Walker - Cross

1    A.   Yes.

2    Q.   And is it true you worked as the managing director for AT&T

3    from approximately 2018 to the end of 2019?

4    A.   Yes.

5    Q.   And you were responsible for the entire relationship and

6    partnership between AT&T and IBM during that time period; isn't

7    that right?

8    A.   Yes.

9    Q.   So, as managing director of financial services for IBM you

10   did not directly report to Mr. Lima, did you?

11   A.   No.

12   Q.   And as managing director of financial services you were

13   responsible for the engagement of accounts in the financial

14   services sector; is that right?

15   A.   Yes.

16   Q.   And that included integrated accounts, correct?

17   A.   Yes.

18   Q.   And isn't it true that it is the IBM -- I will start again.

19            Isn't it true that it is the IBM account plans that

20   show overall how IBM is doing with a particular account?

21   A.   No.

22   Q.   Do you recall testifying at your deposition that the IBM

23   account plans show overall how IBM is doing on an account?

24   A.   No.

25   Q.   Let me ask you this.  IBM account plans show --

1          THE COURT:  Are you saying IBM account plans?

2          MR. McQUADE:  Yes.

3          THE COURT:  I'm sorry to interrupt you.

4   BY MR. McQUADE:

5   Q.  Let me ask this way.  IBM account plans show IBM's overall

6   strategy for a particular account; isn't that correct?

7   A.  Yes.

8   Q.  And IBM account plans show the competitive situation with

9   respect to a particular account; isn't that right?

10  A.  Yes.

11  Q.  And IBM account plans show long-term and short-term plans

12  for a particular account; right?

13  A.  Yes.

14  Q.  They also show the key members from the IBM team for that

15  particular account, right?

16  A.  No.

17  Q.  Do IBM account plans show the key client members that are

18  working for that particular account?

19  A.  The -- yes.

20  Q.  And isn't it true that Mr. Lima did not create the account

21  plans?

22  A.  Correct.

23  Q.  And as you sit here today you don't know whether Mr. Lima

24  actually reviewed account plans for all 77 integrated accounts

25  during his employment at IBM, do you?

K7L5ibm3                        Walker - Cross

1   A.  No.

2   Q.  Is it true that there has been changes with the IBM

3   integrated accounts since the COVID-19 pandemic has struck?

4   A.  Yes.  Two accounts have been added.

5   Q.  Do you recall testifying at your deposition that there were

6   changes in the nature of the integrated accounts, for example

7   there were changes in the accounts' profits and revenues since

8   the COVID-19 pandemic has struck?

9   A.  No.

10  Q.  You don't recall testifying to that?

11  A.  No.

12  Q.  Do you recall testifying that there have been changes with

13  IBM integrated accounts with respect to pricing and strategy

14  since the COVID-19 pandemic struck?

15  A.  No.

16  Q.  Do you recall testifying that there have been changes with

17  IBM integrated accounts with respect to strengths and

18  weaknesses since the COVID-19 pandemic struck?

19  A.  Yes.

20  Q.  And do you recall testifying that there have been changes

21  with IBM integrated accounts with respect to key opportunities

22  since the COVID-19 pandemic struck?

23  A.  Yes.

24  Q.  You testified this morning about Red Hat.  Do you recall

25  that testimony?

K7L5ibm3                      Walker - Cross

1   A.  Yes.

2   Q.  Isn't it true that Microsoft works as a partner with

3   Red Hat on projects?

4   A.  Yes.

5   Q.  In fact, people at IBM refer to Red Hat as Switzerland,

6   doesn't it?  Or don't they?

7   A.  Yes.

8   Q.  And IBM refers to Red Hat as Switzerland because it is

9   neutral and works with many technology companies outside of IBM

10  including Microsoft, correct?

11  A.  Yes.

12  Q.  As a partner with Red Hat Microsoft will have the same

13  knowledge as all other partners of Red Hat; isn't that right?

14  A.  No.

15  Q.  Let me ask you this.  Isn't it true that Microsoft is well

16  aware of Red Hat's offerings and its open source materials?

17  A.  Yes.

18  Q.  Mr. Walker, you testified this morning about cloud.  Do you

19  recall that testimony?

20  A.  Yes.

21  Q.  Mr. Lima was never a part of a cloud computing organization

22  at IBM from an organizational standpoint; isn't that right?

23  A.  Not to my awareness.

24  Q.  And you testified at your deposition that IBM is ranked

25  fourth through tenth in the various cloud categories.  Do you

1   recall that testimony?

2   A.  No.

3   Q.  Isn't it true that Microsoft is the historical leader in

4   public cloud in the Latin American market and keeps gaining

5   market share?

6   A.  Not to my awareness.

7   Q.  Okay.  You do you recall testifying at your deposition that

8   Microsoft is the historical leader in public cloud in the Latin

9   American market and keeps gaining market share?

10  A.  No.

11  Q.  Do you recall seeing a document that was prepared by IBM

12  that laid that out?

13  A.  No.

14  Q.  I would like to mark and pull up Joint Exhibit 97?

15          THE COURT:  We are going to adopt the Court's

16  terminology so this will be now Defendant's Exhibit A for

17  identification.

18          MR. SIGNORACCI:  Your Honor, this document was

19  produced by IBM in discovery and marked as highly confidential

20  IBM information.  We, of course, have no objection to the

21  introduction of the document as evidence but we ask that it be

22  placed under seal.

23          THE COURT:  Counsel?

24          MR. DELIKAT:  No objection.  And, counsel for

25  Microsoft has not been able to join because the line is closed

1    so she is not on anymore.

2            THE COURT:  Okay.  So we will mark whatever this piece

3    of paper is that's coming Defendant's Exhibit A.  Does it have

4    Bates, counsel, so the record will reflect at least, because I

5    don't have it in front of me, at least what it is that is A now

6    under seal?

7            MR. McQUADE:  It does, your Honor.  The first of the

8    Bates Number are covered by what's on the screen.  It is IBM

9    Lima 0100760-83.  That number is partially obscured by the

10   Exhibit 8 Defendant Randy Walker.  It was an exhibit to

11   Mr. Walker's deposition.

12           THE COURT:  Okay.

13           MR. McQUADE:  So that deposition Exhibit 8 sticker is

14   blocking the Bates Number.

15           THE COURT:  How many pages is it?

16           MR. McQUADE:  It is a 24-page document.

17           THE COURT:  Okay.  Is there a copy for me?

18           MR. SIGNORACCI:  Your Honor, one other point I would

19   like to raise --

20           THE COURT:  Wait.  I would like to look at the

21   document while you are cross-examining the witness.  If you

22   don't -- supply me one?

23           MR. SIGNORACCI:  Your Honor, one reason that we might

24   not have the copies on hand is that under the protective order

25   Mr. Lima's counsel was obligated to inform IBM before Mr. Lima

K7L5ibm3                        Walker - Cross

1    questioned any IBM witnesses about documents that were marked

2    highly confidential and IBM information and did not do so.

3         THE COURT:  It is part of the order, I did see that.

4    So, I appreciate the comment but you did agree to notify each

5    other about highly confidential documents that would be used.

6    Let's be practical.  Lawyers write down a lot of things and

7    they intend totally, when they sign their names to them and ask

8    the Judge to so order, to fully comply and I am sure that's no

9    different than here.  Let's put that aside for the moment, we

10   can cure that at lunch.  You are cross-examining, I want to

11   understand your point, and I am hopeful that having a copy of

12   it will enhance the point so that's why am interrupting you and

13   not trying to get in the way but rather I just want to see

14   what's going on, if that's okay.

15        Frank, do you want to get a copy for me?  Thank you.

16        MR. SIGNORACCI:  And I am not sure whether the witness

17   has access to the full copy on his screen.

18        THE COURT:  We will work with the cross as it is but

19   this is now A, in evidence, under seal, at least for the

20   moment.

21        (Defendant's Exhibit A received in evidence)

22        THE COURT:  Sorry to interrupt.  I just want to follow

23   along.  That's all.

24   BY MR. McQUADE:

25   Q.  Mr. Walker, this is a document that was put in front of you

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm3                          Walker - Cross

1    and marked as an exhibit at your deposition.

2              Do you recall this document?

3    A.  Yes.

4    Q.  And what is this document?

5              I'm sorry.  Can you tell us what this document is,

6    please?

7              THE COURT:  Mr. Walker, we are not hearing.  If you

8    could repeat?  I thought you said you had not seen it or you

9    had.

10             THE WITNESS:  I have not seen this document until it

11   was shown to me in the deposition.

12             THE COURT:  Okay.

13   BY MR. McQUADE:

14   Q.  Okay.  Do you remember at your deposition that your

15   attention was pointed to the upper left-hand corner of page 7

16   where it says public cloud, Microsoft is the leader in Latin

17   America and keeps gaining market share.

18             Do you see that?

19   A.  Yes.

20   Q.  Do you recall being asked:  Is that consistent with your

21   understanding of the competitive landscape in Latin America?

22             Do you recall that?

23   A.  No.

24   Q.  Why don't we pull up Mr. Walker's deposition testimony?

25             THE COURT:  Before we do, counsel, who prepared this

K7L5ibm3                    Walker – Cross

1    document, Mr. Walker, if you know?

2              THE WITNESS:  I'm not aware of this document.  First I

3    saw it was when they showed it to me so it looks like it was an

4    internal IBM document that -- for Latin America but I have

5    never seen it before it was shown to me.

6              THE COURT:  Okay.

7    BY MR. McQUADE:

8    Q.  So, Mr. Walker, we are going to pull up a portion of your

9    videotape deposition testimony, the transcript is page 242,

10   line 10 through page 243, line 6.

11             THE COURT:  Are you confronting him with it or are you

12   asking him for his recollection?  What?

13             MR. McQUADE:  I am presenting it to him to refresh his

14   recollection.

15             THE COURT:  Okay.

16             So, they're going to read you your testimony or ask

17   you to look a at it and ask you if you recall testifying as

18   indicated in the deposition transcript.  The answer to that

19   will be yes, I do, or no, I don't.

20             Okay?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Okay.

23             (Videotape deposition played)

24   BY MR. McQUADE:

25   Q.  Okay, Mr. Walker, does that refresh your recollection

K7L5ibm3                        Walker - Cross

1    relating to your testimony?

2    A.  Yes.

3    Q.  Mr. Walker, I would like to draw your attention to

4    Plaintiff's Exhibit 1 which was the PowerPoint slide created by

5    counsel to IBM and presented on your direct examination.  If

6    you could turn to page -- or we will turn the screen for you to

7    page 6 of that document.  Now, this slide has information about

8    Microsoft, correct?

9    A.  Correct.

10   Q.  And how do you know this information about Microsoft that's

11   found on page 6?

12   A.  We -- from two ways.  Our IBM services team, our global

13   business services team works with Microsoft to do migrations

14   into Azure in a multi-cloud environment and also have

15   competitive positioning from our internal competitive teams

16   that share that information with us.

17   Q.  And that information that your competitive teams gathers,

18   they gather publicly available information; isn't that correct?

19   A.  Correct.

20   Q.  And all the information on this page is publicly available;

21   isn't that right?

22   A.  I'm not sure.

23   Q.  And don't you think Microsoft would know the same type of

24   information that appears on this slide about IBM?

25   A.  Not sure.

K7L5ibm3                         Walker – Cross

1    Q.   Okay.   You testified at your deposition that in or about

2    February of 2020 Mr. Lima informed you that he was unhappy at

3    IBM.

4              Do you recall that testimony?

5    A.   Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. McQUADE:   (Continued)

Q.  And you also testified that Mr. Lima in that same
conversation in February 2020 informed you that he was
considering taking a leave of absence because he was unhappy at
IBM.  Do you recall that?

A.  Yes.

Q.  You also had a conversation with Mr. Lima after he gave his
resignation to IBM, didn't you?

A.  Yes.

Q.  And in that conversation, Mr. Lima told you he was
resigning from IBM because he was unhappy with the company.
Isn't that correct?

A.  Yes.

Q.  And during that same conversation, he also told you he was
unhappy with where IBM was going.  Isn't that right?

A.  I don't recall.

Q.  In that conversation, that same conversation, Mr. Lima told
you he was planning to join Microsoft.  Isn't that correct?

A.  That is correct.

Q.  And in that same conversation, Mr. Lima told you about the
position he was intending to take with Microsoft, didn't he?

A.  Yes.

Q.  And during that same conversation, didn't you tell Mr. Lima
that you have a daughter that works at Microsoft?

A.  Yes.

1   Q.  In that conversation, after hearing that Mr. Lima was going

2   to Microsoft and what his position would be at Microsoft, you

3   didn't express any concerns with Mr. Lima about his employment

4   with Microsoft, did you?

5   A.  I don't recall.

6   Q.  Is it your understanding that in Mr. Lima's position at

7   Microsoft, he will be responsible for Microsoft's business in

8   Latin America?

9   A.  That is my understanding.

10  Q.  And is it also your understanding that the position

11  Mr. Lima has accepted with Microsoft is similar in scope and

12  responsibilities to the role he had with IBM as general manager

13  Latin America.  Isn't that right?

14  A.  It would be similar in scope of what Ana Paula Assis, who

15  is our current VP for Latin America would be.

16  Q.  And Mr. Lima held that position, general manager Latin

17  America, up until 2017.  Isn't that right?

18  A.  Correct, but the roles have changed over the past few

19  years, sir.

20  Q.  Yes.  And it's been approximately three years since

21  Mr. Lima held that role as general manager Latin America for

22  IBM.  Isn't that correct?

23  A.  I would say of the three -- yes.  Yes.

24  Q.  Mr. Walker, you signed a declaration in support of IBM's

25  motion for temporary restraining order and preliminary

K7LQibm4                    Walker – Cross

1  injunction in this case.  Isn't that right?

2  A.  Yes.

3  Q.  And at the time you signed that declaration in this case,

4  were you aware that both Microsoft and Mr. Lima had agreed that

5  Mr. Lima would have no involvement with integrated account

6  clients or his partnership executive program clients at

7  Microsoft for the 12 months following his resignation from IBM?

8  A.  No.

9  Q.  You testified earlier today that you are serving in an

10  interim role as general manager of integrated accounts.  Is

11  that correct?

12  A.  Correct.

13  Q.  And the role general manager of integrated accounts is the

14  position that Mr. Lima had when he resigned from IBM.  Isn't

15  that right?

16  A.  Correct.

17  Q.  Isn't it true that in May of this year you recommended that

18  there be no replacement for Mr. Lima's role?

19  A.  My -- yes.

20         MR. McQUADE:  I would like to mark what we have

21  identified as our Joint Exhibit 355 and 356, which we would

22  mark as Defendant's B and Defendant's C.

23         MR. SIGNORACCI:  Your Honor, we have no objection to

24  the admission into evidence, so long as it's under seal, as

25  it's been designated IBM highly confidential information.

1          THE COURT:  Counsel.

2          MR. DELIKAT:  No objection.

3          THE COURT:  I'm struggling a little bit with these

4     consent designations only because I'm trying to move things

5     along for both of you.  In fact, it may be a subject we raise

6     with each other later.  I have before me Lima 0100934.  What is

7     that going to be marked?

8          MR. McQUADE:  Could we mark that Defendant's Exhibit

9     B, please, your Honor.

10         THE COURT:  B in evidence, yes, sealed, at least for

11    the moment.

12         MR. SIGNORACCI:  Thank you, your Honor.

13         THE COURT:  Let me say a word to both of you about

14    this sealing business.  You fully understand the difference

15    between the public's right to know in a public forum, the

16    courtroom is open and available to the public, and your need to

17    protect your own client's secrets and confidences.  I am here

18    to do that, but let's not gild the lily with what is

19    confidences and secrets.  And let's both, please, limit it to

20    what legitimately, because I'm going to look at it just like

21    you look at it, and I'm going to see what you see.  So, let's

22    not clutter the record with sealed documents that really don't

23    belong being sealed, OK?

24         MR. DELIKAT:  Your Honor, that would have been my

25    comment, that there is nothing in this document that meets that

1    standard, but we are trying to move it along.

2              THE COURT:  Let's move it along.  I don't want to make

3    for brief writing or letter writing later.  If there is

4    confidential material here, I'm going to keep it confidential

5    and sealed.  If there isn't, I'm not, period.  OK?  Sorry to

6    interrupt.

7              Exhibit B.  How much time do you think you'll need to

8    complete B and C and whatever additional cross.  I'm just

9    worried about the reporter and lunch hour.  I would just like

10   to get a little plan.  I don't want to interrupt your flow.

11             MR. McQUADE:  Approximately ten minutes.

12             THE COURT:  Ten minutes will be perfect.  I'll assume

13   it's 15, and that will get us to 1:10.

14             MR. McQUADE:  Thank you.

15             THE COURT:  Thank you.

16             (Defendant's Exhibit B sealed and received in

17   evidence)

18   BY MR. McQUADE:

19   Q.  Mr. Walker, we placed in front of you a document that's

20   been marked Defendant's Exhibit B.  If you look up at the top

21   of the page, and we can highlight the "from," it looks like

22   this is an email that you sent to a K. Landis and a group of

23   other individuals at IBM addresses who were cc'd on this email,

24   and this email was sent on May 20, 2020.  Do you see that?

