UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES CORPORATION,

Plaintiff,

v.

RODRIGO KEDE DE FREITAS LIMA,

Defendant.

Civil Action No. 20-cv-4573

**PLAINTIFF IBM'S POST-HEARING REPLY MEMORANDUM**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Robert A. Atkins
Liza M. Velazquez
Crystal L. Parker
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff*
*International Business Machines Corporation*

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

I. THE LAW OF INEVITABLE DISCLOSURE ..... 2

A. Neither Technical Expertise Nor Bad Acts Are Required ..... 2

B. The Likelihood of Inevitable Disclosure in This Case ..... 3

C. Lima's Arguments Are Contrary to the Evidence and the Law ..... 6

II. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF IBM ..... 9

CONCLUSION ..... 10

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc.* v. *Farrell*,
17-2-15056-8 SEA (Wa. Sup. Ct. King Cnty. 2017) ..... 3

*Amazon.com, Inc.* v. *Szabadi*,
No. 14-2-18167-1 SEA (Wa. Super. Ct. King Cnty. 2014) ..... 3

*Estee Lauder Cos.*, *Inc.* v. *Batra*,
430 F. Supp. 2d 158 (S.D.N.Y. 2006) ..... 2

*IBM Corp.* v. *Papermaster*,
No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ..... 10

*Microsoft Corp.* v. *Miszewski*,
No. 11-2-04589-7 SEA (Wa. Super. Ct. King Cnty. 2011) ..... 3

*Payment Alliance Int'l, Inc.* v. *Ferreira*,
530 F. Supp. 2d 477 (S.D.N.Y. 2007) ..... 3

*Wal-Mart Stores, Inc.* v. *Mullany*,
C.A. No. 6040-VCL (Del. Ch. 2010) ..... 3

**Other Authorities**

8 C.F.R. 214.1(l)(2) ..... 9

8 C.F.R. 214.2(o)(2)(iv)(D) ..... 9

8 C.F.R. 214.2(o)(8)(iii)(A) ..... 9

8 C.F.R. 214.2(o)(8)(iii)(B) ..... 9

8 C.F.R. 248.1(a) ..... 9

8 C.F.R. 274.a12(b)(20) ..... 9



**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

**INTRODUCTION**

Lima argues that IBM is not entitled to injunctive relief unless it can prove that he was a "technical" employee who committed bad acts. That is not the law in New York. Under the inevitable disclosure doctrine, the Court can enjoin Lima because he (1) possesses IBM trade secrets and (2) accepted an offer from Microsoft for a job with (3) substantially similar responsibilities as his IBM roles, thus making it likely that he will inevitably rely on IBM's trade secrets in helping Microsoft compete against IBM.

When viewed under the appropriate legal analysis, Lima's factual assertions - - most of which are contradicted by the evidence - - are not grounds for denying a preliminary injunction:

- Lima admits being privy to confidential information, but claims he was only "incidentally exposed" to such information. But most of the confidential information at issue was authored, presented, reviewed, or owned by Lima himself as part of his responsibilities at IBM.
- Lima claims he was not steeped in the technical details of IBM's FS Cloud. But he knows IBM's competitive strategies for FS Cloud, including IBM's confidential client targets, a prospective FS Cloud anchor client, and the FS Cloud budgets.
- Lima claims (not credibly) that he cannot remember the trade secrets at issue because he received such "massive amounts" of IBM confidential information. But that only proves he was exposed to a lot of confidential information as an IBM executive and corporate leader.
- Lima claims that the confidential information at issue is publicly available. But he admitted that none of that information is in any of the public documents he presented.
- Lima claims there is no competition between IBM and Microsoft because Microsoft does not care about IBM and is not a "services" company. But Lima admitted that Microsoft's strategy in 2020 is to "attack" IBM's enterprise clients, and the evidence shows that Microsoft competes against IBM by partnering with other service companies.

