UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Plaintiff,

v.

RODRIGO KEDE DE FREITAS LIMA,

        Defendant.

Case No. 7:20-cv-04573-PMH-PED

---

## **DEFENDANT'S POST-HEARING REPLY BRIEF**

Michael Delikat
James H. McQuade
Mark Thompson
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

Robert N. Holtzman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Attorneys for Defendant Rodrigo Kede de Freitas Lima

# TABLE OF CONTENTS

**Page**

I.     IBM HAS FAILED TO SHOW THAT THE NCA IS ENFORCEABLE ......................... 2

II.    IBM HAS FAILED TO PROVE INEVITABLE DISCLOSURE .................................... 5

     A.    IBM Has Misstated the Relevant Level of Competition Between IBM and Microsoft ................................................................................................................ 5

     B.    The CVP, LatAm Role Is Not Nearly Identical to Lima's Recent IBM Roles ...................................................................................................................... 6

     C.    IBM's "Trade Secrets" Would Not Be Valuable to Microsoft and Lima ............. 8

     D.    Lima Was Not a Technical Employee or "Bad Leaver" …………………….......10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AM Medica Commc'ns Group v. Kilgallen,*
  90 F. App'x 10 (2d Cir. 2003) ...................................................................................................3

*BDO Seidman v. Hirshberg,*
  93 N.Y.2d 382 (1999) ...............................................................................................................2

*DS Parent, Inc. v. Teich,*
  No. 5:13-CV-1489 ......................................................................................................................8

*Flatiron Health, Inc. v. Carson,*
  No. 19 CIV. 8999 (VM), 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020) ...............................3

*LinkCo, Inc. v. Fujitsu Ltd.,*
  230 F.Supp.2d 492 (S.D.N.Y. 2002) ........................................................................................8

**Other Authorities**

8 C.F.R. 214.2(o)(8)(iii)(A) .............................................................................................................4

4131-6078-1350.11

## <u>INTRODUCTION</u>

IBM concedes that its entire case is based on the disfavored doctrine of inevitable disclosure. But the competent evidence establishes that Lima does not possess, remember, or have any use for IBM's confidential information that he incidentally was exposed to, and Microsoft has absolutely no use for IBM's strategies as IBM ████████████████ to look more like Amazon, Microsoft and Google in the so-called battle for the cloud which is at the center of IBM's allegations. To save its claims, IBM uses its post-hearing brief to mischaracterize the testimony and admitted exhibits or relies on purely speculative and without foundation statements by IBM witnesses that the huge number and variety of alleged confidential documents that Lima was exposed to over the last two years of his IBM career somehow remain "in his head" to somehow be used in his new role, although it is undisputed that Lima did not take any of those documents, and IBM has not shown that Lima will have any use for them in his new role as CVP, LatAm.[1]

IBM has not carried its burden with respect to any of the elements of an inevitable disclosure claim. For example, even though there may be some competition between IBM and Microsoft across the vast array of technology services they both offer, the link to an inevitable disclosure claim is missing. IBM has failed to show how Lima's work as CVP, LatAm will result in any unfair competition between IBM and Microsoft. The link is also missing because the role of CVP, LatAm is not "nearly identical" to Lima's recent roles at IBM—GM, GTS, N.A. and GM, IA. Finally, the link is missing because any alleged confidential information in Lima's head would be competitively useless in his role as CVP, LatAm as a result of the voluntary restrictions placed on the role at Microsoft and because Microsoft does not want or need IBM's information— Microsoft is a leader in cloud; IBM is playing catch-up. In fact, one of the most powerful

---

[1] The abbreviated terms herein shall have the same meaning as the terms in Defendant's Post-Hearing Brief ("Lima Br.").

contemporaneous statements made in this case which captures the essence of why that link is missing came from a Microsoft executive during the recruitment process who wrote that for Lima to be successful at Microsoft, he would "need to unlearn 20+ years" of IBM knowledge. There can be no stronger statement that there can be no inevitable or inadvertent disclosure where information someone possesses is totally useless to his new employer.

