UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
INTERNATIONAL BUSINESS
MACHINES CORPORATION,

                   Plaintiff,

v.

RODRIGO KEDE DE FREITAS LIMA,

                   Defendant.
--------------------------------------------------------X

**OPINION AND ORDER**

7:20-cv-04573 (PMH)

PHILIP M. HALPERN, United States District Judge:

     Plaintiff International Business Machines Corporation ("IBM" or "Plaintiff") moves pursuant to Fed. R. Civ. P. 65 for a preliminary injunction, seeking to enjoin Defendant Rodrigo Kede De Freitas Lima ("Mr. Lima" or "Defendant") from, *inter alia*, commencing employment at Microsoft Corporation ("Microsoft") as Corporate Vice President for Latin America. For the reasons set forth below, Plaintiff's application for a preliminary injunction is GRANTED.

## BACKGROUND

     On June 15, 2020, IBM filed its Complaint alleging claims for breach of contract, misappropriation of trade secrets, and declaratory judgment concerning rescission of Defendant's equity award. (Doc. 1, "Compl."). On June 18, 2020, Plaintiff moved by way of Order to Show Cause for a preliminary injunction and a temporary restraining order. (Docs. 12-15). Defendant opposed the application. (Docs. 16-18). On June 19, 2020, after the Court heard oral argument concerning the temporary restraining order, I signed an Order to Show Cause as to why a preliminary injunction should not be ordered to bar Mr. Lima from, *inter alia*, working for Microsoft; and granted a temporary restraining order which prohibited Mr. Lima from commencing employment at Microsoft in violation of his Non-Competition Agreement with IBM,

soliciting certain customers of IBM, and retaining, using, or disclosing IBM confidential or proprietary information. (Doc. 12, "TRO"). The TRO was extended three times for good cause shown and until the hearing on IBM's motion for a preliminary injunction concluded, and to provide the Court with an opportunity to review the voluminous record and issue this Opinion and Order. The parties conducted expedited discovery and submitted pre-hearing briefs and declarations on July 13, 2020. (Docs. 27, 29-33, 36). The Court conducted an evidentiary hearing on the motion for a preliminary injunction and heard testimony over the course of three days.[1] Thereafter, the parties submitted offers of proof, post-hearing briefs, declarations, and opposition thereto. (Docs. 58-64, 66-68, 71). A summary of the significant evidence adduced during the preliminary injunction motion and hearing process is set forth below.

I.      The Parties' Proof

Mr. Lima worked at IBM for approximately 25 years. (Tr. at 378:11-25, 379:1-9, 380:3-5, 385:14-16, 390:16-19; Doc. 17, "Lima Decl.," ¶ 2). In 2010, Mr. Lima took over IBM's Global Technology Service ("GTS") organization in Brazil, and then became General Manager of IBM in Brazil until 2015. (Tr. at 379:6-9). Mr. Lima left IBM for approximately one year, and, in January 2016, returned to IBM in Brazil as General Manager for Latin America. (Tr. at 380:8-16). In July 2017, Mr. Lima accepted the role of General Manager, GTS, North America (specifically, the United States and Canada). (Tr. at 385:14-21; Lima Decl. ¶ 31). In January 2020, Mr. Lima became General Manager of Integrated Accounts, until his resignation on May 18, 2020. (Lima Decl. ¶ 33). From 2016 until his resignation in May 2020, Mr. Lima was a member of IBM's Performance Team. Mr. Lima was also a member of IBM's Acceleration Team. (Lima Decl. ¶¶ 16, 18). Mr. Lima was a "Band A" executive, which IBM describes as the highest rank below the

---

[1] Citations to the transcript of proceedings held before me on July 21, 22, and 28, 2020 will be referred to herein as "Tr.".

Senior Vice President level. (Compl. ¶ 5; Doc. 49, "Answer," ¶ 5). As relevant to IBM's instant application, on December 3, 2019, Mr. Lima executed a Non-Competition Agreement in connection with his employment as a Senior Executive at IBM. (Answer ¶¶ 4, 44; Def. Ex. G;[2] Doc. 1-1, "Non-Compete").

For its case at the preliminary injunction hearing, IBM called Randy I. Walker, Juan Antonio Zufiria, Bridget van Kralingen, and Mr. Lima as witnesses.[3] IBM's witnesses testified in sum and substance that Mr. Lima's positions at IBM gave him knowledge of and made him responsible in part for preparation and/or presentation of IBM's confidential information and trade secrets, particularly concerning its strategies for the cloud computing market, the financial services cloud, integrated accounts, strategies to compete with Microsoft, development of new "cloud" offerings to compete with Microsoft, financial plans, budgets, revenue and growth targets, and client targets. The testimony also established that he received, reviewed, participated in and, in some circumstances, created confidential information on behalf of IBM. Further, the testimony established that Mr. Lima's knowledge as a result of his roles at IBM is so substantial that he

---

[2] References to "Def. Ex." and "Pl. Ex." denote exhibits marked into evidence at the preliminary injunction hearing. Many exhibits were sealed in their entirety at IBM's request, as the parties were unable to agree on the extent of sealing actually required; for purposes of judicial efficiency, those exhibits were sealed at the hearing subject to the Court's review of the parties' subsequent agreement to unseal portions of the record. Because the parties are responsible for the hearing exhibits which will be returned to them shortly, no further sealing order is necessary. The parties also sealed briefs, declarations, exhibits annexed thereto including deposition testimony, offers of proof, and hearing testimony (collectively the "Sealed Documents"). The parties were instructed to resolve the wholesale sealing of the Sealed Documents, recognizing that the Court will not permit such wholesale sealing. The public is entitled to know what transpired here, and limited sealing is reserved and appropriate for proprietary and confidential needs as authorized by the Court's Individual Practices, the Federal Rules of Civil Procedure and applicable case law. The Court held a conference on the record during which the Court heard argument, resolved the pending letter-motions to seal the Sealed Documents, and the parties substantially narrowed and/or withdrew certain of their requests. The Court subsequently Ordered that the parties re-file their submissions in accordance with the Court's rulings. (Doc. 84).

[3] Mr. Walker and Mr. Zufiria testified remotely via the Court's secure video conference bridge due to restrictions as a result of the COVID-19 pandemic; Ms. van Kralingen appeared in person. IBM also called Mr. Lima in person in support of its motion. To promote judicial efficiency, Mr. Lima and Mr. Zufiria were called only once, despite giving testimony for both sides. In addition, portions of Jean Philipe-Courtrois' deposition testimony were read into the record, and the Court also accepted offers of proof following the hearing from both Plaintiff and Defendant. (Def. Ex. N; Docs. 60, 61).

simply will not be able to divorce himself from that knowledge and information such that he could use, disclose or rely upon what he learned while at IBM, intentionally or not, in his proposed new role at Microsoft.

A. Randy I. Walker

Mr. Walker is the Global Managing Director, Financial Services, acting General Manager for Integrated Accounts for IBM, and a member of IBM's Performance Team and Acceleration Team. (Tr. at 13:13-16; Doc. 14, "Walker Decl.," ¶ 1). Mr. Walker testified about IBM's initiatives, developments as regards the financial services cloud, and Mr. Lima's role relative thereto. Specifically, Mr. Walker testified about types of confidential information to which Mr. Lima was exposed, including strategic opportunities, segmenting and selecting clients, and how that compares to competitors, including Microsoft. (Tr. at 54:19-56:19). At the time Mr. Lima served as General Manager for Integrated Accounts, Mr. Walker was IBM's Global Sector Leader for the financial services sector. (Tr. at 80:7-8, Lima Decl., ¶ 33 n.17). Mr. Walker testified Mr. Lima was exposed to IBM competitive strategies, client and geographic targets for its financial services cloud offerings, cloud budgets, and revenue targets, which confidential information is shared only with small groups of IBM's top executives responsible for overseeing IBM's strategies, including Mr. Lima. (Tr. at 35:20-37:22, 39:9-41:1, 41:15-42:7, 103:4-12).