25   A.  Yes.

K7LQibm4                        Walker - Cross

1   Q.  And do you recognize this email?

2   A.  Yes.

3   Q.  This is an email you sent, correct?

4   A.  Yes.

5   Q.  OK.  If you look down into the text of the email, the first

6   line, we can highlight that line for you.  It says, "I know all

7   of you have seen Rodrigo's departure.  He is a good friend and

8   we wish he and his family well as they return to Brazil."

9           Do you see that?

10  A.  Yes.

11  Q.  And then down to the next paragraph it says, "In my

12  discussion with BvK, I have told her that I/we (sorry for

13  speaking for you all) feel strongly that a replacement for

14  Rodrigo's role is not needed."

15          Do you see that?

16  A.  Yes.

17  Q.  And who is BvK?

18  A.  Bridget van Kralingen.

19  Q.  Is it true on May 20, 2020 it was your recommendation that

20  there be no replacement for Rodrigo's role as GM of integrated

21  accounts?

22  A.  Yes.

23  Q.  If I could turn your attention to Defendant's Exhibit C.

24  If we could blow up the top line there that shows that this is

25  an email that you sent to an ARomine@USIBM.com on May 21?

K7LQibm4                              Walker - Cross

1              THE COURT:  Do you have one for me, counsel?

2              MR. SIGNORACCI:  Your Honor, we also ask that this

3    document be placed under seal as it's been labeled IBM highly

4    confidential information, and it concerns confidential

5    information about IBM's business in conversations with very

6    senior executives that are not public.

7              THE COURT:  I agree to B and C under seal.  They will

8    be sealed for the moment.  I'm happy to look at it now and seal

9    it as confidential.

10             (Defendant's Exhibit C sealed and received in

11   evidence)

12   Q.  Mr. Walker, do you see the date of this email is May 21,

13   2020.  Do you see that?

14   A.  Yes.

15   Q.  And who is the person you're sending this email to?

16   A.  Amy Romine.  She is at this time Bridget van Kralingen's

17   H.R. leader.

18   Q.  And the email is also sent to BvK@IBM.com?

19   A.  Yes.

20   Q.  Can you tell us who that is?

21   A.  Bridget van Kralingen.

22   Q.  If we can move down into the body of the email, the third

23   or I guess it's the fourth paragraph, the largest paragraph

24   that starts "IA team," if I could focus you on just that first

25   sentence.  It says "IA team – we will not replace Rodrigo's

SOUTHERN DISTRICT REPORTERS, P.C.

1    role."  do you see that?

2    A.  Yes.

3    Q.  So, as of May 21, 2020, was it true that there would be no

4    replacement for Rodrigo in his role as GM of integrated

5    accounts?

6    A.  At that time, yes.

7    Q.  And as of that date, May 20, 2020, how long had Rodrigo

8    Lima, Mr. Lima, been in the role of GM integrated accounts?

9    A.  Since the beginning of the year.

10   Q.  January?

11   A.  Correct.

12   Q.  OK.  So, January until his resignation in May of 2020.  Is

13   that correct?

14   A.  Yes.

15   Q.  Do you know the actual date of his resignation?

16   A.  I don't recall.

17   Q.  Well, it would have been before May 20, 2020, correct?

18   A.  Yes.

19   Q.  And did there come a time when IBM sent all of its U.S.

20   employees to work from home remotely due to COVID-19?

21   A.  I -- yes.

22   Q.  And when was that?

23   A.  I don't recall.

24   Q.  First week in March sound about right?

25   A.  That I don't recall.

1   Q.  OK.  Mr. Walker, I asked you a series of questions at your

2   deposition about your views and beliefs on Mr. Lima.  I'm going

3   to ask you that same series of questions today to close out

4   your testimony.

5           The first question is this:  Mr. Lima was viewed as a

6   well-thought-of executive at IBM.  Isn't that right?

7   A.  Yes.

8   Q.  And you considered Mr. Lima a friend of yours.  Isn't that

9   right?

10  A.  A colleague and friend.

11  Q.  You believe Mr. Lima to be trustworthy, correct?

12  A.  Yes.

13  Q.  You believe Mr. Lima to be honest, correct?

14  A.  Yes.

15  Q.  You believe or you think that Mr. Lima is an honorable

16  person.  Isn't that right?

17  A.  Yes.

18          MR. McQUADE:  Thank you, Mr. Walker.

19          I have nothing further at this time, your Honor.

20          MR. SIGNORACCI:  Your Honor, I think redirect will

21  just be a very few minutes.

22          THE COURT:  If it's a very few, we will otherwise --

23          MR. SIGNORACCI:  Very few.

24          THE COURT:  -- stop after very few.

25          MR. SIGNORACCI:  Absolutely.  Could you pull up

K7LQibm4                         Walker - Redirect

1    Plaintiff's Exhibit JX-129 and turn to page 5.

2    REDIRECT EXAMINATION

3    BY MR. SIGNORACCI:

4    Q.  Mr. Walker, at the top right hand of this page, do you see

5    the marker IBM confidential?

6    A.  Yes.

7    Q.  Who receives the performance team agenda?

8    A.  The performance team members.

9    Q.  Does everyone at IBM receive this?

10   A.  No.

11   Q.  Does anyone outside of IBM receive this?

12   A.  No.

13          MR. SIGNORACCI:  Ashley, do you have a copy of

14   Defendant's Exhibit C that was just raised?  And scrolling in

15   on the same sentence that defense counsel asked you about, "IA

16   team -- we will not replace Rodrigo's role."

17          What is the next sentence?

18   A.  "I will take a Primus role and leverage the other Sector

19   GMs to take on different aspects in an agile shared distributed

20   fashion."

21   Q.  So under that plan, what was happening with Rodrigo's role?

22   A.  Rodrigo's role had multiple facets.  It had an H.R. facet.

23   It had a strategy facet.  It had an operational facet.  Instead

24   of having -- at the time since I was having multiple hats, we

25   decided to split the role among several other SGM's to take on

1    different important aspects of that role.

2            MR. SIGNORACCI:  That's all, your Honor.

3            THE COURT:  That's what it says.

4            MR. SIGNORACCI:  That's all I have.

5            THE COURT:  Thank you.  It's 1:05.

6            MR. McQUADE:  Your Honor, just one question.

7            THE COURT:  I'm sorry.  Recross.

8            MR. McQUADE:  I think I can limit it just to a couple

9    of questions.

10   RECROSS EXAMINATION

11   BY MR. McQUADE:

12   Q.  Mr. Walker, if I could turn your attention to Plaintiff's

13   Exhibit 2.  This is the agenda.  If I could turn your attention

14   to -- if we go to page 5, the page that your counsel had just

15   referred you to, if you could focus your attention on the

16   bottom of that.  The 9:05 to 9:35 a.m. slot Mystic/Hamilton

17   update, it refers to the Anthem example and next 10.  Do you

18   see that?

19   A.  Yes.

20   Q.  And Anthem, that refers to a deal that IBM had with Anthem.

21   Isn't that correct?

22   A.  Yes, it's referred to as Anthem/Mystic that was signed in

23   Q1.

24   Q.  And that Anthem/Mystic deal that was signed in Q1 was a

25   publicly disclosed deal.  Isn't that right?

1    A.  Yes.

2            MR. McQUADE:  I have nothing further, your Honor.

3            MR. SIGNORACCI:  Nothing further.

4            THE COURT:  OK.  Mr. Walker, I would get off the phone

5    quickly so the lawyers don't think of something else to say to

6    you.  Thank you for your testimony and thank you for patiently

7    restating so that we have a perfect record here of what

8    transpired.

9            THE WITNESS:  Thank you, your Honor.

10           THE COURT:  OK.  1:05.  I would say as quickly as time

11   permits, we will give the reporter a chance to have some rest

12   and a few minutes for lunch.  How about 2:00, does that work?

13           MR. McQUADE:  That's fine, your Honor.

14           THE COURT:  2:00.  All right.  We will be back at

15   2:00, and we stand in recess until then.

16           (Luncheon recess)

17

18

19   K7LQibm4

20                        AFTERNOON SESSION

21                           2:00 p.m.

22           THE COURT:  I see we have somebody in the proverbial

23   witness box besides my law clerk.  OK.  Let's proceed.

24           MS. VELAZQUEZ:  Your Honor, IBM calls Juan Zufiria.

25    JUAN ANTONIO ZUFIRIA,

SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm4                        Zufiria - Direct

1        called as a witness by the Plaintiff,

2        having been duly sworn, testified as follows:

3  DIRECT EXAMINATION

4            MS. VELAZQUEZ:  May I proceed?

5            THE COURT:  Yes.

6  BY MS. VELAZQUEZ:

7  Q.  Mr. Zufiria, good afternoon.  Where are you located today,

8  sir?

9  A.  Today I am located in a city called San Sebastian at the

10 north of Spain in the Basque country.

11 Q.  And by whom are you currently employed?

12 A.  I am employed by IBM.

13 Q.  How long have you worked for IBM?

14 A.  I have worked for IBM 34 years.

15 Q.  And what is your current position at IBM?

16 A.  Senior vice-president of global technology services.

17 Q.  And is it OK if we refer to global technology services as

18 GTS?

19 A.  Yes.

20 Q.  How long have you held your current position?

21 A.  I took this position on February 1 of 2019.

22 Q.  Juan, could you repeat that last line?

23 A.  Yes.  It's at least seven months and a half, more or less.

24 Q.  Who do you report to?

25 A.  I report at this moment to Mr. Mark Foster, which is the

1    IBM services senior vice-president.

2    Q.   And what are your responsibilities?

3    A.   My responsibilities to run Esso global technology services

4    for IBM globally.

5    Q.   How long have you worked in the GTS?

6    A.   During my career, I work in GTS several times.  In totality

7    in the range of 15 years.

8    Q.   And what other positions have you held at IBM?

9    A.   Prior to this position, I was general manager of IBM for

10   Euro.  So I ran all their business for IBM Euro.  Before that,

11   I was global technology services for Euro.  And before that I

12   was general manager of a region in the south of Europe.

13   Q.   Did you have any jobs before you joined IBM?

14   A.   No, IBM was my first job when I graduated from university.

15   Q.   And tell us about your education starting with university.

16   A.   I completed my aeronautical space engineer.  I have a Ph.D.

17   in aeronautical space engineering from Polytech University of

18   Madrid.  After that, I got my Ph.D. in applied mathematics from

19   the California Institute of Technology.  And I also hold --

20   Q.   Juan, could you repeat that last degree?

21   A.   Yes, Master of Business Administration for international

22   business.  That was a master that I took in the London School

23   of Economics and in an IBM program.

24   Q.   Have you received any professional recognition or honors?

25   A.   Well, several.  Probably the most relevant I am a Numerary

1  Member of the Royal Academy of Spain which represents the most

2  relevant and distinct engineers alive at this moment in the

3  country.

4  Q.  Mr. Zufiria, the Court has heard a bit about GTS this

5  morning, but in your own words can you tell us what does GTS

6  do?

7  A.  Well, GTS is about designing, building, and managing IT

8  infrastructures for our clients.  So, we go to a client and let

9  me help you optimize your infrastructure environment.  I'm

10  going to take over the environment, and we optimize with

11  maximum economies of a scale, and that will make it more

12  efficient.

13          THE COURT:  Yes.  I'm trying not to interrupt, but,

14  Mr. Zufiria, I would ask you to slow down a little bit and

15  maybe speak a little louder.  The court reporter is trying her

16  best to get every word you are saying, and I guess because we

17  are so far apart that the transmission is a little difficult at

18  moments.  So, if you wouldn't mind, slow it down just a hair so

19  she can hear you loud and clear and maybe raise your voice a

20  little bit.  OK?

21          THE WITNESS:  I am really sorry, and I will do my best

22  on this.

23          THE COURT:  It's not your fault at all.  It has

24  nothing to do with that.  We're just talking hundreds and

25  thousands of miles away, and I want to make sure my record,

1    which is the most important thing to me, is very clear about

2    what you are telling us.

3              THE WITNESS:  OK.

4              THE COURT:  OK.

5              MS. VELAZQUEZ:  I can ask the question again.

6    Q.  Mr. Zufiria, what does GTS do?

7    A.  What GTS does.  GTS designs, builds, and manages

8    infrastructure IT infrastructures for a client.  Basically, we

9    help them to optimize their IT infrastructures, the

10   complications, the machines, the software to run it in a more

11   efficient way, and in most of the cases we run the

12   infrastructures for them.  That's why we have been called

13   outsourcing.  We outsourcing -- the client outsources the

14   infrastructure to IBM.

15   Q.  Does GTS provide services to IBM clients that involve the

16   IBM public cloud?

17   A.  Yes.  We manage the infrastructure of our clients.

18   Traditionally, clients have traditional infrastructures.  They

19   have private clouds in their data centers, and they consume

20   public (inaudible).  We run the full end-to-end embankment.  So

21   public cloud is one of the legs of the things that we do for

22   our clients.

23   Q.  Does GTS also provide services that involve private and

24   hybrid cloud environments?

25   A.  Yes, traditional private and public cloud environments.

1  Q.  Is the IBM public cloud important for GTS's business?

2  A.  It is very important.  It's part of the total value

3  proposition of our business model and plays a very important

4  role in the balancing of our financials, our numbers of

5  profitability.

6  Q.  Can you explain?

7  A.  Sorry.  Could you repeat the question?

8  Q.  Can you explain?

9  A.  I -- so I said, it is very important for our financials

10  because it's the source -- it is one of the most important

11  sources of our profitability.

12  Q.  And what are enterprise customers?

13  A.  IBM and GTS we work in what we call business-to-business

14  space.  We serve enterprise clients.  We are not in the

15  consumer space.  We don't serve individually consumers.  We

16  serve our clients which have operations, enterprises that they

17  have their own clients and consumers.

18  Q.  And what, if anything, makes IBM public cloud attractive

19  for enterprise clients?

20  A.  Public clouds when referring to enterprise clients requires

21  a specific security, a specific compliance into regulations and

22  that's where we are strong, and we make big investments so that

23  we ensure that our public cloud gives the confidence of

24  regulatory requirements for our clients so that they can feel

25  safe putting their work flows and their applications in our

1    public cloud.

2    Q.   Now, I'm not looking for precise numbers, but can you tell

3    us approximately what IBM's market position is in private

4    clouds?

5    A.   I think at this moment while those numbers probably measure

6    and publish it, we believe that we are leading the private

7    platform space, and a market share in private cloud would be in

8    the range of 20 to 30 percent, but I understand this is

9    difficult to measure.

10   Q.   How about hybrid cloud, can you tell us what approximately

11   IBM's market position is in hybrid cloud?

12   A.   In hybrid cloud after our position of Red Hat, we have the

13   confidence that we are leading in that space, and providing the

14   exact numbers is difficult, but it would be in the same range

15   of numbers that we mentioned before.

16   Q.   Can you tell us what approximately IBM's position is in the

17   public cloud market?

18   A.   In the enterprise public cloud position, I think we are

19   leaders when we consider the total public cloud market, when

20   you include videos, pictures, consumer pictures, etc., our

21   public share is lower.

22   Q.   Does Microsoft has its own public cloud?

23   A.   Microsoft has started some investments in the public cloud.

24   Now they are aggressively moving into the private cloud space

25   to try to get the enterprise workloads.  The enterprise

1   workloads are the ones that still have not been moved into

2   cloud environment.

3   Q.  Does Microsoft have its own services business to move

4   clients to Microsoft's cloud?

5   A.  No.  Microsoft doesn't have a services movement.  When you

6   are in cloud, when you need to perform and move them into the

7   public cloud, you need it's like moving to a new house from

8   your current house, and you need to have a moving company that

9   does the movement of your furniture to the new house.  So

10  Microsoft partners with other services companies to make that

11  movement.

12          In the particular case of GTS, we perform the totality

13  of the work.  We have the new house, and we also have the

14  moving company, so we perform the movement, and we built the

15  new house, and we run the new house.

16  Q.  And by "the house," are you referring to IBM's public

17  cloud?

18  A.  Yes.  When I -- yes, IBM public cloud.  Yes.

19          MS. VELAZQUEZ:  Your Honor, I would like to submit

20  Plaintiff's Exhibit 4, which is part of our witness binder.

21          THE COURT:  Any objection?

22          MS. VELAZQUEZ:  It's a demonstrative.  It's a one-page

23  demonstrative:

24          THE COURT:  I don't want to screw up this binder like

25  I did the prior one.  This is a binder with a number of

K7LQibm4                    Zufiria - Direct

1  exhibits.

2          MS. VELAZQUEZ:  Yes, your Honor.  We won't use them

3  all, but we will go one by one.

4          THE COURT:  So the first one --

5          MS. VELAZQUEZ:  Is a demonstrative.

6          THE COURT:  -- is what's labeled demonstrative, and

7  we're marking that as Plaintiff's 4 for identification until I

8  hear from counsel.

9          MR. DELIKAT:  No objection as a demonstrative exhibit

10  taken for that value.

11          THE COURT:  It is what it is, right?  So then we'll

12  admit number 4, a demonstrative exhibit consisting of two pages

13  at the beginning of this second black binder.  OK, proceed.

14          (Plaintiff's Exhibit 4 received in evidence)

15  Q.  Mr. Zufiria, are you able to see the slide that is up on

16  the page on the screen?