- Lima claims that his proposed role at Microsoft is not "identical" to his roles at IBM because he will be limited to Latin America and will not be involved with IBM's clients. But like his responsibilities at IBM, he will contribute to and implement Microsoft's "global plan" for winning Cloud business away from its competitors, including IBM.

In sum, Lima's defense is to pretend that these rival companies are not competitors, dismiss IBM's trade secrets as forgettable and insignificant facts, and trivialize his former IBM positions and future Microsoft position. None of that can be squared with the fact that both companies view him as among the highest ranking executives, worthy of being paid $19 million (or more) in just a few years. That fact only makes sense because, as the evidence shows, IBM and Microsoft are direct competitors, Lima was and will be entrusted with confidential strategic information related to that competition, and Lima had and will have responsibilities for that competition. This is a paradigmatic case of inevitable disclosure.

## I. THE LAW OF INEVITABLE DISCLOSURE

The standard for a preliminary injunction is set forth in IBM's opening post-hearing brief. (*See* ECF 59 ("IBM Br.") at p. 3.)

### A. Neither Technical Expertise Nor Bad Acts Are Required

The inevitable disclosure doctrine does not require that the employee have technical expertise. In *Estee Lauder Cos.*, *Inc.* v. *Batra*, the court rejected the very argument Lima makes here: that a noncompete should not be enforced against a marketing manager because he "was not the scientist behind the formulas and the development of new products." 430 F. Supp. 2d 158, 175 (S.D.N.Y. 2006). The employee's professed "lack of technical expertise says nothing about whether or not [he] possesses trade secrets and/or protected confidential information." *Id.* The court granted a preliminary injunction based on the risk of inevitable disclosure of *marketing* secrets, holding that the potential harm to the former employer was "not limited to a potential

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION**

replication of its products, but rather could manifest as competitive advantage from knowing the when and how of Estee Lauder's future product introductions." *Id.* at 176.[1]

Microsoft itself has enforced its noncompete against a non-technical marketing executive.[2] Amazon Web Services has also sought enforcement of its noncompetes against non-technical employees.[3] The Delaware Court of Chancery held that claiming not to be "a scientist" does not immunize a senior executive who is "running the corporation" and knows "its strategies and tactics."[4]

Likewise, inevitable disclosure does not require misconduct or bad acts. On the contrary, the court in *Payment Alliance Int'l, Inc.* v. *Ferreira* explained: "even if [the employee] acted with the best of intentions, he may unintentionally transmit information gained through his association with [his former employer] during his day to day contact with his new employer." 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007).

**B. <u>The Likelihood of Inevitable Disclosure in This Case</u>**

The record here proves that Lima possesses competitively sensitive confidential information and, given the similarity of job responsibilities, is likely to inevitably - - even if inadvertently - - use or rely on those trade secrets.

Lima admits to being surrounded by "massive amounts" of confidential information.

---

[1] Similarly, in *Payment Alliance Int'l, Inc.* v. *Ferreira*, the court issued a preliminary injunction to bar violation of a noncompetition agreement by a non-technical executive in the role of Vice President of Operations who was knowledgeable about the marketing of a software application that his former employer had launched, despite the employee's professed "lack of technical knowledge." 530 F. Supp. 2d 477, 481-82, 485 (S.D.N.Y. 2007).

[2] *Microsoft Corp.* v. *Miszewski*, No. 11-2-04589-7 SEA, at 2-3 (Wa. Super. Ct. King Cnty. 2011). (*See* ECF 15-2.)