## ARGUMENT

## I.   IBM HAS FAILED TO SHOW THAT THE NCA IS ENFORCEABLE

IBM fails to acknowledge that, to prevail on its breach of contract claim, it must prove that the NCA is enforceable. In the employment context, a restrictive covenant will only be subject to specific enforcement if it is: (1) necessary to protect the employer's legitimate interests; (2) reasonable in time and area; (3) not unreasonably burdensome to the employee; and (4) not harmful to the general public. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999). New York courts "strictly" apply a high standard for the enforceability of employment restrictive covenants "to limit enforcement of broad restraints on competition." *Id.* IBM has not met its burden.

IBM has not demonstrated that the NCA is no greater than required for the protection of its legitimate interests. IBM has not presented sufficient evidence showing that Lima possesses "trade secrets" or confidential information. It is undisputed that Lima has no current physical access to IBM information. Tr. 506:9-507:17. With respect to IBM information allegedly residing "in his head", Lima testified that he has no present recollection of the details of the voluminous and months-old information presented at the preliminary injunction hearing by IBM. Lima Br. at 7-12. IBM has adduced **no evidence** to contradict that Lima does not recall this information. In fact, the testimony of IBM's own witnesses make clear that this voluminous and months-old information is not easily retained. Tr. 71:3-9; 72:11-73:2; 81:10-82:19. That Lima may have been exposed to this information months ago does not change the undisputed fact that he does not

2

currently recall the details of it. Tr. 81:22-82:19 (Randy Walker admits he has no personal knowledge of what Lima remembers from his employment at IBM).

Further, enforcement of the NCA to protect information related to the IAs is greater than necessary because Lima will be walled off from these accounts during the 12 months following his resignation from IBM. In response to this restriction, IBM argues that "trade secrets Lima learned in his executive roles at IBM encompass IBM's company-wide strategies to compete against Microsoft around the globe, in every industry, in every product line, and at any client or potential client."[2] IBM Br. at p. 14. This argument is meritless because it would unlawfully restrict Lima from working for Microsoft anywhere in the world. *See, e.g.*, *AM Medica Commc'ns Group v. Kilgallen*, 90 F. App'x 10, 11 (2d Cir. 2003) (finding under New York law that an employment restraint extending "anywhere in the world" to be unreasonable). Moreover, the argument is not supported by evidence—the testimony cited by IBM that information relating to IBM's 77 top accounts is directly applicable to all of IBM's clients including its tiniest clients anywhere in the world is vague, not credible and unsupported by a single document. Lima credibly testified that this simply is not the case. Tr. 536:10-25. *Compare* Tr. 252:19-253:16 *with* Tr. 536:10-25.

IBM also argues that "Lima presented no evidence of how Microsoft could police or enforce" the restriction. Lima, however, did testify as to how the restriction would be enforced by him and Microsoft. Tr. 514:4-12; 619:7-13; 619:23-620:1; 620:15-19. But in any event, it is IBM's burden to show that the restrictions are inherently suspect or impossible to enforce, and IBM has offered not a single piece of evidence to demonstrate this. *See Flatiron Health, Inc. v. Carson*, No. 19 CIV. 8999 (VM), 2020 WL 1320867, at *26 (S.D.N.Y. Mar. 20, 2020) (noting that similar

---

[2] IBM has failed to demonstrate that its alleged confidential information constitutes "trade secrets" under the law. This is made plain by the fact that IBM attempts to rely on evidence outside the hearing transcript and hearing exhibits to satisfy the test. *See* IBM Br. at p. 15 n.3. IBM had its chance to prove that its alleged confidential information constituted trade secrets at the hearing. It failed to do so.

3

restrictions were "not novel or inherently suspect.").[3]

Finally, the NCA is unreasonably burdensome for Lima because if enforced as written, Lima and his family's health and well-being and his children's education will be placed in jeopardy. Lima Br. at pp. 13-14. If Lima cannot work in the role of CVP, LatAm—"the capacity specified in the [O-1 visa] petition" Lima's immigration status will be revoked and he and his family will have to return to Brazil. 8 C.F.R. 214.2(o)(8)(iii)(A).[4] He simply cannot be placed in another role by Microsoft.