With respect to the Performance Team, Mr. Walker testified that Mr. Lima attended and presented at Performance Team meetings in April 2020. (Tr. at 14:23-15:2). Mr. Lima was present at the prior Performance Team meeting held in January 2020. (Tr. at 68:14-69:19). Mr. Lima was also a member of IBM's Acceleration Team and attended a January 2020 meeting of that team in which company-wide cloud strategies were discussed. (Tr. at 15:2-5, 68:15-69:19, 525:20-526:1, 527:2-6). Mr. Walker testified that highly confidential IBM information is shared and discussed in

connection with those meetings. (Tr. at 41:15-42:7, 103:4-12). He testified further about Mr. Lima's knowledge concerning IBM's services business plans, moving "enterprise" clients to the cloud, competitive short-term and long-term plans for integrated accounts, and that IBM competes with Microsoft as regards these clients. (Tr. at 25:5-27:8, 67:15-68:2).

B. Juan Antonio Zufiria

Mr. Zufiria is Senior Vice President of GTS and has worked for IBM for 34 years. (Tr. at 106:14-16). Mr. Zufiria testified that Mr. Lima began reporting to him on February 1, 2019 while Mr. Lima was General Manager, GTS, North America. (Tr. at 115:4-13). Mr. Lima's role in that capacity was to run the end-to-end business process and profit for the United States and Canada on GTS infrastructures; and was responsible for driving revenues, securing new signings, and devising and implementing IBM's strategies for all of GTS in North America. (Tr. at 115:24-117:23). Mr. Zufiria testified that IBM's GTS business included services to migrate IBM clients to the cloud, and to install and run data centers and software. (Tr. at 109:6-110:11).

With respect to IBM's confidential information, Mr. Zufiria testified that Mr. Lima had "access to confidential information. He needed to have access to all our investments, cost structure, efficiency programs, automation programs, incentive systems and many other dimensions of the business that are not public and are the core of our company's business." (Tr. at 116:16-20). He further testified that some of the confidential information to which Mr. Lima was privy is of such limited distribution at IBM that it is not shared with the larger IBM operation, may not be copied, and is subject to security protocols. (Tr. at 120:9-17, 132:4-14).

Mr. Zufiria testified that Mr. Lima's role as General Manager, GTS, North America involved job responsibilities in the United States, Canada, and Latin America, including accounts with presences in Latin America, such as AT&T. (Tr. at 114:3-117:23). Among other things, Mr.

Lima prepared and presented the GTS Fall Plan projections for North America which provided a business action plan for IBM to execute throughout 2020. (Pl. Ex. 5; Tr. at 119:14-120:8, 123:8-127:14). Mr. Zufiria further testified that the information set forth in the Fall Plan for GTS North America with which Mr. Lima was involved was not revised or restated in light of the impact of COVID-19, such that IBM's confidential internal strategy in connection therewith is still relevant today. (Tr. at 211:11-25).

C.  Bridget van Kralingen

Ms. van Kralingen is Senior Vice President of Global Markets and has worked at IBM for sixteen-and-one-half years. (Tr. at 245:10-20). Ms. van Kralingen testified that she reports directly to IBM's CEO. (Tr. 245:22-23). She testified that Mr. Lima began reporting to her in January 2020 in his role as General Manager for Integrated Accounts concerning 77 accounts. Those accounts according to Ms. van Kralingen constitute IBM's largest and most significant clients, and encompass all of IBM's products and services on a worldwide basis. (Tr. at 245:12-23, 248:20-250:12, 252:19-253:16, 267:17-21, 277:22-280:20). Ms. van Kralingen testified that she discussed with Mr. Lima IBM's strategies and execution actions at least on a bi-weekly basis. (Tr. at 319:20-320:19). These strategies and actions included the Integrated Accounts Fall Plan and other presentations created, in part by Mr. Lima, for Ms. van Kralingen's Operating Team. (Pl. Exs. 17-19; Tr. at 306:2-310:25, 314:11-316:6, 318:25-320:19).

Mr. Lima prepared and presented "2020 Priorities" for IBM's Integrated Accounts, reflecting his "perspectives on the current climate" and priorities for Integrated Accounts for 2020. (Pl. Ex. 16 at 1, 6; Tr. at 292:8-18, 293:25-294:15). These included strategies to respond to attacks by IBM's competitors, including Microsoft. (Pl. Ex. 16 at 9; Tr. at 296:21-298:8). Ms. van Kralingen testified that what Mr. Lima prepared was an assessment of IBM's spending, strengths

and weaknesses compared to its competitors, and where it stood at the beginning of 2020 -- metrics that would not be disclosed to the public or IBM's competitors. (Tr. at 311:22-313:7). She testified that Mr. Lima was exposed to IBM's full proprietary strategy and technology. (Tr. at 295:24-298:17).

Concerning the cloud, Ms. van Kralingen testified that IBM has developed clear plans and strategies to compete, including against Microsoft. (Tr. at 370:2-4). Thus, Ms. van Kralingen testified that knowing IBM's plans could allow Microsoft to pivot and preempt IBM with their integrated accounts, enterprise clients, and anchor clients. (Tr. at 261:20-262:14, 282:3-11).

Ms. van Kralingen testified that Mr. Lima was responsible for making sure IBM's global strategy plays were executed, including in Latin America. (Tr. at 266:11-267:3, 278:2-280:11). She explained that Mr. Lima's responsibilities were of a global nature, including accounts headquartered in Latin America, and those headquartered elsewhere with operations in Latin America. (Tr. at 266:11-14, 366:25-368:4). Ms. van Kralingen testified that in his proposed role at Microsoft, Mr. Lima "cannot help but use the knowledge that he has lived with and directed every single day of IBM's strategy, [] differentiators, [] weaknesses, [and] plans to jump ahead on cloud and hybrid cloud which are in direct competition with those of Microsoft." (Tr. at 359:2-15, 366:25-368:4).

Ms. van Kralingen testified that on May 15, 2020, Mr. Lima contacted her about his desire to leave IBM and commence employment with Microsoft. (Tr. at 275:14-277:8). On May 18, 2020, Mr. Lima formally tendered his resignation by e-mail sent to Ms. van Kralingen. (Tr. at 277:9-15; Def. Ex. E).

D.  Rodrigo Kede De Freitas Lima

Mr. Lima testified that while he was General Manager, GTS, North America, his office was in Armonk, New York. He lived in Greenwich, Connecticut, and his responsibilities included infrastructure services and technology support services. (Tr. at 385:14-386:25). Mr. Lima testified that in 2019 he had raised concerns with Mr. Zufiria concerning what he believed to be poor service and employee morale, his lack of decision-making authority, and a "toxic" work environment. (Tr. at 396:5-397:19; 399:2-23; 400:7-403:4). Thereafter, Mr. Lima testified that IBM advised him that he was being moved out of that role, and offered him a choice of either General Manager, Technology Support Services or General Manager, Integrated Accounts, the latter of which he ultimately chose. (Tr. at 391:16-392:22). Mr. Lima testified that in connection with this new role he was asked to sign the Non-Compete, and in exchange therefor he was entitled to a total target annualized compensation of $1,450,000 plus benefits. (Tr. at 387:14-388:19; Def. Ex. G). Mr. Lima testified that he could have made close to $20 million at IBM in the four years following execution of the Non-Compete. (Tr. 631:7-14).