17  A.  Yes.

18  Q.  Can you explain this slide to us, how are GTS's competitors

19  leveraging ecosystems to address the same growth opportunities?

20  A.  Yes.  As I said before, we are involved in the movement and

21  also building the new house.  Our competitors they try to

22  partner.  They are very clear public cloud providers.  You can

23  see here in the chart how much Google and also Microsoft logo,

24  and they partnered with other companies like Accenture to

25  perform the movement.  So they built the house, but they need

1    the moving company.  So normally we compete with a union of a

2    public cloud player and a services company in GTS.

3    Q.  Can you give a recent example of GTS competing against

4    Microsoft for cloud business from enterprise clients?

5    A.  Yes.  Last year we competed in many cases.  One very

6    well-known is AT&T and Microsoft is one piece of the business.

7    A piece of the business went public --

8    Q.  I'm sorry, Juan.  You broke up.  Could you tell us again?

9    A.  Yes.  Last year AT&T competed and then part of the

10   workloads went to Microsoft and part of the workloads went into

11   IBM public cloud.

12   Q.  Was Mr. Lima involved in that deal?

13   A.  Yes.

14   Q.  How?

15   A.  Well, it was under his responsibility.  It was probably the

16   most important transaction of last year, and it was part of his

17   business so he was engaged in many of the internal decisions

18   about how to configure the transaction, how to construct, and

19   how to negotiate the transaction.

20   Q.  And you testified that it was part of Mr. Lima's business.

21   What are you referring to, what business?

22   A.  Yes.  This transaction and the business is part of the

23   global technology service of North America business.  So it was

24   part of his business results, his objectives, and targets.

25   Q.  Are IBM and Microsoft continuing to compete for cloud

1  business from AT&T?

2  A.  Yes, we continue competing in new pieces of the business in

3  AT&T and in many other clients.

4  Q.  Did there come a time, Mr. Zufiria, when Mr. Lima began

5  reporting to you?

6  A.  Yes.  He start reporting to me on February 1 of 2019, last

7  year.

8  Q.  And what role did Mr. Lima have at that time?

9  A.  He was at that time general manager of GTS North America.

10 Q.  So, was Mr. Lima already in that role when you took your

11 current job as senior vice-president of GTS?

12 A.  Yes, he was already in the job of leading the GTS North

13 American business.

14 Q.  And how often did you interact with Mr. Lima when you were

15 the senior vice-president of GTS and he was in the role of

16 general manager of GTS for North America?

17 A.  Besides the formal reviews that we have every two weeks

18 formal reviews, I was interacting with him around transactions

19 on decisions of the business two to three times a week.

20 Q.  What were Mr. Lima's responsibilities as the general

21 manager for GTS North America?

22 A.  Would you repeat the question, please?  I didn't hear you

23 well.

24 Q.  What were Mr. Lima's responsibilities as the general

25 manager for GTS North America?

1    A.  He was running the full end-to-end business process and

2    profit for United States and Canada on GTS infrastructures

3    business.

4    Q.  Did Mr. Lima's responsibilities require an understanding of

5    IBM strategy to win cloud business?

6    A.  Yes, in two dimensions.  One, the first dimension is about

7    the nature of the GTS business or business where he need to

8    know all the pricing structure, incentives systems and

9    competitive positioning.  And at the same time because we

10   compete with others in collaboration with other parts of IBM,

11   he have to have also knowledge of other parts of IBM to compete

12   better.  Our market, cost structure, efficiency problems, etc.,

13   that are part of how we make our business more competitive.

14   Q.  As the general manager of GTS North America, did Mr. Lima

15   need access to IBM's confidential information to do his job?

16   A.  Yes, he needed to have access to confidential information.

17   He needed to have access to all our investments, cost

18   structure, efficiency programs, automation programs, incentive

19   systems and many other dimensions of the business that are not

20   public and are the core of our company's business.

21   Q.  As the general manager for GTS North America, did Mr. Lima

22   work with his GTS colleagues in other geographic regions?

23   A.  Yes.  First of all, we used to have systematic meetings all

24   the geographies together where we could discuss opportunities

25   in different geographies on how the business was performing,

1    but at the same time the nature of our enterprise clients,

2    clients that are corporations make some of our transactions,

3    our relationships go beyond boundaries.  For example, last year

4    we have a very important business with CitiBank that involved

5    business in Latin America as well as business in North America,

6    and we were better designing the balancing of the business on

7    the company strategy for that business.

8    Q.  Was Mr. Lima involved in that transaction?

9    A.  Yes, he was involved in the CitiBank transaction.

10   Q.  How was he involved?

11   A.  Well, he participated in the decision process of how we

12   could get North America and to get Latin America (inaudible) or

13   vice versa, and how we are determining the price, the margin,

14   with respect to the strategy for the client for the future.

15           THE COURT:  I'm going to interrupt just because we're

16   having trouble again.  So, if you could go back maybe two

17   sentences, if you recall what you were saying, it would be

18   great.  If not, we'll strike the answer and ask the question

19   again.  Can you remember what you were saying two sentences

20   back?  It's not a test.

21   A.  Yes, he participated in the decisions about margins between

22   North America and Latin America, benefits for the client and

23   our strategy moving forward with the client on a global basis.

24   Q.  Mr. Zufiria, what was your opinion of Mr. Lima's

25   performance during the time that he reported to you?

A.   I think Mr. Lima was already around one year and a half in

his position.  So, when I took the job, he was already in that

position, and I establish a very good working relationship with

him, and I started working with him in the business.

Q.   Prior to Mr. Lima's resignation, was there an expectation

that Mr. Lima would advance to more senior roles at IBM?

A.   When I took the job technically at that time from Ginni

Rometty which was the CEO and chairman of IBM.  I got the

mission they told me to run the GTS business globally, also to

work in coaching and developing the next leaders for the GTS in

the future and for IBM.  One of those interviewed who was

identified as a leader for the future of IBM was Mr. Lima.  So

I start working with him and continue his development so that

he could reach the positions that were expected.

Q.   And who gave you that mission to work with Mr. Lima on his

development?

A.   The chairman and CEO of IBM, Ms. Ginni Rometty.

Q.   Did you discuss with Mr. Lima his potential for promotion

at IBM?

A.   Yes, we discussed this systematically from time to time

during all the time period that our relationship was in the

business.  So we have meetings discussing about the future

potential, about the development areas, and how he could

continue progressing in IBM.

Q.   Did you mentor Mr. Lima?

K7LQibm4                        Zufiria - Direct

1   A.  I was not a formal mentor because we have a formal

2   mentoring program.  I was his manager, and I did a lot of what

3   we call coaching which would be equivalent to mentoring.

4           MS. VELAZQUEZ:  At this point, your Honor, I would

5   like to discuss material which IBM has designated highly

6   confidential relating to IBM's fall plan, and that is -- it's

7   going to be the next exhibit in the binder, so JX-90.

8           THE COURT:  JX-090, so first let me hear on the issue

9   of -- are you asking me to seal the exhibit?

10          MR. SIGNORACCI:  Yes, your Honor, but I can set it up

11  a little bit first.

12          THE COURT:  OK.  Well, I'll leave it to you.

13  BY MS. VELAZQUEZ:

14  Q.  Mr. Zufiria, what is the fall plan?

15  A.  The fall plan, the fall plan is a process that we run every

16  year for each one of the businesses in which we prepare all our

17  actions for the following year.  We run things end of August

18  until middle of November, early December, in which we make all

19  the decisions of what we are going to invest, what accounts we

20  are going to cover, what movements we are going to make in the

21  business, and we agree on our mission of numbers and the

22  targets for the following year.

23  Q.  And does GTS prepare materials for the fall plan?

24  A.  Yes.  The preparation is done, as I said from starting the

25  end of April until -- sorry -- the end of August until the end

K7LQibm4                         Zufiria - Direct

1    of November, first week of December.  That's the period in

2    which we build the floor plan and each unit builds the fall

3    plan for direction.

4    Q.  Did Mr. Lima prepare fall plan materials for GTS North

5    America in 2019?

6    A.  Yes, he prepared the fall plan and present it to me of what

7    the numbers, the investments, and all the parameters and

8    actions to be executed during 2020 to succeed in the business.

9    Q.  Mr. Zufiria, does IBM keep its fall plan materials

10   confidential?

11   A.  Yes.  We have a limited distribution of the fall plans

12   because we don't want our numbers to be known even internally

13   to a big part of our operation.

14   Q.  And how does IBM limit access to fall plan materials?

15   A.  In some cases we even prevent the copying of the files.  We

16   mark all documents as IBM confidential, and we have security

17   rules that we follow for them.

18              MS. VELAZQUEZ:  Your Honor, I would like to show the

19   witness JX-90, but I would ask if you could -- if we could

20   agree to seal the courtroom.

21              THE COURT:  Let's go step at a time.  First, with

22   respect to JX-90, Plaintiff's 5 for identification, is there

23   any objection to the document itself?

24              MR. DELIKAT:  No objection.

25              THE COURT:  Is there any objection to me sealing

K7LQibm4                        Zufiria - Direct

1    Exhibit 5 for identification?

2              MR. DELIKAT:  No objection with the caveats that we

3    set forward previously.

4              THE COURT:  Then with respect to sealing the

5    courtroom, is it that you would like to exclude Microsoft's

6    counsel from hearing the testimony that is about to take place,

7    is that it?

8              MS. VELAZQUEZ:  Yes, your Honor, the fall plan

9    materials that I would like to discuss with the witness contain

10   highly confidential IBM material, as Mr. Zufiria can explain.

11             MR. McQUADE:  I don't think we've reconnected, have

12   we, Frank?

13             MR. SIGNORACCI:  I think the IBM's in-house did

14   reconnect.

15             MR. McQUADE:  Teleconference.  Can you put it on mute?

16             MR. DELIKAT:  I don't think they can hear us.

17             DEPUTY CLERK:  OK.  I muted it.

18             MR. McQUADE:  He's put everybody on mute.

19             THE COURT:  Everybody is on mute.  The witness is not

20   on mute.  And your objection there is?

21             MR. DELIKAT:  No objection on that.

22             THE COURT:  So we will first admit what's previously

23   marked JX-090, a multipage document, as Plaintiff's 5 in

24   evidence.  It will be marked sealed.  I say for the moment

25   because I want to be really clear that we are not marking the

K7LQibm4                    Zufiria - Direct

1      world sealed.  There's a rule, and we're going to comply with

2      the rule.  But for the moment, to move things along for

3      certain, we're going to mark it sealed.  I understand that if

4      Microsoft's counsel is on, she has been muted so she can't hear

5      and, Frank, I'll deem the courtroom sealed so that nobody

6      should come in or leave until we get done with this testimony.

7                DEPUTY CLERK:  Should I lock the door?

8                THE COURT:  No.  We will just stop if I see someone

9      coming in.  I don't think we need to lock the door just yet.

10     Thank you.

11               You can proceed.

12               MS. VELAZQUEZ:  Thank you, your Honor.

13     Q.  Mr. Zufiria, I'm showing you JX-90.  It's an email sent by

14     Ray dePalma to Mr. Lima dated October 11, 2019, and the subject

15     line is unit 2020 fall plan cycle and reviews.  First of all,

16     who is Ray dePalma?

17     A.  Raymond dePalma was the COO for GTS North America reporting

18     to Rodrigo Lima, and he was with operations as the chief

19     operations officer for Mr. Lima.

20     Q.  I would like to turn your attention to the attachment which

21     the color copy begins on page 10 of 14.  Now, I will ask you

22     first, Mr. Zufiria, do you recognize the attachment?

23               THE COURT:  Just let me interrupt.  Sorry,

24     Mr. Zufiria.

25               Is this again something in native and then reprinted

1    in color?

2              MS. VELAZQUEZ:  Yes, your Honor.

3              THE COURT:  Just so the record is clear, Exhibit 5

4    really consists of two versions of the exhibit:  One in native

5    form, one in a beautifully colored format so we all can see it.

6              Sorry to interrupt.  Ask your question again.

7              MS. VELAZQUEZ:  Thank you, your Honor.

8    Q.  Mr. Zufiria, do you recognize this attachment?

9    A.  Yes.  It's the document that explains the fall plan.

10   Q.  Why is Mr. Lima's name on the cover?

11   A.  Because he had the responsibility of this business, and he

12   has the accountability to execute this plan and this is the

13   proposal he brings, the things that he's going to do to deliver

14   the numbers we want to achieve.

15   Q.  Did Mr. Lima review this document with you at the time?

16   A.  Yes.

17   Q.  And the cover of this PowerPoint is marked IBM

18   confidential.  Do you see that, sir?

19   A.  Yes.

20   Q.  Is there confidential information in this document?

21   A.  Yes.  Yes.

22   Q.  Let's take a look at the next slide, which is page 11 of

23   14.  Can you tell me what about the financial model on the

24   left-hand side is confidential?

25   A.  Yes.  This model represents one of the sectors in North

1   America.  It describes the margins of the business, the

2   profitability, the decisions on investment.

3   Q.  And let's take a look at the top bold plays on right-hand

4   side.  First of all, can you tell me what is meant by IBM

5   preferred?

6   A.  It meant that in our business when we serve our clients, we

7   try and meet a client, we take infrastructure half in that

8   particular moment.  They have old machines, new machines, they

9   are consuming some public cloud.  We take that and we move it

10  into the future, we make it more efficient, and in that

11  movement we prefer to regulate in our cloud, in our public

12  cloud.  That mean IBM prefer, it means that our intent is to

13  convince the client that the best cloud for their needs is the

14  IBM public cloud, so we prefer and we propose them to come to

15  our public cloud.

16  Q.  And let's focus on the first bullet under top bold plays.

17  Mandatory cloud first solutioning with Red Hat content.  What

18  were the fall plan discussions about that topic?

19  A.  Well, every time we meet a client with a solution for them

20  in the future, we always prepare it to move to cloud.  We make

21  cloud part of the solution and because Red Hat, Red Hat plays

22  an important role here because it give us the platform to make

23  the movement much easier, therefore, the importance of public

24  combination with Red Hat.

25  Q.  And how about four bullets down, what was discussed in the

1    fall plan about considering acquisitions?

2              THE COURT:  Hold on a second.  If they're with us,

3    it's OK.  If they're not with us, it's not OK.

4              MR. SIGNORACCI:  They're all with us.

5              THE COURT:  You're with us. It's OK.  Sorry to

6    interrupt.

7              MS. VELAZQUEZ:  Thank you.

8    Q.  Mr. Zufiria, the bullet that begins "consider

9    acquisitions," what was the discussed about that in the fall

10   plan?

11   A.  The question was about how we could accelerate the

12   development of the skills knowledge in volume to move faster in

13   the movement of our clients towards the public cloud.  So we're

14   discussing the position of companies who have the skills, but

15   we can secure it faster and move more clients and faster to a

16   public cloud.

17   Q.  What did you mean there by acquisition?  What does that

18   mean?

19   A.  It means buying a company to get the professionals and

20   those professional works for us become part of IBM.  With the

21   knowledge they have, we made the business faster and better.

22   Q.  How about the next bullet, what was discussed in the fall

23   plan about procreating a strategy between GTS, GBS, and global

24   markets to select target accounts?

25   A.  Here we -- the pattern of how clients buy is changing, and

1    sometimes we need to put together GTS --

2              THE COURT:  We've got to stop you again.  I'm sorry.

3    I apologize to you.

4              THE WITNESS:  Sorry.

5              THE COURT:  It's OK.  Don't be sorry.  Nobody is doing

6    anything inappropriately.  We are struggling with the

7    communications.  If you could go back maybe two sentences and

8    see if we can fill in what the reporter missed.

9    A.   We are seeing clients are changing and buying these space.

10   They buy the projects with components of our GTS business and

11   pieces of GBS, which is another business inside IBM that

12   focuses on consulting.  So, we find that we compete better when

13   we are going together, and here this is how we're going to go

14   together, GBS and GTS to which accounts, what are the accounts

15   that we are going to target going together.

16   Q.   And is the list of target accounts referenced in this

17   bullet, is that list of target accounts confidential?

18   A.   Yes.  This list of accounts that we manage in our

19   conversations includes not only which accounts, also when we

20   are going to address the accounts.

21   Q.   And how, if at all, would that information be significant

22   to a competitor of IBM?

23   A.   Well, the competitor will know when we are going to knock

24   the door in the client, in a particular client, or how we are

25   going to bundle the different pieces of IBM, GTS and GBS to

1    compete them.  So knowing that information is very important

2    because it can define knowing what we do in strategy for the

3    competitor of how to counteract.

4    Q.  And were the fall plan discussions for GTS North America

5    relevant to IBM's cloud business in Latin America?

6    A.  First of all, many of the decisions are business-wide.

7    Many of our decisions are similar in different geographies

8    because we have the same competitors.  But in the particular

9    case of North America, there are many clients that have

10   business interests in Latin America.  Our biggest clients

11   operate globally and so they have business presence very

12   relevant in Latin America.  So, therefore, the decisions that

13   are made in the U.S. started out to follow here as income in

14   our Latin America business.

15   Q.  Now, switching topics, Mr. Zufiria, after IBM closed the

16   Red Hat acquisition, were there strategy meetings held to

17   discuss IBM's post acquisition strategy?

18   A.  Yes.

19   Q.  And were you invited to any of those meetings?

20   A.  Yes, I was invited.  We had a very important meeting.  We

21   were all the senior vice-presidents to decide to define what

22   was going to be the strategy after the close of the position.