[3] *See Amazon.com, Inc.* v. *Szabadi*, No. 14-2-18167-1 SEA, Dkt. No. 1 (Wa. Super. Ct. King Cnty. 2014) (strategic partnerships manager) (Signoracci Declaration dated August 7, 2020 ("Signoracci Decl.") Ex. 1); *Amazon.com, Inc.* v. *Farrell*, 17-2-15056-8 SEA, Dkt. No. 1 (Wa. Sup. Ct. King Cnty. 2017) (vice president of cloud sales) (Signoracci Decl. Ex. 2). Lima cites two Amazon cases that did not result in enforcement of the NCA under Washington state law. (Lima Br. at 20-21, 25.) These decisions, paired with the temporary restraining order entered in *Farrell*, show that each NCA case is determined on its own facts. *See* 17-2-15056-8 SEA, Dkt. No. 21 (Signoracci Decl. Ex. 3).

[4] *Wal-Mart Stores, Inc.* v. *Mullany*, C.A. No. 6040-VCL (Tr. 69-70) (Del. Ch. 2010) (Signoracci Decl. Ex. 4).

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

(*See* ECF 64 ("Lima Br.") at 2, *see also id.* at 19.) Yet he claims not to remember most of it, primarily because he was only "incidentally exposed" to it. (*Id.* at 2, 7.) The evidence establishes, however, that the confidential information was not incidental to Lima's job. It was essential to the performance of his executive duties as a leader of IBM.

Most of the confidential information at issue was prepared, reviewed, and/or presented by Lima himself. He ran one of IBM's most important sources of profitability in 2019 and a [REDACTED] billion global business in 2020, comprising IBM's 77 largest clients. (Tr. Zufiria (110:10-11); van Kralingen (248:25-250:12, 278:2-20).) In addition, he participated in executive leadership teams - - such as the Performance Team ("PT") and the Acceleration Team ("AT") - - and strategy meetings of the Board of Directors. Therefore, by way of example:

1. In his 2019 GTS role, Lima *authored* the GTS, North America, Fall Plan and *presented* it to the General Manager of North America. (Ex. 5; Tr. Zufiria (123:8-16).) The information he authored and presented was confidential. (Tr. Zufiria (123:17-124:2).)

2. In his 2020 Global Integrated Accounts role, Lima *authored and presented* the Integrated Accounts "2020 Priorities," including confidential strategies to counter [REDACTED] [REDACTED]. (Ex. 16 at 6-9; Tr. Lima (549:8-16, 551:14-554:20); van Kralingen (292:8-18, 293:25-298:17).) He also was the *owner* of confidential "Actions and Outcomes" relating to Hamilton (FS Cloud) and Project Mystic in the Integrated Accounts.[5] (Ex. 18 at 78; Ex. 19 at 81; Tr. van Kralingen (311:6-314:16, 315:18-316:6, 317:6-17, 319:20-320:19).) And he *received and discussed* with Ms. van Kralingen the Integrated Accounts Fall Plan and other presentations created for her Operating Team. (*See* Exs.

[5] Lima asserts that the Integrated Accounts managing directors did not report to him (Lima Br. at 5), but the sector leaders to which they report were "accountable" to Lima "for their mandate in integrated accounts." (Tr. van Kralingen (335:11-17).) Similarly, Lima's suggestion that his Integrated Accounts role was "eliminated" (Lima Br. at 5) ignores Ms. van Kralingen's testimony that the role [REDACTED]. (Tr. van Kralingen (356:10-358:12).)

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

17, 18, 19; Tr. van Kralingen (306:2-310:25, 314:11-316:6, 318:25-320:19); Lima (586:19-587:15).) Lima admitted that there is confidential information in these documents he authored, presented, discussed, and reviewed. (*See, e.g.*, Tr. Lima (551:16-24, 555:3-7, 589:10-13); *see also* Tr. van Kralingen (293:25-294:15, 311:22-313:7).)