IBM makes much of Lima's proposed compensation at Microsoft. IBM, however, fails to note that the compensation will only be achieved if he hits 100% of his objectives, which he obviously cannot do if he is not working in the role. Tr. 631:7-13. Moreover, the evidence at the hearing made clear that Lima's motivation to leave IBM and join Microsoft was not money—he would have earned more at IBM if he would have stayed at IBM. *Id*. IBM cannot hold Lima's right to earn a living for himself and his family against him in the year following his resignation from IBM, especially considering that IBM removed the provision in Lima's previous NCA, which would have paid him his base salary for the year following the conclusion of his employment with IBM. Tr. 383:13-19; Ex. F at ¶ 4; Ex G.

For the reasons detailed above and in Lima's previous filings, IBM has failed to show that the NCA is enforceable.

---

[3] IBM points to an email sent by a Microsoft employee after it was announced Lima was joining the company in which the employee stated that he wanted to "'chat, sync and share perspectives'" with Lima about global accounts including Citibank, Bank of America, and JP Morgan Chase – each of which is an IBM [IA]." IBM Br. at p. 15. This, however, reinforces the fact that Lima will abide by his restrictions as he did not respond to the email.

[4] While Lima originally thought he would have to spend a few weeks in Brazil without his family after joining Microsoft while his immigration status got worked out, circumstances have changed. If Lima and his family are required to move back to Brazil, due to the travel ban, there is no set date that they can return to the U.S. which puts their health and well-being at risk. Tr. 408:18-411:16; 424:1-15; 426:15-18; 427:4-10; 427:20-22.

## II.  **IBM HAS FAILED TO PROVE INEVITABLE DISCLOSURE**

IBM contends that the inevitable disclosure doctrine should apply here because: (1) Microsoft is a "direct competitor" of IBM; (2) the role of CVP, LatAm is "nearly identical" to Lima's recent roles at IBM; and (3) IBM's trade secrets would be valuable to Microsoft.  For the reasons detailed below, IBM's arguments are meritless.

### A.  **IBM Has Misstated the Relevant Level of Competition Between IBM and Microsoft**

IBM relies on vague and ambiguous statements made by non-testifying witnesses and a misrepresentation of evidence in making its "direct competitors" argument. IBM first points to a presentation prepared by Lima titled "Integrated Accounts – 2020 Priorities." IBM Br. at pp. 17-18. IBM mischaracterizes this document as the "priorities for ███████████████████ ████████████████████ *Id*. at 1. When in fact, ████████████████████████ ████████████████████████████████████████████████████ Tr. 552:24-553:5. Microsoft does not sell mainframes. Tr. 511:9-513:8 (Microsoft does not sell z15 mainframe computers or other similar equipment). Lima further testified clearly that the attack he was referencing was from "the services companies" such as Accenture—**not Microsoft**. Tr. 553:22-554:3. In any event, this document refers to priorities for the IAs—clients that Lima will have no involvement with at Microsoft until May 15, 2021.

Next, IBM points to an email dated January 14, 2020 from Laurence Haziot (Lima's predecessor in the role of GM, IAs) , stating ████████████████████████████ ████████████████████████████████████████████████████ ██████████████ IBM Br. at p. 7. With no testimony from Haziot as to what she meant, the mere fact that Microsoft's Azure cloud stack may appealing to banks is far from being a statement that the two are serious competitors on this product. The undisputed facts remain that the "intersection of

5

competition" between IBM and Microsoft is small. Tr. 466:12-467:22. IBM simply doesn't sell many of types of products that Microsoft sells (LinkedIn, Office, Excel, Outlook) and Microsoft is undisputedly not in the business that constitutes two thirds of IBM's revenues—services. *Id.*

### B.     **The CVP, LatAm Role Is Not Nearly Identical to Lima's Recent IBM Roles**

IBM admits that in order to meet its burden of proof with respect to the inevitable disclosure doctrine, it must show that Lima's new role with Microsoft is "**nearly identical**" to his most recent roles at IBM as GM, GTS, N.A. and GM, IA. IBM Br. at p. 5. IBM has failed to meet its burden of proof. As set forth in great detail in Lima's Post-Hearing Brief (p. 17-18), it simply cannot be said that the positions of GM, GTS, N.A. and GM, IAs and CVP, Lat Am are "nearly identical."