Mr. Lima testified that in his role as General Manager, Integrated Accounts, he was exposed to, prepared, and presented IBM confidential information in connection with IBM's largest global accounts, including information concerning IBM's financial services cloud, budget, and client targets. (Tr. at 577:19-582:16, 584:9-586:14). However, Mr. Lima testified that he does not specifically recall the confidential information he learned or have present access to any materials received. (Tr. at 506:9-507:17, 522:12-17, 524:18-525:19, 527:5-528:4). Mr. Lima admits and acknowledges that he has obligations to IBM relating to the nondisclosure of IBM's confidential information. (Answer ¶ 77; Tr. at 537:13-538:1).

Mr. Lima testified that he began interviewing for various positions at Microsoft as early as February 2019. (Tr. at 403:5-404:6). He testified that in March 2020 he was asked to have "exploratory" conversations with Jean-Philippe Courtois, Microsoft's Executive Vice President Global Sales, Marketing Operations, concerning the role Mr. Lima ultimately accepted. (Tr. at 405:16-406:5, 408:5-8; Def. Ex. N). On April 30, 2020, Mr. Lima received an offer presentation containing a compensation package from Microsoft.[4] (Tr. at 546:18-24; Pl. Ex. 21). On or about May 14, 2020, Mr. Lima accepted employment with Microsoft (Doc. 64, "Lima Post-Hrg Br.," at 6 (citing Tr. at 340:12-15, 628:22-9)), and on May 18, 2020, he tendered his resignation to IBM. (Def. Ex. E).

Mr. Lima testified that he, as Corporate Vice President, Latin America, would be responsible for Microsoft's sales, marketing, and operations in the Latin American countries, and increasing Microsoft's cloud footprint in Latin America. (Lima Decl. ¶ 3; Tr. at 606:13-607:19). Although, according to Mr. Lima, his ultimate geographic base is unclear in light of COVID-19 and other uncertain immigration issues, Mr. Lima's agreement with Microsoft, signed on June 2, 2020, provided that "[i]nitially, [he would] be located in Sao Paulo, Brazil"; and his job with Microsoft is based in Fort Lauderdale, Florida. (Def. Ex. O at 3; Tr. at 457:23-461:22).

Microsoft's Corporate Vice President, Human Resources, Stijn Nauwelaerts, averred that Mr. Lima's job will be to increase sales of Microsoft cloud, win cloud customers, gain market share, and participate in global strategy meetings. (Docs. 61-2, 62-2, "Stijn Dep." at 7:17-20,

---

[4] Despite having been interviewed and considered in February through August 2019 for a position at Microsoft to "run Asia Pacific," (Tr. 403:21-405:4), and his subsequent conversations with Microsoft in March and April 2020 which ultimately led to his acceptance of the subject role at Microsoft (Tr. 405:16-406:5, 408:5-8, 546:18-24; Def. Ex. N; Pl. Ex. 21), Mr. Lima attended and presented at IBM Performance Team meetings in April 2020, at which meetings IBM confidential information, such as key client targets for the financial services cloud, were discussed. (Tr. 577:19-25, 578:19-579:16, 579:22-581:25, 584:9-586:10). Mr. Lima decided not to mention to IBM that he was in discussions with Microsoft about a potential role when he chose to attend, present, and receive IBM confidential information at these meetings. (Tr. at 585:14-17, 628:15-629:2).

137:9-138:17, 140:7-142:3, 145:2-13, 146:5-22, 147:11-21, 148:20-150:17, 150:25-151:10, 152:16-158:14, 180:5-10). Mr. Lima testified that Microsoft's strategy in 2020 is to expand its cloud computing footprint in enterprise clients, including IBM's existing clients. (Tr. at 554:4-9). Mr. Lima testified that part of his role would be to compete against IBM in cloud computing. (Tr. at 608:4-21).

The Court requested that the parties produce a job description or other similar document in an effort to line up Mr. Lima's job responsibilities at IBM against the proposed job at Microsoft. Mr. Lima did not produce any such document; however, IBM introduced as an exhibit at the hearing a copy of the immigration paperwork that Microsoft submitted on Mr. Lima's behalf. (Pl. Ex. 28A). Therein, Microsoft stated: Mr. Lima is "a person of extraordinary ability," will "interface with leadership across Microsoft at the highest levels," and will be "contributing to the [Microsoft] global plan." (*Id*. at 32-33). Mr. Lima testified that Microsoft's description of his proposed position is consistent with his understanding of the job. (Tr. at 614:21-616:13).

Mr. Nauwelaerts, for Microsoft, acknowledges Mr. Lima's Non-Compete with IBM and maintains that it structured the job offered to Mr. Lima in an effort to "avoid the non-compete situation." (Def. Ex. J; Tr. at 339:22-340:9, 368:9-21, 463:7-10, 465:4-25, 466:5-8, 499:6-8). Microsoft's offer to Mr. Lima was that of a "hire-ahead" as Mr. Nauwelaerts contemplated how to "find a way to land [Mr. Lima] in [Microsoft United States] in 14 months," after the restricted period set forth in the Non-Compete ended. (Def. Exs. J, K).

## STANDARD OF REVIEW

In the Second Circuit, a party seeking a preliminary injunction generally must establish three elements: (1) the likelihood of irreparable injury in the absence of an order or injunction; (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits

to make them a fair ground for litigation; and (3) a balance of hardships "tipping decidedly" in the movant's favor. *Fed. Express Corp. v. Fed. Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir. 2000); *see also Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

A court may grant injunctive relief even where an applicant for a preliminary injunction cannot establish a likelihood of success on the merits, if it determines that the applicant "has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953). Under this standard the movant must establish that the harm which it would suffer is "'decidedly' greater" than the harm his opponent would suffer. *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir. 1981) (quoting *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir. 1979)).

The Court need not apply the heightened standard applicable to mandatory injunctions, as opposed to status quo injunctions, which would require that the movant establish a clear or substantial likelihood of success on the merits. *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181, 2020 WL 915824, at *7 (S.D.N.Y. Feb. 26, 2020). "[F]or purposes of granting a preliminary injunction, the 'status quo' is not simply the status quo in the moment before relief is granted. Rather, it refers to 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* (citing *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). IBM's requested injunction may properly be characterized as a preservation of the status quo, which "comports with the general approach of district courts in similar cases. Indeed, 'courts in this Circuit routinely apply the ordinary standard [rather than the heightened, mandatory injunction standard] when deciding whether to issue an injunction in

11

connection with an employment contract.'" *Id.* (quoting *Solomon Agency Corp. v. Choi*, No. 16-CV-353, 2016 WL 3257006, at *2 (E.D.N.Y. May 16, 2016); *New Horizons Educ. Corp. v. Krolak Tech. Mgmt. of Syracuse, LLC*, No. 18-CV-1223, 2018 WL 5253070, at *6 (N.D.N.Y. Oct. 22, 2018); *Devos, Ltd. v. Record*, No. 15-CV-6916, 2015 WL 9593616, at *9 (E.D.N.Y. Dec. 24, 2015)).

## ANALYSIS

I.   <u>Likelihood of Success on the Merits</u>

In this action, as applicable to the instant motion, IBM brings claims for, *inter alia*, breach of the Non-Compete and common law misappropriation of trade secrets which must be analyzed.