23   Q.  Do you recall when that meeting was held?

24   A.  I recall that meeting, yeah.  I recall that meeting.

25   Q.  Was Mr. Lima invited to that meeting?

K7LQibm4                      Zufiria - Direct

1    A.  Yes, he was invited to the meeting.

2    Q.  Was access to the meeting limited?

3    A.  Yes.  It was limited to the senior vice-presidents and

4    another five or six people that were relevant for the

5    conversation and also this meeting is used to help in the

6    development of our future leaders, by inviting them to

7    participate in the meeting.

8              MS. VELAZQUEZ:  I would like to show the witness

9    JX-63.

10             THE COURT:  Let's mark for identification what's

11   previously been labeled JX-63 as Plaintiff's 6 for

12   identification.

13             MR. DELIKAT:  No objection.

14             THE COURT:  So JX-63 will now be 6 in evidence.

15             (Plaintiff's Exhibit 6 received in evidence)

16   BY MS. VELAZQUEZ:

17   Q.  Mr. Zufiria, I'm going to show you an email on page one

18   sent by Ken Keverian to Mr. Lima and others on July 9, 2019.

19   Subject line August 2, mini-offsite.  First of all, who is

20   Mr. Keverian?

21   A.  Mr. Keverian is the head of the strategy for IBM, and he

22   was the chairman that called this meeting.  He was organizing

23   the meeting.

24   Q.  And Mr. Keverian writes in this email: "Would be great if

25   you could join this."

1          What is Mr. Keverian inviting Mr. Lima to join?

2     A.   As I said, there are two reasons.  One, his relevance in

3     the conversation because he was very close of the position and

4     knowledge, and also because to these kind of meetings we invite

5     the future leaders so because this is a development for them to

6     participate in these meetings.

7     Q.   And, Mr. Zufiria, did IBM limit access to this particular

8     meeting?

9     A.   Yes, they would limit the access to this meeting, yes, very

10    limited.

11    Q.   Can you tell us who was invited to participate in this

12    meeting?

13    A.   They called the meeting were the senior vice presidents,

14    and as you can see here, this invitation goes to Ellie Keenan,

15    Mr. Lima and Mr. Phil Guido.  There was another person Mr.

16    Barben (ph) which was not listed here but was also invited.

17          MS. VELAZQUEZ:  Your Honor, just as a housekeeping

18    matter, I just wanted to clarify that we'd like to admit

19    Plaintiff's Exhibit 6 under seal.

20          THE COURT:  Any objection to sealing 6 in evidence

21    belatedly?

22          MR. DELIKAT:  No.

23          THE COURT:  No belated objection.  Sealed.  For the

24    moment I say that and I mean that I'm not sure what's sealable

25    here just yet, but I'm happy to keep an open mind about it.

1          MS. VELAZQUEZ:  Thank you, your Honor.

2     Q.  Did Mr. Lima attend this meeting?

3     A.  Yes.

4     Q.  Did you attend the meeting?

5     A.  Yes.

6     Q.  Let's take a look at the agenda.  So, can you tell us what

7     was the purpose of this particular meeting?

8     A.  The purpose of this particular meeting was to prepare

9     ourselves for our actions that we're going to execute starting

10    the moment which acquisition was approved.  We were preparing

11    ourselves for all the decisions on the strategy that we're

12    going to execute after the signature.

13    Q.  And was the focus of this meeting only on the first hundred

14    days after the acquisition?

15    A.  That was about the activities we were going to do and also

16    sharing also the developments and the investments for the

17    future, and we're going to reconfigure our --

18         THE COURT:  Say it again, please?  Reconfigure.

19    A.  Reconfigure our software for portfolio, software portfolio.

20         MR. SIGNORACCI:  Software portfolio.

21         THE COURT:  Thank you.  Thank you.

22       (Continued on next page)

23

24

25

1    BY MS. VELAZQUEZ:   (Continuing)

2    Q.  And do you see that there is an agenda line about the open

3    hybrid cloud platform and can you tell us what that discussion

4    concerned?

5    A.  Yes.  It was basic -- in this section we discussed how we

6    were going to change the software portfolio for IBM, how we

7    would invest in Red Hat products to become more competitive in

8    the future.

9    Q.  Was there discussion about products that had not yet been

10   developed?

11   A.  There was discussion on product that worked on the

12   development and that had already been announced and there were

13   products that were under development that had not been

14   announced.

15   Q.  And would you be concerned if information that was

16   discussed at this meeting were known to IBM competitors?

17   A.  Yes, because the competitors will know when we are placing

18   our bets, or money difficulties and advantages that we have in

19   the different parts of our portfolio.

20   Q.  Mr. Zufiria, changing topics again, was there an IBM board

21   of directors strategy meeting in September 2019?

22   A.  Yes.

23   Q.  And why is that meeting referred to as a strategy meeting?

24   A.  Once a year all the senior vice presidents meet with the

25   members of the board of directors for two days in order to

1     share with them our strategies what we are investing for the

2     future for the following three to five years, what decisions we

3     are making to make our business more competitive in the future.

4     Q.  And does IBM prepare materials in advance of its board

5     strategy meeting?

6     A.  Yes.  There is a lot of work by the business units to

7     prepare that material and to prepare also the sessions and the

8     conversations with the members of the board.

9     Q.  And are those materials kept confidential?

10    A.  Yes, they are very confidential -- very confidential.

11    Q.  How are those materials kept confidential?

12    A.  They are only shared with the senior vice presidents, the

13    members of the board, we don't allow copies, and only the

14    people that goes to the meeting is able to see the picture.

15              MS. VELAZQUEZ:  I would like to offer into evidence

16    JX 86.

17              MR. DELIKAT:  No objection.

18              THE COURT:  JX 86 now --

19              MS. VELAZQUEZ:  This is under seal, your Honor.

20              THE COURT:  Plaintiff's Exhibit 7.

21              Do we have a sealing objection?

22              MR. DELIKAT:  No objection.

23              THE COURT:  What has been marked JX 86 is now

24    Plaintiff's Exhibit 7 in evidence and sealed.

25              (Plaintiff's Exhibit 7 received in evidence)

1   BY MS. VELAZQUEZ:

2   Q.  So let's go to the nice color version on page 69 of 134.

3          THE COURT:  Again, counsel, just so we are clear, I

4   would like to have a very clear record.  This is again two

5   versions of a document, one of which was reproduced in color,

6   the other which is in native form; correct?

7          MS. VELAZQUEZ:  That's right, your Honor.

8          THE COURT:  Thank you.

9          MS. VELAZQUEZ:  Thank you.  I apologize.

10         THE COURT:  Don't apologize.  I am just trying to make

11  it clear.

12  BY MS. VELAZQUEZ:

13  Q.  Do you recognize this document, Mr. Zufiria?

14  A.  Yes.

15  Q.  And what is it?

16  A.  This was the meeting happened Yorktown Heights in our

17  research lab.

18  Q.  And what is this document?

19  A.  An agenda of the meeting for the first day and the second

20  day.  It was a two-day meeting.

21  Q.  How about the entirety of the document; can you tell the

22  Court what the entirety of the document is?

23  A.  Yes.  This is a meeting agenda -- can you repeat the

24  question?

25  Q.  Sure.  Can you tell the Court, just explain briefly what

1   the entire document is?  Maybe we should go back to page 68.

2   A.  The entire document is all the material that was discussed

3   in this strategy session during the two days.

4   Q.  And were you present for this meeting?

5   A.  Yes, I was present.

6   Q.  Was Mr. Lima invited to this meeting?

7   A.  Yes, he was invited.

8   Q.  Who selected Mr. Lima to participate in this meeting?

9   A.  It was chairman and CEO, this is Ginni Rometty.

10  Q.  Why did Ms. Rometty select Mr. Lima to participate in this

11  meeting?

12  A.  This meeting is done, as I said, once a year with the

13  participation of the senior vice president in the company, and

14  every year the chairman decides to invite four or five

15  additional general managers that represents the next generation

16  of leaders for IBM.  The result is this way these new leaders

17  get exposed to the board of directors so the board members know

18  what is the next generation of leaders -- potential leaders of

19  IBM.

20  Q.  And had Mr. Lima been invited to board strategy meetings in

21  previous years?

22  A.  I know he was invited in the previous year when he was not

23  working for me.

24  Q.  And what is the significance of the fact that Mr. Lima had

25  been invited to board strategy meetings in prior years?

K7L5ibm5                         Zufiria - Direct

A.  One is that he was already identified as a potential leader

and he was one of the few that was invited more than once to

this meeting, very few.  So, it is a clear indication that we

have high expectations for Mr. Lima.  As a result of that, he

was exposed to more confidential information that is very

limited in our future long-time investments.

Q.  So let's take a look at the agenda on page 69.  Do you see

that you are listed as a presenter on day two?

A.  Yes.

Q.  And did you give a presentation to the board of directors?

A.  Yes, I presented here.

Q.  And this agenda indicates that Mr. Lima also participated

in that presentation?

A.  Yes.

Q.  Did Mr. Lima also give a presentation to the board at the

September 2019 strategy meeting?

A.  Yes; and he was part of my presentation.

Q.  This agenda indicates that on day one Arvind Krishna gave a

presentation on *IBM's hybrid cloud strategy:  Countering our

fiercest competitors.*

        Did Mr. Krishna give that presentation to the board?

A.  Yes.

Q.  And on day two Mr. Krishna, and others, also gave a

presentation on cloud and cognitive software.  Did Mr. Krishna

give that presentation to the board?

1   A.  Yes.

2   Q.  Let's take a look at one of the slides from Mr. Krishna's

3   first presentation on day one of the board strategy meeting

4   that is on page 81.  Is Microsoft one of the IBM's cloud

5   competitors identified on this slide?

6   A.  Yes; taken with four significant competitors, AWS,

7   Microsoft, Google, and Alibaba.

8   Q.  And can you explain to us what this slide is conveying

9   about Microsoft?

10  A.  We are following here how Microsoft is playing the battle,

11  how they are leveraging their incumbency.  There Office Windows

12  to move clients into the public cloud.  Also how, they are

13  moving now in what we call the hybrid game in the last bullet

14  in moving them from the public cloud into the private cloud

15  where we are strong, and into the client data.

16  Q.  So, let's take a look at Mr. Krishna's presentation on day

17  two of the board strategy meeting, that begins on slide 36

18  which is page 1 of 3.  I think you testified already,

19  Mr. Zufiria, that Mr. Krishna did indeed give this

20  presentation?

21  A.  Yes.

22  Q.  So, within that presentation there is a discussion about

23  winning in AI, on page 107.  Is the information that was

24  presented by Mr. Krishna on artificial intelligence material

25  that Mr. Lima would have been exposed to as part of his

1   day-to-day job running GTS?

2   A.  No.  It is very clear that participating in this meeting

3   gives a much broader view of the total IBM strategy, not only

4   the one that is relevant to GTS.  In particular, winning in

5   AI -- artificial intelligence -- here we discussed this, the

6   investments and the technologies we were going to use to be

7   competitive, Microsoft and other players in artificial

8   intelligence.

9   Q.  Now, I think we already saw on the agenda that on day two

10  of the board strategy meeting you also gave a presentation to

11  the board, correct?

12  A.  Yes.

13  Q.  And can you tell us were there materials prepared to help

14  you prepare for that presentation?

15  A.  Yes.  We dedicated time with my team and with Mr. Lima,

16  with his participation, of how to prepare the presentation in

17  the meeting.

18  Q.  And was access limited to those preparation materials?

19  A.  Yes.

20  Q.  And how was access limited to those preparation materials?

21  A.  Only to the people that is invited to the meeting; the

22  senior vice presidents and the people that were invited had

23  access to that information.

24          MS. VELAZQUEZ:  I would like to submit as Plaintiff's

25  Exhibit 8 proffer into evidence JX 84.

                     K7L5ibm5                       Zufiria - Direct

 1                THE COURT:  I will mark JX 84 as Plaintiff's Exhibit 8

 2        for identification.  And, also under seal?

 3                MS. VELAZQUEZ:  Under seal.

 4                THE COURT:  Counsel?

 5                MR. DELIKAT:  No objection.

 6                THE COURT:  No objection.  JX 84 will be admitted into

 7        evidence as Plaintiff's Exhibit 8 and it will be considered

 8        under seal.  Again, two copies of the same document, counsel?

 9                MS. VELAZQUEZ:  Yes, your Honor.

10                THE COURT:  Okay.

11                MS. VELAZQUEZ:  I think this is the last one like

12        this.

13                THE COURT:  Okay.  You can have as many as you like.

14                (Plaintiff's Exhibit 8 received in evidence)

15        BY MS. VELAZQUEZ:

16        Q.  Mr. Lima, on page 1 there is a September 18, 2019 e-mail to

17        you copying Mr. Lima and others and the subject line is

18        September board of directors draft speaker notes.

19                Did you receive this document in preparation for your

20        presentation to the board?

21        A.  Yes.

22        Q.  And did you discuss the materials attached in preparation

23        for your presentation to the board?

24        A.  Yes.  We discussed this with -- yes, I discussed this with

25        Mr. Lima and Mr. Bart Van Dendaele who is on my team.

1    Q.   So, let's go to the first slide of the presentation of this

2    document which is on page 18.  Do you see, is Mr. Lima

3    identified there as one of the panelists?

4    A.   Yes.

5    Q.   Now, according to these speaker notes, if you look on page

6    22 of 33 you were assigned to present this slide.  Did you

7    present this slide to the board?

8    A.   Yes.

9    Q.   And what did you discuss?

10   A.   The market opportunity is very big for services on cloud.

11   We are going to change our go-to market, the way of selling IBM

12   services, leverage our incumbency services, decline that we

13   have today to move them into the cloud into the hybrid cloud --

14   public cloud and private cloud and we are going to use Open

15   Shift which is Red Hat in this movement.

16   Q.   You mentioned leveraging our incumbency.  What do you mean

17   by that?

18   A.   Today we will run, because of our big market share, many

19   applications, workloads for our clients.  So, because we run

20   them today we want to move them keep them -- yes.  Moving to

21   the analogy of the houses we have many clients today in our

22   house in GTS, we have a big market share in traditional

23   environments and we want to move those clients' workloads into

24   the future of our IBM private cloud that's leveraging our

25   incumbency.

1    Q.  And when you gave this presentation, did you discuss IBM's

2    competition against Microsoft for public cloud business?

3    A.  Yes.  Actually, the idea of getting GTS plus the other part

4    of services, GTS together, we thought public cloud is to make

5    our proposition stronger and compete better with Microsoft.

6    Q.  Let's skip ahead to page 33 which is the last slide of this

7    presentation.  Page 33, thank you.  At this point this reflects

8    that the panel was handed over to panelist discussion?

9    A.  Yes.

10   Q.  What did Mr. Lima speak to the board of directors about in

11   that panel discussion?

12   A.  He specifically described how the buying behavior of the

13   clients were changing and they were buying the movement and the

14   new house at the same time and how important it was to get it,

15   GTS and -- the other piece of IBM, GTS together to compete

16   better and he was bringing his experience of talking to clients

17   on how this was happening.

18           MS. VELAZQUEZ:  Okay.  So I want to move on to the

19   next document and submit, for evidence, JX 85.

20           THE COURT:  JX 85 we will mark as Defendant's Exhibit

21   9 for identification.

22           MR. DELIKAT:  No objection.

23           THE COURT:  No objection.

24           You want it sealed, counsel?

25           MS. VELAZQUEZ:  No, your Honor.

K7L5ibm5                          Zufiria - Direct

1          THE COURT:  Okay.  This document is in evidence as

2     Plaintiff's Exhibit 9 and it will not be sealed.

3          (Plaintiff's Exhibit 9 received in evidence)

4     BY MS. VELAZQUEZ:

5     Q.  Can you identify this document, Juan?

6     A.  Yes.

7     Q.  And what is it?

8     A.  It is the seating plan for the large dinners.

9     Q.  And are seating charts regularly prepared for board of

10    directors meetings?

11    A.  Always.

12    Q.  And this seating chart shows that you were seated on table

13    3 on day 2?

14    A.  Yeah.

15    Q.  Who else was seated at table 3 with you?

16    A.  It was Mr. Keverian, CEO vice president of strategy, board

17    members Gorsky; Mr. Eske was a more senior member; Mr. Krishna

18    which is the current CEO of IBM; myself -- Mr. Lima and myself.

19    Q.  Did Mr. Lima ever speak with you about competition between

20    IBM and Microsoft for cloud business?

21    A.  We discussed this many times, that the second discussions

22    and he and I --

23    Q.  Juan, could you start again?  He and I?

24    A.  Yes.  He and I discussed many times how the strategy

25    against Microsoft, how we could compete better, what changes we

SOUTHERN DISTRICT REPORTERS, P.C.

1    would make to compete.

2              MS. VELAZQUEZ:  Now I would like to show you JX 13 and

3    submit that into evidence as Plaintiff's Exhibit 10.

4              THE COURT:  Hold on.  The binder has exhibits before

5    that.  Are we taking them out of the binder because we are not

6    going to use them?

7              MS. VELAZQUEZ:  I am going out of order.  I am trying

8    to cut a little bit as well, your Honor.