3. In his Performance Team role in 2020, Lima *prepared and presented* at the April 21, 2020 PT meeting a slide deck regarding the Integrated Accounts, which included plans to pursue Hamilton (FS Cloud) and Project Mystic. (Tr. Lima (584:9-586:14).) He also *received and reviewed* a presentation regarding Hamilton and Project Mystic at the April 10, 2020 PT meeting, which included the budget and client targets for Hamilton and Project Mystic, and identified Lima as the Executive Sponsor of certain client targets. (Ex. 2 at 5; Ex. 3 at 17, 20-21; Tr. Walker (14:23-15:2, 48:10-24); Lima (577:19-582:16).) Lima admitted that this information is confidential. (Tr. Lima (579:3-580:15, 584:6-8); *see also* Tr. Walker (41:23-42:7).)

4. Lima *prepared and presented* portions of presentations, and reviewed the speakers' notes, for the September 2019 Board of Directors Annual Strategy meeting on the subject of IBM's Hybrid Cloud strategies. (Ex. 7 at 110-116; Ex. 8; Tr. Zufiria (131:20-132:14, 133:25-137:17).) This information is confidential. (Tr. Zufiria (132:4-14, 137:18-23).)

Lima also argues that some of IBM's trade secrets were publicly disclosed and he does not remember the rest of the secrets. Neither argument is credible. Lima contends that "the limited information he does recall is publicly available," (Lima Br. at 2), including "a considerable amount of detail regarding the FS Cloud . . . ." *Id.* at 9. For support, Lima testified about an FS Cloud "whitepaper" (Ex. Q) and his counsel questioned Mr. Zufiria about the transcript of an IBM analyst call. (Ex. D; Tr. Zufiria (173:21-192:21).) Lima admitted, however, that none of the confidential information at issue - - *e.g.*, the next geographic region in

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION**

which IBM will launch FS Cloud, the next anchor client, the FS Cloud client targets - - was disclosed in those documents. (Tr. Lima (603:3-605:17).)

As for his purported memory loss, the evidence demonstrates that Lima's testimony should not be credited:

- He claims "no present recall" of AT meetings, yet in his declaration he recalled being "made privy" to specific information at the January 2020 AT meeting. (Lima Br. at 8; ECF 17 at ¶ 5.)
- The statements he made in his declaration about his lack of knowledge and involvement with FS Cloud, and his testimony on direct examination that his involvement was "None," were not truthful or forthcoming. (ECF 17 at ¶ 5; Tr. Lima (472:7-10, 595:9-603:2).)
- Lima asks the Court to accept his claimed lack of memory because he "could not be expected to recall" the confidential information. (Lima Br. at 2.) He has that backwards. He *could* be expected to recall that information because it was information that Lima "lived with and engaged and drove and shaped every single day" and, without which, he "couldn't have done his job." (Tr. van Kralingen (306:24-307:3, 320:2-321:8).) And the information in question - - including the FS Cloud client targets, anchor client, and geographies for expansion - - is information Lima can be expected to remember, and admitted that he was made privy to. (Tr. Lima (578:19-580:6).)

**C. <u>Lima's Arguments Are Contrary to the Evidence and the Law</u>**

**1. <u>Microsoft Is a Direct Competitor of IBM</u>**

Lima admitted in his earlier brief that Microsoft competes against IBM. (*See* ECF 30 at 14.) He also admitted to that competition at the hearing. (Tr. Lima (551:16-554:20, 607:12-608:25).) He nonetheless tries to minimize the competition by characterizing IBM as a "services" company and Microsoft as a Cloud company. (*See* Lima Br. at 2, 11, 12.) He disregards, however, the unrebutted testimony that Microsoft competes against IBM in

**SUBMITTED UNDER SEAL CONTAINS CONFIDENTIAL INFORMATION**

technology services by partnering with services companies to bid against IBM for large Cloud engagements. (Tr. Walker (25:5-22); Zufiria (112:3-18).) And *both* companies are in the Cloud business. Lima's own presentations and admissions prove that Microsoft (along with AWS) is [redacted] and that Microsoft was [redacted]. (Ex. 10 at 1; Ex. 16 at 8; Tr. Lima (551:16-554:20); Zufiria (143:8-144:1).) In Microsoft's own assessment, Lima was not confined to services at IBM, but was "tasked with growing revenue and the transformation to Cloud" and his "priorities are focused on improving quality and gaining traction with cloud adoption." (ECF 63-23 (emphasis added).)