**In fact, the only IBM role that could be considered to be similar in scope and responsibilities to the position that Lima has accepted with Microsoft is the position of GM, LatAm that Lima held from January 2016 to July 2017**. Tr. 95:10-23 (Testimony of Randy Walker stating that Lima's proposed Microsoft role is similar in scope and responsibilities to the role held by IBM's current GM of LatAm). But IBM has abandoned any argument that a role he held over three years ago has any relevance to its claims.

The chart below, which closely analyzes IBM's chart of alleged similarities between Lima's recent roles at IBM and his role as CVP, LatAm (IBM Br. pp. 13-14), makes clear that no similarities actually exist and Lima's recent IBM roles are "vastly different" (OP at ¶ 8) from his proposed role at Microsoft, and there is "almost zero overlap" between the roles. Ex. N at p. 22-23 (78:20-79:13).

| IBM's Alleged Similarity | Proof That No Actual Similarity Exists |
|---|---|
| **IBM: Contribute to global strategy**<br><br>**MSFT: Contribute to the global plan** | Lima was not responsible for developing "global strategy" in his roles as GM, GTS, N.A. and GM, IAs. In his role as GM, GTS, N.A., Lima's contribution to strategy was limited to development of strategy for IBM's service business, a business which Microsoft does not compete, in North America only. Tr. 117:8-14; 269:10-270:1. Furthermore, in his role as GM, IAs, Lima was not responsible for IBM's overall global strategy—this was a bookkeeper/coordinator position focused on the financial performance of IBM's IAs only. Tr. 225:3-9; 248:25-250:18; 512:10-22. Further, Lima will NOT contribute to Microsoft's global strategy in the role of CVP, LatAm and he will only be responsible for executing Microsoft's global strategy in LatAm, which is set by others. Tr. 463:1-3; OP at ¶¶ 9, 11. Finally, the reference to Lima's contribution to the "global plan" at Microsoft in his O-1 visa application refers to the strategy within Lima's supervisor's organization—not the overall global sales strategy for Microsoft. As Lima testified "there is a difference." 616:24-617:4. |
| **IBM: Report to SVP who reports to CEO**<br><br>**MSFT: Report to EVP who reports to CEO** | Lima reported to SVP Juan Zufiria, who reported to the CEO, while in the role of GM, GTS, N.A, but that is no longer the reporting structure for the role. Zufiria no longer reports to the CEO, he reports to another SVP, Mark Foster. Tr. 106:24-107:1; 158:9-159:14. Furthermore, although Lima reported to SVP Bridget Van Kralingen in the position of GM, IAs, that reporting structure was not commiserate with the bookkeeping/coordinator responsibilities or importance of the position, which was eliminated upon Lima's resignation. Ex. B; Ex. C. |
| **IBM: Participate in global leadership teams including PT, AT, and Global Integrated Accounts Leadership Team**<br><br>**MSFT: Participate in global leadership teams including GSMO LT, OCLT, and LATAM LT** | IBM has failed to prove that the leadership teams that Lima was involved with at IBM are "nearly identical" to the leadership teams he will allegedly be a part of at Microsoft. According to IBM (the cited evidence does not support the statement), the GSMO LT and OCLT at Microsoft "include discussions of the priorities for Microsoft's global sales strategy," IBM Brief at p. 13. PT however, is focused on performance of the company and the AT is focused on growth, not strategy. Tr. 14:21-15:5; 520:1-9. The IBM team that is focused on strategy, is IBM's Strategy Team, which Lima was not a member of since 2016-17. Tr. 520:10-521:2. Furthermore, the Global IAs Account Leadership Team and the LatAm Leadership Team are not "nearly identical"—only two IAs are located in LatAm and in any event, Lima will have no involvement with IBM's IAs in the role of CVP, LatAm. Tr. 513:11-16; 515:15-17. |
| **IBM & MSFT: Coordinate work and support general managers in sales, including Cloud** | First, in the role of CVP, Lat Am, Lima will responsible for more than just "coordinating work and support[ing GMs]." He will be responsible for directly managing country GMs. Ex. 28. Second, in the role of GM, GTS, N.A., Lima was responsible exclusively for sales of services (an area in which Microsoft does not compete)—he had no cloud responsibility. Tr. 466:20-467:22. Third, with respect to the GM, IAs role, only 1% of the IA revenue comes from public cloud and Lima will have no involvement with IBM's IAs in the role of CVP, LatAm in any event. Tr. 326:18-20. |
| **IBM &MSFT: Responsible for winning sales, including in Latin America** | Lima was NOT responsible for winning sales and revenue in LatAm in the role of GM, GTS, N.A. Lima was responsible for winning sales and revenue in North America (U.S. and Canada) only with respect to IBM's service business, a business which Microsoft undisputedly does not compete. Tr. 269:10-270:1; 348:22-349:2. In the role of GM, IAs, Lima was accountable for the revenue of the IBM IAs, but had no managerial authority or responsibility to affect sales and revenue. Tr. 393:7-394:2; OP at ¶ 2. Furthermore, only two IAs are located in LatAm and in any event, Lima will have no involvement with IBM's IAs in the role of CVP, LatAm. Tr. 513:11-16; 515:15-17. |
| **IBM& MSFT: Responsible for sales and revenue including in Latin America** | |