A.   <u>Breach of Non-Compete</u>

It is not disputed that Mr. Lima signed the Non-Compete on or about December 3, 2019, in connection with his last role at IBM as General Manager, Integrated Accounts. (Answer ¶¶ 4, 44; Def. Ex. G; Tr. at 388:15-19). The Non-Compete, which is governed by New York law (Non-Compete ¶ 13), states in pertinent part as follows:

> 1. … You acknowledge and agree that: …
>
> a) the compensation that you will receive…is consideration for your work at IBM, your agreement to the terms and conditions of this Agreement, and your compliance with the post-employment restrictive covenants included in this Agreement…
>
> b) (i)…your employment by IBM…requires that you have access to, and knowledge of, IBM Confidential Information that pertains not only to your business or unit, but also to [IBM's] global operations;... (ii) you are given access to, and develop relationships with, customers of [IBM] at the time and expense of [IBM]; and (iii) … your services to [IBM] are, and will continue to be, extraordinary, special and unique. …
>
> e) …for twelve (12) months following the termination of your employment…(i) you will not directly or indirectly, within the Restricted Area, Engage in or Associate with (a) any Business Enterprise or (b) any competitor of [IBM], if performing the duties and responsibilities of such engagement or association

could result in you (1) intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which you had access by virtue of your job duties or other responsibilities with IBM or (2) exploiting customer goodwill cultivated in the course of your employment with IBM….

3. You acknowledge that [IBM] will suffer irreparable harm if you fail to comply with Paragraph 1 or otherwise improperly disclose, use, or rely on IBM Confidential Information. You acknowledge that the restrictions set forth in Paragraph 1 are reasonable as to geography, scope and duration. . . .

(Non-Compete ¶¶ 1, 3).

The Non-Compete defines "Business Enterprise" as "any entity that engages in . . . competition with any business unit or division of [IBM] in which you worked at any time during the three (3) year period prior to the termination of your employment." (*Id*. ¶ 2(a)). "Engage in or Associate with" is defined to include acting as an "associate, employee, member, consultant, or contractor." (*Id*. ¶ 2(d)). The Restricted Area is "any geographic area in the world in which you worked or for which you had job responsibilities, including supervisory responsibility, during the last twelve (12) months of your employment with IBM. . . ."  (*Id*. ¶ 2(f)).

This Court, tasked with determining the likelihood of success on the merits of a breach of a written non-competition agreement, must determine under New York law whether the Non-Compete is reasonable under the circumstances.[5] New York courts have adopted the prevailing common law "reasonableness" standard. *See Int'l Bus. Machines Corp. v. Visentin*, No. 11-CV-399, 2011 WL 672025, at *20–21 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437 F. App'x 53 (2d Cir. 2011)

---

[5] With respect to IBM's claim of breach of the Non-Compete, the case of *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999), is particularly instructive. Therein the Second Circuit explained the genesis of non-competition agreements, discussing an early common law case in England recognizing that an employee may agree to restrict his own work. The agreement in that English case restrained a baker from engaging in his trade in the neighborhood for a period of time in exchange for good consideration. The *Ticor* Court explained that the Queens Bench held that such an agreement is a valid exchange by the employee's "own consent, and for his own profit, [to] give over his trade; and part with it to another in a particular place." *Id*. at 69 (citing *Mitchel v. Reynolds*, 1 P. Wms. 181, 186, 24 Eng. Rep. 347, 349 (Q.B. 1711)).  As such, an employee is free to restrain his own trade in exchange for good and valuable consideration. The issue for the Court, then, is whether the agreed-upon restraint of Mr. Lima's own trade is reasonable.

(citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999)). A restraint must be reasonable in time and geographic scope, and is reasonable if it: "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.*  "A violation of any prong renders the covenant [not to compete] invalid." *Id.*  The Court must therefore evaluate each of the three prongs in order to determine whether IBM has carried its burden to demonstrate that it has a likelihood of success on the merits.

        1.  <u>Legitimate Interest of the Employer</u>

        The "legitimate interest" of the employer includes preventing the employee's solicitation or disclosure of trade secrets, confidential information, information regarding the employer's customers, and when the employee's services to the employer are deemed special or unique. *Ticor*, 173 F.3d at 70 (citing *Purchasing Assocs. v. Weitz,* 13 N.Y.2d 267, 272–73 (1963)); *see also Intertek Testing Servs., N.A., Inc. v. Pennisi*, No. 19-CV-7103, 2020 WL 1129773, at *22 (E.D.N.Y. Mar. 9, 2020) (legitimate interests include safeguarding the goodwill and relationships of clients and customers and maintaining trade secrets and confidential information, including client contacts and pricing information, from unfair competition).

        The Non-Compete defines IBM Confidential Information as "any information of a confidential or secret nature that is disclosed to you, or created or learned by you that relates to the business of [IBM], including trade secrets," and provides several examples of what constitutes IBM Confidential Information. (*Id.* ¶ 2(e)). IBM maintains that in order to properly interpret the term "IBM Confidential Information" the Court should apply the common law trade secrets test and consider those factors to determine whether information constitutes a trade secret. (Doc. 58, IBM Post-Hrg Br. at 15-16, n.3).

The Court notes that the definition of "IBM Confidential Information" in the Non-Compete protects a broader range of information than the common law New York doctrine of "trade secrets" might protect. However, IBM urges the Court to construe the information at issue as "trade secrets" and as further discussed herein, also asks the Court to apply the "inevitable disclosure" doctrine (applicable to the tort of misappropriation of trade secrets) to its contract claim. Defendant argues in connection with this approach as well. Thus, the Court shall consider the parties' arguments, though it is worth noting that "trade secrets" is but one protected category of "IBM Confidential Information" defined in the Non-Compete.

New York courts define a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (internal quotation marks omitted); *accord Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (citing Restatement of Torts § 757 cmt. b (1939)). "[C]onfidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *In re Dana Corp.,* 574 F.3d 129, 152 (2d Cir. 2009). Courts consider the following factors when determining whether certain information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Haber,* 188 F.3d at 44; *Ashland Mgmt.,* 82 N.Y.2d at 407.

As discussed *supra*, IBM's witnesses testified about the types of trade secrets and confidential information disclosed to Mr. Lima and to which Mr. Lima had access; as well as trade

secrets and confidential information that Mr. Lima himself prepared for IBM. These include, but are not limited to, IBM's strategic initiatives, particulars concerning the financial services cloud, IBM's competitive business and pricing strategies, the identity of new client targets, anchor clients, IBM's competitive strategies with respect to "head-to-head" competition with Microsoft, and IBM's plans to "catch up" as regards the public cloud. The information to which he was exposed and that which he helped to develop, if disclosed to a competitor, could aid the competitor in pivoting its plans to preempt IBM. (Tr. 22:4-7, 26:16-17, 54:19-56:19, 114:3-6, 114:25-115:3, 136:4-15, 140:1-5, 141:19-142:1, 152:15-16, 261:20-262:14, 282:3-11, 369:23-370:12, 551:16-24, 554:21-555:7, 584:6-8, 589:10-13, 592:5-25, 603:3-605:17).