9              THE COURT:  Should I return the documents in between?

10             MS. VELAZQUEZ:  We can always adjust after the

11   examination.

12             THE COURT:  I have enough, I don't need more.

13             JX 13 is marked for identification as Plaintiff's

14   Exhibit 10.  Any objection?

15             MR. DELIKAT:  No objection.

16             THE COURT:  Sealing not?  No?

17             MS. VELAZQUEZ:  No, your Honor.

18             THE COURT:  No sealing.  Okay.  JX 13 is now

19   Plaintiff's Exhibit 10 in evidence.

20             (Plaintiff's Exhibit 10 received in evidence)

21   BY MS. VELAZQUEZ:

22   Q.  Can you identify this document, Mr. Zufiria?

23   A.  Uh-huh.

24   Q.  What is it?

25   A.  Yes.  Yes.

K7L5ibm5                    Zufiria - Direct

Q.   It appears to be an e-mail from Mr. Lima to Bart

Van Dendaele copying you dated February 26, 2019.  Do you see

that?

A.   Yes.

Q.   And did you receive this document on or about February 26,

2019?

A.   Yes.

Q.   And if you go to page 2 of 3, starting at the very bottom

of the page and carrying over to page 3 there is an earlier

e-mail from Mr. Lima to you and Mr. Van Dendaele dated February

26 and the subject line is Microsoft azure cloud computing

platform and services and Mr. Lima writes:  Worth reading.

          What is he forwarding to you, sir?

A.   Well, he was worried about Microsoft hacking some of our

accounts -- all of the accounts, I would say, and he tendered

this document describing elements of actions that Microsoft

were doing to compete with us.

Q.   And if you go to the first e-mail -- I am on page 1 which

is the last e-mail in time.  Can you explain what Mr. Lima is

communicating to you in that e-mail?

A.   Well, they say that the strategy of Microsoft was to

establish various small with EC priors in our clients but it

was present in all our clients, and they were also leveraging

the incumbency on the office space and they were building

capabilities to do the moving of the workloads to the new

K7L5ibm5                    Zufiria – Direct

1   house.

2   Q.  I want to show you another example of an e-mail

3   conversation between you and Mr. Lima, JX 342, which is the

4   last tab in this binder.

5          THE COURT:  Okay.  We are going to mark JX 342 as

6   Plaintiff's Exhibit 11 for identification.

7          MS. VELAZQUEZ:  And I would like to submit this one

8   under seal, your Honor.

9          THE COURT:  Yes; 342 has two requests; one for

10  admissibility, counsel?

11         MR. DELIKAT:  No objection.

12         THE COURT:  And two as to sealing, counsel?

13         MR. DELIKAT:  No objection.

14         THE COURT:  No objection to either.  Thank you.

15         11 is now in evidence, JX 342.

16         (Plaintiff's Exhibit 11 received in evidence)

17  BY MS. VELAZQUEZ:

18  Q.  Mr. Zufiria, can you identify this document?

19  A.  Yes.

20  Q.  Is this a September 21, 2019 e-mail change involving

21  Mr. Lima, you, Ginni Rometty, and current CEO Arvind Krishna

22  regarding a client account?

23  A.  Yes.

24  Q.  I want to focus you on the September 21 e-mail at 9:01 in

25  the morning that begins at the bottom of this page and it

1  carries over to page 2.  Is Mr. Lima addressing Ginni Rometty?

2  A.  Yes.

3  Q.  Now, if you look at page 2 do you see where he writes:  We

4  did add IBM cloud into -- and he lists a number of clients -- I

5  won't let this one be different.

6  A.  Yes.

7  Q.  Can you explain what Mr. Lima meant by that statement?

8  A.  Yes.

9         Basically he was saying that he knows the new

10  contracts that we are having in our base of clients, we are

11  literally using IBM public cloud.

12  Q.  And so then let's look at the top e-mail on the first page

13  which is the last one in time.  Can you explain what Mr. Lima

14  was communicating to Ms. Rometty and you and Mr. Krishna when

15  he wrote:  We need to use our incumbency and not to defend but

16  attack.

17  A.  Yes.

18         The previous list of clients was an assisted list of

19  clients when we were leveraging our incumbency, using our

20  relationship and recording contracts to introduce the IBM

21  public cloud.  Mr. Lima was saying this is not enough, we need

22  to go to the places where Microsoft is dominant and we need to

23  attack there.

24  Q.  Can you give me any examples of recent client deals that

25  Mr. Lima was involved in in which IBM competed that involved

K7L5ibm5                    Zufiria - Direct

1    Microsoft?

2    A.   We mentioned before the AT&T case.   There is another case

3    this year in Anthem, okay, in the first quarter this year it

4    was recompeted.

5    Q.   And can you explain how we competed against Microsoft --

6    how IBM competed against Microsoft in the Anthem deal?

7    A.    In most of the cases we compete with us at the beginning

8    with two players, Microsoft plus a services company who does

9    the moving.   We compete against two employers, Microsoft and

10   the other services company.

11   Q.   And what was Mr. Lima's involvement in the Anthem deal?

12   A.    The account of IBM, it was under his new responsibility

13   this year so he was involved in the design of the transaction

14   in designing the model of Mystic in which we put the public

15   cloud of services and the GTS services together to compete

16   better.

17   Q.   So, Mr. Zufiria, changing topics, did Mr. Lima express any

18   frustrations to you about the GTS business?

19   A.   Sorry.   Could you repeat again?

20   Q.   Sure.

21        Did Mr. Lima express any frustrations to you about the

22   GTS business?

23   A.   Yes.   Every time we meet and discuss the leadership team we

24   discussed about the things we need to improve, where we need to

25   place investments, how fast we are moving and, in general, we

1    talk about the things that can be improved so this comes with

2    frustration.

3    Q.   Did Mr. Lima express to you the view that some of these

4    issues had improved under his watch?

5    A.   Several years ago when Mr. Lima took the job, the quality

6    of our service to our clients was not good and in the first

7    year and a half Mr. Lima changed that.  He improved the quality

8    of the service, which is the base of our business, and clients

9    had started liking IBM GTS again in North America.

10   Q.   Did GTS North America have a goal for bringing in new

11   business in 2019?

12   A.   Once the quality of the service was better, good, the

13   challenge of the business was how we can bring more clients or

14   more business in assisting clients.  So, there was the vision

15   of how to acquire new business and that was the focus for 2019.

16   Q.   And was Mr. Lima involved in setting that goal for new

17   business in 2019?

18   A.   Yes.  He personally committed with his leadership team, the

19   leadership team of GTS North America, to bring an amount of new

20   business.

21   Q.   And what was that commitment that Mr. Lima made?

22   A.   It was a commitment to sign $5 billion of new business

23   during the year.

24           THE COURT:  Five billion?  Did you say five billion or

25   five million?

K7L5ibm5                           Zufiria - Direct

1              THE WITNESS:  Five billion.  Billion with a B.

2              THE COURT:  B.

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.

5              THE WITNESS:  They themselves committed that they

6     would not get incentives as a team if they don't reach that

7     number.

8     BY MS. VELAZQUEZ:

9     Q.  Was that goal achieved in 2019?

10    A.  No.

11    Q.  Did IBM consider whether a different goal might make sense

12    for Mr. Lima in 2020?

13    A.  We considered that because of several dimensions.  We

14    thought that after almost three years in the job now that the

15    quality of service was good, probably changing leadership to go

16    to win more business could be good for the business and at the

17    same time we wanted to continue developing Mr. Lima for the

18    future so we thought that probably exposing him to other jobs

19    would continue his development.

20    Q.  Was the possibility of changing roles something that you

21    and Mr. Lima discussed in 2019?

22    A.  Yes.  We discussed several times of the convenience for the

23    business and for himself of considering a potential change.

24    Q.  And in 2019 did Mr. Lima indicate to you that he was open

25    to changing roles at IBM?

K7L5ibm5                          Zufiria - Direct

1    A.  Yes.

2    Q.  And did there come a time when Mr. Lima left the role of

3    general manager for North America GTS?

4    A.  That was in January this year.

5    Q.  And how did that come about?

6    A.  There was a conversation among the senior VPs.  We thought

7    that, based on the two dimensions, the need for a change in

8    leadership and the probably continuing developing Mr. Lima

9    through new responsibilities would be a good moment of change

10   and senior leaders, senior vice presidents, we decided to make

11   the change.

12   Q.  So I wanted to submit I think what will be our last exhibit

13   which is JX 103, Plaintiff's Exhibit 12, and this one under

14   seal, your Honor.

15           THE COURT:  Okay.  JX 103 is marked 12 for

16   identification.  Is there any objection by the defendant?

17           MR. DELIKAT:  Is that in the book?

18           MS. VELAZQUEZ:  Yes, it is in the book.

19           THE COURT:  It is out of order.

20           MS. VELAZQUEZ:  Yes, it is.  We had moved things

21   around.  I'm sorry, your Honor.

22           MR. DELIKAT:  I see it.

23           THE COURT:  I'm okay with it being out of order.

24           MR. DELIKAT:  No objection.

25           THE COURT:  No objection to it being marked in

K7L5ibm5                          Zufiria - Direct

1    evidence and sealed, correct?

2              MR. DELIKAT:  With the same reservations we expressed

3    before on sealing.

4              THE COURT:  I don't know what that means for both of

5    us but we are reserving everything as we go.  I just want to

6    emphasize that sealing a document in the modern era requires a

7    fairly delicate balance and there has to be a really good

8    reason to seal.  Some of these I might be able to understand,

9    others I have some concerns about, but for the moment it is

10   evidence in under seal.

11             MS. VELAZQUEZ:  Thank you, your Honor.

12             (Plaintiff's Exhibit 12 received in evidence)

13   BY MS. VELAZQUEZ:

14   Q.  Mr. Zufiria, this is an e-mail from Bridget Van Kralingen

15   to you dated January 10, 2020 on which others are copied.

16             Do you see that, sir?

17   A.  Yes.

18   Q.  And can you identify the individuals who are copied on this

19   e-mail?

20   A.  Yes I can see me; Ginni Rometty; Diane Gherson, the head of

21   human resource; Mark Foster, the head of five-year services;

22   Mr. Martin Schroeter was the head of IBM global markets.

23   Q.  Can you explain to the Court what you and the others on

24   this e-mail chain are discussing?

25   A.  We offered Mr. Lima two different job opportunities that

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm5                         Zufiria - Direct

1    could help to progressing his development.  And after my

2    conversation with him he had a conversation with --

3    Q.   Sorry, Juan.  After your discussion with him --

4    A.   After my discussion with him in which we offered him the

5    two jobs he said he was going to talk to Bridget Van Kralingen

6    and here we have the note that Bridget wrote to all of us after

7    she had the conversation with Rodrigo.

8    Q.   And what were the two roles that Mr. Lima was offered?

9    A.   The first job was a --

10              THE COURT:  Sorry, stop.  The first was?

11              THE WITNESS:  Technology support services.  Technology

12   support services.

13              THE COURT:  GM.

14              THE WITNESS:  Yes.

15              THE COURT:  Got it.

16   BY MS. VELAZQUEZ:

17   Q.   And the second role?

18   A.   The second was to link all the interrelated accounts, the

19   most important accounts of five year, our biggest accounts.

20   Q.   And how did the two roles that Mr. Lima was offered in

21   January 2020 compare to his role running GTS North America?

22   A.   They were roles of the same level, the same bank, both are

23   general managers, and both members of the performance team.

24   Q.   And did Mr. Lima select a role in January 2020?

25   A.   Yes.  He decided to select the interrelated account role.

K7L5ibm5                          Zufiria - Direct

1   Q.  Wrapping up now, how did you first become aware that

2   Mr. Lima had resigned from IBM?

3   A.  Well, I got a call from Sam Ladah.  He told me about

4   Rodrigo resigning and going to work for Microsoft.  He did it

5   because he knew I have invested a lot of time in the

6   development of Rodrigo and he was a very important leader in my

7   organization last year, and I just can imagine he thought a lot

8   of thoughts through my brain about all the hours we were

9   discussing about how to compete against Microsoft and now all

10  that knowledge was going to go into Microsoft.

11  Q.  And so to wrap up, sir, did you have concerns about

12  Mr. Lima taking the role of corporate vice president for Latin

13  America at Microsoft without waiting the 12-month period

14  specified in the non-compete agreement?

15  A.  Yes.  I have big concerns.  First of all, Microsoft is one

16  of our biggest competitors at this moment.  Second, that he has

17  a lot of confidential information in his brain that would not

18  allow him to do his job, use it.  It is difficult to have a

19  Chinese wall in your brain and not to use what you know to

20  compete and that knowledge, in the case of Mr. Lima, is what

21  you know because of his job, also because of his relevance in

22  IBM and the participation in meetings beyond -- this

23  information beyond his job.  Also, all the strategies about

24  our, how we are competing with IBM services, how we are

25  constructing a public cloud to compete in the financial

K7L5ibm5                        Zufiria - Direct

1    services sector, our strategy around Red Hat investments.  All

2    the things about our business in North America this year as

3    well as in the big clients who has operations in Latin America.

4    The participation of all the strategy meeting with the both

5    knowing all the investment, all the future of IBM.  And

6    finally, also knowing what IBM knows and thinks about Microsoft

7    is a big concern to be used by Microsoft against IBM.

8              MS. VELAZQUEZ:  Thank you, Mr. Zufiria.

9              THE COURT:  Mr. Zufiria, I noticed in your e-mail to

10   Ginni you said that Mr. Lima was -- you had talked to him, I

11   guess this is January 8th, he was disappointed and he felt that

12   he was not useful.  Tell me a little bit about that

13   conversation, if you don't mind, what you recall -- first of

14   all, let me ask the question.  Do you recall that conversation

15   that's referenced in your January 8 e-mail which is a part of

16   Plaintiff's Exhibit 12 in evidence?

17             Do you remember having a conversation with Mr. Lima on

18   January 8?

19             THE WITNESS:  Yes, I remember that conversation.

20             THE COURT:  You remember it generally, I assume you

21   don't remember every word you said to him and every word he

22   said to you; correct?

23             THE WITNESS:  Correct.

24             THE COURT:  Okay.  So, tell me as best you recall,

25   tell me what Mr. Lima said to you and what you said to Mr. Lima

K7L5ibm5                        Zufiria - Direct

1    on the evening of January 8 when you spoke to him about, I

2    presume, the topic of changing jobs.

3               THE WITNESS:  Yes.  I called him into my office and we

4    met face to face --

5               THE COURT:  Where was your office?

6               THE WITNESS:  The office was in Madison 590 in New

7    York City.

8               THE COURT:  Okay.  Go ahead.

9               THE WITNESS:  I told him that all the senior VPs have

10   decided to make the change in the organization, the change that

11   we have been discussing in the past and he was disappointed for

12   two reasons; one is because he was expecting the new jobs being

13   bigger, a promotion, not a movement into the same level; and

14   the second because probably he worked at -- he was leaving the

15   business without the recovery he was expecting.

16              THE COURT:  Is that a reference to the $5 billion that

17   he was committed to in 2019?

18              THE WITNESS:  That was only one of the parameters,

19   okay, there were other parameters.  We also didn't see the

20   progress that we were expecting.

21              THE COURT:  Okay.  This is a person you trusted, yes?

22              THE WITNESS:  Yes.

23              THE COURT:  Do you believe he talked plainly to you

24   when he was speaking to you?

25              THE WITNESS:  I think so.

K7L5ibm5                    Zufiria - Direct

1          THE COURT:  Did you talk plainly to him?

2          THE WITNESS:  Yes.

3          THE COURT:  Did you encourage him to stay at IBM?  If

4     you recall.

5          THE WITNESS:  No.  At that moment he didn't say about

6     leaving IBM, I don't remember that.

7          THE COURT:  Okay.

8          THE WITNESS:  The previous year sometimes he said

9     maybe I need to take a break or not because he was working very

10    hard and I encouraged him to change his balance of life and to

11    continue progress in the business.

12         THE COURT:  In your discussions with him I am just

13    trying to get an understanding from your point of view, it's

14    important to me, in the discussions that you had been having

15    with Mr. Lima about his performance and what not, did you

16    suggest or was there any indication to Mr. Lima that they would

17    take him out of this role and move him into a -- I don't know

18    how to say it better than -- a higher role, not a parallel role

19    to where he was, not at the same level.  Was there any

20    discussion that led him to be thinking about the fact that he

21    was going to be taken out of this role but given more

22    responsibility in a different area?

23         THE WITNESS:  There was a lot of conversation about

24    him becoming a bigger leader in idea in the future, not

25    specifically from this job to become a senior vice president,

K7L5ibm5                      Zufiria - Direct

1    but we discussed many times that he would become a senior vice

2    president after completing different jobs with good

3    performance.

4              THE COURT:  He would be considered for the slot of

5    senior VP after other jobs.  Okay.

6              THE WITNESS:  After other jobs.

7              THE COURT:  And successful completion of other jobs.

8              THE WITNESS:  I would say this, that progression in

9    his role as leader, okay, because sometimes one year you -- and

10   others can be good but you can still progress as a leader as

11   you manage divisions.

12             THE COURT:  Okay.  And there was no indication or

13   discussion at that time that he was going to leave IBM, to your

14   knowledge?