**2. Lima's Responsibilities at Microsoft Would Overlap Significantly with His Responsibilities at IBM**

Lima tries to show that his proposed Microsoft job will not overlap with his previous IBM jobs by pointing out trivial differences, like the total number of employees in Latin America and the physical location of the offices. (Lima Br. at 17-18.) He omits all the responsibilities he had at IBM for developing, presenting, and implementing IBM's domestic and global strategy to compete for the Cloud business, and the responsibilities he will have at Microsoft for "contributing to [Microsoft's] global plan" and participating in Microsoft's attack on IBM's client base. (Ex. 28A at 33; Tr. Lima (607:9-608:25); Ex. N (34:14-35:21); IBM Br. at 8-13.)

He likewise omits from his job comparison chart (on the IBM side) his participation on the PT and the AT and at the Board of Directors Strategy meeting, all of which involved him in discussions with the CEO and Chairman, as well as the SVPs, about IBM's global and company-wide strategies. (*See* IBM Br. at 10-11, 17, 19-20.) And he omits from his chart (on the Microsoft side) his participation in Microsoft's global leadership teams, which he could not deny are involved in setting Microsoft's global priorities. (Tr. Lima (610:24-611:17, 617:5-9); *see also* Ex. N (35:22-37:11).)

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

Thus, Microsoft itself does not view Lima as a bookkeeper - - and certainly has offered to pay him a lot more than a bookkeeper's salary. (Ex. 21 at 14-16.)[6] Based on their interviews of Lima as a candidate for a high-ranking position, executives at Microsoft reported that Lima had

[REDACTED]

[REDACTED]

[REDACTED] (ECF 63-25 at 3 (emphasis added); ECF 60 at 3 (¶2).)[7]

Lima suggests the overlap will be eliminated because he promises not to be involved with IBM's Integrated Account clients. (Lima Br. at 17.) But the risk that Lima will use the secrets he knows about IBM's competitive strategies for *all* clients will not be mitigated by Lima walking out of meetings about *some* clients - - even if Microsoft could police such an unworkable and unrealistic restriction. (*See* IBM Br. at 14-15, 19.)

### 3. IBM's Trade Secrets Would Be Valuable to Microsoft

Lima claims that IBM's trade secrets are "not valuable to Microsoft because Microsoft, not IBM, is a leader in the cloud computing market." (Lima Br. at 20.) He overlooks, however, the evidence that the Cloud market is still in its early stage (only 20% of workloads have moved to the Cloud), and his own statements while at IBM and his own admissions in court that Microsoft has targeted IBM's clients. (Ex. 16 at 8; Tr. Walker (22:11-24:6, 25:24-26:9); van Kralingen (256:22-258:6); Lima (551:16-554:20, 607:12-608:25).) It follows that Microsoft would find it valuable to know IBM's confidential plan for countering that attack. Moreover, the unrebutted testimony proves that IBM is the leader in enterprise clients, and Lima knows confidential details about IBM's strategy to promote its FS Cloud offering to win business from

---

[6] As Mr. Zufiria explained, Lima was not a mere bookkeeper, but was expected to "create the change that" IBM wanted in the Integrated Accounts position. (Tr. Zufiria (224:11-17); *see also id.* van Kralingen (269:10-270:1).)

[7] Microsoft also described Lima as "a leader of extraordinary ability in business and technology." (Ex. 28A at 33.)

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

those clients - - all of which would be valuable to Microsoft. (Tr. Walker (22:24-29:23).)