7

4131-6078-1350.11

### C.    **IBM's "Trade Secrets" Would Not Be Valuable to Microsoft and Lima**

IBM also failed to establish that its alleged "trade secrets" or confidential information would be valuable to Microsoft and Lima because the details of such information are not in Lima's possession or in "his head." To the extent Lima does recall any details of IBM information, that information would not be valuable in his new role at Microsoft for the reasons detailed below.

**FS Cloud:** IBM argues that Lima was exposed to strategies regarding its "industry leading" FS Cloud as well as particular client targets for the FS Cloud, including an "anchor" client in a particular region at PT meetings[5], which would somehow be useful to Lima in his role of CVP, LatAm. IBM Br. At pp. 19-20. With respect to FS Cloud strategies, IBM has failed to offer proof of a specific, actionable strategy regarding FS Cloud that Lima was purportedly exposed to. IBM's professed desire to sell its cloud offerings to its financial services customers is not a specific, actionable strategy. *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 499–500 (S.D.N.Y. 2002) (noting that "information consisting simply of business possibilities or goals is not a trade secret"). Nor is Laurence Haziot's ambiguous and unexplained statement that ███████████████████ ███████████████████████ a specific, actionable strategy.[6] *DS Parent, Inc. v. Teich*, No. 5:13-CV-1489 LEK/DEP, 2014 WL 546358, at *8 (N.D.N.Y. Feb. 10, 2014) (denying motion for preliminary injunction and finding that it was unlikely that plaintiffs would prevail on their claim for breach of non-competition agreement because non-specific "strategic" communications and plans, including the need to create "awareness" of plaintiff's products, did not constitute a protectable trade secret). Lima further testified that this email was not confidential. Tr. 499:1-5.

---

[5] Other than information regarding the FS Cloud and information regarding the IAs, IBM does not contend that Lima was exposed to any other specific alleged confidential information at AT or PT meetings. In addition, much of the information regarding IBM's FS Cloud has already been publicly disclosed including some highly technical information. Ex. Q at 6.

[6] Considering IBM witness Juan Zufiria testified that Haziot served as merely a "bookkeeper" in the role of GM, IAs, it strains belief that she would be the creator and communicator of any specific, actionable IBM strategy. Tr. 224:11-225:9.

Moreover, IBM has failed to offer any evidence that Microsoft has any use for IBM's self-proclaimed strategies. In fact, Microsoft is already offering cloud products to its financial services clients and is more successful than IBM in the cloud space. Tr. 193:1-14; 482:3-483:7.