Mr. Lima argues that some of the information he can recall was made publicly available and thus is not subject to protection. (Def. Exs. D, Q; Tr. at 173:21-192:21). However, Mr. Lima himself admitted that information to which he was made privy, and information that he created and presented, is in fact confidential information that is not made public. Some of the confidential information includes the next geographic region in which IBM intends to launch the financial services cloud, its next anchor client in that region, and IBM's financial services cloud client targets, which includes IBM's anchor client for financial services cloud in Latin America, the region he agreed to run for Microsoft. (Answer ¶ 29; Tr. at 551:16-24, 554:21-555:7, 582:4-16, 584:6-8, 589:10-13, 592:5-25, 603:3-605:17).

The evidence adduced establishes that each factor of the trade secrets test has been met. The information is not known outside of the business or even shared with the larger IBM operation. (*See, e.g.*, Tr. at 120:9-17, 132:4-14). The information is shared only with small groups of IBM's top executives responsible for overseeing IBM's strategies, may not be copied, and is subject to security protocols. (Tr. at 35:20-37:22, 39:9-41:1, 41:15-42:7, 103:4-12, 120:9-17, 132:4-14). The

Court understands that the information cannot easily be acquired or duplicated. The information is valuable to IBM as well as its competitors, including Microsoft. (*See, e.g.*, Tr. 261:13-262:15, 266:15-267:13, 282:20-283:11, 320:20-321:8). IBM makes significant investments in the confidential aspects of its business, such as financial services cloud target clients. (*See*, *e.g.*, Tr. 282:3-19, 297:18-23). Generally, the Court also understands that a significant amount of time and money is expended to create these trade secrets and confidential information. Accordingly, the record here is clear that what IBM seeks to protect constitutes its trade secrets and IBM confidential information.

Even if the Court applied the "IBM Confidential Information" definition in the Non-Compete to IBM's contract claim, it is clear that the information at issue constitutes IBM Confidential Information. As discussed *supra*, Mr. Lima acknowledged the confidential nature of the information disclosed to him, created by him, and/or learned by him that relates to IBM's business. (Non-Compete ¶ 2(e); Answer ¶ 29; Tr. at 551:16-24, 554:21-555:7, 584:6-8, 589:10-13, 592:5-25, 603:3-605:17). That information includes, *inter alia*, "customer and prospective customer information, client data, global strategic plans . . . information regarding the development status of specific [IBM] products, assessments of the global competitive landscape of the industries in which [IBM] competes, . . . financial status and plans . . . ." (Non-Compete ¶ 2(e); *see, e.g.*, Tr. 22:4-7, 26:16-17, 54:19-56:19, 114:3-6, 114:25-115:3, 136:4-15, 140:1-5, 141:19-142:1, 152:15-16, 261:20-262:14, 266:11-267:3, 278:2-280:11, 282:3-11, 359:2-15, 366:25-368:4, 369:23-370:12, 551:16-24, 554:21-555:7, 584:6-8, 589:10-13, 592:5-25, 603:3-605:17).

The Non-Compete expressly provides that Mr. Lima has a duty to maintain the confidentiality of IBM's trade secrets and confidential information, "mak[ing] explicit an employee's implied duties under New York law with respect to confidential information." *Haber*,

188 F.3d at 47-48. Importantly, Mr. Lima acknowledged that his employment by IBM gave him "access to, and knowledge of, IBM Confidential Information" as well as "relationships with[] customers of [IBM] at the time and expense of [IBM]," and that his services were "extraordinary, special and unique." (Non-Compete, ¶ 1(b)). The Court concludes based upon that language that Mr. Lima acknowledged IBM's legitimate interests in the information it seeks herein to protect by way of the Non-Compete. Accordingly, the Court finds that IBM has established its legitimate interest in protecting this IBM Confidential Information and trade secrets.

2. Undue Hardship

 "Even where a company's interests are legitimate and reasonably protected by a restrictive covenant, courts will decline to enforce restrictive covenants where they impose an undue hardship." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 222 (S.D.N.Y. 2013). Defendant argues that the Non-Compete prohibits him from working in the technology industry and as such, will negatively impact his future job opportunities and earning potential. (Doc. 30, Lima Pre-Hrg Br. at 20). He also argues that the covenant is unreasonable because it fails to provide for payment of his salary during the non-compete period, as had a prior agreement he signed in connection with his employment at IBM in Brazil. (Lima Post-Hrg Br. at 3-4; Def. Ex. F). While courts will consider whether "an employee receives continued consideration for his loyalty and goodwill," this factor is not dispositive. *Bradford v. New York Times Co.,* 501 F.2d 51, 58 (2d Cir. 1974). Rather, it is but one consideration in the determination of whether the covenant as a whole is reasonable. In this case, it cannot be disputed that Mr. Lima was compensated in advance by IBM in exchange for his acceptance of the terms of the Non-Compete. Indeed, Mr. Lima was being paid at IBM, all in, at a rate that could have made him close to $20 million in four years. Some of that compensation paid for these Non-Compete obligations.

Moreover, this is not a case where enforcement of the Non-Compete precludes Defendant from all gainful employment within an industry. The clause at issue in this case simply does not create a complete ban on employment at Microsoft (or elsewhere) as Mr. Lima suggests. Rather, the employment is restricted only if it is with an entity in a proscribed type of competition with IBM, within a geographic area in which he had job responsibilities within the last twelve months of his employment, begins within twelve months of his termination of employment with IBM, and "could result" in his use, disclosure, or reliance upon IBM Confidential Information. (Non-Compete ¶ 1). In other words, Mr. Lima is not completely barred from working for a competitor of IBM, like Microsoft; and is only precluded from types of potential employment that would place him in direct competition with IBM where he could use, disclose, or rely upon IBM Confidential Information or trade secrets. He is not precluded from potential roles at Microsoft that would not place him in direct competition with IBM, including roles in Microsoft's consumer-based business units like Office 365, gaming, personal computing, and LinkedIn. (*See* Doc. 13, Pl. Mem. in Support at 22; Doc. 27, IBM Pre-Hrg Br. at 14, 24-25; IBM Post-Hrg Br. at 25).

Defendant further argues that the Non-Compete is unenforceable and imposes undue burden because it is unreasonable in time and geographic scope. The Court finds that, like the Court's determination in *Int'l Bus. Machines Corp. v. Papermaster*, the twelve-month restriction in the Non-Compete is sufficiently limited in time; and that the nature of the business "requires that the restriction be unlimited in geographic scope." No. 08-CV-9078, 2008 WL 4974508, at *11 (S.D.N.Y. Nov. 21, 2008); *see Natsource LLC,* 151 F. Supp. 2d at 471–72; *see also Estee Lauder Cos. v. Batra,* 430 F. Supp. 2d 158, 181 (S.D.N.Y. 2006) (upholding worldwide limitation); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 534 (S.D.N.Y. 2004) (finding one-year duration of covenant not unreasonably long). New York courts "routinely find

one-year restrictions to be reasonable." *Reed Elsevier, Inc. v. Transunion Holding Co.*, No. 13-CV-8739, 2014 WL 97317, at *8 (S.D.N.Y. Jan. 9, 2014). Furthermore, Mr. Lima expressly agreed in the Non-Compete that the restrictions were reasonable as to geography, scope, and duration. (Non-Compete ¶ 3). That promise, like the other promises he made and was paid for, has meaning in this context.