15             THE WITNESS:  No.  He discussed about taking a leave

16   of absence at the meeting of the 2019 because he was stressed

17   and we talked several times and I tried to convince him to

18   change his work/life balance because he was working very, very

19   hard, okay, and to feel better and probably even perform

20   better.

21             THE COURT:  When say work/life balance, we were all

22   working very, very hard.  Lawyers work hard, they work 18 hours

23   a day.  How do people at IBM work?  How many hours?

24             THE WITNESS:  It depends a lot.  10, 11 hours.  It

25   depends on the person.  There is people that work more or less.

1          THE COURT:  Okay.  I interrupted the flow.  Thank you.

2          Any cross?

3          MR. DELIKAT:  Yes, your Honor.

4          THE COURT:  I thought so.  Would you like to stay

5     seated?

6          MR. DELIKAT:  Yes, your Honor, if I could please stay

7     seated.

8          THE COURT:  Absolutely.  Happy to have you stay

9     seated.

10         MR. DELIKAT:  I think I have lost the feed.

11         THE COURT:  I have too.  We are looking at the clock,

12    it is 10 to 4:00.

13         MR. DELIKAT:  We will get straight into it, your

14    Honor.  We don't need a break, it is up to you.

15         THE WITNESS:  I'm fine.

16         THE COURT:  All right.  Proceed.

17    CROSS EXAMINATION

18    BY MR. DELIKAT:

19    Q.  Thank you, your Honor.

20         Good afternoon, Mr. Zufiria.  This is Mike Delikat.  I

21    am sitting at the table, I am waiving at you; I am the same

22    person that took your deposition in this case.  I am going to

23    be asking you a series of questions.  Some of them will call

24    for a yes or no answer.  If you could answer those questions

25    that way we would appreciate it.  Your lawyer can come back and

K7L5ibm5                          Zufiria - Cross

1   ask any clean up questions or explanation questions but if the

2   question calls for a yes or no answer, I ask you to answer it

3   that way.

4           Do you understand?

5   A.  Yes.

6           THE COURT:  And the Judge is asking you to do the

7   same, please.

8   BY MR. DELIKAT:

9   Q.  So let's start with the titles of executives at IBM.  You

10  are a senior vice president of GTS, correct?

11  A.  Yes.

12  Q.  And with responsibilities globally for GTS, correct?

13  A.  Yes.

14  Q.  And there are seven senior vice presidents at IBM, correct?

15  A.  How many you said?

16  Q.  I believe seven.  Or is that the incorrect number?

17  A.  There are more.  I think in total with a title there are

18  around 12, if I believe I am correct.

19  Q.  So there are 12 senior vice presidents, correct?

20  A.  Yes.

21  Q.  And you, as a senior vice president, Mr. Zufiria, report to

22  another senior vice president, correct?

23  A.  Yes.

24  Q.  And his name is Mark Foster; is that correct?

25  A.  Yes.

K7L5ibm5                          Zufiria – Cross

1   Q.  And for how long have you reported to Mark Foster who is a

2   senior vice president?

3   A.  Since April this year.

4   Q.  Since April of 2020, correct?

5   A.  Yes.

6   Q.  And before that time you reported to the CEO of IBM Ginni

7   Rometty when she was in that role, correct?

8   A.  Yes.

9   Q.  And Mr. Foster, he now reports to the new CEO of IBM; is

10  that correct?

11  A.  Yes.

12  Q.  So we have the senior vice president level and above that

13  we have the CEO, correct?

14  A.  Yes.

15  Q.  And Mr. Lima, he was never a senior vice president,

16  correct?

17  A.  Correct.

18  Q.  He was always a general manager, correct?

19  A.  Yes.

20  Q.  And how many general managers did you have reporting to

21  you?

22  A.  Around 14, 15.  Something like this.

23  Q.  14 or 15 general managers reported to you.

24          And how many general managers, approximately, are

25  there at IBM?

K7L5ibm5                          Zufiria - Cross

1    A.   I think around a hundred.

2    Q.   Just 100 or was your testimony 200 at your deposition?

3    A.   I would say around 100.  I don't know the exact number,

4    okay, because the general managers are Band A and Band B.

5    Q.   And Mr. Lima was which band?

6    A.   Band A, which is the highest band of general manager.

7    Q.   And approximately how many Band A general managers are

8    there at IBM during the period of time he worked there?

9    A.   Band A, I would say around 80 or 90.  80.

10   Q.   How many, is it Band B, is the level below?

11   A.   Yes.

12   Q.   Approximately how many Band B general managers are there?

13   A.   I would say around a hundred and something.  Okay?

14   Q.   Okay.  Now, you are familiar with the complaint that was

15   filed in this case, correct, the legal complaint?

16   A.   Yeah.

17   Q.   And I asked you at your deposition about the statement in

18   the second paragraph of the complaint that Mr. Lima had, "a

19   seat at the table alongside the chairman and senior executive

20   officer of the company."

21        Do you recall when I asked you about that at your

22   deposition?

23   A.   I remember.

24   Q.   So, in the structure that you have just explained for the

25   Court, can you explain how it was that Mr. Lima had a seat at

K7L5ibm5                     Zufiria - Cross

1   the table alongside the chairman and chief executive officer of

2   IBM?

3   A.  Because, as you know, he was one of the high flyers in IBM,

4   he was many times invited to have dinner conversations with the

5   senior vice president and with the chairman of the company.

6   Q.  Okay, but he was never senior vice president, was he?

7   A.  No.

8   Q.  And if you could look at, if we could bring up, it was

9   JX 85, I believe Plaintiff's Exhibit 9, your Honor, I

10  completely missed the number on that, that was the seating

11  chart --

12          THE COURT:  JX 85 was Plaintiff's Exhibit 9, you are

13  correct.

14  Q.  If we can bring that up, Mr. Zufiria, I see that Mr. Lima

15  is not listed on day one of the seating chart at this board

16  meeting at either the lunch or dinner, correct?

17  A.  Yes.

18  Q.  Because he wasn't at the board meeting at day one, was he?

19  A.  I -- he was invited.  I don't remember whether he attended

20  or not.

21  Q.  So it is your testimony that he was invited to attend both

22  days of the board meeting; is that your testimony?

23  A.  That's what I remember.

24  Q.  And was there an invitation that you recall seeing that had

25  his name on it that invited him to the whole meeting as opposed

SOUTHERN DISTRICT REPORTERS, P.C.

K7L5ibm5                         Zufiria — Cross

1    to just for his presentation?  Yes or no?  Yes or no, do you

2    recall seeing an invitation?

3              THE COURT:  Give him a chance to answer.

4    A.  I recall that Ms. Ginni Rometty invited, wanted him to be

5    in the board and wanted to be attend the meeting with the

6    board.  What I don't remember is whether he was on day 1 or

7    only on day 2.

8    Q.  And then if we go to day 2 we see that he is listed at

9    table 3, correct?

10   A.  Yes.

11   Q.  Ginni Rometty is not sitting at table 3, is she?

12   A.  No.

13   Q.  Yes or no?

14   A.  No.

15   Q.  He doesn't have a seat alongside the chairman and chief

16   executive officer on that particular day at that dinner, does

17   he?

18   A.  On that particular day, that dinner he was not sitting with

19   Ginni Rometty.

20   Q.  And why is it -- it is hard to tell, this is IBM's document

21   but his name seems lighter, in other words a lighter font as

22   opposed to the other names at the table.  Do you know why that

23   is?

24   A.  Because he was not a senior vice president and he was

25   invited to get exposed to the board so the board members should

K7L5ibm5                         Zufiria - Cross

1    know that he is one of the high flyers and they should observe

2    him.

3    Q.  How come you said in your testimony on direct that at these

4    board meetings only senior vice presidents are normally

5    invited, correct?

6    A.  We invite only --

7    Q.  Yes or no -- excuse me.  Yes or no, was that your testimony

8    on direct examination today?

9    A.  If you ask me -- can you repeat the question, please, so I

10   can be precise in my answer?

11             THE COURT:  I think, counsel, slow down.  I have got

12   your point, I don't know how much you need to embellish it but

13   you go as long as you need to, don't let me get in your way.  I

14   understand what you have communicated but try it again and give

15   him a chance to answer.  We are separated by time and space

16   here so let's give him a chance to answer.

17             MR. DELIKAT:  Okay.

18   BY MR. DELIKAT:

19   Q.  Do you recall testifying today on your direct examination

20   that only senior vice presidents are regularly invited to board

21   of director meetings?

22   A.  To board of director meetings, yes.  To the strategy

23   meeting once a year of the board of directors we always invite

24   five or six general managers with high production.

25   Q.  Is that a part of the strategy meeting?

1    A.   Yes.

2    Q.   Withdrawn.

3            I am referring to Plaintiff's Exhibit 7, let's bring

4    that up, it is the cover page of the IBM board of directors

5    strategy meeting.  Okay?  And the record will speak for itself

6    but do you recall stating on your direct examination that this

7    deck is only shared with senior vice presidents?  Today.

8    A.   Senior vice presidents, yes, but participants of the

9    meeting, yes.

10   Q.   And did you also recall stating on your direct examination

11   that no copies of this deck are distributed to anyone other

12   than to senior vice presidents?

13   A.   Yes.

14   Q.   And the agenda for that day would indicate that Lima was

15   there on a panel that you led that went on for 45 minutes on

16   day two of this particular meeting, correct?  That's what the

17   agenda says?  Yes or no.

18   A.   He was the full second day, I remember, because he was

19   invited to the full session but he participated only in that

20   part of the session on the stage.

21   Q.   And you are sure he was there the entire day of the second

22   day of the board meeting; is that your testimony?

23   A.   Yes.

24   Q.   What time did the board meeting end on the second day?

25   A.   After the dinner that I participated.

1   Q.  And isn't it true that Mr. -- what is that?

2   A.  I don't remember the exact hour but I finished after the

3   meal.

4   Q.  And there was a dinner on the second day, not a lunch at

5   the end of the meeting, correct?

6   A.  Yes.

7   Q.  And isn't it true that Mr. Lima spoke for less than five

8   minutes on a panel that you led at this 2019 board of directors

9   meeting?

10  A.  No.  He spoke more than this because during the meeting

11  there were conversations among the senior vice president, the

12  board of directors, and the general managers were invited.  The

13  meeting was interactive, it was prepared to be interactive and

14  he participated in the conversation.

15  Q.  Now, when Mr. Lima held the role of GTS North America he

16  reported to you, correct?

17  A.  Yes.

18  Q.  But he was already in that role when you were appointed to

19  be the global head of GTS in February of 2019, correct?

20  A.  Yes.

21  Q.  And so you directly managed Mr. Lima for less than one

22  year, correct?

23  A.  Can you repeat the question?

24  Q.  Yes.  You had responsibility for directly managing Mr. Lima

25  for less than one year, correct?

K7L5ibm5                          Zufiria – Cross

1   A.  Yes; 11 months.

2   Q.  And in addition to Mr. Lima who was responsible for North

3   America there was an individual named Antonio Lubrano that

4   reported to you, correct?

5   A.  Yes.

6   Q.  And Mr. Lubrano held the title of GTS for South America;

7   isn't that true?

8   A.  Yes, Latin America; yes.

9   Q.  And Mr. Lubrano held the title of the head of GTS for South

10  America for the entire time that you supervised Mr. Lima who

11  was the head of North America, correct?

12  A.  No.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K7LQibm6                         Zufiria – Cross

1    BY MR. DELIKAT:

2    Q.  There was a change in Mr. Lubrano, correct?

3    A.  There was a change in Mr. Lubrano.  If I remember properly,

4    it was at the end of the third quarter.

5    Q.  And he was replaced by an individual named Ricardo Gozzoli,

6    who was given the title of head of GTS for South America,

7    correct?

8    A.  Head of GTS for Latin America.

9    Q.  For Latin America, OK, and that would include Central

10   America, correct?

11   A.  Yes.

12   Q.  And it was Mr. Lubrano and Mr. Gozzoli who had

13   responsibility for GTS clients in South America, correct?

14   A.  Yes.

15   Q.  On your direct examination, you testified quite a bit about

16   IBM confidential information.  What is your understanding of

17   the term IBM confidential information?

18   A.  It is the information that is not available to anybody

19   outside IBM because it's core for our competitive advantage.

20   Q.  Information not available to anyone outside of IBM, and

21   then I couldn't hear the rest.

22   A.  And it's basic for our competitive advantage.

23   Q.  And it's for your competitive advantage, correct?

24   A.  Yes.  Yes.

25   Q.  OK.  One more foundational question before I get into this.

K7LQibm6                        Zufiria - Cross

1    You've spoken about GTS and your responsibilities for being the

2    global head of that, but you also mentioned another acronym

3    GBS, correct?

4    A.  Yes, Global Business Services is another part of IBM that

5    does consulting and works on other applications.

6    Q.  And GTS and GBS until recently were run as separate

7    business units, correct?

8    A.  Yes.

9    Q.  And they were combined, GTS and GBS were combined and put

10   under the overall direction of Mr. Mark Foster, correct?

11   A.  We have not done the match yet, but that was the intent to

12   make our business stronger.

13   Q.  Right.  And when that happens, you will be reporting to

14   Mr. Foster who will be the head or is already the head of this

15   combined business, correct?

16   A.  Correct.

17   Q.  And as we said before, Mr. Foster is a senior

18   vice-president, correct?

19   A.  Correct.

20   Q.  And just to confuse it a little bit more, the combined GTS

21   and GBS is now known as IBM Services, correct?

22   A.  Correct.

23   Q.  Now, you recall in your deposition I asked you questions

24   about GTS and GBS being combined to form IBM Services, correct?

25   A.  Correct.

K7LQibm6                           Zufiria - Cross

1   Q.  And you testified that the reasons why GTS and GBS were

2   combined would be considered to be confidential IBM

3   information, correct?

4   A.  Some of the reason, yes.  Other reasons, no.

5   Q.  And do you recall your testimony at the deposition?

6   A.  I don't recall it exactly.  There are elements that we

7   publicize, we say.  But there are elements we don't publicize

8   that have to do with our economics of investments and

9   strategies that we don't publicize because they are to our

10  competitive advantage.

11          MR. DELIKAT:  I'm going to bring up a video clip from

12  your deposition used for impeachment purposes, your Honor.

13          THE COURT:  I think you should at least let counsel

14  know what page and line you're going to in case he needs to

15  point the witness to.

16          MR. DELIKAT:  Yes, plus the transcript will run right

17  under it too.  It's deposition transcript page 18, line 15 to

18  page 19, line 2 of Mr. Zufiria and -- do you have the video

19  clip here?  Yes.

20  Q.  We're going to play the video clip from the deposition and

21  see what you said there, OK?

22  A.  Yes.

23          (Videotaped deposition and transcript played)

24  Q.  Having heard your testimony, is your recollection refreshed

25  that you refer to the reasons behind the combination of GTS and

SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm6                          Zufiria - Cross

1    GBS to be confidential insider information?

2    A.   Yes.   As I said, there are elements that we publicize that

3    say we are going to get stronger, we go better to the market,

4    but the reasons why we do it internally, how they come explains

5    the benefit it brings to us, not only to the client.   That

6    would be confidential information.

7    Q.   So, if a IBM senior executive like Mr. Lima publicly

8    discussed the reasons surrounding the combination of GTS and

9    GBS, that executive would be disclosing confidential IBM

10   information, correct?

11   A.   If it uses the internal part, there are things we don't

12   share, yes.

13           THE COURT:   If it's the reason we don't share.   I

14   think that's what the witness said.

15           MR. SIGNORACCI:   If he uses the internal part the

16   reasons we don't share.

17           THE COURT:   I see.

18   Q.   And if a senior executive like Mr. Lima would disclose the

19   reasons behind an acquisition like Red Hat disclosed them in a

20   public forum, would that be disclosing confidential

21   information?

22   A.   There are many elements of how Red Hat is in position that

23   has to do with the economics of the idea that --

24   Q.   That wasn't my question.   It's a yes or a no.

25   A.   Correct.

K7LQibm6                          Zufiria - Cross

1    Q.   If a senior executive like Mr. Lima disclosed the reasons

2    behind the Red Hat acquisition, would that be the disclosure of

3    confidential information by that individual?

4    A.   Yes.

5    Q.   OK.   What about information how the Red Hat acquisition

6    would be used going forward after the acquisition, if an

7    individual like Mr. Lima disclosed that, would that be an

8    improper disclosure of confidential information?

9    A.   For example, if he discloses our investment plans in IBM

10   product associated to Red Hat, that will be confidential

11   information.

12   Q.   And if a senior executive like Mr. Lima disclosed the

13   three-year strategy plan for the combined GBS and GTS

14   businesses, would that be an improper disclosure of IBM

15   confidential information?

16   A.   If he discloses in definite parameters what we don't share

17   with the market, yes.

18   Q.   And how much of these things do you end up sharing with the

19   market.   So, if you have a three-year business plan, what's

20   shared with the market and what's not shared with the market?

21   A.   We can share that we are going to develop some

22   functionality for our product, but we don't share how much

23   money we are investing and what basic technology we are using

24   to create that functionality.

25   Q.   Do you know what the cognitive enterprise initiative is at

K7LQibm6                    Zufiria - Cross

1    IBM?  Yes or no.

2    A.  Sorry, I didn't hear.  The voice disappeared.  Sorry.

3    Q.  Yes.  Do you know what the cognitive enterprise initiative

4    is at IBM?