Indeed, sensitive about his knowledge of confidential information, Lima argues that "Microsoft already offers cloud products specifically designed for financial firms." (Lima Br. at 10.) Lima offered no proof or explanation of that. But assuming it were true, it just shows that Microsoft is in head-to-head competition for financial services firms and, logically, would be interested in IBM's plans to win those enterprise clients, including IBM's confidential client targets and proprietary contracting strategies (*e.g.*, Project Mystic).[8]

## II. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF IBM

Lima claims that if an injunction is entered, "he and his family will be required to return to Brazil indefinitely." (Lima Br. at 13.) Lima cites 8 C.F.R. 214.2(o)(8)(iii)(A), which suggests that the U.S. government *might* send Microsoft a notice of intent to revoke Lima's O-1 visa if he is not employed in the capacity discussed in the O-1 petition. But even if Microsoft did receive such a notice, Lima would have several options to stay in the U.S.: *first*, there would be a 30-day grace period for Microsoft to rebut the noticed revocation with proof it has given Lima another job (8 C.F.R. 214.2(o)(8)(iii)(B)); *second*, Lima would have a 60-day grace period to apply for a different visa should his employment with Microsoft cease prior to the end of his O-1 term in 2023 (8 C.F.R. 214.1(l)(2)); *third*, Microsoft easily could place Lima in a different, non-competitive position (while keeping him on its payroll) and amend its O-1 petition (8 C.F.R. 214.2(o)(2)(iv)(D), 8 C.F.R. 274.a12(b)(20)); and *fourth,* Lima could file an application to change his status from holding an O-1 visa to holding a B-2 tourist visa, which he has obtained. (Tr. Lima (415:19-416:2); 8 C.F.R. 248.1(a); *see* INS Memorandum, "No Unlawful Presence While EOS/COS Pending" (Mar. 3, 2000), published on AILA InfoNet at Doc. No. 00030773, *available at* https://www.aila.org/infonet/ins-no-unlawful-presence-while-eos-cos-pending.)

[8] It is noteworthy that Lima does not deny knowing confidential information about Project Mystic.

In any event, Lima is a citizen of Brazil, owns two residential properties in Brazil, has a $1.7 million investment fund in Brazil, and already accepted an offer from Microsoft to work in Brazil. (Tr. Lima (459:19-21, 540:23-541:8); Ex. O at 3.) On June 2, 2020, Lima agreed to take the job as Microsoft's CVP, LATAM, and move to Brazil for at least one year. (Ex. O at 1, 3.) He did not decline or object, even though he knew he would lose the visa associated with his employment at IBM, and thus might need to move his family from Connecticut, and even though Covid-19 was already plaguing Brazil. The immigration, health, and legal (NCA) consequences of resigning from IBM were inherent in Lima's decision to leave the company. Going back home to Brazil was always a prospect, which is why he told Ms. van Kralingen of his desire to do so (Tr. van Kralingen (276:16-277:8)), readily agreed with Microsoft to do so (Ex. O at 3), and never mentioned any of these purported concerns in his declaration or brief in opposition to the TRO (June 18, ECF 16, 17), the hearing on the TRO (June 19), the hearing on the extension of the TRO (July 6), his deposition (July 9), or his pre-hearing brief (July 13, ECF 30) - - just one day before the originally scheduled hearing.

The threat to IBM from Lima working as Microsoft's CVP, LATAM, and thus inevitably using IBM's trade secrets in competition against IBM, outweighs any alleged hardship Lima would face if he is enjoined from starting that job for another ten months. *See IBM Corp.* v. *Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at *13 (S.D.N.Y. Nov. 21, 2008) ("IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple.").

## CONCLUSION

IBM respectfully requests that the Court enter a preliminary injunction enjoining Lima from commencing employment as Microsoft's Corporate Vice President, Latin America, or otherwise performing services for Microsoft in violation of his NCA, prior to May 20, 2021.

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

Dated: New York, New York

August 7, 2020

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: *Pietro J. Signoracci*
Robert A. Atkins
Liza M. Velazquez
Crystal L. Parker
Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**