███████████████████████████████████████████████████████████

████████████████████████████████████ Lima will have no involvement with for 12 months[7], and IBM has failed to adduce any evidence that Microsoft competes with IBM for business with respect to the one "client target", which is not an IA or a PEP client account.[8]

**GTS N.A. 2020 Fall Plan:** IBM argues that information Lima may recall from the GTS N.A. Fall Plan is useful to Lima and Microsoft because "Microsoft often partners with a Cloud services provider, like Accenture, in order to compete against IBM's combined Cloud and Cloud services offerings." IBM Br. at p. 7. There is no evidence in the record establishing that Microsoft and its independent partners, like Accenture, share information between them, especially information like that contained in the GTS N.A. Fall Plan regarding services.

**September 2019 Board Meeting:** IBM makes unsupported generalizations that Lima, who was present for a small part of the 2019 Board meeting, was somehow privy to "confidential corporate strategies, including in Cloud" at that meeting. IBM Br. at p. 7. To buttress this argument, IBM claims that Lima presented to IBM's Board on "Hybrid Cloud" at the meeting, but neglects to mention that the presentation title was "**<u>Services</u>** in Hybrid Cloud", an area in which Microsoft does not compete. Ex. 8. Furthermore, Lima testified, and the presentation itself makes clear, that he did not give the presentation and only spoke for one minute as part of a panel discussion. *Id*;

---

[7] IBM's allegation that Lima participated in ██████████████ regarding AT&T in 2019 simply is not true. Lima did not work with AT&T during the last years of his employment at IBM. Tr. 518:5-519:25. In any event, AT&T is an IA that Lima will be walled off from in his role of CVP, LatAm for Microsoft is AT&T. Dkt. 17 at ¶ 6.
[8] The Court has the discretion to add that one client to the list of IA and PEP clients that can become a part of an order that Lima will have no involvement with those clients for 12 months following his resignation from IBM.

Tr. 488:24-489:5; 491:3-492:20.

In any event, IBM has failed to articulate how the unspecified "confidential corporate strategies, including in Cloud" from 2019 will be useful in his role as CVP, LatAm. IBM, ██ ████████████ is chasing Microsoft in cloud computing, not the other way around. Tr. 50:21-52:9; Tr. 370:13-17 (B. Van Kralingen acknowledging that ███████████████████ ██████████████████████████. This is perhaps best exemplified by IBM's Chairman and then-CEO's internal email dated September 21, 2019, in which she ████████████████ ████████████████████████████████████████████████████ Tr. 193:22-194:6; Ex. 11.

**IA Information:** As explained above, information Lima was allegedly privy to regarding the IAs, will not be competitively useful to Lima in his role as CVP, LatAm because he will be restricted from these accounts during the 12 months following his resignation from IBM.[9]

### D.   Lima Was Not a Technical Employee or a "Bad Leaver"

Finally, IBM does not even attempt to argue that the inevitable disclosure doctrine should apply because Lima is a highly technical employee or that he was a "bad leaver" who cannot be trusted. This is no doubt because it cannot. The undisputed evidence makes clear that Lima was not a technical employee—he was a general manager. OP at ¶ 4. The undisputed evidence also establishes that Lima's resignation was "by the book" and that Lima is a trustworthy person. Tr. 102:11-17; 154:21-25; 232:17-25; 355:6-8.

---

[9] In its post-hearing brief, IBM appears to have abandoned its allegation that Lima currently knows actionable confidential information that would be useful in his new role regarding Red Hat. This is no doubt because IBM had no evidence to support this allegation just as it failed to prove its other allegations in this case as detailed above.

Dated August 7, 2020

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: /s/ Michael Delikat

Michael Delikat
James H. McQuade
Mark Thompson

51 West 52nd Street
New York, NY 10019
(212) 506-5000
mdelikat@orrick.com
jmcquade@orrick.com
mthompson@orrick.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Robert N. Holtzman
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100
rholtzman@kramerlevin.com

*Attorneys for Defendant Rodrigo Kede de Freitas Lima*

11