Mr. Lima testified that he had no alternative plan if the requested injunction were to be granted as he did not find it necessary to arrange for other employment. (Tr. at 541:22-542:15). He testified that if he was not able to commence the proposed employment with Microsoft, his plan was to spend time with his children and exercise. (Tr. at 542:6-15). Mr. Lima testified that he and his wife have accumulated a net worth of $5 million, have multiple real properties, and would be able to pay his expenses until the end of the non-compete period. (Tr. at 540:19-541:21). In fact, while the TRO was in place and during the preliminary injunction hearing, Mr. Lima was hired by Microsoft and put on Microsoft's payroll. (Tr. at 462:4-6; 542:25-543:2). The record is devoid of evidence that indicates that should the Court enjoin Mr. Lima for the duration of the non-compete period Microsoft would terminate Mr. Lima and remove him from its payroll and/or refuse to find another job for him. Likewise, there is no proof that at the end of the non-compete period Microsoft would not have a job for him. (Tr. at 542:16-543:13).

Defendant raised an additional non-economic topic at the hearing to argue that enforcement of the Non-Compete causes him and his family undue hardship. Mr. Lima testified that he and his family would be forced to return to Brazil due to immigration reasons if he were to be precluded from taking this exact position for which he was hired at Microsoft. (Tr. at 408:18-411:16, 415:1-10, 423:21-25). Mr. Lima testified that he did not want to go back to Brazil out of concern for his and his family's health and welfare in light of the COVID-19 pandemic. He testified that his family

loves living in the United States, and that he would prefer that his sons stay in the Greenwich schools because a move to the Brazil schools would be "devastating" for them. (Tr. at 408:18-411:16). The Court need not delve into the intricacies of the immigration law and speculate as to the significance of his visa status to determine if there is a hardship, because when Mr. Lima signed Microsoft's written offer letter on June 2, 2020, he agreed that "[i]nitially, [he would] be located in Sao Paulo, Brazil" and would wait until after his "first year of employment" to move to Florida, where his job with Microsoft is actually based. (Def. Ex. O at 3; Tr. at 457:23-461:22). The precise nature of the hardship claim -- moving his family from Greenwich, Connecticut -- fails in light of the employment terms Mr. Lima agreed to at Microsoft.

There was simply no credible evidence adduced to suggest that the conditional, limited restriction in the Non-Compete would cause Mr. Lima to suffer undue hardship, especially knowing that he agreed to move to Brazil and Fort Lauderdale, Florida. Accordingly, under the circumstances, the Court finds that the Non-Compete does not impose an undue hardship on the employee and is reasonable in time and geographic scope under the circumstances of this case.

3. Injury to the Public

It is a well settled principle under New York law that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Aquavit Pharm., Inc. v. U-Bio Med, Inc.*, No. 19-CV-3351, 2020 WL 4504737, at *4 (S.D.N.Y. Aug. 5, 2020) (citing *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 31 N.Y.3d 1002, 1006 (2018)). This case is no different. The sophisticated parties to this contract agreed to its terms, and Mr. Lima accepted good and valuable consideration for the restrictions contained therein. "If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements."

*Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 351 (S.D.N.Y. 2018) (citing *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014)). Accordingly, the Court finds that the Non-Compete is not injurious to the public.

    4.  <u>Inevitable Disclosure</u>

Having found the restraint reasonable, the Court must assess whether IBM's claim of breach of the Non-Compete because of inevitable disclosure of IBM Confidential Information and trade secrets by Mr. Lima is likely to succeed at trial. The Court's inquiry is whether, in accepting the position as Corporate Vice President, Latin America at Microsoft, Mr. Lima, directly or indirectly: (a) is acting as an employee, (b) in a geographic area in which he worked or had job responsibilities within the last twelve months, (c) for a competitor of IBM, (d) *if doing so could result in* his intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information or exploiting customer goodwill. (*See* Non-Compete ¶ 1(e)).

To resolve this inquiry, IBM urges the Court to consider the analysis employed and result of the Court's decision in *Papermaster*, 2008 WL 4974508, while Defendant maintains that *Visentin*, 2011 WL 672025, provides the guide. While each is informative, neither case is squarely on point, because it appears that the non-competition agreements involved in those cases both contained absolute prohibitions on employment. The Non-Compete that Mr. Lima signed is conditional, as explained above. Simply put, Mr. Lima's Non-Compete is not the same contract as Mr. Papermaster's or Mr. Visentin's contract. Indeed, IBM advised that the Non-Compete was revised in 2012 following the Court's decision in *Visentin*. (IBM Post-Hrg. Br. at 4). With that said, the parties insist that the Court construe this contract language under the same tort concepts described in *Papermaster* and *Visentin*; and apply the doctrine of inevitable disclosure to IBM's contract claim.

IBM maintains that the doctrine of inevitable disclosure is engrafted into the Non-Compete apparently through the language "could result in . . ." (Non-Compete ¶ 1(e)). Funk & Wagnalls defines the word "could" as the past tense of the word "can," which in turn is defined as "[t]o be able to". FUNK & WAGNALLS STANDARD COLLEGE DICTIONARY (1973). The word "inevitable" on the other hand, means "unavoidable." *Id*. Surely, if an action is unavoidable, it can be -- is able to be -- done. Thus, the Court is not convinced that the language in the contract "could result in" is the precise embodiment of the inevitable disclosure doctrine. Indeed, it appears that "inevitable" disclosure is a subset of the "could result in" disclosure contract term.[6]

To determine whether, under the common law, disclosure is inevitable, courts consider the following factors:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (citing *Payment Alliance Int'l. Inc. v. Ferreira,* 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (internal quotation marks and citations omitted)).

The parties dispute that IBM and Microsoft are direct competitors. Mr. Lima principally argues that IBM is chasing Microsoft in cloud computing, not the other way around and as such, is not a true competitor. However, the witnesses testified that Microsoft and IBM engage in head-to-head competition, including in cloud computing. (Tr. at 22:4-7, 26:16-17, 114:3-6, 114:25-115:3, 136:4-15, 140:1-5, 141:19-142:1, 152:15-16, 369:23-370:12). In particular, the companies are in cloud computing competition as regards IBM's "enterprise" clients and as regards the

---

[6] Here, as with the vibration between trade secrets and IBM Confidential Information, the engrafting of tort concepts onto contract language is a red herring because under either analysis, Plaintiff has sustained its burden of proof.

financial services cloud. (Tr. at 22:11-24:6, 25:24-26:9, 50:21-53:15, 256:22-259:2, 371:8-372:2, 282:3-283:11). Moreover, Mr. Lima admitted that Microsoft competes against IBM. (Lima Pre-Hrg Br., 14; Tr. at 551:16-554:20, 607:12-608:25).

The parties also dispute that Mr. Lima's proposed employment at Microsoft is nearly identical to that at IBM. Mr. Lima distinguished IBM as a "services" company and Microsoft as a cloud company, indicating that his role at IBM was limited to services. (Tr. at 462:19-463:6, 466:13-467:22). Mr. Zufiria explained, however, that moving a client to the public cloud is like moving a family into a new house, and while Microsoft has the house, it uses a third-party partner moving company to make the move. IBM, on the other hand, has the house and provides the services as the moving company. (Tr. at 112:3-18). The record reflects that Microsoft partners with a cloud services provider to compete against IBM's combined cloud and cloud services offerings. (Tr. at 25:5-22, 112:3-18, 113:18-114:19).