5    A.  Yes, I know it.  Yes.

6    Q.  In fact, that was mentioned in one of the documents that

7    was marked and requested to be sealed by your lawyer.  Do you

8    recall seeing it on one of the documents that came in, the

9    cognitive enterprise initiative?

10   A.  Yes.

11   Q.  And is that a confidential initiative of IBM?

12   A.  What we are trying to do is.

13   Q.  Yes or no.  Is it a confidential business initiative of

14   IBM?

15   A.  No, the business initiative is not confidential.  No.

16   Q.  OK.  And what about the Garage initiative.  What's that?

17   A.  It's a methodology that we have that we offer to clients.

18   Q.  And if a specific Garage initiative was disclosed by a

19   senior executive like Mr. Lima outside of IBM, would that be an

20   improper use of IBM confidential information?

21   A.  Yes, if we disclose the method, yes.

22   Q.  OK.  I'm going to direct your attention -- Mark, did you

23   hand our exhibits up to the Court?

24              THE COURT:  Not yet.

25              MR. DELIKAT:  Your Honor, I forget what number we're

SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm6                    Zufiria - Cross

1    up to on the defendant's side.

2              MR. THOMPSON:  4.  I think we did A, B and C.

3    Q.  It's a document that was used on his deposition.  It was

4    marked as Exhibit D-1 at the witness's deposition.

5              MS. VELAZQUEZ:  I have it then.

6              THE COURT:  Another set would be helpful to the Court

7    that would be great.  A, B and C.  So far so I think we're up

8    to D.

9              MR. DELIKAT:  D as in defendant, your Honor.

10             THE COURT:  D as in defendant.

11   Q.  Mr. Zufiria, do you have in front of you?

12             THE COURT:  Wait.  Wait.  I haven't admitted anything.

13   D is JX-35 for identification.  D for identification, JX-315.

14             MR. DELIKAT:  315, correct.

15             THE COURT:  Sorry, 315.  Is there any objection to

16   Joint Exhibit 315 going into evidence?

17             MR. SIGNORACCI:  No, your Honor.

18             THE COURT:  D previously marked JX-315 is in evidence.

19             (Defendant's Exhibit D received in evidence)

20             THE COURT:  You may proceed.

21   Q.  Mr. Zufiria, do you remember I questioned you about this

22   document at your deposition?

23   A.  Could you please turn it up because I cannot read it.

24   Q.  Why don't you blow up the top block there so he could see

25   it, just that, and let me help you if it is hard to see.  It's

K7LQibm6                    Zufiria - Cross

1   by a company called Alpha Sense, Inc.?

2   A.  Yes.

3   Q.  And it says, highlighted document, and so the highlights

4   that you see on this document are by them.  And then it says

5   International Business Machines Corp.  It says, International

6   Business Machines Corp at the JP Morgan Technology Media and

7   Communications Conference (virtual) on May 13, 2020.  Do you

8   see that?

9   A.  Yes.

10  Q.  And you understand what a virtual conference is in the days

11  of COVID-19, correct?

12  A.  Yes.

13  Q.  And did you listen into this particular conference --

14  A.  No.

15  Q.  -- when it was carried virtually?

16  A.  No.  No.

17  Q.  OK.  And if we can go down a little bit further to who the

18  participants was, it says corporate participants, note key

19  speaker, to speak first and then conference call participants.

20  It has the date of this recently May 28, 2020.  It says, edited

21  transcript of International Business Machines Corp.

22  presentation on May 13, and the participants were Mark Foster.

23  OK.  That's your boss, correct?

24  A.  Yes.  Yes.

25  Q.  Senior VP of IBM Services.  Correct?

K7LQibm6                       Zufiria - Cross

1    A.  Yes.

2    Q.  And you see below that is Mr. Huang, H-U-A-N-G's name.  He

3    is an analyst with JP Morgan Chase.  Do you see that?

4    A.  Yes.

5    Q.  And so if we can go first to page 2 and the paragraph

6    begins, if you can highlight it.  And let me just say first

7    it's a question-and-answer format.  Do you see that Mr. Huang

8    as the analyst is asking Mr. Foster, who is the head of IBM

9    Services, a series of questions and those are contained in this

10   transcript.  Do you see that?

11   A.  I see, but I cannot read it.  When you said it if you could

12   read it, please.

13   Q.  OK.  And so is the question -- the first question that

14   begins, if you could just highlight the first question that

15   begins and the answer down to the end of the answer, which is

16   right there before the next question.  There is a question by

17   Mr. Huang, you see what he asked there, given the success and

18   how quickly you did that, referring to the combination,

19   resulting in an organization of 240,000 individuals, and he

20   asks for Mr. Foster's thoughts on that.  Do you see that?

21   A.  Yes.

22   Q.  And then let's go down just two paragraphs into his answer.

23   I'm sorry, the next paragraph, "We have been able to see."  And

24   Mr. Foster is describing Garage methodology, he says, which is

25   our methodology for working closely on co-creational models

SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm6                         Zufiria - Cross

1    with our clients in a physical environment.  And if you go on

2    there, he talks about a particular client.  He names a client,

3    Frito-Lay, correct?

4    A.   Yeah.

5    Q.   Frito-Lay is the snack --

6    A.   Yes.

7    Q.   -- company to your understanding?

8    A.   Yes.

9    Q.   And that's an important client for IBM?

10   A.   Yes.

11   Q.   And then Mr. Foster goes on to explain what exactly the

12   work was done on the Garage for Frito-Lay.  He says, it's one

13   of the biggest Garages we have.  It has sort of 11 concurrent

14   streams, transforming the way they do their customer-service

15   thinking.  And we were able to not only maintain that in the

16   virtual world very closely but actually leverage it now to be

17   even more dynamically facing a whole bunch of helping Frito-Lay

18   resolve for its day-to-day supply chain dynamics in a very,

19   very powerful way.

20         Now, don't you think a competitor would be interested

21   in hearing about the specific work that IBM is doing for

22   Frito-Lay under their Garage methodology?

23   A.   Yes, a competitor would be interested.  Yes.

24   Q.   And Mr. Foster here is naming the client and calling it one

25   of the biggest Garages we have and describing the work that was

1   done for them, correct?

2   A.   It was correct describing the outcome of the work.

3   Q.   And the Garage methodology, is that a proprietary

4   methodology for IBM?

5   A.   Yes.

6   Q.   And do you think it was appropriate for Mr. Foster in a

7   public forum to be talking about IBM's proprietary Garage

8   methodology and naming a client that had a large role in that

9   business?

10  A.   Mentioning the client is in agreement with the client,

11  mentioning the outcome of the work is an agreement with the

12  client.  Mentioning how is the methodology.  How the

13  information is managed in the meetings to is confidential.

14  Q.   Do you know for a fact that Frito-Lay agreed that

15  Mr. Foster could make a public disclosure about the business

16  that IBM was doing for them involving this Garage methodology.

17  Do you know that for a fact?  Yes or no.

18  A.   I know by a fact -- I don't know it, but I assumed yes,

19  because we do it always like this.

20  Q.   Let's go on to a couple of other clients that Mr. Foster

21  mentions in this interview.  Let's go to page 3.  And if we can

22  go to the paragraph that begins, "So I think we have been

23  able," it's in the middle, and highlight that paragraph out.

24  Everybody sees that?  OK.  Good.  In that particular paragraph,

25  take a look at it, I asked you questions about it at your

K7LQibm6                        Zufiria - Cross

1    deposition, so I believe you're familiar with it.

2    A.  Yes.

3    Q.  Mr. Foster mentions a few other clients.  He mentions

4    Credit Mutuel, correct?  Do you see that?

5    A.  Yes.

6    Q.  Is that one of IBM's integrated accounts?

7    A.  I think yes now it's an integrated account.  It's now one

8    of the integrated accounts.

9    Q.  It's one of 77 or 79 biggest IBM accounts, correct?

10   A.  I believe so, yes.  I don't know that it is, but I believe

11   so.

12   Q.  And do you know for a fact whether Credit Mutuel consented

13   to the disclosure of the kind of work that IBM is doing for

14   them in the application of Watson and virtual assistance to

15   their banking assistance.  Do you know for a fact whether they

16   consented to that?

17   A.  Yes, I know it.  In this particular case, I know it.

18   Q.  And did you learn that after your deposition when I asked

19   you that question?

20   A.  No, because I remember that when I was running Europe, we

21   signed a big agreement and IBM asked permission and we

22   publicized this in our outside medias.

23   Q.  So, when a big deal is signed like this with Credit Mutuel

24   for doing this kind of work, there typically is a public

25   release that this transaction was signed with that particular

K7LQibm6                        Zufiria - Cross

1    client, correct?

2    A.   Correct, there is an agreement that is reached on how to

3    make (inaudible).

4    Q.   That was also with respect to the Anthem transaction,

5    correct, that there was a public announcement concerning that

6    correct?

7    A.   I remember, yes.

8    Q.   So it's your belief that Mr. Foster was not improperly

9    disclosing IBM confidential information when he named the

10   client and talked about the specifics work that IBM was doing

11   for them, correct?

12   A.   Yes, correct.

13   Q.   And let's go down further in that paragraph.  There's

14   another client mentioned, Providence Healthcare.  Do you know

15   whether or not Providence Healthcare consented to the

16   disclosure of the particular kind of work in a particular

17   location that IBM was doing for them?  Yes or no.

18   A.   I -- no, I don't know it.

19   Q.   OK.  And you see there Mr. Foster is openly sharing the

20   fact of what they're doing for Providence Healthcare, helping

21   them hire some 4,500 nurses a month to use that capability to

22   hire people remotely, OK?  And this, of course, is in the

23   context of a May interview during COVID-19 when many healthcare

24   institutions are vigorously competing for the scarce medical

25   talent that's available, correct?

K7LQibm6                        Zufiria - Cross

1    A.   Yes.

2    Q.   And do you think it is confidential business information of

3    Providence Healthcare to reveal the fact that you were able to

4    come up with a program that allows them to hire remotely.

5    Isn't that confidential information?

6    A.   I don't know if it is confidential for Providence

7    Healthcare.  And I don't know their agreement.  Nobody we have

8    an agreement with a client before we published any data of any

9    public relationship in all of the business that we do.

10   Q.   And so what would you say is the percentage of the

11   transactions that you close with clients like this Providence

12   Healthcare or Credit Mutuel that are actually publicly

13   disclosed to the press that a deal has been done?

14   A.   I don't know the percentage.  OK, I don't know.  We try to

15   make it as big as possible, but I would not be able to give you

16   a percentage.

17   Q.   OK.  Now, you recall when we started this line of

18   questioning, we brought up your deposition testimony where you

19   said it would be inside information to disclose the reasons

20   behind the combination of GTS and GBS.  Do you recall that

21   testimony?

22   A.   Some of the reasons.  Not all.

23   Q.   OK.  So let's go down to the next question, if you could

24   highlight that the next question on the page which begins

25   "right."  So we will highlight the question first.  And

Mr. Huang is saying to Mr. Foster, "Right, so helping clients

having full breadth obviously is important, which I think is a

good segue to my next question, which was in April, you were

named the head of IBM Services which brings together GTS and

GBS into one place.  Why combine the two, Mark?  I've been

getting that question from investors.  It seems like obviously

a big move.  Why is it important to do now?"

          Do you see that question?

A.  Yes.

Q.  And before we get to the answer on that, let's ask you a

few other questions.  Was the combination of GTS and GBS

discussed in many senior leadership team meetings at IBM before

it actually happened?

A.  Yes.

Q.  And were the reasons behind the combination debated back

and forth by IBM leaders before it actually happened?

A.  Yes, many conversations and we discussed the reasons many

times.

Q.  OK.  And so let's look at the answer then.  Let's blow up

the answer that Mr. Foster gave to "Why combine the two, Mark?"

OK, and why don't you just take a look at that.  I won't read

the whole thing into the record.

          THE COURT:  It's in the record.

          MR. DELIKAT:  I won't read it.

          THE COURT:  You don't need to read it.  It's here

1    already.

2    Q.  Now, Mr. Foster here mentions the combined scale of the

3    business, 240,000 people.  Do you believe that giving out, you

4    know, the numbers of people in combined organizations within

5    IBM is confidential business information?

6    A.  Not to this level.  To the level of the aggregate, no.

7    Q.  And so if Mr. Lima when he was interviewing for Microsoft

8    told them that he managed an organization of X thousand

9    employees, would he have been revealing IBM confidential

10   information?

11   A.  If he is referring to a segment of the business, yes,

12   because we never published the sizes of the segments of the

13   business.

14   Q.  But it's OK for Mr. Foster to refer to the combined

15   population of two other business units?

16   A.  Yes, because this is a segment reporting external that we

17   are transferring to the level GTS and GBS start-up services.

18   Q.  Where do you draw the line between size of organization

19   that it's OK to talk about publicly and size of organization

20   that it's confidential information and it's not OK to talk

21   about publicly?

22   A.  I would say the segment knew that we report to an

23   aggregated level.

24   Q.  But do you recall that during your deposition you recalled

25   that revealing the size of a business unit would not be

K7LQibm6                    Zufiria - Cross

1   confidential information?  Do you recall that information?

2   A.  Yes, for a portion of the business.

3   Q.  This is not all of IBM.  This is just a business unit,

4   correct?

5   A.  GTS is a business unit, GBS is a business unit.

6   Q.  And now turning to page 4, more from Mr. Foster about a

7   combining the two, and if we go down to the middle of that

8   page.  Question:  Yes, so I know.  If you could blow that up.

9           OK.  Mr. Huang persists, and at the end of it, he

10  says, "What's the end game for GTS in your mind as you now have

11  that under your leadership and bringing it together with GBS?"

12  Do you see that?  Do you see that question?

13          THE COURT:  I do.

14  A.  Yes.

15  Q.  And so now Mr. Huang is probing more about the reasons

16  behind the GBS and GTS combination.  Is that correct?

17  A.  Yes.

18  Q.  Let's blow up the answer Mr. Foster gave.  The second

19  paragraph to that.  And here is the question and the second

20  paragraph, he says, "GTS has been on a journey of its own

21  reinvention."  What's that about what transformation was GTS

22  going through?

23  A.  The transformation of moving into a much more cloud-centric

24  world and increasing the automation in the business.

25  Q.  In fact, he said, "It has started from a more on premise

1    legacy, in other words, private cloud, moving to a world of

2    cloud" correct?

3    A.   More than private cloud.  I would say legacy assistance to

4    move it from the data assistant to private cloud and to public

5    cloud.

6    Q.   Right.  But IBM is starting from where it is and trying to

7    move, his words, "to a world of cloud."  Do you see that?  He

8    says, "moving to a world of cloud."

9    A.   Yes.  To the world of cloud, yes.  We are moving to the

10   world of cloud, yes.

11   Q.   And so here he is revealing the reasons behind why

12   combining GTS and GBS will allow IBM to be more successful in

13   the world of cloud, correct?  He's given the answer there?

14   A.   Yes, he's saying some of the reasons, not all of them.

15   Q.   OK.  Now, let's go down to the next paragraph of his

16   answer.  In this paragraph, he starts talking about Red Hat

17   Open Shift capabilities.  And if we go to the sentence, "And I

18   see the capacity for GTS."  He writes -- he says, "And I see

19   the capacity for GTS, in particular, to really give us an

20   opportunity to see some of the major new control points around

21   the infrastructure architecture of the future, particularly if

22   we can leverage things like our Red Hat Open Shift

23   capabilities, our multi-cloud manager capabilities in new areas

24   such as some complex multi-cloud data management, complex

25   multi-cloud security management."

1          So, here Mr. Foster is freely talking about how Red

2     Hat is going to be integrated into the IBM business so that it

3     can compete more successfully in the cloud services space,

4     correct?

5     A.  No.  It's not how we are going to break Red Hat into IBM.

6     It's how we are going to use Red Hat to do better work in our

7     client.  It's not about integration.

8     Q.  He uses the word leverage.  He says, "If we can leverage

9     things like our Red Hat Shift capabilities into these things."

10    So, he's talking about how Red Hat is going to be leveraged or

11    used by IBM in order to compete more successfully with the

12    market leaders in cloud, correct?

13    A.  Yes, the same way that another company also uses Red Hat to

14    do the same thing because Red Hat is run independently.

15    Q.  And then if we go to the next question, and this goes on

16    for several pages, but we'll just get to the highlights here.

17    Mr. Huang says, "We finally just mentioned Red Hat.  Well, you

18    touched upon it, so let's expand on it.  So you went through

19    the -- bringing together GTS and GBS.  How does Red Hat then

20    fit on top of all of that?"

21          And Mr. Foster gives an answer there.  Can we blow up

22    his answer?  And it goes on to the next page.  So if you could

23    read that?

24    A.  Yes.

25    Q.  And so Mr. Foster in response to the analyst's question at

1  this conference is explaining how Red Hat is going to be used

2  in the overall organization in order to position you better for

3  the emerging, the coming in the future hybrid cloud work,

4  correct?

5  A.  Yes.

6  Q.  And do you think he's sharing confidential information

7  about how Red Hat would be used by IBM in the future after its

8  acquisition when he told the analyst that in an open

9  conference?