As Mr. Lima testified, Microsoft and IBM each have global strategies for competing against the other. (Tr. at 606:13-608:25; *see also* Tr. at 266:15-267:3). Mr. Lima's proposed job will be to execute global strategies on behalf of Microsoft, just as he executed IBM's global strategies. He will also participate on Microsoft's global leadership teams, which are involved in setting Microsoft's global priorities, as he did as a member of IBM's Performance and Acceleration Teams. (Tr. at 610:24-611:17, 617:5-9; Ex. N). Similar to the reporting structure when Mr. Lima was General Manager, Integrated Accounts at IBM and he reported to Ms. van Kralingen who in turn reported directly to the CEO (Tr. 245:22-23), at Microsoft, Mr. Lima would report to Mr. Courtois, who reports directly to the CEO (Tr. 606:2-12). At IBM, he was responsible for winning sales and implementing strategy, including in Latin America. Those responsibilities are the same as he would have at Microsoft. (Tr. 16:7-17:3, 66:13-67:5, 114:3-117:23, 266:11-14,

366:25-368:4, 606:13-607:19; Walker Decl. ¶ 20). At both IBM and Microsoft, Mr. Lima's role involved increasing revenue and gaining market share of cloud, including in Latin America. (Tr. 278:2-281:16, 311:22-313:23; Stijn Dep. at 7:17-20, 137:9-138:17, 140:7-142:3, 145:2-13, 146:5-22, 147:11-21, 148:20-150:17, 150:25-151:10, 152:16-158:14, 180:5-10.) Comparing apples to apples, the evidence establishes that the responsibilities that Mr. Lima expects to have in his new role overlap significantly with the work he performed for IBM within the past twelve months.

The record also reflects that knowledge of the trade secrets at issue would be valuable to Microsoft. For example, the 77 integrated accounts that Mr. Lima managed at IBM also work with Microsoft. While Mr. Lima suggests that Microsoft's proposed restrictions could be "policed" through discovery and contempt proceedings, (Lima Post-Hrg Br. at 25), and Mr. Lima argues that he can be walled off or "fenced" from the clients whose accounts he was responsible for at IBM, Mr. Lima also testified that he does not know how Microsoft will do so, nor how that could be "policed" or enforced by Microsoft. (Tr. at 463:7-10, 618:17-25, 619:14-620:8, 620:24-625:6). Notably, one of the confidential key client targets discussed at the April 2020 Performance Team Meetings that Mr. Lima attended while in talks with Microsoft is not one of the clients he proposes to be restricted from while at Microsoft. (Tr. at 581:12-25). In any event, Mr. Lima testified that Microsoft has targeted IBM's clients. (Tr. at 551:16-554:20, 607:12-608:25). The Court also finds Ms. van Kralingen's testimony compelling that if Microsoft knows IBM's strategies with those clients, they can pivot and preempt IBM in the market. (Tr. at 261:20-262:14, 282:3-11).

Thus, the evidence establishes that the nature of the industry is very competitive. Market competitors like Microsoft and IBM engage the same clients (like the 77 accounts for which Mr. Lima was responsible at IBM), while competing to move those clients to the cloud. (*See, e.g.*, Tr. 256:22-259:2, 282:3-283:11). The witnesses testified that 80% of the market is open for

competition, including the computing business of the enterprise clients for which IBM and Microsoft compete, as only 20% of business applications and processes have moved to the cloud. (Tr. 22:11-24:6, 25:24-26:9, 256:22-258:6, 371:8-372:2). Mr. Lima in fact, while employed at IBM, indicated that Microsoft has "built an enterprise business and they are at 100% of my accounts," and that Microsoft is "going after our critical [enterprise] workload." (Ex. 10 at 1; Tr. 143:18-144:1). Accordingly, the Court finds that having knowledge of IBM's strategies and methodologies, while attacking the same business Microsoft wants, is not only valuable to Microsoft but highlights the significance of the trade secrets at issue.

Mr. Lima argues that he has not acted as General Manager, Latin America, for three years and as such, whatever information he might have known in his former role is now stale, especially in light of the COVID-19 pandemic. (Tr. at 210:24-211:10, 212:1-9, 385:14-16, 484:21-485:1, 530:12-15). IBM's witnesses testified, however, that Mr. Lima's responsibilities at IBM over the last twelve months were of a global nature, as he was responsible for making sure IBM's global strategy plays were executed, and included clients headquartered in Latin America as well as companies headquartered elsewhere with operations in Latin America. (Tr. at 266:11-267:3, 278:2-280:11, 366:25-368:4). Mr. Lima also acknowledged his knowledge of IBM's anchor client for financial services cloud in Latin America, the region he agreed to run for Microsoft. (Tr. 582:4-16, 584:6-8). Furthermore, in the Non-Compete, Mr. Lima acknowledged that his employment as General Manager, Integrated Accounts, required that he have access to, and knowledge of, IBM Confidential Information pertaining to his business as well as global operations, that IBM is a global company, and that the responsibilities of certain IBM employees including members of the Acceleration Team, such as himself, are global in scope. (Non-Compete ¶¶ 1(b), 2(f)).

Based on the testimony and evidence adduced, the Court finds that Mr. Lima, in the role proposed at Microsoft, could use, disclose, and/or rely upon IBM Confidential Information and trade secrets. Accordingly, IBM has demonstrated a likelihood of success on the merits on its claim that Defendant breached the Non-Compete by accepting a job with an IBM competitor in a geographic area in which he had job responsibilities within the last twelve months that "could result" in his use, disclosure, and/or reliance upon Plaintiff's trade secrets and confidential information for the benefit of Plaintiff's competitor. *See, e.g., Papermaster*, 2008 WL 4974508, at *10; *Pennisi*, 2020 WL 1129773, at *26; *Haber*, 188 F.3d at 45-48; *Gen. Sec., Inc. v. Comm. Fire & Sec., Inc.*, No. 17-CV-1194, 2018 WL 3118274, at *5 (E.D.N.Y. June 25, 2018). Alternatively, IBM has raised sufficiently serious questions going to the merits to make them a fair ground for litigation.

### B.  Misappropriation of Trade Secrets

IBM also predicates its motion on the tort theory of misappropriation of trade secrets. It is not clear to the Court that there is a tort duty and claim independent of the contract claim asserted by IBM. The tort duty alleged in the Complaint is a "common law duty not to disclose [trade secrets and confidential information] outside of IBM." (Compl. ¶ 76). That duty appears to be indistinguishable from, or at least redundant of, the contractual obligation Mr. Lima has in the Non-Compete. It is generally for that reason that a plaintiff cannot turn a contract claim into a tort claim arising from a duty similar to the obligations set forth in the contract. *See, e.g., Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*, 580 F. Supp. 2d 285, 293 (S.D.N.Y. 2008) (citing *Clark–Fitzpatrick, Inc. v. Long Island R.R.,* 70 N.Y.2d 382, 389 (1987) (distinct duty must "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."); *Luxonomy Cars, Inc. v. Citibank, N.A.,* 65

A.D.2d 549, 550 (2d Dep't 1978) ("Abstractly, a tort may accompany a breach of contract, but only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated" (citing *Rich v. New York Cent. & Hudson R.R. Co.,* 87 N.Y. 382 (1882))).

Thus, this path may very well be foreclosed ultimately for IBM. However, at this stage in the litigation, the Court need not make such a determination, as the Court has found a sufficient basis for granting the preliminary injunctive relief sought as it relates to IBM's contract claim. Accordingly, because the scope of the preliminary injunction warranted by IBM's contract claim will necessarily extend to the conduct giving rise to the misappropriation of trade secrets claim, the Court finds it unnecessary to engage in a second, parallel analysis at this time. *See, e.g., Devos*, 2015 WL 9593616, at *18.