10  A.  No.  No.

11  Q.  OK.  Let's go on.

12      THE COURT:  Hold on one second.  Hold on one second.

13  I want to get a sense of timing, so I can let the court

14  reporter know and courthouse staff know.

15      MR. DELIKAT:  I certainly won't finish cross, but I

16  can certainly finish this document and go on to a few other

17  things.

18      THE COURT:  Let me say this.  I'm not going to

19  interrupt your cross.  You're free to cross until the cows come

20  home.  However, I think I have the point, and I think it would

21  go a little more quickly and efficiently if you highlighted for

22  me the language that you think bespeaks a confidentiality or

23  IBM confidential piece of information.  The witness seems to be

24  saying to me in response to your questions, "These answers are

25  not confidential because they're at a high level."  This is an

1    interview at a communications media JP Morgan conference.  I

2    have your point as loudly and clearly as you need me to

3    understand Mr. Delikat.

4            MR. DELIKAT:  OK.

5            THE COURT:  But it really doesn't ultimately answer

6    the ultimate question which I have here, which is does this

7    defendant have IBM confidential information or trade secrets

8    that he's going to use when he gets to Microsoft should I

9    permit him to go there in violation of the agreement.  Your

10   point, however, is very well taken, and I get it.  I'm with you

11   on it.

12           MR. DELIKAT:  OK.

13           THE COURT:  So maybe we could just tighten it up a

14   little and get to the language.

15           MR. DELIKAT:  I will go to some other areas where more

16   detail is exposed.

17           THE COURT:  Terrific.  We're going to break here, I

18   would say at -- we're going to have to break at 5:00 because

19   actually I have a preliminary injunction group waiting for me

20   to issue an order for them, so I want to be able to get that

21   order signed.  So we can either take a break for a minute or

22   we'll just stop at 5:00.  I think we'll just stop at 5:00

23   today, and we'll start again at 9:30 tomorrow.  Does that work

24   or would you like to go further, counsel?

25           MR. DELIKAT:  We're happy to go further after.  It's

1    up to your Honor.

2            MR. ATKINS:  Your Honor, we're prepared to go for as

3    long as you're willing to have us.

4            THE COURT:  I'm willing to have you for as long as you

5    can ask questions and I can hear answers, but I have court

6    reporters and staff that are here only for limited parts of the

7    day.  So, I appreciate that.  I would take up you up on an

8    opportunity maybe to talk you in a socially distanced distance

9    a couple of you, one or two from each side after we conclude

10   today's business for a few minutes.  I think that might be

11   helpful.  But I'm not going to keep the reporters here.

12           MR. ATKINS:  So, for other witnesses who are waiting

13   in the wings or a witness waiting in the wings --

14           THE COURT:  I don't think Mr. Delikat is anywhere near

15   finished, so I don't think we are going to conclude with this

16   witness today.  We will bring him back in the morning.  He will

17   pick up what he has on cross.  I assume there is some redirect

18   coming, and then we will go to the next series of witnesses.  I

19   would encourage you to tighten up the presentations because we

20   really are on a tight schedule here, and we spent a fair amount

21   of time on the back-and-forth, which I perfectly understand.

22   So I don't know how much we need to --

23           MR. ATKINS:  So, your Honor, we are going to conclude

24   at 5:00.

25           THE COURT:  We are going to conclude at 5:00.  I would

K7LQibm6                    Zufiria – Cross

1    ask a couple of you to come into the robing room with me

2    afterwards.  I think we can socially distance.  I can't have

3    all of you, but I would like to talk to one from each side and

4    maybe two, OK?

5            MR. ATKINS:  Thank you, your Honor.

6            THE COURT:  Go ahead.

7            MR. DELIKAT:  Your Honor, let me just state on the

8    record, we think this is critical to the point you raised as to

9    whether or not the general information Mr. Lima was exposed to

10   was anything more than what is in here, OK?

11           THE COURT:  And I get it, and I'm with you, and I

12   appreciate the point.  It's loud and clear.

13           MR. DELIKAT:  Let me just call out a couple of other

14   areas on this particular document.

15           THE COURT:  By the way, I'm not cutting you off.  You

16   do what you need to do.

17   BY MR. DELIKAT:

18   Q.  If we go to page 5, the paragraph that begins, "And it's

19   going to be multi-cloud," if you could highlight that.

20           Mr. Zufiria, this is more about Red Hat.  Open Shift

21   is part of Red Hat or how it's known, correct, its methodology?

22   A.  Yes, it's part of the product of Red Hat.

23   Q.  If you look at this paragraph here, it goes into

24   considerable more detail as to how Red Shift (sic) is going to

25   be leveraged or used by IBM, correct?

K7LQibm6                    Zufiria - Cross

1  A.  Is how Red Hat is going to be used by clients, not only
2  IBM.  This is an value for Open Shift is described here.  It is
3  a description of the product.
4  Q.  IBM's mission in acquiring Red Hat was to increase its
5  revenue by having a more complete service offering, correct?
6  A.  No.  It was trying to help clients to construct the future
7  infrastructure in a much more efficient way.
8  Q.  And so it's all about selling these services to the
9  clients.  That's what it's all about, correct?
10 A.  It's about selling a protection, selling a product and
11 selling services, OK?  Selling a product and selling services.
12 Q.  Now, Mr. Lima was not a technical employee, was he?
13 A.  No.
14 Q.  Mr. Lima was in services and in a sales function
15 essentially, correct?
16 A.  Could you repeat the question?  I didn't hear it.
17 Q.  He was in what you call as services, correct?
18 A.  He was in GTS.  He was services.  He was also working in
19 America before so he knew about products, hardware, software,
20 and all the mentions of services of IBM.
21 Q.  But when he worked for you, he was in services, correct?
22 A.  Yes, correct.
23 Q.  And just one more paragraph after this one that we have
24 open, and more about Red Hat creating a new architectural
25 standard that you like, and he gives more details around that.

K7LQibm6                        Zufiria - Cross

1   Do you think the competitor would be interested in hearing

2   about what your plans are for how Red Hat can help your

3   customers?

4   A.   Well, I think this is public knowledge now because this is

5   what we used to market Red Hat.  We say what the product is

6   able to do for our client.

7   Q.   Just one more the document is going to be in evidence, but

8   let's go down to the next answer where it begins, "Yes,

9   Tien-Tsin."  So, in answer to this question, Mr. Foster is

10  talking about the fact that the three-year strategy planning

11  session and presentation was done to Arvind.  Who is Arvind and

12  Ginni?

13  A.   Arvind is the new CEO.

14  Q.   And who is Ginni?

15  A.   Ginni is the former chairman -- current chairman and

16  overseer of IBM.

17  Q.   So, what happened at this meeting was certainly

18  confidential IBM business information, correct?

19  A.   Inside the meeting there was confidential information.

20  Having the meeting is not confidential.

21  Q.   I'm not sure I understand that.  The meeting was not a

22  confidential information, the delivery of the three-year

23  strategy plan?

24  A.   No.  The information that was mentioned in the meeting was

25  confidential.

1   Q.  And he goes on to talk about what the highlights were of

2   the three-year strategy planning session.

3   A.  Yeah.

4   Q.  And what is the big value pool, its intelligent work flows.

5   What is that?

6   A.  Value pool intelligent work flows is that we often said

7   that we believe that corporations should introduce artificial

8   intelligence in the work processes, in the work flow process.

9   That's what we call the cognitive enterprise.

10  Q.  OK.  And if we go to the next page, and this is the last

11  item on page 6.  In the answer, in the middle of the page

12  "Well, first of all."  And then the next paragraph, here

13  Mr. Foster is talking about more acquisitions, correct?  He's

14  talking about the Bluewolf acquisition.  What was that about?

15  A.  This is an acquisition that we had several years ago.

16  Q.  And what about Promontory which was another acquisition?

17  A.  Yeah, I don't remember, but Promontory is another one, yes.

18  Q.  And then in the next paragraph he goes to talk more about

19  Red Hat and how that fits into IBM's acquisition strategy,

20  correct?

21  A.  Yes.

22  Q.  Now, do you recall testifying -- these are yes and no

23  answers.  We'll stop at 5:00, your Honor?

24          THE COURT:  Yes.

25  BY MR. DELIKAT:

K7LQibm6                     Zufiria - Cross

1   Q.  You testified at your deposition that in 2019, IBM's market

2   share in new public cloud services was approximately three

3   percent, correct?

4   A.  Correct, in the total public cloud, not in the enterprises.

5   Q.  But the public cloud you testified was three percent,

6   correct?

7   A.  Yes.  And give me the definition of public cloud.

8   Q.  Well, you were asked the question, you said three percent,

9   and then you also testified that Microsoft's market share of

10  the public cloud was somewhere between 25, 30 to 35 percent,

11  correct?

12  A.  Correct, in the definition, in the broad definition of

13  public cloud, not in the enterprise, and I insisted on that

14  point because those are different markets.

15  Q.  It's true IBM closely follows Microsoft activity in public

16  cloud, correct?

17  A.  No, that's not correct.

18  Q.  OK.  Let's take a look at Exhibit that your counsel put in,

19  Plaintiff's 10.  Let's bring that up.  Can you highlight the

20  below -- that's not the right one.  It's JX-342.

21          THE COURT:  11.

22  Q.  I'm sorry, that was 11.  Thank you.  So, Plaintiff's 11,

23  JX-342, OK?  If we could highlight on September 21, the Ginni

24  Rometty response.  So, Ginni is writing and she is writing here

25  "And note my point.  Do what Microsoft does even if you also

K7LQibm6                    Zufiria - Cross

1   give some cloud for free if necessary, but if it is not used,

2   they owe us."

3          So, it's fair to say Ginni Rometty was the CEO was

4   following what Microsoft was doing in terms of it's "let give

5   away some free cloud to get more business," correct?

6   A.  Yes, correct.  Yeah.

7   Q.  So, when I asked you the question whether or not it was

8   true that IBM closely follows Microsoft activity and how it

9   sells its public cloud, and you said no, how would Ginni know

10  this if she didn't closely follow it?

11  A.  Yes.  Sorry, I misunderstood.  I said whether we followed

12  the strategy.  I mean, I understood we said we do what they do

13  to catch them up or we understand what they are doing, and we

14  analyze what they are doing.  If follow means understand and

15  analyze what they are doing, yes.  They are our competitor, but

16  we don't copy what they do.

17  Q.  And the way this works, Mr. Zufiria, there are GTS clients

18  in private cloud that do not use IBM for their public cloud

19  use, correct?

20  A.  Yes, there are a few, yes.

21  Q.  In fact, Savadel (ph), Broad Ridge, TSB were all IBM

22  clients in the private cloud, their own cloud, correct?

23  A.  Yes, there we have many clients in public cloud because all

24  clients are consuming --

25          THE COURT:  We've lost you.  All clients are consuming

K7LQibm6                     Zufiria - Cross

1    in the future is what was the last the court reporter got down.

2    A.  Yeah, we believe that in the future clients will consume

3    part of their work, the work loads will be international

4    assistance.  Other part will be in private cloud another part

5    will be in public cloud.  How fast and how you balance the

6    different scenarios with the kind of the industry and the

7    status of a given client.  At this moment, international

8    services industry, there are more consumption of private but

9    there is the movement to come to public.

10   Q.  Let's finish up.  If we could go back to the demonstrative

11   that was created by your lawyers, Plaintiff's Exhibit 4.  So

12   let's try to break this down and make it easy.  The cloud is

13   really stored space.  It's like a warehouse, right?  It's where

14   data and software and other things that companies use for IT is

15   stored, correct?

16   A.  Yes, correct.

17   Q.  And these warehouses, you know, can be huge facilities

18   where many pieces of equipment are running to provide that

19   cloud service, correct?

20   A.  Correct.

21   Q.  And clients put their confidential information into this

22   storage facility so they request use it, manage it and

23   otherwise have it available for their own purposes, correct?

24   A.  Some of them, if they're allowed by the regulation and they

25   give enough guarantees of security.  And by the way this is the

1    strength of hybrid public cloud.  That's why it's called

2    enterprise.

3    Q.  So, the cloud business is selling storage space, correct?

4    A.  That's one of the businesses.

5    Q.  Let me ask the next question.  We're running out of time.

6    Let me ask the next question.  Let's look at this document

7    here.  It shows IBM to the left had an integrated we-do-it-all

8    business, correct?

9    A.  Yeah.

10   Q.  But if you look at the cloud providers like Amazon,

11   Microsoft and Google, they are providing the cloud, but it's

12   other companies that are competing with IBM for the service

13   businesses:  Accenture, DXC Technology, Cognizant, HCL,

14   Infosys, Tada (ph) -- these are the Indian companies -- and Why

15   Pro.  Do you see that?

16   A.  Yes, but services bid companies bid for services.

17   Q.  Right, and Microsoft does not have its own services

18   capabilities.  It works with independent companies that provide

19   that service, correct?

20   A.  Yes, correct.

21   Q.  And Microsoft does not have IT service companies like the

22   companies from India.  It works with those as part of a

23   package, but those are all independent companies.  Is that

24   correct?

25   A.  Correct.

K7LQibm6                          Zufiria - Cross

1    Q.  And so the competition on services are really with the

2    companies that are listed here that are not the cloud

3    providers, the competition on services, correct?

4    A.  Yeah, but GTS not a cube at this time to the other

5    services' players because we pay also infrastructure.  We own

6    the assets.  The other players, they don't own the assets.

7    They don't own data centers.  We own the data centers.  We have

8    our own cloud, and we compete with them.  Therefore, we compete

9    always with a combination of public to players and services to

10   players because we have the totality.  We build a new house,

11   and we do the moving of the furniture to the new house while

12   our competitors, some of them built the house, and others do

13   the movement.  We built the house; we do the movement.

14   Q.  If Mr. Lima went to Accenture, you'd have the same problems

15   then if he went to Microsoft, correct?

16   A.  Similar problems.

17   Q.  If he moved to India and he went to work for Infosys, you

18   would have the same problems with him working on Infosys on IT

19   service companies because you do that business, correct?

20   A.  Correct.

21   Q.  But Microsoft does not do the IT service business or the

22   global technology service, correct?  Yes or no.

23   A.  Incorrect.

24   Q.  OK.  We'll end here, your Honor.

25   A.  It's incorrect.

K7LQibm6                    Zufiria - Cross

1           THE COURT:  Mr. Zufiria, we're going to stop the

2    cross-examination now.  It's 5:00 in New York, and I need to

3    let the reporters go, and I need to let the courtroom deputy

4    go.

5           I'm hoping that you won't have any conversation with

6    anybody while you're in the middle of your cross-examination.

7    That would run afoul of the basic premise that the defendants

8    are entitled to cross-examine you until they are completed

9    without interference or conversation with anybody:  Not your

10   significant other, certainly not IBM's counsel.  The only

11   conversation you could have is if something came up in your

12   mind about a privilege or you're worried about an

13   attorney-client privilege or something of that ilk, very

14   serious in your mind, maybe then it would be OK.  But otherwise

15   I would ask you on your oath to talk to no one until we

16   reconvene tomorrow morning.  Is that crystal clear?

17          THE WITNESS:  Your Honor, I understand.

18          THE COURT:  Perfect.  Thank you.  All right.  We will

19   stand in recess until 9:30 tomorrow morning.

20          I would ask counsel to give me a minute.  I need to

21   sign an order, and then I would like to speak to one or two

22   from each side socially distanced.  We can either do it here

23   and ask everybody to go outside or you're welcome into my

24   robing room.  We'll just space out.  Does that work?

25          MR. ATKINS:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.

K7LQibm6                    Zufiria – Cross

1              THE COURT:  Thank you.

2              (Hearing adjourned to July 22, 2020 at 9:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     RANDY I. WALKER

4     Direct By Mr. Signoracci                        12

5     Cross By Mr. McQuade . . . . . . . . . . . . . .70

6     Redirect By Mr. Signoracci . . . . . . . . . 103

7     Recross By Mr. McQuade . . . . . . . . . . . 104

8      JUAN ANTONIO ZUFIRIA

9     Direct Ms. Velazquez . . . . . . . . . . . . 106

10    Cross By Mr. Delikat . . . . . . . . . . . . 157

11                        PLAINTIFF EXHIBITS

12    Exhibit No.                              Received

13     2 and 3 sealed and  . . . . . . . . . . . . .44

14     1   . . . . . . . . . . . . . . . . . . . . .22

15     2   . . . . . . . . . . . . . . . . . . . . .73

16     3   . . . . . . . . . . . . . . . . . . . . .77

17     4   . . . . . . . . . . . . . . . . . . . . 113

18     6   . . . . . . . . . . . . . . . . . . . . 128

19     7   . . . . . . . . . . . . . . . . . . . . 132

20     8   . . . . . . . . . . . . . . . . . . . . 138

21     9   . . . . . . . . . . . . . . . . . . . . 141

22     10  . . . . . . . . . . . . . . . . . . . . 142

23     11  . . . . . . . . . . . . . . . . . . . . 144

24     12  . . . . . . . . . . . . . . . . . . . . 150

25                        DEFENDANT EXHIBITS

```
 1    Exhibit No.                              Received

 2     A    . . . . . . . . . . . . . . . . . . .89

 3     B sealed and    . . . . . . . . . . . . . .98

 4     C sealed and    . . . . . . . . . . . . . 100

 5     D  . . . . . . . . . . . . . . . . . . . 173

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```