## II.  Irreparable Harm

"Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Uni-World*, 73 F. Supp. 3d at 236 (internal quotation marks omitted). "To satisfy the irreparable harm requirement, [a plaintiff] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, No. 10-CV-8976, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) (citing *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007)).  "[A] party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate

compensation." *Id.* (citing *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002)). "[W]hen a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm.'" *Uni-World*, 73 F. Supp. 3d at 236 (quoting *Johnson Controls, Inc.*, 323 F. Supp. 2d at 532). Courts have found irreparable harm where there is a likely risk that a former employer's trade secrets will inevitably be disclosed. *See, e.g., Papermaster*, 2008 WL 4974508, at *6. "A trade secret once lost is, of course, lost forever and, therefore, such a loss cannot be measured in money damages." *Estee Lauder,* 430 F. Supp. 2d at 174.

Here, Plaintiff has established a risk that its trade secrets likely will inevitably be disclosed. There is nothing in the record here to suggest that this is the unusual case in which such a loss could be readily remedied by money damages. In fact, the parties have agreed otherwise: specifically, Mr. Lima expressly agreed in the Non-Compete that a violation of the restrictions set forth therein would cause IBM irreparable harm, entitling it to injunctive relief. (Non-Compete ¶ 3); *see Roswell Capital Partners LLC v. Alternative Const. Techs.,* No. 08-CV-10647, 2009 WL 222348, at *17 (S.D.N.Y. Jan. 30, 2009) ("While not dispositive, courts may view [such terms] as evidence of an admission that irreparable harm has occurred."). "[A] defendant's agreement to such contractual provisions might arguably be viewed as an admission [] that plaintiff will suffer irreparable harm were defendant to breach the contract's non-compete provision." *Singas*, 468 F. App'x at 46; *see, e.g. Haber*, 188 F.3d at 49 (finding irreparable injury in light of, *inter alia*, the defendant's acknowledgement in his employment agreement "that a breach of the confidentiality clause would cause 'irreparable injury'" to the plaintiff). Although not dispositive, Mr. Lima's acknowledgement that a violation of the Non-Compete would cause IBM irreparable harm -- a fact that he agreed to -- further supports a finding of irreparable harm.  *Pennisi*, 2020 WL 1129773, at

*18 (citing *HRB Res. LLC v. Schon*, No. 19-CV-0339, 2019 WL 4015256, at *2-3 (N.D.N.Y. Apr. 25, 2019); *Solomon*, 2016 WL 3257006, at * 4; *Devos*, 2015 WL 9593616, at * 8, 10; *Uni-World*, 73 F. Supp. 3d at 236-37; *Johnson Controls, Inc.*, 323 F. Supp. 2d at 532. Under the circumstances, the Court finds that, without injunctive relief, IBM would suffer irreparable injury.

III.    <u>Balance of the Hardships</u>

As discussed *supra*, Mr. Lima has argued that the Non-Compete prohibits him from working in the technology industry and as such, will negatively impact his future job opportunities and earning potential. However, the Non-Compete does not create such a *per se* ban on employment. Mr. Lima argued that he will face economic hardship if an injunction were to be granted; but he made no alternative employment plans and testified that he would be able to pay expenses in the event he could not assume his post at Microsoft prior to May 2021. He was hired by Microsoft during the proceedings, put on payroll, and did not produce evidence that Microsoft would take him off the payroll if an injunction were to be issued. No one testified that Microsoft would be unable to find him alternate employment, or that he would be precluded from this job, at the end of the non-compete period. Mr. Lima argued that he and his family did not want to return to Brazil and they would be forced to do so if an injunction were to be granted. Notwithstanding his protestation, Mr. Lima agreed to return to Brazil as recently as June 2, 2020, when he signed Microsoft's written offer letter which provided that he would initially be located in Brazil and then be required to move to Fort Lauderdale, Florida.

The threat of Mr. Lima inevitably disclosing IBM's trade secrets and confidential information to one of its competitors outweighs the purported hardships that Mr. Lima would face if an injunction were to be issued. Here, IBM's "need to protect its legitimate business interests substantially outweighs the harm resulting to" Mr. Lima from not working for Microsoft as

Corporate Vice President, Latin America for the next eight months. *Papermaster*, 2008 WL 4974508, at *13. On this record, the Court does not find that the balance of hardships tips in Mr. Lima's favor, rather, the Court finds the balance of the hardships tip decidedly in IBM's favor. Accordingly, the Court grants a preliminary injunction as specifically set forth below.

IV.  <u>Bond</u>

The parties had agreed in connection with the Court's issuance of the TRO that there would be no bond required under Fed. R. Civ. P. 65. (Doc. 21 at 29:17-20). Neither party addressed the issue of a bond in the course of the underlying preliminary injunction motion practice, during the hearing, or in post-hearing submissions. Fed. R. Civ. P. 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, the Non-Compete provides that "[IBM] would . . . be entitled to injunctive relief in a court of appropriate jurisdiction without the need to post a bond . . . ." (Non-Compete, ¶ 4). Accordingly, no bond is required, as the parties have waived the requirement. *Singas*, 2011 WL 497978, at *12; *see also Marsh USA Inc. v. Karasaki*, No. 08–CV–4195, 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31, 2008) ("Moreover, the parties agreed in Section 7 of the RCA that no bond would be required for any temporary or permanent injunction, and the parties may agree to waive the bond requirement."); *Iannucci v. Segal Co., Inc.*, No. 06-CV-4720, 2006 WL 8407380, at *6, n.4 (S.D.N.Y. June 27, 2006) ("Because article 10 of the Agreement states that defendant will not be required to post any security or bond in the event it seeks injunctive relief from a court, no such security or bond is required by this Court.").

**<u>CONCLUSION</u>**

Based on the foregoing, the court GRANTS IBM's motion for a preliminary injunction as follows: Defendant is preliminarily enjoined through May 18, 2021 or further Order of this Court from (i) working at or providing services to Microsoft as Corporate Vice President, Latin America; (ii) working or providing any services in violation of the December 3, 2019 Non-Compete Agreement signed by Mr. Lima; (iii) soliciting any customer of IBM with which Mr. Lima was involved as a part of his job responsibilities during the last twelve months of his employment at IBM; and (iv) retaining, using, disclosing, and/or relying upon IBM Confidential Information, defined as any information of a confidential or secret nature that was disclosed to Mr. Lima, or created or learned by Mr. Lima, that relates to the business of IBM, including trade secrets, and including, but not limited to, IBM's formulae, patterns, compilations, programs, devices, methods, techniques, software, tools, systems, and processes, IBM's selling, manufacturing, and servicing methods and business techniques, implementation strategies, and information about any of the foregoing, IBM's training, service, and business manuals, promotional materials, training courses, and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, client data, global strategic plans, marketing plans, information about  IBM's management techniques and management strategies, information regarding long-term business opportunities, information regarding the development status of specific IBM products, assessments of the global competitive landscape of the industries in which IBM competes, plans for acquisition or disposition of products or companies or business, units, expansion plans, financial status and plans, compensation information, and personnel information, whether intentionally or unintentionally.

The parties shall appear by telephone for an initial case management and scheduling

conference on October 15, 2020 at 11:30 a.m. At the time of the scheduled conference, all parties shall call the following number: (888) 398-2342; access code 3456831. The parties are directed to confer at least 21 days prior to the conference date and attempt in good faith to agree upon a proposed discovery plan that will ensure trial readiness within six (6) months of the conference date. The parties are further directed to complete and file via ECF a proposed Civil Case Discovery Plan and Scheduling Order available on my individual webpage on the S.D.N.Y. website at least one week before the conference.

**SO ORDERED:**

Dated: New York, New York
       September 3, 2020

_____
Philip M. Halpern
United States District Judge